Rena Andoh (admitted *pro hac vice*)
 randoh@sheppardmullin.com
**SHEPPARD, MULLIN, RICHTER
& HAMPTON LLP**
30 Rockefeller Plaza
New York, NY 10112
Telephone: (212) 653-8700
Facsimile: (212) 653-8701

Lai L. Yip (SBN 258029)
 lyip@sheppardmullin.com
Four Embarcadero Center, 17th Floor
San Francisco, CA 94111
Telephone: (415) 434-9100
Facsimile: (415) 434-3947

Travis J. Anderson (SBN 265540)
 tanderson@sheppardmullin.com
12275 El Camino Real
Suite 100
San Diego, CA 92130
Telephone: (858) 720-8900
Facsimile: (858) 509-3691

Kazim A. Naqvi (SBN 300438)
 knaqvi@sheppardmullin.com
1901 Avenue of the Stars
Suite 1600
Los Angeles, CA 90067
Telephone: (310) 228-3700
Facsimile: (310) 228-3701

Attorneys for Plaintiff and
Counterdefendant Moog Inc.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MOOG INC., | Case No. 2:22-cv-09094-GW-MAR |
| Plaintiff, | |
| v. | **1) PLAINTIFF AND COUNTERDEFENDANT MOOG INC.'S NOTICE OF MOTION AND MOTION TO DISMISS COUNTS 1 THROUGH 9 IN DEFENDANT AND COUNTERCLAIMANT SKYRYSE INC.'S COUNTERCLAIMS PURSUANT** |
| SKYRYSE, INC., ROBERT ALIN PILKINGTON, MISOOK KIM, and DOES NOS.1-50, | |
| Defendants. | |

-1-

**TO FED R. CIV. P. 12(b)(2), (3), and (6); AND**

2) **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

[*Filed concurrently with Declaration of Kazim A. Naqvi; [Proposed] Order*]

Date:     March 23, 2023
Time:    8:30 a.m.
Ctrm.:   9D, The Hon. George H. Wu

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Complaint Filed:      March 7, 2022
Counterclaims Filed: January 30, 2023

TO THE ABOVE CAPTIONED COURT, AND TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that at 8:30 a.m. on Thursday, March 23, 2023, or as soon thereafter as this matter may be heard in Courtroom 9D of the above-captioned Court, located at the United States Courthouse, 350 West 1st Street, Los Angeles, CA, 90012, the Honorable George H. Wu presiding, Plaintiff and Counterdefendant Moog Inc. ("Moog") will, and hereby does, move for an order dismissing all nine claims for relief asserted in defendant and counterclaimant Skyryse, Inc.'s ("Skyryse") Counterclaims ("CC") (Dkt. 348-01) in this action pursuant to Fed. R. Civ. P. 12(b)(2), (3), and (6). Moog moves to dismiss Skyryse's first count for Breach of Contract (CC ¶¶ 88-93) pursuant to Fed. R. Civ. P. 12(b)(2), (3), and (6) for lack of personal jurisdiction, improper venue, and failure to state a claim upon which relief can be granted. Moog moves to dismiss, Skyryse's following counts pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted:

- Count 2 – Breach of the Implied Covenant of Good Faith and Fair Dealing (CC ¶¶ 94-101).
- Count 3 – Breach of Implied Contract (CC ¶¶ 102-107).
- Count 4 – Trade Secret Misappropriation Pursuant to the Defend Trade Secrets Act 18 U.S.C. § 1836 *et seq*.
- Count 5 – Fraud (CC ¶¶ 119-125).
- Count 6 – Tortious Interference with Contractual Relationships (CC ¶¶ 126-130).
- Count 7 – Intentional Interference with Existing Business Relationships (CC ¶¶ 131-136).
- Count 8 – Intentional Interference with Prospective Business Advantage (CC ¶¶ 137-143).
- Count 9 – Unfair Business Practices, Bus. & Prof. Code § 17200 *et seq*.

This motion is made on the following grounds:

- Skyryse's fraud claim fails because it does not allege any actionable misrepresentation. All of the purported misrepresentations by Moog are general statements of future conduct, as opposed to a false statement of past or existing facts. Skyryse also fails to meet Rule 9(b)'s particularity requirement.

- Skyryse's trade secret misappropriation claim under the Defend Trade Secrets Act ("DTSA") fails for the simple reason that it cannot sufficiently identify a single trade secret. Throughout the CC, Skyryse provides a vague list of general categories of information. This is insufficient under the law. Skyryse also fails to plead facts supporting its bald allegations that Moog misappropriated any Skyryse trade secrets.

- Skyryse's breach of contract claims fail at threshold level because two of the four contracts at issue (the Terms & Conditions and 2019 NDA by incorporation) require exclusive jurisdiction and venue in New York. This Court lacks jurisdiction and venue to hear any claims related to those agreements. The alleged breaches for Moog's failure to deliver hardware fail under Statement of Work 1 ("SOW1") because the documents referenced by Skyryse show that it expressly cancelled the SOW1, and agreed to pay Moog for work completed and close out Phase 1. The remain alleged breaches fail because Skyryse has not pled any facts that Moog improperly used Skyryse confidential information. Skyryse fails to identify a single trade secret that Moog improperly used.

- Skyryse's breach of the implied covenant claim is time-barred by the two-year SOL for claims sounding in tort. Here, Moog's alleged wrongdoing "became clear" to Skyryse by August 17, 2020, at the latest. The claim also fails because Skyryse expressly contracted that Moog had no obligation to enter into any additional SOW beyond Phase 1, and

1     Phases 2-4 would require separate SOWs to be mutually agreed upon. No

2     breach has been pled.

3   • The implied contract claim fails because it is also time-barred under a

4     two-year SOL. The claim additionally fails because there is an express

5     contract (SOW1) that contradicts the purported terms of any implied

6     contract to engage in Phases 2-4. Skyryse also fails to sufficiently

7     identify the terms of any implied contract.

8   • Skyryse's tortious interference with contract and intentional interference

9     with existing business relationships claims fail because Skyryse does not

10    specifically identify any contract that has been interfered with, and does

11    not allege facts how Moog intentionally interfered with those contract(s)

12    or business relationships. The claim for intentional interference with

13    prospective business advantage also fails because Skyryse does not

14    identify any prospective economic relationships, instead only citing to

15    unidentified "prospective customers."

16  • Skyryse's unfair competition claim fails because: 1) its other claims do

17    not satisfy the "unlawful prong"; 2) no facts are pled showing antitrust

18    violations or harm to competition under the "unfair" prong; and 3) no

19    facts are pled showing Moog's conduct harms consumers at large for the

20    "fraudulent" prong.

21   This motion is made following the conference of counsel pursuant to C.D.

22  Cal. Local Rule 7-3 that took place on February 13, 2023 at 1:00 p.m.

23   This motion is based on this Notice, the accompanying Memorandum of

24  Points and Authorities, the Declaration of Kazim A. Naqvi, all pleadings, papers

25  and other documentary materials in the Court's file for this action, those matters of

26  which this Court may or must take judicial notice, and such other matters as this

27  Court may consider in connection with the hearing on this matter.

28

Dated:  February 21, 2023      SHEPPARD MULLIN RICHTER & HAMPTON LLP

By _____
                    */s/ Rena Andoh*
                      Rena Andoh

Attorney for Plaintiff and Counterdefendant
MOOG INC.

## **TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................. 14

II.     FACTUAL AND PROCEDURAL BACKGROUND ............................... 14

    A.   Moog's Autonomous Flight Capabilities Before Working with Skyryse ................................................................. 15

    B.   The 2018 and 2019 NDAs ......................................... 15

    C.   SOW 1 ......................................................................... 16

    D.   The Terms & Conditions ........................................... 17

    E.   Skyryse Does Not Identify a Single Trade Secret ............... 18

    F.   Skyryse, not Moog, Cancels SOW1 ......................... 18

    G.   Moog Provides a Quote in Response to Skyryse's Completely Different and Expanded RFQ ............................ 20

    H.   Skyryse Does Not Identify any Misappropriation by Moog ............................................................................ 22

    I.   Skyryse Targets and Hires Dozens of Moog Employees ............ 22

III.    SKYRYSE'S COUNTS 1 THROUGH 9 SHOULD BE DISMISSED ................................................................. 23

    A.   Choice of Law Issues ............................................... 23

        1.   NY Choice of Law Rules Apply ........................... 23

        2.   CA Law Applies to Statute of Limitations Issues ............ 24

    B.   Skyryse Fails to State a Claim for Fraud ............................ 25

    C.   Skyryse Fails to State a Claim for Trade Secret Misappropriation ................................................................. 27

        1.   Skyryse Fails to Identify its Purported Trade Secrets ................................................................. 27

        2.   Skyryse Fails to Allege Misappropriation ........................ 30

    D.   Skyryse Fails to State a Claim for Breach of Contract ............ 30

        1.   NY Law Applies ......................................................... 30

        2.   Skyryse's Breach of Contract Claim Fails as Pled ............ 31

    E.   Skyryse Fails to State a Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing ........................ 33

1         1.    The Implied Covenant Claim is Time-Barred ........................... 33

2         2.    The Implied Covenant Claim Fails as Pled .............................. 33

3    F.    Skyryse Fails to State a Claim for Breach of Implied
       Contract ................................................................................. 35

4

5         1.    The Implied Contract Claim is Time Barred. ........................... 35

       2.    The Implied Contract Claim is Insufficiently Pled ................. 35

6

7    G.    Skyryse Fails to State a Claim for Tortious Interference
       with Contractual Relationships or Existing Business
       Relationships ........................................................................... 37

8

9         1.    CA Law Likely Applies .......................................................... 37

10         2.    Skyryse Fails to Allege Sufficient Facts to State a
       Claim ...................................................................................... 37

11    H.    Skyryse Fails to State a Claim for Intentional
       Interference with Prospective Business Advantage ............................ 39

12

13    I.    Skyryse Fails to State a Claim for Unfair Business
       Practices .................................................................................. 40

14  IV.    CONCLUSION ................................................................................. 42

# <u>TABLE OF AUTHORITIES</u>

Page(s)

<u>Cases</u>

*2002 Lawrence R. Buchalter Alaska Tr. v. Philadelphia Fin. Life Assur. Co.*
   96 F. Supp. 3d 182 (S.D.N.Y. 2015) ............................................................ 31, 34

*Allied Trend Int'l, Ltd. v. Parcel Pending, Inc.*
   No. SACV1900078AGJDEX, 2019 WL 4137605 (C.D. Cal. June 3,
   2019) ................................................................................................................ 36

*Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc.*
   No. CV-14-02139-MWF VBKX, 2015 WL 1608991 (C.D. Cal. Apr. 10,
   2015) ................................................................................................................ 31

*Anderson v. Stallone*
   No. 87-0592 WDKGX, 1989 WL 206431 (C.D. Cal. Apr. 25, 1989) .............. 35

*Art Cap. Grp., LLC v. Carlyle Inv. Mgmt. LLC*
   151 A.D.3d 604 (1st Dept., 2017) .................................................................... 32

*Atlantis Info. Tech., GmbH v. CA, Inc.*
   485 F. Supp. 2d 224 (E.D.N.Y. 2007) .............................................................. 34

*Bank Hapoalim B.M. v. Bank of Am. Corp.*
   No. 12-CV-4316-MRP ...................................................................................... 24

*Baymiller v. Guar. Mut. Life Co.*
   2000 WL 33774562 (C.D. Cal. Aug. 3, 2000) .................................................. 27

*Becton, Dickinson & Co. v. Cytek Biosciences Inc.*
   No. 18-CV-00933-MMC, 2018 WL 2298500 (N.D. Cal. May 21, 2018) ......... 28

*Cappello v. Walmart Inc.*
   394 F. Supp. 3d 1015 (N.D. Cal. 2019) ........................................................... 40

*Casey v. Metropolitan Life Ins. Co.*
   688 F. Supp. 2d 1086 (E.D. Cal. 2010) ........................................................... 33

*Cel-Tech Comm's, Inc. v. Los Angeles Cellular Telephone Co.*
   20 Cal. 4th 163 (1999) ..................................................................................... 41

*Cent. Nat'l-Gottesman, Inc. v. M.V. "GERTRUDE OLDENDORFF"*
   204 F. Supp. 2d 675 (S.D.N.Y. 2002) .............................................................. 31

SMRH:4865-5736-6354.1

*Coastal Abstract Serv. v. First Am. Title Ins. Co.*
   173 F.3d 725 (9th Cir. 1999)...................................................................26

*Competitive Techs. v. Fujitsu Ltd.*
   286 F. Supp. 2d 1118 (N.D. Cal. 2003) ...............................................23

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*
   2014 WL 3529686.................................................................................25

*Damabeh v. 7-Eleven, Inc.*
   No. 5:12-CV-1739-LHK, 2013 WL 1915867 (N.D. Cal. May 8, 2013) ..........40

*Daugherty v. Am. Honda Motor*
   144 Cal. App. 4th 824 (2006)...............................................................41

*DiDio v. Jones*
   No. CV134949PSGAGRX, 2014 WL 12591625 (C.D. Cal. May 6, 2014) ......33

*Dimensions, Inc. v. Perficient, Inc.*
   No. 15 CIV. 8309 (PGG), 2017 WL 10676897 (S.D.N.Y. Mar. 28, 2017).......39

*Fam. Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.*
   525 F.3d 822 (9th Cir. 2008)................................................................38

*Fehl v. Manhattan Ins. Grp.*
   No. 11-CV-02688-LHK, 2012 WL 10047 (N.D. Cal. Jan. 2, 2012) ................33

*First Hill Partners, LLC v. BlueCrest Cap. Mgmt. Ltd.*
   52 F. Supp. 3d 625 (S.D.N.Y. 2014)....................................................37

*Forest Park Pictures v. Universal Television Network, Inc.*
   683 F.3d 424 (2d Cir. 2012) .................................................................35

*Galvez v. Loc. 804 Welfare Tr. Fund*
   543 F. Supp. 316 (E.D.N.Y. 1982).......................................................26

*Garter Bare Co. v. Munsingwear Inc.*
   723 F.2d 707 (9th Cir. 1984).................................................................39

*Gateway Rehab & Wellness Ctr., Inc. v. Aetna Health of California, Inc.*
   No. SACV 13-0087-DOC MLG, 2013 WL 1518240 (C.D. Cal. Apr. 10,
   2013).....................................................................................................36

*Gemsa Enterprises, LLC v. Pretium Packaging, LLC*
   No. SACV21844JVSJDEX, 2021 WL 4551200 (C.D. Cal. July 27, 2021)......38

*Genasys Inc. v. Vector Acoustics, LLC*
No. 22-CV-152 TWR (BLM), 2022 WL 16577872 (S.D. Cal. Nov. 1, 2022) ..................................................................................................... 27

*GeoData Sys. Mgmt., Inc. v. Am. Pac. Plastic Fabricators, Inc.*
No. CV1504125MMMJEMX, 2015 WL 12731920 (C.D. Cal. Sept. 21, 2015) ..................................................................................................... 24

*Glen Holly Entertainment, Inc. v. Tektronix*, *Inc.*
100 F. Supp. 2d 1086 (C.D. Cal. 1999) ............................................... 26

*Grice v. McMurdy*
498 F. Supp. 3d 400 (W.D.N.Y. 2020) ............................................... 25

*Guz v. Bechtel Nat'l, Inc.*
24 Cal. 4th 353 (2000) ......................................................................... 34

*Hidden Brook Air, Inc. v. Thabet Aviation Int'l Inc.*
241 F. Supp. 2d 246 (S.D.N.Y. 2002) ................................................. 24

*Indigo Grp. USA Inc v. Polo Ralph Lauren Corp.*
No. 2:11-CV-05883-JHN-CW, 2011 WL 13128301 (C.D. Cal. Oct. 25, 2011) ..................................................................................................... 26

*Ingels v. Westwood One Broadcasting Services, Inc.*
129 Cal. App. 4th 1050 (2005) ............................................................ 41

*Invisible Dot, Inc. v. DeDecker*
2019 WL 1718621 (C.D. Cal. Feb. 6, 2019) ...................................... 28

*J&R Multifamily Grp., Ltd. v. U.S. Bank Nat'l Ass'n as Tr. for Registered Holders of UBS-Barclays Com. Mortg. Tr. 2012-C4, Com. Mortg. Pass-Through Certificates, Series 2012-C4*
No. 19-CV-1878 (PKC), 2019 WL 6619329 (S.D.N.Y. Dec. 5, 2019) ............ 39

*Lance Camper Mfg. Corp. v. Republic Indem. Co.*
44 Cal. App. 4th 194 (1996) ............................................................... 36

*Macquarie Grp. Ltd. v. Pac. Corp. Grp., LLC*
No. 08CV2113-IEG-WMC, 2009 WL 539928 (S.D. Cal. Mar. 2, 2009) .......... 24

*Masimo Corp. v. Apple Inc.*
No. SACV2048JVSJDEX, 2020 WL 4037213 (C.D. Cal. June 25, 2020) ......................................................................................................... 28, 29

*Mobilitie Mgmt., LLC v. Harkness*
    No. 816CV01747JLSKES, 2016 WL 10880151 (C.D. Cal. Nov. 28,
    2016) ................................................................................................................23

*Moses v. Apple Hosp. Reit Inc.*
    No. 14-CV-3131-DLI-SMG, 2015 WL 1014327 (E.D.N.Y. Mar. 9, 2015)......35

*Muldoon v. Tropitone Furniture Co.*
    1 F.3d 964 (9th Cir. 1993) ..............................................................................24

*Navigation Holdings, LLC v. Molavi*
    445 F. Supp. 3d 69 (N.D. Cal. 2020)...............................................................28

*nKlosures, Inc. v. Avalon Lodging LLC*
    No. CV2200459RSWLJDEX, 2022 WL 17093927 (C.D. Cal. Nov. 17,
    2022) ................................................................................................................36

*O'Hearn v. Bodyonics, Ltd.*
    22 F. Supp. 2d 7 (E.D.N.Y. 1998)....................................................................34

*Ormeno v. Relentless Consulting Inc.*
    No. 21-CV-1643 (LJL), 2022 WL 103482 (S.D.N.Y. Jan. 11, 2022) ..............35

*Phillips v. Audio Active Ltd.*
    494 F.3d 378 (2d Cir.2007) ..............................................................................31

*Planet Payment, Inc. v. Nova Info. Sys., Inc.*
    No. 07-CV-2520 CBA RML, 2011 WL 1636921 (E.D.N.Y. Mar. 31,
    2011) ..........................................................................................................24, 37

*Precision Concepts, Inc. v. Bonsanti*
    172 A.D.2d 737 (2d Dept, 1991).......................................................................32

*Robinson & Wilson, Inc. v. Stone*
    35 Cal.App.3d 396, 110 Cal.Rptr. 675 (1973) ..................................................36

*Santa Fe Pointe, LP v. Greystone Servicing Corp.*
    No. C-07-5454-MMC, 2009 WL 1438285 (N.D. Cal. May 19, 2009).............30

*Sharbat v. Iovance Biotherapeutics, Inc.*
    No. 20CIV1391(ER), 2022 WL 45062 (S.D.N.Y. Jan. 5, 2022) ......................25

*Space Data Corp. v. X*, No. 16-cv-03260-BLF, 2017 WL 5013363 (N.D.
    Cal. Feb. 16, 2017) ..........................................................................................30

*Tarmann v. State Farm Mut. Auto. Ins. Co.*
  2 Cal. App. 4th 153 (1991) .................................................................26

*Teledyne Risi, Inc. v. Martin-Baker Aircraft Co. Ltd.*
  No. CV1507936SJOGJSX, 2016 WL 8857029 (C.D. Cal. Feb. 2, 2016)
  ......................................................................................................38, 40

*In re Tobacco II Cases*
  46 Cal. 4th 298 (2009) .......................................................................41

*Torain v. Clear Channel Broad., Inc.*
  651 F. Supp. 2d 125 (S.D.N.Y. 2009) .........................................31, 34

*Vess v. Ciba-Geigy Corp. USA*
  317 F.3d 1097 (9th Cir. 2003) ......................................................27, 41

*Weiss v. DreamWorks SKG*
  No. CV1402890DDPAJWX, 2015 WL 12711658 (C.D. Cal. Feb. 9,
  2015) ....................................................................................................33

*Whiteslate, LLP v. Dahlin*
  No. 20-CV-1782 W (BGS), 2021 WL 2826088 (S.D. Cal. July 7, 2021) .........28

*Woodard v. Labrada*
  No. EDCV16189JGBSPX, 2021 WL 4499184 (C.D. Cal. Aug. 31, 2021).......25

Statutes

18 U.S.C. § 1839(5) ...............................................................................30

Cal. Bus. & Prof. Code § 17200 ............................................................40

Other Authorities

Rule 9(b) ....................................................................................27, 41, 42

# I.   INTRODUCTION

After being sued for the undisputed theft and misappropriation of over 1.4 million Moog files by its former employees, Skyryse has now made a desperate attempt to further delay and complicate these proceedings by asserting baseless counterclaims ("CC"). The crux of Skyryse's claims is that Moog allegedly: 1) duped Skyryse into entering into Phase 1 of a contemplated four Phase project without any intent to enter into Phases 2-4; 2) failed to deliver hardware owed under the Parties' lone statement of work ("SOW1"); 3) misappropriated Skyryse's trade secrets for its own purposes; and 4) generally competed and interfered with Skyryse's business. To spin this false story, Skyryse twists and cherry-picks portions of documents and e-mail communications without attaching them to the CC. The full context of these documents undermine Skyryse's claims and tells the true story. Moreover, Skyryse fails to adequately plead facts supporting the nine counterclaims.  It is respectfully submitted that each of Skyryse's counterclaims fails as a matter of law and must be dismissed based on the grounds summarized above in the Notice of Motion and described further below.

# II.   FACTUAL AND PROCEDURAL BACKGROUND

Skyryse casts an elaborate story in its counterclaims that Moog had fallen behind in the aviation marketplace, that Skyryse was a trailblazer in the space with advanced technology, and that Moog was dependent on Skyryse to make progress in the field of autonomous flight. (CC, ¶¶ 11-30). Skyryse further alleges that Moog, recognizing its need to catch up with newer, innovative companies, concocted a scheme to enter into business with Skyryse so that it could obtain its confidential information about automated flight, with the intent to use Skyryse's purportedly confidential information with other third parties to compete against Skyryse. (*Id.*, ¶¶ 31-80). However, the very documents that Skyryse quotes from and references tell a different story. Moog introduces many of them into evidence

1   under the incorporation by reference doctrine. (Declaration of Kazim A. Naqvi
2   ("Naqvi Dec."), ¶ 2).

3   **A.    Moog's Autonomous Flight Capabilities Before Working with**
4   **Skyryse**

5   Skyryse mischaracterizes a 2017 strategic options assessment by third party
6   Avascent for Moog (the "2017 Study"). (CC, ¶¶ 17-22) (Naqvi Dec., Ex. A).
7   Skyryse alleges the assessment showed that Moog "had failed to innovate," "had
8   already fallen behind the curve," and "lacked essential knowledge of and expertise
9   in advanced, highly automated flight systems." (*Id*.). The 2017 Study says none of
10  these things. In fact, the 2017 Study notes (among other things) Moog's substantial
11  then-existing capabilities, saying that ███████████████████████████████████
12  ███████████████████████████" and that "███████████████████████████████
13  ███████████████████████." (Naqvi Dec., Ex. A at p. 4).

14  Skyryse then selectively quotes from an August 30, 2018 outreach e-mail
15  from Moog employee Jeff Ehret to Skyryse, trying to downplay Moog's progress
16  in autonomous flight. (Naqvi Dec., Ex. B). Ehret's e-mail provides the opposite:
17  "███████████████████████████████████████████████████████████████
18  ███████████████████████████████████████████████████████████████
19  ███████████████████████████████████████████████." (*Id*., emphasis
20  added). Skyryse CEO Marc Groden noted in response: "████████████████████
21  ███████████████████ ████████████████████████████████████████████
22  ███." (*Id*.).

23  **B.    The 2018 and 2019 NDAs**

24  Moog and Skyryse entered into an initial non-disclosure agreement on
25  October 24, 2018 (the "First NDA"), and a second on March 15, 2019 (the
26  "Second NDA"). (CC, ¶¶ 25-27, Exs. A-B). The stated purpose in the Second
27  NDA is the "***integration of Moog's flight control systems /subsystems /***
28  ***components and associated autonomous control technologies*** with Skyryse's

aircraft platforms and associated autonomous control technologies." (*Id*., Ex. B, p. 1, emphasis added). The First NDA and Second NDA both have New York choice of law provisions. (CC, Exs. A and B, § 10).

**C.    SOW 1**

The Parties entered into a Statement of Work on May 31, 2019 ("SOW1"). (CC, Ex. C). Skyryse's stated value was experience "█████████████████████████████████████████████████," whereas Moog was described as having experience "███████████████████████████████████████████████" and also possessing "███████████████████████████████████████████████." (*Id*., § 2). Skyryse's stated responsibility was solely to ███████████████████████," not to develop any component of the flight control system (*Id*., § 3). As a result, Skyryse "███████████████████████████████." (*Id*., § 2). From the outset, Moog was an industry-leader in flight control systems and had extensive capability in automated flight operations.

Section 4 (Program Overview) provides: "█████████████████████████████████████████████████████████████████████████████████████" (*Id*., § 4, emphasis added). Similarly, Section 5 provides again: "█████████████████████████████████████████████████████████████████████████████████████." (*Id*., § 5, emphasis added). Thus, the Parties expressly agreed that their obligations would be limited to SOW1 and any additional SOWs would have to be subsequently mutually agreed-to by the parties.

1   In terms of pricing, Skyryse agreed to pay Moog ████████ for phase one

2   for one unit of development hardware and ████████████████████████████.

3   (*Id.*, § 7).

4   In Section 7.2 (Moog Value Addition), Skyryse agreed that "████████

5   ████████████████████████████████████████

6   ████████████████████████████████████████,"

7   and that "████████████████████████████████████

8   ████████████████████████████████████

9   ████████." (*Id.*, § 7.2, emphasis added). Skyryse further agreed that "██████

10  ████████████████████████████████████

11  ████████████████████████." (*Id.*). These

12  documents undermine Skyryse's allegation that Moog "lacked essential knowledge

13  of and expertise in the advanced, highly automated flight systems." (CC, ¶ 22).

14  Section 9 (Appendix) further made clear that ████████████████

15  ████████████████████████████████████████

16  ████████████████████████████████." (*Id.*, § 9,

17  emphasis added). In other words, if one party did not want to proceed with an

18  SOW for Phase 2, it could choose not to move forward.

19  **D.    The Terms & Conditions**

20  On June 3, 2019, the Parties agreed upon Terms & Conditions to govern

21  SOW1. (CC, Ex. D) (the "T&C"). The Parties agreed that New York law shall

22  govern the agreement. (*Id.*, § 31). The Parties also agreed that: "***Any controversy***

23  ***or claim arising out of or related to this Agreement***, ***or the breach thereof***, which

24  cannot be settled by the Parties shall be finally settled by a court. The Parties

25  expressly agree that ***only the courts located in the City of Buffalo, County of Erie,***

26  ***State of New York, in the USA shall have jurisdiction and venue to resolve such***

27  ***a dispute***." (*Id.*).

28

1   Section 23 incorporates by reference the 2019 NDA. (*Id.*, § 23). Under
2   Section 39, the Parties agreed they could amend the T&C as mutually agreed to in
3   writing. (*Id.*, § 39).

4   **E.    Skyryse Does Not Identify a Single Trade Secret**

5   Skyryse repeatedly alleges that it shared "valuable confidential information"
6   with Moog throughout their business relationship. (CC, ¶¶ 40-45). However,
7   Skyryse does not identify any specific trade secret it disclosed to Moog, nor does it
8   attach or even reference any specific documents constituting a trade secret. Instead,
9   Skyryse identifies vague categories of information like "drawings," "schematics,"
10  and "business plans." (*Id.*, ¶ 40). It describes its "state-of-the-art trade secret flight
11  control technology" as allowing use of "███████████████████." (*Id.*, ¶
12  41). There is nothing proprietary about this general concept, especially given
13  Moog's prior experience with R-44 helicopters in the area of autonomous flight
14  going back to 2014. (Naqvi Dec., Ex. B).

15  Skyryse selectively quotes from a January 17, 2019 e-mail from Mark
16  Groden to various Moog personnel as purported evidence of proprietary
17  information. (*Id.*, ¶ 42) (Naqvi Dec., Ex. C). This e-mail actually shows that no
18  proprietary information was disclosed, and Groden was merely generally
19  describing Skyryse's broad objectives. (*Id.*). Skyryse also references, but does not
20  attach or describe, a confidential "Skyryse Master Plan" that it purportedly shared
21  with Moog. (CC, ¶¶ 43-44).

22  **F.    Skyryse, not Moog, Cancels SOW1**

23  Skyryse claims that "during its work under SOW 1, Moog secretly decided it
24  would walk away from the collaboration, cut Skyryse out, and develop copycat
25  flight technology on its own in direct competition with Skyryse." (*Id.*, ¶ 48). The
26  documents Skyryse rely on provide otherwise.

27  Skyryse quotes from a September 20, 2019 e-mail from Moog CEO John
28  Scannell, claiming his statement that "[w]e look forward to continuing to work

with Skyryse" is some sort of representation or promise of future work together, even though neither party was obligated to proceed past SOW1. (*Id*., ¶ 50). A review of the underlying e-mail exchange shows that Scannell made this statement after politely ███████████████████████████████████████████

███████████████████████. (Naqvi Dec., Ex. D (SKY_00078691)). (*Id*.).

This e-mail exchange had nothing to do with any promises of future work together.

Skyryse misrepresents the Parties' dealings in closing out Phase 1. In March 2020, Skyryse communicated to Moog that it wished to cancel the purchase order for Phase 1 while the Parties discuss a revised scope of work. Alan Kresse from Moog sent Skyryse a letter confirming Skyryse's intent to cancel the purchase order for Phase 1, requesting that Skyryse provide formal written notification of the intent to cancel. (CC, ¶ 53). (Naqvi Dec., Ex. E). In response, Gonzalo Rey from Skyryse indicated that he is jointly exploring with Moog "███████████

██████████████████████████████" and that Skyryse was open to "██████████████████████████████████████." (CC, ¶ 55) (Naqvi Dec., Ex. F). Dave Norman from Moog responded a few days later, noting that the letter from Kresse was just "██████████████████████████████████████

███████████████" but that Moog was "██████████████████████████████████."

(CC, ¶ 56) (Naqvi Dec., Ex. F). Norman also emphasized to Rey that Moog had "put in a significant effort to this point" and made "[hardware] commitments" and the Parties would need to reconcile Moog's work to date "before agreeing to Phase 2 SOW." (*Id*.). There is nothing in this exchange suggesting Moog forced Skyryse to cancel SOW1 with assurances the Parties would enter into additional SOWs.

On March 19, 2020, Tim Abbott from Moog e-mailed Rey from Skyryse, explaining that Moog had completed 30.8% of the work from SOW1 and thus was owed ~$970,000 from Skyryse. (CC, ¶ 59) (Naqvi Dec., Ex. G). Abbott also provided an estimate for a revised purchase order ***based on a draft SOW that Moog had sent Skyryse***, totaling $4.22M. (*Id*.). In response, Rey expressly

1   acknowledged: "█████████████████████." (*Id.*, emphasis added).

2   Rey further described "███████████████████████," one for

3   "████████████" and another for "██████." (*Id.*). Abbott clarified in a

4   March 23, 2020 e-mail that the $4.22M estimate was only for "██████████

5   ████████████████████████████████████████

6   ████████████████." (*Id.*, emphasis added). Abbott sent another e-mail

7   on March 25, 2020 breaking down the $970,235.37 owed from Skyryse

8   (approximately $405k in materials and $815k in labor, minus $250k in payments

9   received), further advising that Moog needs Skyryse to provide a letter "formally

10  stating the intention to revise the current statement of work and allowing us to

11  invoice you for work complete[d] to date." (CC, ¶ 60) (Naqvi Dec., Ex. G). In

12  response, Rey stated: "█████████████████████" and the letter

13  would be sent "████████." (*Id.*, emphasis added).

14      The purpose of this e-mail exchange is clear on its face—Moog needed

15  Skyryse to formally confirm that it was revising or cancelling SOW1, and would

16  pay Moog for work completed to date and thus Moog would not be on the hook for

17  all deliverables under SOW1. Skyryse expressly agreed to this arrangement, and on

18  March 31, 2020, Rey sent Moog a letter formally cancelling the purchase order for

19  SOW1. (CC, ¶ 61) (Naqvi Dec., Ex. H).

20      **G.   Moog Provides a Quote in Response to Skyryse's Completely**

21           **Different and Expanded RFQ**

22      On May 22, 2020, Skyryse issued a completely new and different request for

23  quote to Moog (the "RFQ"). (CC, ¶ 64) (Naqvi Dec., Ex. I). Skyryse falsely tries to

24  equate the scope of this RFQ with the estimate Moog previously provided to

25  Skyryse in connection with Moog's proposed SOW for ██████. (CC, ¶¶ 64-

26  66).

27      The Skyryse RFQ disclosed to Moog for the first time that Skyryse was

28  seeking certification of its own FlightOS flight control software. (Naqvi Dec., Ex.

1   I, p. 1). Skyryse was "██████████████████████" and sought a quote

2   for up to "████████████████" based on Skyryse's proposed SOW and

3   provides six general line items of what Skyryse was seeking from Moog, including

4   development and delivery of a ████████████████████████████████

5   ████████████████████████████████████████████████

6   (*Id.*, pp. 1-2). The RFQ based on Skyryse's own proposed SOW for up to ███

7   ██████ is completely different than Moog's $4.22M estimate for ███

8   ████████████████████" based on Moog's separate proposed SOW. The

9   RFQ makes clear that Skyryse was not interested in delivery of original equipment

10  or the continuation of SOW 1.

11      Moog responded to Skyryse's new and expanded RFQ in good faith on June

12  17, 2020. (CC, ¶ 66) (Naqvi Dec., Ex. J). Moog made clear that Skyryse's "██

13  ████████████████████████████████████████████████."

14  (*Id.*). It also expected ████████████████████████████

15  ██████████ showing that this was a completely new and different proposal. It

16  still provided a rough estimate totaling between ████████████████████

17  ████████████████████████████████████████████████

18  ███ . (*Id.*).

19      In August 2020, Baptist claimed that the unit price for each shipset should

20  be ████████████████" each for "████████████████." (CC, ¶ 68) (Naqvi

21  Dec., Ex. K). Thus, based on *Skyryse's own statements*, its proposed estimate for

22  ████████████ would be ████████████████ at minimum for just the initial

23  shipsets, and not including design and labor costs. This makes plain that Moog's

24  prior $4.22M estimate was for a completely different and more limited scope of

25  work, and that Moog did not make any "sham" offer where the RFQ was unclear

26  about sustained production quantities or minimums.  Finally, Skyryse quotes from

27  August 12 and 17, 2020 correspondence between Baptist and Rey, claiming that by

28  this time it had "finally become clear to Skyryse that Moog was acting in bad faith

1    [and] with an improper motive." (CC, ¶¶ 69, 70) (Naqvi Dec., Exs. L, M).

2    Skyryse's claims accrued by this time, at the latest.

3    **H.    Skyryse Does Not Identify any Misappropriation by Moog**

4         Skyryse alleges that to "compete against Skyryse," Moog used Skyryse's

5    alleged confidential information to pursue its own autonomous flight development

6    plans. (CC, ¶¶ 72-80). Skyryse alleges Moog used Skyryse's trade secrets to

7    "████████████████████████████████████████████████████████████

8    ████.'" (*Id.*, ¶ 77). Skyryse also points to purported proprietary "certification

9    plans," including utilizing an ███████████████████████████████████████████

10   ████████████████████████████ These general concepts are not proprietary

11   on their face, and moreover, Skyryse fails to identify any specific Skyryse trade

12   secret that Moog allegedly misappropriated.

13        Skyryse quotes from three internal Moog presentations related to

14   autonomous flight programs, claiming they show Moog's implementation of

15   Skyryse's trade secrets. (CC, ¶¶ 75-78) (Naqvi Dec., Ex. N, O, P). The actual

16   documents show otherwise. Skyryse's theory appears to be that because Moog is

17   working on autonomous flight for R-44 helicopters, and Skyryse works on similar

18   projects, Moog must have misappropriated Skyryse's trade secrets. Not only have

19   no facts been alleged in support, there is no dispute that Moog had been

20   independently working on these projects with R-44 aircrafts going back to 2014

21   and Skyryse agreed Moog would continue to invest in such projects. (Naqvi Dec.,

22   Ex. B; Ex. C, § 7.2).

23   **I.    Skyryse Targets and Hires Dozens of Moog Employees**

24        After a $200M fundraise in October 2021, Skyryse went on a targeted hiring

25   spree of Moog's software engineers and other personnel. Skyryse falsely claims

26   that "Moog set about trying to block Skyryse's success in recruiting." (CC, ¶ 81).

27        Skyryse quotes from November 2021 e-mails from Norman generally

28   discussing Skyryse's raiding of Moog's employees to claim that "Mr. Norman's

1  goal was to get Moog's employees talking and intimidate them from leaving."

2  (CC, ¶ 84) (Naqvi Dec., Ex. Q). However, the actual documents show that Norman

3  suggested that Moog's lawyers remind departing employees of their obligation "█

4  ████████████████████████████████████████████████████████████████████"

5  and that any "██████████████████████████" are related to unauthorized

6  disclosure of Moog trade secrets. (*Id*.). Norman's concern has been validated by

7  the subsequent theft of Moog trade secrets by Skyryse employees. Moreover,

8  Skyryse does not allege that Moog actually blocked Skyryse from hiring any

9  specific employee.

10        Skyryse quotes from the same e-mail where Norman talks about

11  "██████████████████████████████████████████████

12  ██████████████  to suggest "an attempt to glean Skyryse's confidential

13  information from these third parties." (CC, ¶ 87). Norman's e-mail makes no

14  reference to or indication of obtaining Skyryse information and, given the context

15  of the entire e-mail, was intended to inquire of Robinson why Skyryse was actively

16  recruiting so many Moog employees. (*Id*.). Skyryse does not identify what alleged

17  Skyryse confidential information Moog obtained from Robinson.

18  **III.    SKYRYSE'S COUNTS 1 THROUGH 9 SHOULD BE DISMISSED**

19        **A.    Choice of Law Issues**

20              **1.    NY Choice of Law Rules Apply**

21        "[A]fter a 1404(a) transfer, the transferee court must apply the choice-of-law

22  principles of the original forum." *Mobilitie Mgmt., LLC v. Harkness*, No.

23  816CV01747JLSKES, 2016 WL 10880151, at *3 (C.D. Cal. Nov. 28, 2016). This

24  doctrine "applies not only to the transferred claims but also to any counterclaims,

25  even if the counterclaims are asserted after the case has been transferred."

26  *Competitive Techs. v. Fujitsu Ltd.*, 286 F. Supp. 2d 1118, 1157 (N.D. Cal. 2003).

27  Here, transfer occurred under Section 1404(a), so NY choice of law rules apply.

28

Under NY law, the choice-of-law analysis is only conducted if there is a "material conflict," meaning that "the differences in the laws 'have a significant possible effect on the outcome of the trial.'" *Hidden Brook Air, Inc. v. Thabet Aviation Int'l Inc.*, 241 F. Supp. 2d 246, 279 (S.D.N.Y. 2002). Where there is no conflict, a NY court applies NY law because it is the law of the forum state and is administratively easier. *Planet Payment, Inc. v. Nova Info. Sys., Inc.*, No. 07-CV-2520 CBA RML, 2011 WL 1636921, at *8 (E.D.N.Y. Mar. 31, 2011).  California courts similarly apply California law where no conflict exits. *GeoData Sys. Mgmt., Inc. v. Am. Pac. Plastic Fabricators, Inc.*, No. CV1504125MMMJEMX, 2015 WL 12731920, at *5 (C.D. Cal. Sept. 21, 2015).  However, where a CA court conducts a choice-of-law analysis pursuant to NY law after a transfer, either NY or CA law can apply. *See Macquarie Grp. Ltd. v. Pac. Corp. Grp., LLC*, No. 08CV2113-IEG-WMC, 2009 WL 539928, at *10 (S.D. Cal. Mar. 2, 2009) (the SDCA, applying NY choice of law rules, held that where there was no conflict between the laws NY law applied because "a New York court would find New York law controls this claim," also noting that briefing under CA law would "apply with equal vigor to New York law.").

### 2.   CA Law Applies to Statute of Limitations Issues

Following a transfer, CA courts apply the statute of limitations that the NY court would have applied, which would be NY's statute of limitations under NY choice of law principles.  *See Muldoon v. Tropitone Furniture Co.*, 1 F.3d 964, 966 (9th Cir. 1993). However, when applying NY choice of law rules, the transferee court must also apply NY's borrowing statute, which the NY court would have applied.  *Bank Hapoalim B.M. v. Bank of Am. Corp.*, No. 12-CV-4316-MRP MANX, 2012 WL 6814194, *3 (C.D. Cal. Dec. 21, 2012) (holding that borrowing statute must be applied to claims in transferred case from NY).

NY Courts, although the statute of limitations is procedural, still apply the borrowing statute as an exception to the general rule that NY's statute of

1  limitations applies. *Grice v. McMurdy*, 498 F. Supp. 3d 400, 413 (W.D.N.Y.

2  2020). Under the borrowing statute, "when a nonresident sues based upon a cause

3  of action that accrued outside of New York, 'the court must apply the shorter

4  limitations period, including all relevant tolling provisions, of either: (1) New

5  York; or (2) the state where the cause of action accrued.'" *Id*. For claims with an

6  economic injury, the action accrues where the plaintiff resides, and the shorter of

7  the statutes of limitation, as between the SOL in the state of plaintiff's residence

8  and in NY, must be used. *Id*. CA transferee courts applying NY choice of law

9  rules follow this application of the borrowing statute and apply the shorter SOL to

10 claims that accrued outside of New York. *See In re Countrywide Fin. Corp.*

11 *Mortg.-Backed Sec. Litig.*, 2014 WL 3529686 at *1 (in case transferred from NY,

12 applying borrowing statute and finding claim untimely under foreign law). Here,

13 given Skyryse's location, CA law will apply for statute of limitations purposes.

14    **B.    Skyryse Fails to State a Claim for Fraud**

15       "The elements of fraud in New York and California are materially

16 identical." *Woodard v. Labrada*, No. EDCV16189JGBSPX, 2021 WL 4499184, at

17 *16 (C.D. Cal. Aug. 31, 2021). Those elements are: (1) a misrepresentation or

18 omission of material fact; (2) which the defendant knew to be false (scienter); (3)

19 which the defendant made with the intention of inducing reliance; (4) upon which

20 the plaintiff reasonably/justifiably relied; and (5) which caused injury to the

21 plaintiff. *Sharbat v. Iovance Biotherapeutics, Inc.*, No. 20CIV1391(ER), 2022 WL

22 45062, *4 (S.D.N.Y. Jan. 5, 2022).

23       Skyryse identifies four purported fraudulent misrepresentations by Moog: 1)

24 "that Moog would be 'continuing to work with Skyryse' throughout their

25 collaboration" ("Statement 1"); (2) "that the parties were on 'our path forward' to

26 Phase 2 of their collaboration and beyond" ("Statement 2"); 3) "that Skyryse

27 needed to cancel, terminate, or revise a purchase order . . . to secure continued

28 performance from Moog" for Phase 2 and beyond ("Statement 3"); and 4) Moog's

1   "informal estimate of its quote for work it would do in Phase 2 of the parties'

2   collaboration was approximately $4 million" ("Statement 4"). (CC, ¶ 120).

3       Actionable statements convey a "specific and measurable claim, capable of

4   being proved false or of being reasonably interpreted as a statement of objective

5   fact." *Coastal Abstract Serv. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th

6   Cir. 1999). To support fraud, an "alleged misrepresentation must ordinarily be an

7   affirmation of past or existing facts." *Glen Holly Entertainment, Inc. v. Tektronix,*

8   *Inc.*, 100 F. Supp. 2d 1086, 1093 (C.D. Cal. 1999).

9       "[P]redictions as to future events, or statements as to future action by some

10   third party, are deemed opinions, and not actionable fraud." *Tarmann v. State*

11   *Farm Mut. Auto. Ins. Co.*, 2 Cal. App. 4th 153, 158 (1991); *Indigo Grp. USA Inc v.*

12   *Polo Ralph Lauren Corp.*, No. 2:11-CV-05883-JHN-CW, 2011 WL 13128301, at

13   *3 (C.D. Cal. Oct. 25, 2011) (dismissing fraud claim with prejudice where each of

14   the "supposed misrepresentations involve a statement that Ralph Lauren 'would'

15   do something in the future"). NY law is in accord. *Galvez v. Loc. 804 Welfare Tr.*

16   *Fund*, 543 F. Supp. 316, 318 (E.D.N.Y. 1982) ("an essential element of an action

17   for fraud or deceit is a representation as to a past or present fact, not as to what will

18   be done in the future.").

19       All of the four purported misrepresentations pled by Skyryse are

20   unactionable future statements. Statement 1 is clearly a statement of future action,

21   as evidenced by the phrase "continuing to work with Skyryse." Statement 2 relates

22   to the "path forward to Phase 2 of their collaboration and beyond." Statement 3

23   involves closing out Phase 1 to secure "continued performance by Moog" for

24   Phase 2 and beyond. Statement 4 regards a purported estimate for future work

25   provided by Moog for Phase 2. Moreover, all four of these statements concern

26   future events related to Phase 2, but it is undisputed that the Parties only engaged

27   in Phase 1, and there was no contractual obligation whatsoever to proceed to Phase

28

2. Skyryse has not, and cannot, identify a single "affirmation of past or existing facts" to constitute an actionable fraud claim.

Skyryse's fraud claim also fails for lack of reasonable reliance because the purported misrepresentations contradict the express, repeated language in SOW1 about Phases 2-4 requiring additional SOWs on mutual agreement. *See Baymiller v. Guar. Mut. Life Co.*, 2000 WL 33774562, at *4 (C.D. Cal. Aug. 3, 2000) ("there cannot be reasonable reliance upon misrepresentations or a failure to disclose that are contradicted by the express language of the insurance contracts.").

Finally, Skyryse has not pled fraud, especially the purported misrepresentations, under Rule 9(b)'s heightened specificity requirements. *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) ("Averments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged.").

### C.   Skyryse Fails to State a Claim for Trade Secret Misappropriation

To state a claim for trade secret misappropriation under the DTSA, a plaintiff must allege that: (1) the plaintiff owned a trade secret; (2) the defendant misappropriated the trade secret; and (3) the defendant's actions damaged the plaintiff." *Genasys Inc. v. Vector Acoustics, LLC*, No. 22-CV-152 TWR (BLM), 2022 WL 16577872, at *8 (S.D. Cal. Nov. 1, 2022).

### 1.   Skyryse Fails to Identify its Purported Trade Secrets

Skyryse identifies its purported trade secrets at issue as: "proprietary automated flight technologies, certification, development, and testing plans, and other financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes regarding advanced automated flight control systems, general aviation, and urban transportation." (CC, ¶ 109.)  Elsewhere in the CC, Skyryse describes its purported trade secrets as: 1) "highly confidential technical information, drawings,

schematics, computer aided design (CAD) files, and business plans regarding Skyryse's test aircraft and certification plans and roadmaps"; 2) "proprietary, highly confidential, and state-of-the art trade secret flight control"; 3) a "confidential 'Skyryse Master Plan'"; and 4) "confidential business information and strategies regarding its plans to develop automated flight systems." (*Id.*, ¶¶ 40-45). All of these generic, conclusory, and general descriptions fall woefully short of Skyryse's pleading obligations.

To allege a trade secret, a plaintiff must "describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies." *Navigation Holdings, LLC v. Molavi*, 445 F. Supp. 3d 69, 75 (N.D. Cal. 2020).  A "laundry list of items ... does not meaningfully define the trade secrets at issue." *Invisible Dot, Inc. v. DeDecker*, 2019 WL 1718621, at *5 (C.D. Cal. Feb. 6, 2019). Listing "catchall phrases" or "categories of information" is insufficient to identify trade secrets. *See Whiteslate, LLP v. Dahlin*, No. 20-CV-1782-W-(BGS), 2021 WL 2826088, at *6 (S.D. Cal. July 7, 2021) (dismissing claim where trade secrets were identified as "contracts, document templates, and other work-product, as well as Slate's client list and database"); *Becton, Dickinson & Co. v. Cytek Biosciences Inc.*, No. 18-CV-00933-MMC, 2018 WL 2298500, at *3 (N.D. Cal. May 21, 2018) (allegations of "design review templates," "fluidics design files," and "source code files" were too broad to identify trade secrets); *Masimo Corp. v. Apple Inc.*, No. SACV2048JVSJDEX, 2020 WL 4037213, at *5 (C.D. Cal. June 25, 2020) (broad references to categories like "product plans," "personnel information," "product briefs," and "technical drawings," without "reference to specific plans, briefs, or drawings" were insufficient).

Skyryse has done exactly what the Ninth Circuit prohibits. It has provided a "laundry list" of "catchall phrases" or "categories of information." Skyryse fails to

specifically identify or attach as documentary evidence any technology, document, plan, process, technique, or source code file allegedly misappropriated by Moog. Merely claiming that Moog has misappropriated "flight technologies," "engineering information," "formulas," or "codes," for example, does not place Moog on fair notice of what it is being accused of misappropriating, much less demonstrate that this material is, as Skyryse repeatedly pleads, "confidential information."

Skyryse's failure to identify a single trade secret is particularly troubling given that Skyryse was clearly on notice of this requirement. Indeed, Skyryse previously repeatedly argued that Moog's trade secret claims failed to satisfy the particularity requirement.  Specifically, Skyryse argued that "[v]ague descriptions of 'certain' information in broad categories like 'source code,' 'certification process documents,' and 'check-lists' come nowhere close to meeting the standard for 'particularity' required." (Dkt. 166-1, p. 12). Skyryse also argued: "Only Moog knows, for example, which specific lines or blocks of its source code, which information in its certification process documents, and which portions of its checklists it alleges to be trade secrets." (*Id*., p. 13). Skyryse even demanded that Moog provide a "narrative response describing with particularity . . . which specific software, components of software, checklists, code, or compilations thereof Moog claims are protectable as trade secrets under the law." (Dkt. 193, p. 6, fn. 2).

As it currently stands, only Skyryse knows which types of documents or information within the 24 broad, boilerplate categories listed in Paragraph 109 constitute protectable trade secrets. Skyryse has failed to place Moog on notice of a single protectable trade secret. Conversely, concurrent with the filing of this Motion, Moog is serving a comprehensive, multi-hundred page trade secret disclosure.

## 2.    Skyryse Fails to Allege Misappropriation

Under the DTSA, "misappropriation" means either (1) the acquisition of a trade secret by another person who knows or has reason to know that the trade secret was acquired by improper means; or (2) the disclosure or use of a trade secret of another without express or implied consent." 18 U.S.C. § 1839(5)).

Here, Skyryse has not pled any facts showing when and how Moog misappropriated its trade secrets. Skyryse does not allege any facts describing what trade secrets Moog misappropriated, who was involved in the misappropriation, and how they were used at Moog. It merely cites to two internal Moog presentations showing that Moog was pursuing autonomous flight projects with R-44 aircrafts (which it had been doing since 2014). (Naqvi Dec., Exs. N, O). Skyryse expressly acknowledged that Moog had, and would continue to, invest in autonomous flight programs for R-44. (CC, Ex. C, § 7.2). Conclusory allegations of competitive activity are not sufficient to state a claim for misappropriation. *Space Data Corp. v. X*, No. 16-cv-03260-BLF, 2017 WL 5013363, at *2 (N.D. Cal. Feb. 16, 2017) (finding insufficient "conclusory assertions . . . not supported by adequate factual allegations" where alleged misappropriation consisted of defendants engaging "in other business activity based on Space Data's confidential trade secret information").

### D.    Skyryse Fails to State a Claim for Breach of Contract

#### 1.    NY Law Applies

"[W]here, as here, a diversity action is transferred by a New York district court to a California district court, the California court must apply New York law in determining whether a choice-of-law provision in an agreement is enforceable," and "a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction." *Santa Fe Pointe, LP v. Greystone Servicing Corp.*, No. C-07-5454-MMC, 2009 WL 1438285, at *3 (N.D. Cal. May 19, 2009).  Under NY law, "as a general matter, the parties' manifested intentions

1  to have an agreement governed by the law of a particular jurisdiction are honored."

2  *2002 Lawrence R. Buchalter Alaska Tr. v. Philadelphia Fin. Life Assur. Co.*, 96 F.

3  Supp. 3d 182, 207 (S.D.N.Y. 2015) ("Alaska").  NY has sufficient contacts

4  because Moog maintains its principal place of business in New York, the NDAs

5  and T&C all have New York choice of law provisions, and the T&C has exclusive

6  jurisdiction and venue in New York. *See Torain v. Clear Channel Broad., Inc.*, 651

7  F. Supp. 2d 125, 138 (S.D.N.Y. 2009).  New York law applies to this claim.

8  **2.  Skyryse's Breach of Contract Claim Fails as Pled**

9  Skyryse's breach of contract claim is based on alleged breaches of: 1)

10  Sections 2, 3, and 5 of the 2018 and 2019 NDAs (for using Skyryse confidential

11  information); 2) Sections 1-5, and 7-9 of SOW 1 (for not delivering hardware); and

12  3) Sections 9, 14, 20, 23, 30, 32, and 43 of the T&C (for using Skyryse

13  confidential information). (CC, ¶ 91).  It is undisputed that the T&C governed

14  work under SOW 1 and incorporated the 2019 NDA by reference. (*Id.*, ¶ 36; Ex. D,

15  § 23).

16  However, Section 31 of the T&C not only says that NY law governs, but

17  also includes an exclusive jurisdiction and venue clause in NY. (*Id.*, § 31). "If the

18  forum clause was communicated to the resisting party, has mandatory force and

19  covers the claims and parties involved in the dispute, it is presumptively

20  enforceable." *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 383 (2d Cir.2007).  "For

21  a forum selection clause to be deemed mandatory, jurisdiction and venue must be

22  specified with mandatory or exclusive language." *Cent. Nat'l-Gottesman, Inc. v.*

23  *M.V. "GERTRUDE OLDENDORFF"*, 204 F. Supp. 2d 675, 678 (S.D.N.Y. 2002).

24  CA law provides the same. *See Almont Ambulatory Surgery Ctr., LLC v.*

25  *UnitedHealth Grp., Inc*., No. CV-14-02139-MWF-VBKX, 2015 WL 1608991, at

26  *45 (C.D. Cal. Apr. 10, 2015) ("The prevailing rule is ... that where venue is

27  specified with mandatory language the clause will be enforced.").

28

1      Thus, Skyryse's breach of contract claims that are predicated on breaches of

2 the T&C and the 2019 NDA fail because this Court lacks jurisdiction and venue to

3 adjudicate such claims. The terms of the T&C are unambiguous that "***only*** the

4 courts" located in New York "shall have jurisdiction and venue to resolve" "[a]ny

5 controversy or claim arising out of or related to" the T&C. This Court must dismiss

6 Skyryse's breach of contract claims based on the T&C and 2019 NDA because it

7 lacks jurisdiction and venue to hear them. (CC, Ex. C, § 31).

8      Any breach claim regarding SOW1 also fails because Skyryse has not pled

9 facts showing a breach by Moog for purported failure to deliver all hardware under

10 SOW1. Skyryse expressly cancelled SOW1 on March 31, 2020. (Naqvi Dec., Ex.

11 H). Skyryse agreed to pay Moog for work completed (~$970k) and close out Phase

12 1 – and understood how Moog calculated the $970k number. (*Id.*, Ex. G). Moog

13 was thereby released of any obligation for all the deliverables under SOW1

14 because the Parties modified their agreement.

15      Moog's purported breaches of the 2018 NDA, 2019 NDA, and the T&C also

16 fail because it has not pled any facts that Moog improperly used Skyryse

17 confidential information. Skyryse fails to identify any trade secret or confidential

18 information that Moog misappropriated. *See Art Cap. Grp., LLC v. Carlyle Inv.*

19 *Mgmt. LLC*, 151 A.D.3d 604, 605 (1st Dept., 2017) (dismissing a claim for breach

20 of a confidentiality agreement where a plaintiff does not identify what confidential

21 information was allegedly misused). The fact that Moog has overlapping business

22 and also works on autonomous flight for R-44 helicopters (which Skyryse

23 acknowledged, historical and future) is not sufficient to establish a breach.

24 *Precision Concepts, Inc. v. Bonsanti*, 172 A.D.2d 737, 738 (2d Dept, 1991)

25 (affirming dismissal of misappropriation claim where "plaintiff failed to

26 sufficiently assert that the knowledge and information [at issue] was obtained from

27 [plaintiff]….").

28

**E.      Skyryse Fails to State a Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing**

Skyryse alleges "Moog unfairly interfered with Skyryse's right to receive the benefits of at least SOW 1, the Purchase Order, the Terms and Conditions, and subsequent SOWs" by "providing Skyryse with a sham quote for services that Moog knew was unreasonable and intended not to be accepted" and by "actively working to unfairly compete against Skyryse, rather than collaborating with it." (CC, ¶ 99).

**1.      The Implied Covenant Claim is Time-Barred**

"A claim for the covenant of good faith and fair dealing has a two year statute of limitations when it sounds in tort." *Fehl v. Manhattan Ins. Grp.*, No. 11-CV-02688-LHK, 2012 WL 10047, at \*4 (N.D. Cal. Jan. 2, 2012); *Casey v. Metropolitan Life Ins. Co.*, 688 F. Supp. 2d 1086, 1100 (E.D. Cal. 2010). "This claim accrues at the time of breach." *Weiss v. DreamWorks SKG*, No. CV1402890DDPAJWX, 2015 WL 12711658, at \*6 (C.D. Cal. Feb. 9, 2015).

Skyryse's implied covenant claim sounds in tort as opposed to contract. *See DiDio v. Jones*, No. CV134949PSGAGRX, 2014 WL 12591625, at \*2 (C.D. Cal. May 6, 2014) (implied covenant claim sounded in tort where defendant allegedly "acted in conscious disregard of plaintiffs' rights"). The claim is not tied to any particular contractual provision or Moog's alleged breach thereunder, and is instead predicated on the same types of alleged conduct that support its fraud claim. These claims accrued at latest on August 17, 2020, when Skyryse alleges that Moog's alleged bad faith conduct and improper motives had "become clear to Skyryse." (CC, ¶¶ 69-70) (Naqvi Dec., Exs. L, M). The counterclaims were not filed until January 30, 2023.

**2.      The Implied Covenant Claim Fails as Pled**

Pursuant to NY choice of law analysis, a federal court in a diversity action in NY uses NY law to determine the scope of a contractual choice-of-law

clause.  *Alaska*, 96 F. Supp. 3d at 211.  Under NY law, a breach of the covenant of good faith and fair dealing is governed by a contractual choice-of-law provision like the ones at issue in the NDAs and T&C.  *Id*. at 213-14 (gathering cases); *see also Torain*, 651 F. Supp. 2d at 138 (finding that breach of implied covenant was governed by law selected in choice-of-law provision). Thus, New York law governs this claim substantively.

To the extent Skyryse argues that its breach of implied covenant claim sounds in contract as opposed to tort (to circumvent the SOL), its claim still fails. It is well-established that "[u]nder New York Law, a claim for breach of an implied covenant of good faith and fair dealing does not provide a cause of action separate from a breach of contract claim."  *Atlantis Info. Tech., GmbH v. CA, Inc.*, 485 F. Supp. 2d 224, 230 (E.D.N.Y. 2007). As a result, the claim "must be dismissed, as a matter of law, as redundant."  *O'Hearn v. Bodyonics, Ltd*., 22 F. Supp. 2d 7, 11-12 (E.D.N.Y. 1998). California law is in accord. *See Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 353, 327 (2000) ("where breach of an actual term is alleged, a separate implied covenant claim, based on the same breach, is superfluous").

If based in contract, Skyryse's breach of implied covenant claim must be dismissed for lack of jurisdiction and venue, as described above. It is also redundant with its breach of contract claims. Skyryse's claims additionally fail because: 1) it expressly agreed to cancel the purchase order for SOW1 and pay Moog for work completed; 2) Moog did not provide any "sham" quote and provided a quote in response to Skyryse's new and expanded RFQ (which was a little more than double of Skyryse's own estimate); and 3) Skyryse expressly contracted that Moog had no obligation to enter into any additional SOW for Phases 2-4. (CC, Ex. C, §§ 4, 5, 9) (Naqvi Dec., Exs. G, J). Thus, the documents referenced in Skyryse's CC demonstrate that here were no breaches.

1

**F.      Skyryse Fails to State a Claim for Breach of Implied Contract**

2   Skyryse alleges it and Moog "entered into an implied-in-fact contract to

3 engage in a multi-phase development initiative," and that "Moog breached its

4 obligations to Skyryse by failing to perform the acts required under Phase 2 and

5 subsequent Phases." (*Id.*, ¶¶ 103, 105).

6

**1.      The Implied Contract Claim is Time Barred.**

7   Under California law, breach of implied-in-fact contract is subject to a 2-

8 year statute of limitations.  *Anderson v. Stallone*, No. 87-0592-WDKGX, 1989 WL

9 206431, at *2 (C.D. Cal. Apr. 25, 1989); *Ormeno v. Relentless Consulting Inc.*, No.

10 21-CV-1643 (LJL), 2022 WL 103482, at *4-*5 (S.D.N.Y. Jan. 11, 2022) (applying

11 the borrowing statute to find that an action for breach of implied contract was time-

12 barred by California's two-year statute of limitations).

13   This claim accrued at latest on August 17, 2020, when Skyryse alleges that

14 Moog's alleged bad faith conduct and improper motives had "become clear to

15 Skyryse." (CC, ¶¶ 69-70) (Naqvi Dec. L, M). The counterclaims were not filed

16 until January 30, 2023.

17

**2.      The Implied Contract Claim is Insufficiently Pled**

18   There is at least some conflict between the laws of New York and California

19 regarding breach of implied contract.  *Forest Park Pictures v. Universal Television*

20 *Network, Inc.*, 683 F.3d 424, 433 (2d Cir. 2012).  For contract actions, a "center of

21 gravity" approach is taken to determine which law applies, considering the place of

22 performance, place of contracting, and places of business of the parties.  *Id.*  Here,

23 California law likely applies given Skyryse's location in and alleged harm in

24 California. *See Moses v. Apple Hosp. Reit Inc.*, No. 14-CV-3131-DLI-SMG, 2015

25 WL 1014327, at *4 (E.D.N.Y. Mar. 9, 2015) ("[b]oth tests [i.e., interest analysis

26 and "center of gravity"] focus on the parties' domiciles and the locus of the tort or

27 harm a plaintiff suffers").

28

1    Under California law, the elements for a breach of an implied-in-fact

2    contract claim are: (1) that a valid contract existed; (2) Plaintiff's performance, or

3    excused nonperformance, of the contract; (3) Defendants' breach; and (4) resulting

4    damages. *nKlosures, Inc. v. Avalon Lodging LLC*, No. CV2200459RSWLJDEX,

5    2022 WL 17093927, at *7 (C.D. Cal. Nov. 17, 2022). "Where a contract is so

6    uncertain and indefinite that the intention of the parties in material particulars

7    cannot be ascertained, the contract is void and unenforceable." *Robinson &*

8    *Wilson, Inc. v. Stone*, 35 Cal.App.3d 396, 110 Cal.Rptr. 675, 683 (1973); *Gateway*

9    *Rehab & Wellness Ctr., Inc. v. Aetna Health of California, Inc.*, No. SACV 13-

10    0087-DOC MLG, 2013 WL 1518240, at *4 (C.D. Cal. Apr. 10, 2013) (an implied

11    contract is not found where "the most rudimentary terms necessary for the

12    determination of damages" are not defined and pleaded, including rates of

13    payment).

14    Here, the purported implied contract to "engage in a multi-phase

15    development initiative" is not sufficiently defined. Skyryse does not and cannot

16    allege any specific payment, deliverable, labor, or other requirements under Phases

17    2 and 4. This is because the Parties were not obligated to enter into any contract

18    beyond Phase 1, and no SOWs had been executed for Phases 2 through 4.

19    In any event, it is "well settled that an action based on an implied-in-fact or

20    quasi-contract cannot lie where there exists between the parties a valid express

21    contract covering the same subject matter." *Lance Camper Mfg. Corp. v. Republic*

22    *Indem. Co.*, 44 Cal. App. 4th 194, 203 (1996); *Allied Trend Int'l, Ltd. v. Parcel*

23    *Pending, Inc.*, No. SACV1900078AGJDEX, 2019 WL 4137605, at *3 (C.D. Cal.

24    June 3, 2019) ("As a matter of law, a party can't add to or contradict the terms of a

25    written contract through an implied contract claim."). Here, a contract already

26    exists – SOW1 – that expressly governs the terms for the multi-phase development

27    initiative.  SOW1 only covered Phase 1 and the Parties never executed additional

28    SOWs for Phases 2 through 4. (CC, Ex. C, §§ 4, 5, 9).

1  **G.    Skyryse Fails to State a Claim for Tortious Interference with**
2  **Contractual Relationships or Existing Business Relationships**

3   Skyryse alleges that it and "Robinson Helicopter entered into various
4  contracts" and that "Moog was aware of these contracts" but that its conduct
5  "prevented Skyryse's performance" or made it "more difficult." (*Id*., ¶¶ 127, 128).
6  Skyryse also concludes, without facts, that Moog intended to disrupt these
7  purported contracts. (*Id*., ¶ 129).

8   Skyryse's seventh counterclaim for intentional interference with existing
9  business relationships is not a recognized standalone cause of action in the Ninth
10  Circuit. It appears to be predicated on the same alleged conduct regarding
11  purported interference with Skyryse's business relationship (as opposed to
12  unidentified contracts) with Robinson. (*Id*., ¶¶ 131-136).

13  **1.    CA Law Likely Applies**

14   NY courts have found that there is a conflict between NY and CA law on
15  this claim because CA law allows a claim based on "a disruption" rather than only
16  "actual breach." *First Hill Partners, LLC v. BlueCrest Cap. Mgmt. Ltd.*, 52 F.
17  Supp. 3d 625, 635 (S.D.N.Y. 2014). Given this conflict, NY conducts an interest
18  analysis test. *Id*. Because a claim for tortious interference is considered a
19  "conduct-regulating cause of action," "the law of the jurisdiction where the tort
20  occurred will generally apply." *Id*. at 636. Where the conduct and injuries happen
21  in multiple locations, generally the "last event necessary for the tort" will
22  determine the jurisdiction, and the last event is the injury. *See Planet Payment,
23  Inc.*, 2011 WL 1636921 at *9. Given Skyryse's location and alleged injury, CA
24  law will likely apply.

25  **2.    Skyryse Fails to Allege Sufficient Facts to State a Claim**

26   A tortious interference with contractual relations claim under California law
27  has five elements: "(1) a valid contract between plaintiff and a third party; (2)
28  defendant's knowledge of the contract; (3) defendant's intentional acts designed to

1    induce breach or disruption of the contract; (4) actual breach or disruption; and (5)

2    resulting damage." *Fam. Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.*,

3    525 F.3d 822, 825 (9th Cir. 2008).

4          As a threshold matter, Skyryse's sixth counterclaim fails because it has not

5    identified a specific contract that was purportedly interfered with. Skyryse only

6    generally alleges that it has "various contracts" with Robinson Helicopter.  It does

7    not identify any contract by its date, terms, or otherwise. Moog cannot defend

8    against a claim that it interfered with third party contract(s) when it does not know

9    what those contracts are. Ninth Circuit courts routinely dismiss tortious

10   interference claims on similar grounds. *See Teledyne Risi, Inc. v. Martin-Baker*

11   *Aircraft Co. Ltd.*, No. CV1507936SJOGJSX, 2016 WL 8857029, at *5 (C.D. Cal.

12   Feb. 2, 2016) ("Here, Plaintiff has failed to identify the specific contract with

13   which Defendant interfered. Plaintiff also does not provide any factual allegation

14   that MB in fact knew about the alleged third party contract."); *Gemsa Enterprises,*

15   *LLC v. Pretium Packaging, LLC*, No. SACV21844JVSJDEX, 2021 WL 4551200,

16   at *6 (C.D. Cal. July 27, 2021) (dismissing claim with prejudice "because Gemsa

17   does not identify any specific contract with any specific third party").

18         Skyryse also fails to allege facts that Moog intended to interfere with or

19   disrupt Skyryse's unspecified contracts with Robinson. The CC has no allegations

20   specifying what actions Moog took. While Skyryse cites to a communication

21   where Moog referenced contacting Robinson Helicopter (CC, ¶ 87), that

22   communication says nothing about obtaining Skyryse confidential information or

23   interfering with any contracts. (Naqvi Dec., Ex. Q). Moreover, Skyryse does not

24   allege any facts that any such communication leading to interference actually

25   occurred.

26         Finally, Skyryse does not plead how its unidentified contracts were

27   breached, that its business relationship with Robinson was harmed, or that any

28

1   damages resulted. Skyryse does not allege that it lost any business or contracts

2   with Robinson. Skyryse merely offers conclusions without the required facts.

3       **H.   Skyryse Fails to State a Claim for Intentional Interference with**

4            **Prospective Business Advantage**

5       Skyryse alleges it "invested significant time, resources, and capital to

6   develop confidential and proprietary information about prospective customers."

7   (CC, ¶ 138). It concludes that Moog had knowledge of these unidentified

8   "prospective customers," and "intentionally interfered with these business

9   relationships," which resulted in "actual disruption." (*Id.*, ¶¶ 139-141).

10       There is no substantive difference between the law of NY and CA with

11   regard to tortious inference with prospective economic advantage.  Six

12   *Dimensions, Inc. v. Perficient, Inc.*, No. 15 CIV. 8309 (PGG), 2017 WL 10676897,

13   at *5 n.3 (S.D.N.Y. Mar. 28, 2017).  The same analysis for tortious interference

14   with contract applies. *See J&R Multifamily Grp., Ltd. v. U.S. Bank Nat'l Ass'n as*

15   *Tr. for Registered Holders of UBS-Barclays Com. Mortg. Tr. 2012-C4, Com.*

16   *Mortg. Pass-Through Certificates, Series 2012-C4*, No. 19-CV-1878 (PKC), 2019

17   WL 6619329, at *6 (S.D.N.Y. Dec. 5, 2019) (holding that "where plaintiffs are

18   located," and therefore where the injury occurred, is the jurisdiction with the

19   applicable law).  Given Skyryse's location and alleged injury, CA law will likely

20   apply.

21       Proving a claim of tortious interference with prospective business advantage

22   requires "(1) the existence of a special economic relationship between [plaintiff]

23   and third parties that may economically benefit [plaintiff]; (2) knowledge by the

24   [defendant] of this relationship; (3) intentional acts by the [defendants] designed to

25   disrupt the relationship; (4) actual disruption of the relationship; and (5) damages

26   to the [plaintiff]." *Garter Bare Co. v. Munsingwear Inc.*, 723 F.2d 707, 715 (9th

27   Cir. 1984).

28

Skyryse's claim fails on a threshold level because it does not identify any specific or particular prospective business relationships. Instead, it merely points to an amorphous group of unidentified "prospective customers." Courts have held that, "in order to state a claim for intentional interference with prospective business advantage, it is essential that the Plaintiff allege facts showing that Defendant interfered with Plaintiff's relationship with a particular individual." *Damabeh v. 7-Eleven, Inc.*, No. 5:12-CV-1739-LHK, 2013 WL 1915867, at *10 (N.D. Cal. May 8, 2013) (holding that claims fail where plaintiff alleges "a prospective business relationship with his employees and customers" because this "failed to identif[y] the particular relationships or opportunities with which Defendant is alleged to have interfered"); *Teledyne Risi, Inc. v. Martin-Baker Aircraft Co. Ltd.*, No. CV1507936SJOGJSX, 2016 WL 8857029, at *6 (C.D. Cal. Feb. 2, 2016) ("Plaintiff makes a conclusory assertion that Defendant has interfered with the economic relationship between Teledyne and the sequencer marketplace as a whole, rather than alleging that Defendant interfered with a specific relationship.").

Skyryse also fails to allege facts showing: (1) Moog knew of these unidentified "prospective customers;" (2) intentional conduct by Moog to disrupt these unidentified relationships; (3) disruption of the unidentified relationships; or (4) resulting harm to Skyryse. There are simply no facts pled in support of this claim.

## I.      Skyryse Fails to State a Claim for Unfair Business Practices

California's UCL broadly proscribes unfair competition, which includes "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200; *Cappello v. Walmart Inc.*, 394 F. Supp. 3d 1015, 1018 (N.D. Cal. 2019)). Nevertheless, Skyryse's UCL claim fails under all three prongs.

Skyryse alleges Moog engaged in unlawful conduct "by interfering with Skyryse's lawful hiring of California-based employees"(CC, ¶ 146), but fails to specify both how Moog interfered with Skyryse's hiring or unlawfully prevented

1    any employee from joining Skyryse.  A claim under the UCL's "unlawful" prong

2    is met if a practice violates some other law.  Where the underlying or "borrowed"

3    claim fails, so too does the UCL claim.  *Ingels v. Westwood One Broadcasting*

4    *Services, Inc.*, 129 Cal. App. 4th 1050, 1060 (2005). Skyryse cannot meet the

5    "unlawful" prong of the UCL because each of its other causes of action fails.

6            Skyryse alleges that Moog "interfer[ed] with Skyryse's business

7    relationships, interfer[ed] with Skyryse's lawful hiring of Moog personnel, and

8    induc[ed] Skyryse to terminate its purchase order with Moog." (CC, ¶ 148).  The

9    California Supreme Court defines an "unfair" act as: "conduct that threatens an

10   incipient violation of an antitrust law, or violates the policy or spirit of one of those

11   laws because its effects are comparable to or the same as a violation of the law, or

12   otherwise significantly threatens or harms competition." *Cel-Tech Comm's, Inc. v.*

13   *Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163, 187 (1999) ("[i]njury to a

14   competitor is not equivalent to injury to competition; only the latter is the proper

15   focus of antitrust laws."). Skyryse's UCL claim fails under the "unfair" prong

16   because it does not allege any facts that Moog violated any antitrust laws, or

17   harmed market competition in general.

18           Skyryse then concludes Moog engaged in "deceptive trade practices" by

19   "making false and misleading representations to Skyryse to induce it to take

20   actions detrimental to its own interests." (CC, ¶ 147). The "term 'fraudulent,' as

21   used in the UCL, has required . . . a showing that members of the public are likely

22   to be deceived." *Daugherty v. Am. Honda Motor*, 144 Cal. App. 4th 824, 838

23   (2006); *see also In re Tobacco II Cases*, 46 Cal. 4th 298, 312  (2009) (a fraudulent

24   business practice is one that is likely to mislead consumers).  Allegations of

25   fraudulent conduct made under the UCL must be pled with particularity and

26   comply with Rule 9(b). *See Vess v. Ciba-Geigy Corp. USA*, 317 F. 3d 1097, 1106

27   (9th Cir. 2003). Skyryse's UCL claim fails under the "fraudulent" prong because it

28   alleges no facts demonstrating that Moog is likely to mislead consumers at large.

1    Skyryse also fails to allege any facts, let along sufficient facts under Rule 9(b),

2    regarding Moog's purported "false and misleading representations to Skyryse."

3    **IV.    <u>CONCLUSION</u>**

4          Moog respectfully requests that the Court grant this Motion and dismiss with

5    prejudice Skyryse's Causes of Action One through Nine in the Counterclaims.

6

7

8    Dated:  February 21, 2023          SHEPPARD MULLIN RICHTER & HAMPTON LLP

9                                       By  _____
                                                    */s/ Rena Andoh*
10                                                   Rena Andoh

11                                         Attorney for Plaintiff and Counterdefendant
                                                       MOOG INC.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **CERTIFICATE OF COMPLIANCE**

2      The undersigned, counsel of record for Moog Inc., certifies that this brief

3   contains 8,999 words, which:

4      ___ complies with the word limit of L.R. 11-6.1.

5      X complies with the word limit set by Court order dated February 14, 2023

6      (Dkt. 357).

7

8   Dated:  February 21, 2023      SHEPPARD MULLIN RICHTER & HAMPTON LLP

9                                                    By _____
                                                                              */s/ Rena Andoh*
10                                                                          Rena Andoh

11                                                    Attorney for Plaintiff and Counterdefendant
                                                                        MOOG INC.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28