UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:22-cv-09094-GW-MAR | Date | April 14, 2023 |
|---|---|---|---|
| Title | *Moog Inc. v. Skyryse, Inc. et al.* | | |

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Damon Berry | Terri A. Hourigan | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Kazim A. Naqvi | Grant B. Gelberg |
| Rena Andoh | Arman Zahoory |
| Travis J. Anderson | Douglas E. Lumish |
| | Gabriel S. Gross |
| | Scott D. Tenley |

**PROCEEDINGS:    IN CHAMBERS - Final Rulings on: DEFENDANTS ROBERT ALIN PILKINGTON AND MISOOK KIM'S MOTION TO DISMISS COUNTS SIX, NINE, AND TEN PURSUANT TO Fed. R. Civ. P. 12(b)(6) [131], PLAINTIFF AND COUNTERDEFENDANT MOOG INC.'S MOTION TO DISMISS COUNTS 1 THROUGH 9 IN DEFENDANT AND COUNTERCLAIMANT SKYRYSE INC.'S COUNTERCLAIMS PURSUANT TO FED R. CIV. P. 12(b)(2), (3), and (6) [360], DEFENDANT SKYRYSE, INC.'S MOTION FOR A TEMPORARY STAY [392]**

Attached hereto is the Court's Final Rulings on the Motions:

| | : |
|---|---|
| Initials of Preparer | DBE |

_**Moog Inc. v. Skyryse, Inc. et al**_; Case No. 2:22-cv-09094-GW-(MARx)
Final Rulings on: (1) Defendants Robert Pilkington and Misook Kim's Motion to Dismiss, (2) Plaintiff and Counter-Defendant Moog, Inc.'s Motion to Dismiss Counts 1 through 9 of Defendant and Counterclaimant Skyryse, Inc.'s Counterclaims, and (3) Defendant Skyryse, Inc.'s Motion to Stay Case

## I.    Background

Plaintiff Moog Inc. ("Moog") designs and manufactures "electric, electro-hydraulic and hydraulic motion, controls and systems for applications in aerospace, defense, industrial and medical devices."   Complaint ("Compl."), Docket No. 1, ¶ 10.   Defendant Skyryse, Inc. ("Skyryse") is an aviation start-up company with a purported goal of building "autonomous flying aircraft, _i.e._, aircraft without pilots, and to build such autonomous flying systems into already-developed aircraft."  _Id._ ¶ 11.  Defendants Robert Alin Pilkington and Misook Kim (collectively, the "Individual Defendants") are former employees of Moog, who joined Skyryse in the winter of 2021.  _Id._ ¶¶ 12-13.[1]

This action arises from Skyryse's and the Individual Defendants' purported "coordinated scheme" to "misappropriate valuable confidential, proprietary, and trade secret information by way of stealing it, and further recruit swaths of Moog's valuable employees to use that misappropriated information."  _Id._  ¶ 4.  Specifically, Moog alleges that, in November 2021, Kim purportedly misappropriated "Moog's confidential, proprietary, and trade secret data and program files" upon Pilkington's instruction and in coordination with Skyryse.  _Id._ ¶ 6.  Moog alleges that Defendants worked together "to copy and misappropriate" 136,994 files from Moog for use at Skyryse.  _Id._  Moog later revised that number to more than 1.3 million files.  _See_ Docket No. 63-3.

On March 7, 2022, Moog initiated this action against Skyryse and the Individual Defendants (collectively, "Defendants") in the Western District of New York, asserting eleven causes of action: (1) violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 (against all Defendants); (2) misappropriation of trade secrets (against all Defendants); (3) breach of fiduciary duty and duty of loyalty (against the Individual Defendants); (4) aiding and abetting breach of fiduciary duty (against Pilkington); (5) unfair competition (against Skyryse); (6) conspiracy (against all Defendants); (7) breach of contract (against Skyryse); (8) breach of contract (against the Individual Defendants); (9) tortious inference with prospective economic advantage

---

[1] The Individual Defendants are no longer employed by Skyryse.  _See_ Docket No. 214 at 15.

(against all Defendants); (10) unjust enrichment (against all Defendants); and (11) imposition of constructive trust (against all Defendants).  *See generally id.*[2]

Following the initiation of this action, the U.S. Attorney's Office for the Central District of California ("USAO") opened a parallel criminal investigation, and represented that the Individual Defendants are the subjects of said investigation.  *See* Docket No. 214-2 at ¶ 8.[3]  On June 15, 2022, the USAO served the Individual Defendants with grand jury subpoenas.  *See* Docket No. 264-2 at 32:20-23.

On December 15, 2022, the district court for the Western District of New York granted Defendants' motions to transfer and transferred the action to this Court.  *See* Docket No. 297. Skyryse answered the Complaint on January 30, 2023, denying the material allegations in Moog's Complaint and asserting several affirmative defenses.  *See* Answer, Defenses, and Counterclaims ("CC"), Docket No. 350.  In addition, Skyryse brought nine counterclaims against Moog: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) breach of implied contract; (4) violation of the DTSA; (5) fraud/misrepresentation; (6) tortious interference with contractual relationship; (7) intentional interference with existing business relationships; (8) intentional interference with prospective business advantage; and (9) unfair business practices in violation of California Business and Professions Code § 17200 *et seq.* ("UCL").  *See generally id.*

There are three motions presently before the Court.  The Individual Defendants filed a Motion to Dismiss counts six, nine, and ten of the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  *See* Individual Defendants' Motion to Dismiss Counts Six, Nine, and Ten ("Indiv. Def. MTD"), Docket No. 131.  Moog filed an opposition brief.  *See* Opposition to Individual Defendants' Motion to Dismiss ("Opp. to Indiv. Def. MTD"), Docket No. 153 (sealed[4]).

Moog filed a Motion to Dismiss Skyryse's counterclaims pursuant to Federal Rule of Civil Procedure 12(b)(2), (3), and (6).  *See* Moog's Motion to Dismiss Counts One Through Nine in

---

[2] The same day that Moog filed its Complaint, it also moved for a temporary restraining order and a preliminary injunction.  *See* Docket No. 4.  Four days later, on March 11, 2022, the parties signed a stipulated order resolving Moog's motion for a temporary restraining order.  *See* Docket No. 25.

[3] In a letter dated June 10, 2022, Moog informed the district court in the Western District of New York of "an ongoing federal investigation into the files taken from Moog that are the subject of this lawsuit."  *See* Docket No. 222-7.

[4] At the hearing, the parties shall advise the Court whether they request that any portion of this tentative ruling remain sealed in the final version of the order.

Skyryse's Counterclaims ("Moog MTD"), Docket No. 360 (sealed).  Skyryse filed an opposition brief, *see* Opposition to Moog's Motion to Dismiss Counts One Through Nine ("Opp. to Moog MTD"), Docket No. 397 (sealed), and Moog filed a reply, *see* Reply in Support of Motion to Dismiss Counts One Through Nine ("Reply ISO Moog MTD"), Docket No. 426 (sealed).

Finally, Skyryse filed a Motion to Stay, contending that a six-month stay of this action is necessary pending the USAO's ongoing criminal investigation.  *See* Skyryse's Motion for a Temporary Stay ("MTS"), Docket No. 392.  The Individual Defendants joined the Motion to Stay. *See* Individual Defendants' Joinder in Motion to Stay ("Joinder"), Docket No. 393.  Moog filed an opposition brief, *see* Opposition to Skyryse's Motion to Stay ("Opp. to MTS"), Docket No. 421, and Skyryse filed a reply, *see* Reply in Support of Motion to Stay ("Reply ISO MTS"), Docket No. 430.  The Individual Defendants also filed a reply.  *See* Docket No. 428.

## II.  Legal Standard

### A.  Dismissal under Fed. R. Civ. P. 12(b)(3) for Improper Venue

A defendant may move to dismiss an action for improper venue under Fed. R. Civ. P. 12(b)(3). The plaintiff then bears the burden of showing that venue is proper as to each defendant. *See Piedmont Label Co. v. Sun Garden Packing Co.*, 598 F.2d 491, 496 (9th Cir. 1979); *Allstar Mktg. Grp., Ltd. Liab. Co. v. Your Store Online, Ltd. Liab. Co.*, 666 F. Supp. 2d 1109, 1126 (C.D. Cal. 2009).  On a motion to dismiss pursuant to Rule 12(b)(3), "the trial court must draw all reasonable inferences in favor of the non-moving party and resolve all factual conflicts in favor of the non-moving party . . . ."  *Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1138 (9th Cir. 2004).  However, the court need not accept the pleadings as true, and it may consider facts outside the pleadings.  *Holland Am. Line, Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 455 (9th Cir. 2007) (citing *Murphy*, 362 F.3d at 1137).  When venue is not proper, the court "shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought."  28 U.S.C. § 1406(a).

### B.  Dismissal under Fed. R. Civ. P. 12(b)(6) for Failure to State a Claim

"A motion to dismiss a counterclaim brought pursuant to Federal Rule of Civil Procedure 12(b)(6) is analyzed under the same standard as a Rule 12(b)(6) motion to dismiss a plaintiff's complaint."  *Leadership Stud., Inc. v. Blanchard Training & Dev., Inc.*, No. 15-CV-01831-WQH-(KSCx), 2017 WL 3315652, at *4 (S.D. Cal. Aug. 2, 2017).  Under Rule 12(b)(6), a defendant may move to dismiss for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P.

12(b)(6).  A complaint may be dismissed for failure to state a claim for one of two reasons: (1) lack of a cognizable legal theory; or (2) insufficient facts under a cognizable legal theory.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008) ("Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory.").

In deciding a 12(b)(6) motion, a court "may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007); *see also Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) (indicating that a court may consider a document "on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion").  The court must construe the complaint in the light most favorable to the plaintiff; accept all allegations of material fact as true; and draw all reasonable inferences from well-pleaded factual allegations.  *Gompper v. VISX, Inc.*, 298 F.3d 893, 896 (9th Cir. 2002); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001), *amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001); *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996).  The court is not required to accept as true legal conclusions couched as factual allegations.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Where a plaintiff facing a 12(b)(6) motion has pled "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," the motion should be denied.  *Id.*; *Sylvia Landfield Tr. v. City of Los Angeles*, 729 F.3d 1189, 1191 (9th Cir. 2013).  But if "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not show[n] . . . the pleader is entitled to relief."  *Iqbal*, 556 U.S. at 679 (citations omitted).

Also, to state a claim for fraud under Rule 9(b), a party must plead "with particularity the circumstances constituting the fraud," and allegations must "be specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong."  *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (internal quotations and citation omitted). Rule 9(b) may apply when claims include "averments of fraud," even if the word "fraud" is not used.  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1104-06 (9th Cir. 2003).  "Averments of fraud must be accompanied by 'the who, what,

4

when, where, and how' of the misconduct charged." *Id.* at 1106 (quoting *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997)).

    **C.  Motion to Stay**

A court has discretion to stay civil litigation in light of a parallel criminal matter "when the interests of justice seem to require such action." *Keating v. Off. of Thrift Supervision*, 45 F.3d 322, 324 (9th Cir. 1995) (internal quotations and citation omitted).  The court, however, is not constitutionally required to issue a stay. *Fed. Sav. & Loan Ins. Corp. v. Molinaro*, 889 F.2d 899, 901 (9th Cir. 1989).  The decision to stay should be made "in light of the particular circumstances and competing interests involved in the case." *Keating*, 45 F.3d at 324 (internal quotations and citation omitted).  This includes a consideration of the "extent to which the defendant's fifth amendment rights are implicated." *Id*. (internal quotations and citation omitted).  Additional factors the court considers include:  (1) the interest of the plaintiffs in proceeding expeditiously with the civil litigation and the potential prejudice to the plaintiffs of a delay; (2) the burden that the proceedings may impose on defendants; (3) the convenience of the court in management of its cases, and the efficient use of judicial resources; (4) the interests of persons not parties to the civil litigation; and (5) the interest of the public in the pending civil and criminal litigation. *Id*. at 325.

**III.  <u>Discussion</u>**

    **A.  Motion to Stay**

The Court first addresses the Motion to Stay because it could, conceivably, moot the pending Motions to Dismiss (at least for a short period of time).  As a preliminary matter, the Court notes that a similar motion was previously filed by the Individual Defendants in the transferor court. *See* Docket No. 214.  Skyryse joined that motion and filed a supporting brief. *See* Docket No. 241.  On September 8, 2022, Magistrate Judge McCarthy denied the motion without prejudice. *See generally* Docket No. 259.

Skyryse "believes the posture of this case has sufficiently evolved so that a stay is currently appropriate." *See* Docket No. 365 at 9.  While it appears that the USAO is actively pursuing its investigation, including by issuing a series of grand jury subpoenas over the past several months, *see* MTS at 5, no criminal indictments have issued yet.  Even though Skyryse asserts that the "government's investigation is more mature," *see* Reply ISO MTS at 9, there is no evidence that a criminal indictment is looming.

On the other hand, the Court acknowledges that, in the past seven months, civil discovery

has progressed in this action.  Indeed, it now appears that the Individual Defendants have asserted their Fifth Amendment privileges, *see* Docket No. 428 at 3, and have "confirmed that they will invoke their Fifth Amendment rights to avoid testifying when that occurs," *see* MTS at 7.[5]  Despite this contention, Moog asserts that "the Defendants' prejudice is entirely premised on the hypothetical circumstance of the Individual Defendants asserting Fifth Amendment rights in this action, *which has not happened*."  Opp. to MTS at 7-8.  Nevertheless, if the Individual Defendants have invoked their Fifth Amendment rights (it appears that they have), then Magistrate Judge McCarthy's determination that Defendants' concerns were "hypothetical," as they had not yet asserted a Fifth Amendment privilege, appears outdated.  *See* Docket No. 259 at 3.   The Court will now consider the merits of the Motion.[6]

     1.   *The Extent to Which Defendants' Fifth Amendment Rights Are Implicated*

First, the Court must address "the extent to which the defendant's Fifth Amendment rights are implicated."  *Keating*, 45 F.3d at 324.  The key issue before the Court is whether to grant a stay of this action pre-indictment.  "The status of the criminal proceeding is crucial, though not determinative, in a court's decision whether or not to stay the civil case."  *eBay, Inc. v. Digit. Points Sols.*, No. C 08-4052 JF (PVT), 2010 WL 702463, at \*3 (N.D. Cal. Feb. 25, 2010).   When "no indictment has been returned" and no criminal action is underway, the case for a stay is much weaker.  *Molinaro*, 889 F.2d at 903.  Indeed, the Ninth Circuit has advised that:

> A defendant has no absolute right not to be forced to choose between testifying in a civil matter and asserting his Fifth Amendment privilege.  Not only is it permissible to conduct a civil proceeding at the same time as a related criminal proceeding, even if that necessitates invocation of the Fifth Amendment privilege, but it is even permissible for the trier of fact to draw adverse inferences from the invocation of the Fifth Amendment in a civil proceeding.

*Keating*, 45 F.3d at 326 (citing *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976)).  Accordingly, "*Keating* stays are rarely, if ever, granted where no indictment has yet been returned."  *Est. of Morad v. City of Long Beach*, No. CV 16-06785 MWF (AJWx), 2017 WL 5187826, at \*8 (C.D.

---

[5] On March 10, 2023, the Individual Defendants invoked their Fifth Amendment privileges against the grand jury subpoena iDS, a third-party forensic vendor, received.  Docket No. 428 at 3.  More recently, on March 21, 2023, the Individual Defendants invoked their Fifth Amendment rights over all communications from certain iDS devices.  *Id.*  They have also invoked their Fifth Amendment privileges in response to the USAO's subpoenas.  *Id.*

[6] According to Skyryse, the government does not plan to take a formal position on this Motion.  *See* MTS at 20.

Cal. Apr. 28, 2017).   The potential prejudice to a civil defendant facing a parallel criminal investigation is "more remote" than it is for an indicted defendant, and the delay to the plaintiff is "potentially indefinite."   *Sterling Nat'l Bank v. A-1 Hotels Int'l, Inc.,* 175 F. Supp. 2d 573, 577 (S.D.N.Y. 2001).   At the same time, courts will not categorically deny a stay "solely because the defendant has not yet been indicted."   *Chao v. Fleming*, 498 F. Supp. 2d 1034, 1038 (W.D. Mich. 2007) (citing *Walsh Sec., Inc. v. Cristo Prop. Mgmt., Ltd.*, 7 F. Supp. 2d 523, 527 (D.N.J. 1998)).

In its Motion, Skyryse relies on several cases where stays were granted; however, in many of these cases, the defendants had already been indicted.   *See, e.g., SEC v. Nicholas*, 569 F. Supp. 2d 1065, 1067 (C.D. Cal. 2008) (granting the USAO's motion to stay where defendants faced criminal charges); *Micron Tech., Inc. v. United Microelectronics Corp.*, No. 17-cv-06932-MMC, 2019 WL 3037542, at *1-*2 (N.D. Cal. July 11, 2019) (granting motion to stay where an indictment had been filed); *Taylor, Bean & Whitaker Mortg. Corp. v. Tridaunum Fin., Inc.*, No. 2:09-cv-0954-FCD-EFB, 2009 WL 2136986, at *1 (E.D. Cal. July 15, 2009) (same).   Recognizing this critical distinction, Skyryse cites to a few cases where a district court stayed a civil proceeding in the absence of a criminal indictment.   *See, e.g.*, *Wroth v. City of Rohnert Park*, No. 17-cv-05339-JST, 2018 WL 888466, at *2 (N.D. Cal. Feb. 14, 2018) (granting a temporary stay pending completion of the criminal investigation); *Chalfant v. San Bernardino Cnty.*, No. 15-cv-01645-JGB(DTB), 2016 WL 11746411, at *2 (C.D. Cal. May 11, 2016) (granting a two-month stay pre-indictment); *see also De La O v. Arnold-Williams*, No. CV-04-0192-EFS, 2005 WL 8158924, at *3 (E.D. Wash. June 21, 2005) (granting a four-month stay pre-indictment).   Ultimately, though, these "divergent district court decisions reflect the difficulty of assessing the strength of a civil defendant's Fifth Amendment concerns when no criminal indictment has issued." *eBay, Inc.*, 2010 WL 702463, at *4.

Here, Skyryse is a corporation and corporations do not have Fifth Amendment rights. *Braswell v. United States*, 487 U.S. 99, 107 (1988).   However, where individuals' Fifth Amendment rights will interfere with a corporation's ability to defend itself, a stay might be appropriate.   *See Taylor, Bean & Whitaker*, 2009 WL 2136986, at *3 (explaining that, while a defendant corporation did not have Fifth Amendment rights, its directors' Fifth Amendment rights prejudiced its "ability to meaningfully defend itself").   The Individual Defendants' Fifth Amendment rights may be implicated because there is a pending criminal investigation by the

USAO revolving around what may be the same legal and factual issues as this case.[7]  As such, the Individual Defendants may have to choose between asserting their rights against self-incrimination, "thereby inviting prejudice in the civil case, or waiving those rights, thereby courting liability in the civil case." *Jones v. Conte*, No. C 045312S1, 2005 WL 1287017, at *1 (N.D. Cal. Apr. 19, 2005) (internal quotation marks and citation omitted).  However, again, the Court acknowledges that this risk is only theoretical because the Individual Defendants have not yet been indicted.  *See eBay, Inc.*, 2010 WL 702463, at *3 (finding that the "potential prejudice to a civil defendant facing a parallel criminal investigation is more remote than it is for an indicted defendant . . .").

At this juncture, a stay would likely result in a delay of Moog's ability to pursue its civil claims, while the "implication of the [Individual Defendants'] constitutional rights is still indeterminate." *Id.* at *4 (citing *Sterling Nat'l Bank,* 175 F. Supp. 2d at 577).  Because a criminal prosecution has not yet materialized, the Individual Defendants' Fifth Amendment interests appear only minimally implicated.  *See Molinaro*, 889 F.2d at 903 (noting that the case for staying civil proceedings is "a far weaker one" when "no indictment has been returned[, and] no Fifth Amendment privilege is threatened").  Nevertheless, the Court is inclined to find that the Individual Defendants have "significant, though not overwhelming, Fifth Amendment interests that must be considered in light of its analysis of the other *Keating* factors."  *See eBay, Inc.*, 2010 WL 702463, at *3 (internal quotation marks and citations omitted).

2.  *The Remaining Keating Factors*

a.  <u>Moog's Interest in Proceeding Expeditiously and the Potential Prejudice to Moog</u>

A court should consider the plaintiff's interest in proceeding expeditiously and any potential prejudice to plaintiff when considering a motion to stay.  *Molinaro*, 889 F.2d at 903. "Courts have recognized that a civil plaintiff has an interest in having her case resolved quickly."

---

[7] Without an indictment, the Court cannot definitively conclude that there is overlap between this action and a potential criminal action.  However, the Court acknowledges that Moog informed the transferor court of "an ongoing federal investigation into the files taken from Moog that are the *subject of this lawsuit*."  *See* Docket No. 222-7 (emphasis added); *see also* Docket No. 264-2 at 33:3-6 ("So 20 days after the June 10 letter where Moog advised the Court and all counsel that the FBI was investigating *this case* . . ." (emphasis added)).  Moreover, Moog admitted that it contacted the FBI once it "became aware that at least some Moog data had been stolen," even though the USAO purportedly initiated contact with Moog.  *See* Declaration of Arman Zahoory ("Zahoory Decl."), Docket No. 392-1, ¶ 5, Ex. C.  While there appears to be some overlap, this remains speculative absent an indictment.

*ESG Cap. Partners LP v. Stratos*, 22 F. Supp. 3d 1042, 1046 (C.D. Cal. 2014).  A stay for an indeterminate period of time prejudices the plaintiff, but a temporary stay is less prejudicial.  *Compare IBM v. Brown*, 857 F. Supp. 1384, 1391 (C.D. Cal. 1994) (denying a stay "for an indeterminate period"), *with Medina v. Argent Mortg. Co.*, No. 05-CV-2905 RS, 2006 WL 1305230, at *2 (N.D. Cal. May 11, 2006) (explaining that a stay was appropriate because criminal proceedings were expected to conclude within six months).

Moog argues that a stay of this action, even for six months, would prevent it from gathering information needed to seek additional injunctive relief.  Opp. to MTS at 22.  Skyryse counters that it is in substantial compliance with the parties' March 11, 2022 stipulation, which protects Moog's interests, and that Moog has engaged in dilatory litigation conduct, including never seeking a preliminary injunction.  *See* Reply ISO MTS at 11-12.

"Preliminarily, the fact that [Moog] has not sought a [preliminary injunction yet] is not dispositive of the issue of whether Plaintiff has a compelling interest in proceeding expeditiously with the instant civil litigation."  *Cal-Cleve, Ltd. v. Wrag-Time Air Freight, Inc.*, No. CV 04-10543 SJO (JTLx) , 2005 WL 8157878, at *4 (C.D. Cal. May 20, 2005).  Further, Moog undoubtedly has an interest in prompt resolution of its case.  *See Sw. Marine Inc. v. Triple A Mach. Shop, Inc.*, 720 F. Supp. 805, 809 (N.D. Cal. 1989) ("Witnesses relocate, memories fade, and persons allegedly aggrieved are unable to seek vindication or redress for indefinite periods of time on end.") (internal quotations and citation omitted).  Moreover, delaying discovery would likely prejudice Moog.  For example, in *General Electric Co. v. Liang*, No. CV 13-08670 DDP (VBKx), 2014 WL 1089264, at *4 (C.D. Cal. Mar. 19, 2014), the court determined that the plaintiff had "significant interests in determining whether, and if so to whom, its trade secrets may have been disclosed so that it can seek any necessary further preliminary injunctive relief."  The same is true here.  Accordingly, the Court finds that Moog's interests in proceeding with this civil action are substantial and, therefore, counsels against granting a stay.

> b.  <u>The Burden on Defendants</u>

Courts also consider the effect granting or denying a stay will have on the defendant.  *Molinaro*, 889 F.2d at 903.  When a defendant's main witnesses are likely to invoke their Fifth Amendment rights, it "will certainly hinder [the defendant's] defense in a substantial way."  *Delphi Connection Sys., LLC v. Koehlke Components, Inc.*, No. SACV 12-01356-CJC (MLGx), 2012 WL 12895670, at *2 (C.D. Cal. Oct. 17, 2012).  Absent a stay, Skyryse argues that it will be severely

limited in its ability to meaningfully defend itself, and that the Individual Defendants will be forced to make the choice of defending the civil action at the risk of waiving their Fifth Amendment rights.  *See* MTS at 14-17; *see also* Joinder at 6.  However, this concern does not carry as much weight as if the Individual Defendants had already been criminally charged.  *See Christian v. Rutkowski*, No. 2:14-cv-08924-ODW (MRWx), 2015 WL 5456600, at \*3 (C.D. Cal. Sept. 17, 2015) ("[T]he gravity of the choice is substantially lessened given that there is no concrete showing that [defendant] will be criminally charged.").  "Simply being forced to invoke the Fifth Amendment, and accordingly incurring an adverse inference, is not by itself the sort of prejudice that categorically favors a stay."  *Morad*, 2017 WL 5187826, at \*9.

Further, Skyryse enjoys no Fifth Amendment privilege and any prejudice remains speculative as the Individual Defendants have not yet been charged and there is no indication that an indictment is forthcoming.  It appears that the depositions of the Individual Defendants is of particular concern here.  *See* MTS at 6-7, 12.  Given Moog's intention to pursue a preliminary injunction and its request for a hearing in September 2023, Skyryse expects that the Individual Defendants will "undoubtedly be called for deposition" in the coming months.  *Id.* at 7.[8]  If the depositions were to proceed and the Individual Defendants opted to invoke their Fifth Amendment privileges (as they have indicated), the Court may take measures to limit any prejudice.  For these reasons, the Court finds that the burden on Defendants if a stay is denied is minimal.

c.   The Court's Interest in Judicial Efficiency

A court also considers how granting a stay will impact the efficient use of judicial resources, including the court's ability to clear its docket.  *Molinaro*, 889 F.2d at 903.  This factor, which considers "the convenience of the court in the management of its cases, and the efficient use of judicial resources," "normally does not favor granting a stay" because the court has "an interest in clearing its docket."  *ESG Cap. Partners*, 22 F. Supp. 3d at 1047.

Skyryse argues that "a stay will ensure that the common underlying issues can be efficiently litigated without the risk of inconsistent outcomes" and would stave off discovery disputes that have already arisen.  MTS at 18-19.  While a stay may eliminate the need for some discovery motions related to the Individual Defendants' assertion of their Fifth Amendment

---

[8] Per the parties' expedited discovery stipulation, each side may take depositions in advance of briefing and a hearing on the motion for a preliminary injunction.  *See* Docket No. 33 at ¶¶ 3-5.

privileges, Skyryse's argument is weak since no criminal proceeding has yet commenced. As such, "judicial efficiency is not furthered by waiting indefinitely for a resolution that may never come." *Chrome Hearts, LLC v. Old Sch. Fairfax, Inc.*, No. 2:16-cv-09080-BRO (JPRx), 2017 WL 8943005, at \*5 (C.D. Cal. Aug. 25, 2017). On balance, the Court concludes that this factor weighs against granting a stay.

> d.   The Interests of Non-Parties and the Public

The Court would find that there are no non-parties who would be significantly affected by a denial of a stay in this matter.

The last factor the Court considers is the public's interest in pending litigation. *Molinaro*, 889 F.2d at 903. Skyryse argues that "courts generally recognize that the public has a stronger interest in the integrity and efficient resolution of the criminal matter." MTS at 21. Moog counters that the public has an interest in the speedy resolution of the civil action. Opp. to MTS at 29. While both parties advance legitimate public interests, neither is particularly persuasive here.

The Court recognizes that "[t]he public has an interest in ensuring that the criminal process is not subverted by ongoing civil cases." *Douglas v. United States*, Nos. C 03-04518 JW, C 04-05357 JW, 2006 WL 2038375, at \*6 (N.D. Cal. July 17, 2006) (quotations omitted). However, since a criminal proceeding has not commenced, the criminal process is not subverted by the proceedings in this action. Where "the timing and scope of [any] potential indictment are unknown," as in the present case, "the risk of an unfair criminal proceeding must be given less weight because such concerns are necessarily speculative." *Gen. Elec. Co. v. Liang*, No. CV 13-08670 DDP (VBKx), 2014 WL 1089264, at \*6 (C.D. Cal. Mar. 19, 2014). As to Moog's argument, the Court does not believe that a significant delay in the speedy resolution of this case will result from a short stay of the Individual Defendants' depositions. Therefore, the Court finds this factor to be neutral.

In sum, the Court finds that the *Keating* factors considered together weigh against a stay at this time. The Court therefore **DENIES** the Motion to Stay without prejudice.

**B.  The Individual Defendants' Motion to Dismiss**

The Court would next address the Individual Defendants' Motion to Dismiss. The Individual Defendants move to dismiss Moog's claims for conspiracy, unjust enrichment, and tortious interference with prospective economic advantage. *See generally* Indiv. Def. MTD.

1.  *Count Nine: Tortious Interference with Prospective Economic Advantage*

As a preliminary matter, Moog and the Individual Defendants dispute whether California law or New York law should apply to Moog's tortious interference with prospective economic advantage claim. *Compare* Indiv. Def. MTD at 6, *with* Opp. to Indiv. Def. MTD at 5. This Motion was briefed prior to the transfer of this action to this Court. Because this case was transferred from the Western District of New York pursuant to 28 U.S.C. § 1404(a), *see* Docket No. 297, the Court therefore applies the substantive law, including choice-of-law rules, of New York to Moog's claim. *Van Dusen v. Barrack,* 376 U.S. 612, 639 (1964) ("A change of venue under § 1404(a) generally should be, with respect to state law, but a change of courtrooms."); *Newton v. Thomason*, 22 F.3d 1455, 1459 (9th Cir. 1994) ("Because the case was transferred under 28 U.S.C. § 1404(a) . . . we apply the choice-of-law rules of [the transferor forum]"). New York choice of law requires the Court to first analyze whether a true conflict exists. *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 492 (S.D.N.Y. 2001).

Here, the Individual Defendants argue that a conflict exists because the "five elements of the claim under California law are distinct from the four elements of the claim under New York law." Indiv. Def. MTD at 6. Moog counters that the elements of the claim under both New York and California law are essentially the same and therefore the Court should apply New York law. Opp. to Indiv. Def. MTD at 6.

A fellow district court has analyzed this issue and the Court finds its reasoning persuasive. *See Macquarie Grp. Ltd. v. Pac. Corp. Grp., LLC*, No. 08-cv-2113-IEG-WMC, 2009 WL 539928, at *10 (S.D. Cal. Mar. 2, 2009). In *Macquarie*, the court held that the plaintiff's tortious interference with prospective economic relations was governed by New York law "because there is no conflict between New York and California law." *Id.* The court reasoned that:

> The only arguable difference [between New York and California law] is California's requirement the act be "wrongful by some other legal measure." However, this is a false distinction as New York defines "improper means" to mean the conduct "must amount to a crime or an independent tort." *Henneberry,* 415 F. Supp. 2d at 468 (citation omitted). Because there is no material difference, a New York court would find New York law controls this claim.

*Id.* at *10-*11. Other courts have reached a similar conclusion. *See, e.g.*, *Cline v. Reetz-Laiolo*, 329 F. Supp. 3d 1000, 1033 n.18 (N.D. Cal. 2018) (noting that the plaintiff acknowledged that "New York and California tortious interference claims have the same elements").

While the Individual Defendants contend that a conflict exists because "California requires

actual disruption of the relationship and economic harm proximately caused by the defendant, [whereas] New York only requires injury to the relationship," *see* Indiv. Def. MTD at 6 n.3, the Court would agree with Moog that this is a "distinction without a substantive difference," *see* Opp. to Indiv. Def. MTD at 6 n.7.  In fact, a fellow district court determined that "no choice of law analysis [was] necessary . . . because, whether California or New York applie[d], there must be an actual injury resulting from the interference," and cited with equivalence these two elements under California and New York law.  *See Gutride Safier LLP v. Reese*, No. C-13-1062 EMC, 2013 WL 4104462, at *9 (N.D. Cal. Aug. 9, 2013).  Accordingly, the Court will follow this reasoning and find that New York law applies to Moog's tortious interference claim.

The Court concludes that Moog has sufficiently pled the first three elements.  Moog pleads the existence of an ongoing business relationship with the U.S. Government, including future contracts with the U.S. Government, of which the Individual Defendants, as former employees of Moog, were aware, and that the Individual Defendants acted for a wrongful purpose and used improper means by copying nearly all of the files related to sensitive U.S. Government programs. *See* Compl. ¶¶ 241-247.  While Moog alleges "injury to the business relationship," the problem is that it has done so in a conclusory fashion only.  For example, Moog alleges that it must report the data theft at issue to the U.S. Government which "*poses the risk of harm* to Moog's reputation and goodwill in the industry."  *Id.* ¶ 159 (emphasis added).  Later, Moog conclusorily states that the Individual Defendants' actions have "injured [its] ongoing business relationship with the U.S. Government," but does not explain *how.  Id.* ¶ 248.  Again, Moog speculates that because it must notify the U.S. Government of a data theft its "reputation and goodwill . . . has been damaged." *Id.*  However, elsewhere the Complaint states that "Moog's ability to obtain future contracts with the U.S. Government *could* be impaired or delayed as a result of Kim's actions."  *Id.* (emphasis added).  At times, the Complaint concludes that Moog's business relationship with the U.S. Government has been damaged, while also stating that the relationship "could be impaired" or there is a "risk of harm."  *Compare* Compl. ¶ 248, *with id.* ¶¶ 159, 248.  Therefore, as currently pled, the Court concludes that Moog has failed to plausibly allege any injury to the business relationship resulting from the Individual Defendants' purported interference.  The Court dismisses count nine with leave to amend.

    2.   *Count Ten: Unjust Enrichment*

Next, the Individual Defendants contend that, under either New York or California law,

Moog's claim for unjust enrichment must be dismissed because it merely duplicates its trade secret and breach of contract claims. *See* Indiv. Def. MTD at 5. In addition, the Individual Defendants argue that Moog fails to allege how they (rather than Skyryse) were enriched. *Id.* Moog counters that its unjust enrichment claim is not merely duplicative of its misappropriation and breach of contract claims, and asserts that the Complaint contains allegations about how the Individual Defendants were enriched. *See* Opp. to Indiv. Def. MTD at 8-9.

The Court need not engage in a choice of law analysis (at least for now) because, whether California or New York law applies, Moog must allege that the Individual Defendants were enriched. *See Eidelman v. Sun Prod. Corp.*, No. 16-CV-3914 (NSR), 2017 WL 4277187, at *6 (S.D.N.Y. Sept. 25, 2017) ("To state a claim for unjust enrichment, Plaintiff 'must plead that (1) the defendant was enriched (2) at the plaintiff's expense and (3) that equity and good conscience require the defendant to make restitution.'" (citation omitted)); *Corelogic Sols., LLC v. Credifi Corp.*, No. 8:20-cv-01676-FLA (DFMx), 2021 WL 1156860, at *9 (C.D. Cal. Jan. 29, 2021) ("The elements of an unjust enrichment claim are the receipt of a benefit and the unjust retention of the benefit at the expense of another." (citation omitted)).

Moog's assertion that "Defendants have been unjustly enriched" to "the advantage of Pilkington and Kim" is conclusory and unsupported by any factual allegations. *See* Compl. ¶¶ 253-254. In its opposition, Moog states that the Individual Defendants "would benefit in their job performance from use of Moog information while working at Skyryse (and Kim would remain in Pilkington's good graces by stealing such data)." Opp. to Indiv. Def. MTD at 9. But Moog has not pled these facts in its Complaint and may not amend its Complaint through a brief filed in opposition to a motion to dismiss.[9] *See Diamond S.J. Enter., Inc. v. City of San Jose*, 395 F. Supp. 3d 1202, 1231 (N.D. Cal. 2019) ("[T]he Court does not consider what Plaintiff *intended* to allege, but rather, considers what *is* alleged in the SAC."); *Tietsworth v. Sears*, 720 F. Supp. 2d 1123, 1145 (N.D. Cal. 2010) ("It is axiomatic that the complaint may not be amended by briefs in opposition to a motion to dismiss."). Because Moog has not adequately alleged that the Individual Defendants were enriched, the Court dismisses Moog's tenth cause of action as to the Individual

---

[9] In addition, while Moog points to various allegations in its Complaint to show that the Individual Defendants were enriched, *see* Opp. to Indiv. Def. MTD at 9, these allegations primarily show that Skyryse, not the Individual Defendants, benefitted. For example, the Complaint alleges that the data copied "saves Skyryse tens of millions of dollars and several years of work." Compl. ¶ 147.

Defendants. Moog is granted leave to amend this claim.

3. *Count Six: Conspiracy*

Finally, the Individual Defendants move to dismiss Moog's conspiracy claim, arguing that "the only allegations setting forth an agreement between the Individual Defendants and Skyryse are conclusory." Indiv. Def. MTD at 4.[10] In support, the Individual Defendants point to *Medtech Products Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 794-95 (S.D.N.Y. 2008), where the court dismissed a civil conspiracy claim to misappropriate trade secrets because it was founded on conclusory allegations. There, the court noted that "merely hiring the employees of a competitor is not indicative of an agreement to misappropriate trade secrets." *Id.* at 812. Rather, the court determined that "[t]here [we]re no allegations in the complaint that the Defendants specifically agreed to use [] the trade secrets that the [former employees] gleaned from their employment . . . in order to produce [the] competing product." *Id.* at 794. In fact, the court noted that the "only allegation that can be fairly read to allege an agreement among Defendants to misappropriate Medtech's trade secrets reads as follows: 'Upon information and belief, [Defendants] conspired, agreed, and planned to use Medtech's confidential and proprietary information . . .'" *Id.* at 795. As a result, the court held that the complaint "merely conclude[d] that an agreement existed without any factual basis to make the allegation *plausible*." *Id.*

Here, however, the Complaint contains allegations that the Individual Defendants and Skyryse agreed to copy and use Moog's trade secrets. *See* Compl. ¶¶ 6 ("Pilkington instructed Kim . . . to copy and misappropriate an enormous amount of Moog's confidential, proprietary, and trade secret data . . . to provide such information to Pilkington and Skyryse for improper use"); 94

---

[10] Again, no choice of law analysis is necessary for this claim because the result would be the same under either California or New York law. Under California law, "[s]tanding alone, a conspiracy does no harm and engenders no tort liability. It must be activated by the commission of an actual tort." *Qwest Commc'ns Corp. v. Weisz*, 278 F. Supp. 2d 1188, 1191 (S.D. Cal. 2003). Likewise, "civil conspiracy is not an independent tort under New York law." *Chrysler Cap. Corp. v. Century Power Corp.*, 778 F. Supp. 1260, 1267 n.8 (S.D.N.Y. 1991). Instead, "[a]llegations of conspiracy are permitted only to connect the actions of separate defendants with an otherwise actionable tort." *Charles Ramsey Co., Inc. v. Fabtech-NY LLC*, No. 1:18-cv-0546 (LEK/CFH), 2020 WL 352614, at *22 (N.D.N.Y. Jan. 21, 2020) (citation omitted). Thus, under New York law, a plaintiff "may plead the existence of a conspiracy to demonstrate that each defendant's conduct was part of a common scheme by demonstrating *the underlying tort*" and (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation; and (4) resulting damage. *Id.* (citation omitted). Similarly, under California law, a plaintiff must allege the formation of a conspiracy, wrongful acts committed pursuant thereto, and resulting damages. *Cellular Plus, Inc. v. Sup. Ct.*, 14 Cal. App. 4th 1224, 1236 (1993).

Further, the Individual Defendants do not challenge Moog's underlying tort for misappropriation of trade secrets. *See generally* Indiv. Def. Mot.

("Pilkington and other Skyryse employees, in a strategic effort to carry out Skyryse's raid of Moog, systematically worked to recruit Moog employees to join Skyryse"); 219 ("Defendants reached an agreement to commit the [misappropriation] . . . which is indicated by their collaboration and cooperation to use Moog's trade secret, confidential and proprietary information in and for Skyryse's business").  These facts distinguish the present case from *Medtech*.

Further, Moog's Complaint alleges facts that are "'suggestive' of an agreement to engage in 'illegal conduct.'"  *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) (holding that plaintiff pleaded sufficient facts to state a plausible claim for civil conspiracy, given that many of the relevant facts are known only to the defendant); *see also Yahoo! Inc. v. XYZ Cos.*, 872 F. Supp. 2d 300, 305 (S.D.N.Y. 2011) ("Agreements in civil conspiracies 'may be inferred from circumstantial evidence,' as they are often difficult to prove through direct evidence.").  Accordingly, "[w]hen the entire factual context is considered, it is clear that Moog has 'nudged [its] claim[ ]' that Defendants conspired together 'across the line from conceivable to plausible.'" *Soo Park*, 851 F.3d at 928 (quoting *Iqbal*, 556 U.S. at 680).[11]  The Court therefore denies the Motion as to Moog's conspiracy claim.

For these reasons, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** the Individual Defendants' Motion to Dismiss.  Moog's ninth and tenth causes of action are dismissed with leave to amend.[12]

### C.  Moog's Motion to Dismiss

The Court now turns to Moog's Motion to Dismiss Skyryse's counterclaims.

1. *Counterclaim Four: Trade Secret Misappropriation*

---

[11] The Court also finds the Individual Defendants' argument about "group pleading" to be misplaced.  *See* Indiv. Def. MTD at 5.  Here, the Complaint does attribute specific conduct to the Individual Defendants.  For example, Pilkington allegedly instructed Kim to copy numerous files, which Kim purportedly did, and Kim provided those files to both Pilkington and Skyryse for a purported improper use.  Compl. ¶ 6.  This appears sufficient.

[12] While only briefly addressed by the parties in connection with Moog's ninth cause of action, the Court questions whether the California Uniform Trade Secrets Act ("CUSTA") preempts Moog's unjust enrichment and/or conspiracy claims.  *See Emergy Inc. v. Better Meat Co.*, No. 2:21-cv-02417-KJM-CKD, 2022 WL 7101973, at *8 (E.D. Cal. Oct. 12, 2022) (noting that "courts have held CUTSA may preempt various claims, including claims for . . . unjust enrichment . . . where the wrongdoing alleged in connection with such claims is the misappropriation of trade secrets"); *see also Artec Grp., Inc. v. Klimov*, No. 15-cv-03449-EMC, 2016 WL 8223346, at *6 (N.D. Cal. Dec. 22, 2016) (holding that plaintiff's claims for unjust enrichment and civil conspiracy were preempted by CUSTA because they were "based on the same nucleus of facts as [plaintiff's] misappropriation of trade secrets claim").  Because this potential preemption issue was not briefed by either party in connection with these claims, the Court will not address it in this Order but raises it for the parties' consideration.

Moog contends that the Court should dismiss Skyryse's trade secret misappropriation counterclaim under the DTSA because (1) Skyryse failed to sufficiently identify its trade secrets and (2) Skyryse failed to plead facts showing when and how Moog misappropriated them.  Moog MTD at 27-30.

    a.  <u>Particularity</u>

The DTSA creates a cause of action where (1) the plaintiff possesses a trade secret, (2) the defendant has misappropriated the trade secret; and (3) the plaintiff's trade secret is "related to a product or service used in, or intended for use in, interstate or foreign commerce."  18 U.S.C. § 1836(b).  DTSA claims are *not* subject to a heightened pleading standard.  Pleadings for trade secret misappropriation should be held to the standard articulated in Federal Rule of Civil Procedure 8(a)(2): "A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  *See Cedars Sinai Med. Ctr. v. Quest Diagnostic Inc.*, No. CV 17-5169-GW-(FFMx), 2018 WL 2558388, at *4 (C.D. Cal. Feb. 27, 2018); *see also Space Data Corp. v. X*,  No. 16-cv-03260-BLF, 2017 WL 3007078, at *3 (N.D. Cal. Feb. 16, 2017) (applying the Rule 8 standard in determining whether the identification of trade secrets in a complaint is adequate).  While this standard is not as high as the particularity requirement for fraud claims under Federal Rule of Civil Procedure 9, "the pleadings must have enough specificity to provide both the Court and defendants with notice of the boundaries of this case."  *See Citcon USA, LLC v. RiverPay, Inc.*, No. 18-cv-02585-NC, 2018 WL 6813211, at *4 (N.D. Cal. Dec. 27, 2018) (quotation marks omitted).

Still, the level of specificity required is not high.  *See Cedars Sinai*, 2018 WL 2558388, at *5.  A plaintiff does not have to identify "the particular trade secrets *at the pleading* stage" so long as the plaintiff can "identify a trade secret with reasonable particularity prior to commencing discovery."  *Meggitt San Juan Capistrano, Inc. v. Yongzhong*, 575 F. App'x 801, 803 (9th Cir. 2014) (quotation marks omitted); *see also Autodesk, Inc. v. ZWCAD Software Co.*, No. 5:14-cv-01409-EJD, 2015 WL 2265479, at *5 (N.D. Cal. May 13, 2015) ("[A] plaintiff need not 'spell out the details of the trade secret.'").  However, the plaintiff must "describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies."  *Vendavo, Inc. v. Price f(x) AG*, No. 17-cv-06930-RS, 2018 WL 1456697, at *4 (N.D. Cal. Mar. 23, 2018) (citation omitted).

Skyryse defines the trade secrets as its "proprietary automated flight technologies, certification, development, and testing plans . . . regarding advanced automated flight control systems, general aviation, and urban transportation." CC ¶ 109. The trade secrets include flight control technology allowing Skyryse to use the R-44 as a certification test bed and enabling it to incrementally progress to a full four-axis control system. *See id.* ¶¶ 40-41, 45, 109-112. In addition, they include a size- and weight- optimized system with pilot-operated manual reversion capabilities and a confidential development plan to train automated flight systems, as well as a "Master Plan" to develop a vehicle-agnostic system by using data gathered during testing to guide the product definition and leverage the data for further product development. *Id.* ¶¶ 40-43, 79.

The Court finds these descriptions sufficiently specific to provide notice as to the boundaries of the claim, as it is similar to other descriptions which have survived dismissal. *See, e.g., Rockwell Collins, Inc. v. Wallace*, No. 17-1369-AG-(JCGx), 2017 WL 5502775, at *2 (C.D. Cal. Nov. 20, 2017) (finding "technical drawings, technical specifications, business information, documents, and data relating to flight control systems, methods, assemblies, and services" sufficient to place defendant "on notice of what's at issue in this case – protected information concerning 'flight control systems, methods, assemblies, and services'"); *TMC Aerospace, Inc. v. Elbit Sys. of Am., LLC*, No. CV 15-07595-AB (Ex), 2016 WL 3475322, at *5 (C.D. Cal. Jan. 29, 2016) (finding "proprietary design drawings, manufacturing techniques, and manufacturing equipment including moulds and jigs" as an adequate description of trade secrets); *Autodesk,* 2015 WL 2265479, at *5 (finding "source code which comprises AutoCAD 2007 and 2008 is a trade secret, including those portions of code that underlie the commands, interfaces and program files associated with the dozens of specific features which were wrongfully acquired and used in defendants' ZWCAD+ 2012 and 2014 programs" as adequate).

Further, Skyryse sets forth a timeline alleging when and how it shared its trade secrets with Moog. For example, starting in 2019, Skyryse "disclos[ed] to Moog details of [it]s proprietary, highly confidential, and state-of-the art trade secret flight control technology." CC ¶ 41. Over the course of their collaboration, Skyryse shared "valuable confidential information with Moog through many interactions, including in-person meetings at Skyryse's headquarters where Moog personnel inspected Skyryse's aircraft." *Id.* ¶ 40. In addition, Skyryse shared "highly confidential technical information, drawings, schematics, computer aided design (CAD) files, and business plans regarding [its] test aircraft and certification plans and roadmaps." *Id.* As such, the Court

finds that Skyryse has adequately described its trade secrets such that Moog is on notice as to what is at issue in these claims.

      b.  <u>Misappropriation</u>

The Court turns next to the sufficiency of the allegations of misappropriation. The DTSA "contemplates three theories of liability: (1) acquisition, (2) disclosure, or (3) use." *Cave Consulting Grp., Inc. v. Truven Health Analytics Inc*., No. 15-CV-02177-SI, 2017 WL 1436044, at *4 (N.D. Cal. Apr. 24, 2017). "Improper means" "includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." 18 U.S.C. § 1839(6).

Moog primarily relies on *Space Data Corp. v. X*, No. 16-cv-03260-BLF, 2017 WL 5013363, at *2 (N.D. Cal. Feb. 16, 2017). There, the court found plaintiff's misappropriation allegations to be insufficient when plaintiff alleged only that "[d]efendants have engaged in other business activity based on Space Data's confidential trade secret information, which conflict with their legal obligations to Space Data," and when plaintiff did not support those "conclusory allegations" with adequate "factual allegations." *Id.*

In contrast, Skyryse's counterclaims sufficiently allege facts which give rise to the inference that Moog used its trade secrets, including:

- "Moog used Skyryse's trade secrets and other confidential information to develop plans to update its Robinson R44 test aircraft to be 'Stable in 4-Axis Control,'" (CC ¶ 76);
- "Moog described in an internal presentation the very secrets that Skyryse had shared with it in confidence regarding certification plans . . . "[i]n other words, Moog was using for its own competitive purposes confidential business information that took Skyryse years to develop," (*id.*);
- "Moog has been using and exploiting confidential information it acquired from Skyryse to enable [a company it acquired] to develop a '4-Axis Autopilot System,' which [this company] did not have prior to being acquired by Moog," (*id.* ¶ 77);
- Moog "has used Skyryse's confidential flight certification model to unfairly compete against Skyryse in attracting business from other customers," including using its "automated flight control technology demonstrator" for another company (*id.* ¶ 78);
- "Mimicking Skyryse's own plans and strategies, Moog is exploiting Skyryse's confidential information to help [another company]," (*id.*); and
- "Skyryse had shared with Moog the same type of product development plans and strategies confidentially three years earlier," including Skyryse's "Master

Plan," which Moog is now purportedly using (*id.* ¶ 79).

In fact, the allegations here are very similar to those alleged in *Alta Devices, Inc. v. LG Electronics, Inc.*, 343 F. Supp. 3d 868, 883-84 (N.D. Cal. 2018). For example:

> The allegations include that LGE was interested in and eager to explore Alta's "disruptive" technology in 2011–2012, Compl. ¶¶ 12–14, and that the parties executed an NDA in 2011, *id.* ¶ 14. Convinced of the technical superiority and commercial feasibility of Alta's technology, LGE proceeded to obtain details about Alta's technology under the NDA after LGE had stated a plan for developing Alta's technology "in-house." *Id.* ¶¶ 14–16, 50–55. After obtaining Alta's trade secrets during the 2011–2012 time period, LGE subsequently came back to Alta in 2013–2014 to ask for samples of Alta's solar cells. *Id.* ¶ 64. Then LGE began producing technology and a manufacturing tool similar to Alta's. *Id.* ¶¶ 65–72.

*Id.* Just like in *Alta Devices*, Skyryse's counterclaims contain allegations that Moog was "particularly interested" in Skyryse's technology in 2018, and wanted the "two companies [to] explore th[e] market together utilizing [its] strengths." CC ¶ 24. The parties executed two non-disclosure agreements ("NDA") in 2018 and 2019 to facilitate these discussions. *Id.* ¶¶ 25, 27. In the process, Skyryse shared valuable confidential information with Moog. *Id.* ¶¶ 40-45. However, unbeknownst to Skyryse, "Moog secretly decided it would walk away from the collaboration, cut Skyryse out, and develop copycat flight technology on its own in direct competition with Skyryse." *Id.* ¶ 48. Yet, "[u]naware it was being duped, Skyryse kept sharing confidential and proprietary information with Moog," *id.* ¶ 51, and Moog began developing plans similar to Skyryse's, *id.* ¶¶ 75-79.

Skyryse also alleges that Moog acquired Genesys Aerosystems, a direct competitor with Skyryse, because it "presented Moog with an opportunity to take what it learned from Skyryse and exploit it for its own benefit." *Id.* ¶ 74. Such allegations also state a claim of use misappropriation. *See, e.g.*, *Gatan, Inc. v. Nion Co.*, No. 15-cv-01862-PJH, 2017 WL 1196819, at *6 (N.D. Cal. Mar. 31, 2017) (finding allegations of misappropriation sufficient where the defendant was subject to an agreement and had a duty to maintain confidentiality of the plaintiff's trade secrets, yet the defendant used the trade secrets to develop defendant's own technology). Accordingly, the Court finds that Skyryse has plausibly alleged that Moog misappropriated its trade secrets.

For these reasons, the Court denies the Motion as to Skyryse's fourth counterclaim.[13]

2.  *Counterclaim Five: Fraud/Misrepresentation*

An intentional misrepresentation claim requires "(1) a misrepresentation, (2) with knowledge of its falsity, (3) with the intent to induce another's reliance on the misrepresentation, (4) actual and justifiable reliance, and (5) resulting damage." *Daniels v. Select Portfolio Servicing, Inc.*, 246 Cal. App. 4th 1150, 1166 (2016).  Skyryse's claim for fraud/misrepresentation is based on allegations that Moog made four false representations: (1) "that Moog would be 'continuning to work with Skyryse' throughout their collaboration"; (2) "that the parties were on 'our path forward' to Phase 2 of their collaboration and beyond"; (3) "that Skyryse needed to cancel, terminate, or revise a purchase order . . . to secure continued performance from Moog . . ."; and (4) "that Moog's . . . informal estimate of its quote for work it would do in Phase 2 of the parties' collaboration was approximately $4 million."  CC ¶ 120.

Moog's primary argument that Skyryse fails to state a claim for fraud is that all four of these statements are "unactionable future statements."  Moog MTD at 26.  Skyryse does not dispute that these are statements of "future action."  *See* Opp. to Moog MTD at 19-20.  Rather, Skyryse contends that this is a situation where "broken promises of future conduct may [] be actionable." *Id.* at 19 (citing *Tarmann v. State Farm Mut. Auto. Ins. Co.*, 2 Cal. App. 4th 153, 158-59 (1991)).

Courts have recognized that "predictions of future events are ordinarily considered nonactionable expressions of opinion."  *Mueller v. San Diego Ent. Partners, LLC*, 260 F. Supp. 3d 1283, 1296 (S.D. Cal. 2017); *see also Tarmann*, 2 Cal. App. 4th at 158.  In particular, the Court finds Moog's citation to *Roots Ready Made Garments v. Gap Inc.*, No. C 07-03363 CRB, 2008 WL 239254, at *6 (N.D. Cal. Jan. 28, 2008), to be persuasive.  There, the alleged fraudulent statements included assurances that a Gap program director would "continue to 'push the approval and opening, sooner rather than later,'" that Gap "'intended to develop a long-term relationship with Roots,'" and that "'Gap would attempt to find a way to continue to do business directly with

---

[13] In its reply brief, Moog argues for the first time that Skyryse's alleged trade secrets are actually Moog's and that Skyryse fails to establish independent economic value.  Reply ISO Moog MTD at 15-16.  As a general rule, courts do not consider arguments raised for the first time on reply.  *See, e.g., Bazuaye v. I.N.S.*, 79 F.3d 118, 120 (9th Cir. 1996) ("Issues raised for the first time in the reply brief are waived."); *NYKO Techns. Inc. v. Energizer Holdings Inc.*, No. CV 12-3001 GAF (VBKx), 2013 WL 12134128, at *1 (C.D. Cal. Sept. 19, 2013) ("[A]n argument raised for the first time in a reply brief does not permit the moving party an opportunity to respond to it, and the Court should not consider the validity of such arguments."); *Dytch v. Yoon*, No. C 10-02915 MEJ, 2011 WL 839421, at *3 (N.D. Cal. Mar. 7, 2011) ("Defendant's argument . . . was raised for the first time in her reply brief.  As a result, it is improper for the Court to consider it.").  Therefore, the Court will not consider these arguments.

Roots.'"  *Id.*  The court concluded that "[p]romises to find a way to continue working and statements about intent to develop a long-term relationship do not constitute statements of *fact*." *Id.*

At oral argument, Skyryse argued that the statements in *Roots Ready* were far more vague than the statements at issue here.  However, the statements here involve similar general assurances that Moog would "continu[e] to work with Skyryse" and that the parties were on a  "path forward" to Phase 2.  *See* CC ¶ 120.  As such, the Court agrees with Moog that any alleged statements "of an  intention  to  pursue  a  long-term  relationship  with  Skyryse  are  not  actionable misrepresentations."  Reply ISO Moog MTD at 13; *see also Indigo Grp. USA Inc. v. Polo Ralph Lauren Corp.*, No. 2:11-cv-05883-JHN-CW, 2011 WL 13128301, at *3 (C.D. Cal. Oct. 25, 2011) (holding that statements of an "intended course of action" were not actionable fraud).  This covers Statements 1 (that Moog would "continu[e] to work with Skyryse") and 2 (that the parties were on a  "path forward" to Phase 2 of their collaboration and beyond).  *See* CC ¶ 120.[14]

However, the Court is not as convinced that Statements 3 and 4 fall within this category of "future intention" because these statements concern (1) the steps Skyryse needed to perform to secure  Moog's  continued  performance  and  (2)  a  quote  for  Phase  2  work  of  the  parties' collaboration.  *See id.*  Therefore, the Court is inclined to find that Skyryse can proceed with its counterclaim as to these two statements.

Moog argues that Skyryse has not specified the "who, what, when, where, and how" of the alleged misrepresentations.  Moog MTD at 27.  The Court disagrees.  Skyryse alleges, among other things, that on March 25, 2020, Moog's Timothy Abbott falsely stated to Skyryse's Gonzalo Rey that Skyryse needed to provide Moog with a formal letter "stating the intent to revise the current statement of work" in order to "facilitate the invoicing process" and to secure Moog's continued performance.  CC ¶ 60.  And on March 9, 2020, Mr. Abbott provided Mr. Rey with "takeaway numbers" for the next phase that were misleading and deceptive.  *Id.* ¶ 59.  Skyryse alleges that Moog never intended to continue with the project.  *See id.* ¶¶ 62, 66.  Instead, it was planning to use the "cancellation" it purportedly coaxed out of Skyryse to end their collaboration.  *Id.* ¶ 62.  In addition, on June 16, 2020, Mr. Abbott delivered to Skyryse a quote for the next phase of work that was in the range of $47.5 to $75 million – much higher than the $4 million number previously

---

[14] Nevertheless, because the Court is permitting Skyryse leave to amend this claim, Skyryse has the opportunity to try to plead around the Court's finding that these are unactionable future statements.

provided – because "Moog knew and intended that Skyryse would have no choice but to reject it." *Id.* Because Moog "did not have the right to terminate its agreement with Skyryse," it made these statements to "convince *Skyryse* to cancel the issued purchase order." *Id.* ¶ 49. Based on these allegations, Skyryse has sufficiently set forth the elements of fraud by alleging the "who, what, when, where, and how." *Cooper*, 137 F.3d at 627.

Next, Moog contends that Skyryse's fraud claim fails for lack of reasonable reliance because there was no contractual obligation to proceed to Phase 2. Moog MTD at 26-27. Skyryse counters that it pleaded that it relied on Moog's misrepresentations in making a nearly $1 million payment to Moog for systems it ordered, but never received, because "it trusted Moog." Opp. to Moog MTD at 20; *see also* CC ¶ 61. In addition, Skyryse argues that under the terms of their statement of work ("SOW"), the parties "intended to engage in a multi-phase development initiative." *Id.* at 20; *see also* CC ¶ 31. In its reply, Moog contends that it never "agreed" to enter into Phases 2-4 and points to provisions of the SOW stating that any future phases would require separate SOWs. Reply ISO Moog MTD at 12.

At the motion to dismiss stage, "[the Court must] strive to resolve any contractual ambiguities in the [non-moving party's] favor." *See Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995). Where the language "leaves doubt as to the parties' intent," the motion to dismiss must be denied. *Consul Ltd. v. Solide Enters., Inc.*, 802 F.2d 1143, 1149 (9th Cir. 1986). Here, the parties dispute whether the SOW obligated Moog to proceed to Phases 2-4 in their collaboration. Both parties can point to language in the SOW that appears to support their positions. Because the SOW is capable of two or more reasonable interpretations— specifically as to whether or not Moog was obligated to proceed to Phase 2—the SOW is "ambiguous" and "leaves doubt as to the parties' intent."

At oral argument, both parties reiterated their respective positions on the SOW by pointing to various provisions contained therein. Moog argued that the SOW reflects that it never agreed to proceed to Phase 2, whereas Skyryse asserted that the SOW reflects a manifestation of the parties' intent to enter into a long term objective, binding them to proceed. Counsels' arguments are emblematic of the dilemma the Court faces: Should it accept Moog's interpretation of the SOW or Skyryse's interpretation? Because interpretation of the SOW is a factual matter to be determined by the circumstances, the Court cannot resolve this dispute on a motion to dismiss. The Court therefore declines to conclude that Skyryse could not reasonably rely on the alleged

misrepresentations due to the contractual provisions in the SOW at this time.

For these reasons, the Court grants Moog's Motion as to only Statements 1 and 2. Skyryse is granted leave to amend this claim.

### 3. *Counterclaim One: Breach of Contract*

Skyryse's breach of contract claim is based on alleged breaches of (1) Sections 2, 3, and 5 of the parties' 2018 NDA and 2019 NDA for using confidential information; (2) Sections 1-5 and 7-9 of the SOW for not delivering hardware; and (3) Sections 9, 14, 20, 23, 30, 32, and 43 of the Terms and Conditions ("T&C") for using confidential information. *See* CC ¶ 91. As a preliminary matter, Moog argues that this Court lacks jurisdiction[15] and venue to adjudicate Skyryse's breach of contract claims predicated on breaches of the 2019 NDA and the T&C[16] because they are subject to a forum selection clause. Moog MTD at 31-32.[17] Skyryse counters that the forum selection clause does not require dismissal because (1) it is inoperative, (2) it would be unreasonable to enforce, and (3) Moog waived its ability to enforce the clause. Opp. to Moog MTD at 8-12.[18]

### a. Whether the Forum Selection Clause is Inoperative

Skyryse first argues that the forum selection clause is no longer in effect because it did not survive termination of the T&C. *Id.* at 8-9. Specifically, Skyryse asserts that the express survival of three other provisions in the T&C implies that the forum selection clause does not survive termination. *Id.* However, "[c]ourts in the Second Circuit routinely enforce forum-selection clauses after the termination of an agreement, even where the agreement – like here – does not contain a general, standalone survival clause." *George V. Eatertainment S.A. v. Elmwood Ventures LLC*, No. 1:22-cv-08047 (JLR), 2023 WL 2403618, at *8 (S.D.N.Y. Mar. 8, 2023). Moreover,

---

[15] Moog appears to abandon its personal jurisdiction argument. *See* Reply ISO Moog MTD at 21. As such, the Court does not address it in this Order.

[16] The forum selection clause is in the T&C, which incorporated the 2019 NDA by reference. Moog MTD at 31. In its briefing, Skyryse does not dispute that the forum selection clause also applies to the 2019 NDA. At oral argument, Skyryse attempted, for the first time, to cabin the applicability of the forum selection clause to only the T&C and not to the 2019 NDA. Because this was not raised in Skyryse's papers, the Court declined to hear argument on this point. However, Skyryse is permitted to raise this issue at a later date.

[17] The forum selection clause states: "Any controversy or claim arising out of or related to this Agreement, or the breach thereof, which cannot be settled by the Parties shall be finally settled by a court. The parties expressly agree that only the courts located in the City of Buffalo, County of Erie, State of New York, in the USA shall have jurisdiction and venue to resolve such a dispute." CC, Ex. D, § 31.

[18] The parties appear to agree that New York law applies to this claim. *See* Moog MTD at 31; *see also* Opp. to Moog MTD at 6-7.

"[a]bsent an express indication to the contrary, the Court presumes the parties would not intend the forum-selection clause to terminate with the agreement." *Id.* at *9.  The Court therefore rejects Skyryse's "theory that the absence of an express survival clause applicable to a provision necessarily implies that the provision does not survive."  *Id.*; *see also In re A2p SMS Antitrust Litig.*, 972 F. Supp. 2d 465, 494 (S.D.N.Y. 2013) (enforcing arbitration provision post-termination despite its omission from an express survival clause that enumerated 15 provisions that would survive).

b.   <u>Whether It is Unreasonable to Enforce the Forum Selection Clause</u>

Next, Skyryse argues that it would be "unreasonable to resolve some of the parties' claims in New York and others here."  Opp. to Moog MTD at 10.  A forum selection clause may be deemed unreasonable if: "(1) its incorporation was the result of fraud or overreaching; (2) the law to be applied in the selected forum is fundamentally unfair; (3) enforcement contravenes a strong public policy of the forum in which suit is brought; or (4) trial in the selected forum will be so difficult and inconvenient that the plaintiff effectively will be deprived of his day in court." *Martinez v. Bloomberg LP*, 740 F.3d 211, 228 (2d Cir. 2014) (quoting *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 383 (2d Cir. 2007)).

Here, Skyryse does not contend that the forum selection clause was the result of fraud, that New York law is fundamentally unfair, or that enforcement contravenes a strong public policy. Rather, Skyryse asserts that "forum selection clauses that lead to inefficient, non-localized, piecemeal litigation should not be enforced."  Opp. to Moog MTD at 10.  However, "courts in the Second Circuit routinely hold that the inefficiencies involved in piecemeal litigation resulting from the enforcement of forum selection clauses is not sufficient to trump the clause." *Amto, LLC v. Bedford Asset Mgmt., LLC*, 168 F. Supp. 3d 556, 571 (S.D.N.Y. 2016).  As such, Skyryse has not carried its "heavy burden" of showing that "it would be unfair, unjust, or unreasonable" to enforce the forum selection clause.  *Martinez*, 740 F.3d at 219.

c.   <u>Whether Moog Waived Its Ability to Enforce the Forum Selection Clause</u>

Finally, Skyryse argues that Moog waived any right it might have under the forum selection clause because it did not raise this argument when the parties were litigating the transfer motions in the transferor court.  *See* Opp. to Moog MTD at 11-12.  Moog counters that it has not sued Skyryse for breach of the T&C, which contains the mandatory forum selection clause, and Moog sought to enforce the clause at the earliest available opportunity.  Reply ISO Moog MTD at 24.

25

Further, when Moog opposed Skyryse's transfer motion, Skyryse had not yet filed its counterclaims. *Id.* at 25. The Court agrees with Moog. Moreover, there is "a 'strong public policy' in favor of enforcing forum selection clauses, and as such, waiver of a forum selection clause 'should not be found lightly.'" *Wachovia Bank Nat'l Ass'n v. EnCap Golf Holdings, LLC*, 690 F. Supp. 2d 311, 327 (S.D.N.Y. 2010) (citation omitted). For these reasons, the Court concludes that Moog has not waived enforcement of the forum selection clause.

Because the Court finds that the forum selection clause applies to Skyryse's breach of contract claims related to the 2019 NDA and the T&C, the Court dismisses these claims without prejudice. Courts in the Second Circuit "typically will dismiss rather than transfer a case where an applicable forum selection clause allows a plaintiff a choice of more than one permissible forum." *KTV Media Intern., Inc. v. Galaxy Grp., LA LLC*, 812 F. Supp. 2d 377, 389 (S.D.N.Y. 2011). Here, the forum selection clause provides that courts located in the "City of Buffalo, County of Erie, State of New York" shall have jurisdiction and venue. As such, Skyryse could presumably bring its claims in either a state or federal court. Therefore, a dismissal of these claims is appropriate here rather than a transfer. *See GMAC Com. Credit, LLC v. Dillard Dep't Stores, Inc.,* 198 F.R.D. 402, 409 (S.D.N.Y. 2001).

Turning to Skyryse's breach of contract claims related to the 2018 NDA and the SOW, Moog contends that Skyryse (1) has not pled any facts that Moog improperly used Skyryse confidential information or that Moog misappropriated any trade secret or confidential information and (2) has not pled facts showing a breach by Moog for purported failure to deliver all hardware because Skyryse cancelled the SOW. Moog MTD at 32. However, as discussed above, *see* Section III.C.1, *supra*, Skyryse has plausibly alleged that Moog misappropriated its trade secrets and/or improperly used its confidential information. As to Moog's argument that it was released of any obligation due to Skyryse's cancellation of the SOW, this ignores Skyryse's allegations that its cancellation was procured by fraud. CC ¶¶ 53-62. The Court appreciates Moog's arguments, but the Court is ultimately bound by the standards for Fed. R. Civ. P. 12(b)(6), which requires that the Court accept Skyryse's sufficiently pled allegations as true. At this stage of the proceedings, the Court is inclined to find that Skyryse has adequately alleged that Moog breached the parties' contracts.

Accordingly, the Court finds that Skyryse's breach of contract claim survives, but is limited to claims related to the 2018 NDA and the SOW.

26

4.  *Counterclaim Two: Breach of the Implied Covenant of Good Faith and Fair Dealing*

At the outset, Moog asserts that this claim is time-barred based on a two-year statute of limitations.  A claim for the covenant of good faith and fair dealing has a two year statute of limitations when it sounds in tort, and a four-year statute of limitations if it sounds in contract. *Love v. Fire Ins. Exch.*, 221 Cal. App. 3d 1136, 1144 (1990).  In this case, it appears as though Skyryse's theory of Moog's breach of the covenant of good faith and fair dealing sounds in contract and a four year statute of limitations applies.  For example, Skyryse alleges that Moog interfered with its "right to receive the benefits of" the parties' agreements, and that Moog breached the agreements by "abusing its discretion" by "insisting that Skyryse provide a written 'cancellation,'" by providing Skyryse with a sham quote, and by actively working to unfairly compete against Skyryse.  CC ¶ 99.  Therefore, the Court concludes that a four-year statute of limitations instead of a two-year statute of limitations applies to Skyryse's breach of implied covenant of good faith and fair dealing claim, meaning the claim is not time barred.[19]

Next, Moog argues that the claim should be dismissed because it is duplicative of Skyryse's breach of contract counterclaim.  Moog MTD at 34.  The Court is not persuaded by this argument.  Elsewhere in its Motion, Moog expressly states that Skyryse's implied covenant claim is "*not* tied to any particular contractual provision or Moog's alleged breach thereunder." *Id.* at 33 (emphasis added).  Moreover, Skyryse has sufficiently alleged that this claim arises out of actions Moog took that deprived Skyryse of its benefits under the parties' agreements, and therefore is not duplicative of its breach of contract claim.

Finally, Moog argues that Skyryse's implied covenant claim fails because (1) Skyryse expressly agreed to cancel the purchase order for the SOW, (2) Moog did not provide a "sham" quote, and (3) Skyryse expressly contracted that Moog had no obligation to enter into any additional SOWs for Phases 2-4.  Moog MTD at 34.  Skyryse counters that (1) its "cancellation" was the product of fraud, (2) Moog simply disputes its factual allegations about a sham quote, which must be accepted as true, and (3) Moog merely presents its own partisan interpretation of the SOW.  Opp. to Moog MTD at 15.

---

[19] In addition, the only case Moog cites in support of its argument that this claim sounds in tort is *DiDio v. Jones*, No. CV 13-4949 PSG (AGRx), 2014 WL 12591625, at *2 (C.D. Cal. May 6, 2014).  There, however, the court concluded that the plaintiff's implied covenant claim sounded in tort because the plaintiff specifically sought punitive damages in connection with that claim, which would not be available for a claim that sounded in contract. *Id.*  Also, the plaintiff did not dispute the defendant's characterization of their claim as one based in tort. *Id.*

While Moog points to documents that it contends "directly undermine and render implausible Skyryse's allegations," Reply ISO Moog MTD at 28, the Court is not as convinced. For example, although Moog references e-mails and documents concerning Skyryse's cancellation of the SOW and the purported sham quote, these documents do not squarely address Skyryse's allegations. Namely, that Moog secretly never intended to continue with the project, so it concocted a plan to convince Skyryse to cancel the purchase order through "dishonest and bad-faith tactics," including coaxing a cancellation notice out of Skyryse and presenting Skyryse with a sham quote it knew Skyryse would have to reject. *See* CC ¶¶ 49, 66. These are fundamentally factual disputes, which cannot be resolved on a motion to dismiss, and would benefit from further factual development and discovery. *See Bayerische Landesbank, New York Branch v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 56 (2d Cir. 2012) ("[I]n the context of a motion to dismiss, if a contract is ambiguous as applied to a particular set of facts, a court has insufficient data to dismiss a complaint for failure to state a claim.") (internal quotation marks and citations omitted); *see also Phillips v. Reed Grp., Ltd.*, 955 F. Supp. 2d 201, 240 (S.D.N.Y. 2013) ("This argument fails because it requires the Court to assume that the Defendants never intended to enter into an agreement with Plaintiff about his equity interest before the formal LLC agreement was signed. Whether Defendants actually harbored such an intention is an issue of fact that cannot be resolved on a motion to dismiss."). Again, the Court must credit the facts in Skyryse's well-pleaded counterclaims as true and draw all plausible inferences in Skyryse's favor at this procedural stage.

Therefore, the Court denies Moog's Motion as to Skyryse's implied covenant claim. However, to the extent this claim relies on the 2019 NDA and the T&C, the Court dismisses those claims without prejudice, for the reasons discussed above in Section III.C.3.

5. *Counterclaim Three: Breach of Implied Contract*[20]

Moog argues that Skyryse cannot bring both an implied contract claim and an express contract claim. *See* Moog MTD at 36. However, "[a]t the pleading stage, a plaintiff should be permitted to alternatively plead both an implied contract claim and an express contract claim even though they are inconsistent theories." *California Spine & Neurosurgery Inst. v. United Healthcare Ins. Co.*, 19-cv-02417-LHK, 2019 WL 4450842, at *5 (N.D. Cal. Sept. 17, 2019)

---

[20] For the same reasons discussed above, *see* Section III.C.4, *supra*, the Court concludes that this claim is not time barred.

(collecting cases permitting plaintiffs to plead both implied contract and express contract theories).

Nevertheless, the Court agrees with Moog that the purported implied contract is not sufficiently defined. Moog MTD at 36. "[A] plaintiff must allege facts about the specific terms of its agreement or agreements with a defendant in order to make an implied contract claim." *ABC Servs. Grp., Inc. v. United HealthCare Servs., Inc.*, No. SA CV 19-0531-DOC (DFMx), 2019 WL 4137624, at *6 (C.D. Cal. June 14, 2019) (citation omitted). Instead, Skyryse generally alleges that various Moog personnel promised that the parties would work together to "develop [Skyryse's] business model" and "solve some of the technical challenges on [Skyryse's] way to market success." CC ¶ 50. Because Skyryse has failed to allege the specific terms under Phases 2-4, the Court dismisses Skyryse's third counterclaim with leave to amend.

6. *Counterclaim Six: Tortious Interference with Contractual Relationships*

Moog next argues that Skyryse's sixth counterclaim for tortious interference with contractual relationships should be dismissed. *See id.* at 37-39. Under California law, a claim for intentional interference with contract requires: "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Nat'l Funding, Inc. v. Com. Credit Counseling Servs., Inc.,* No. CV 18-6437-MWF-(ASx), 2020 WL 10965737, at *5 (C.D. Cal. Nov. 5, 2020) (citation omitted).[21]

"To plead the claim adequately, [a counterclaimant] must identify the third party or parties with whom they contracted, and the nature and extent of their relationship with that party or parties." *UMG Recordings, Inc. v. Glob. Eagle Ent., Inc.*, 117 F. Supp. 3d 1092, 1115 (C.D. Cal. 2015). Although "intentional interference does not require a specific intent to cause a breach of contract or to disrupt contractual relations . . . intent can be found where the interference is 'certain or substantially certain,' even if the defendant does not act with 'the purpose of interfering with the contract or desire' such results." *Cisco Sys., Inc. v. STMicroelectronics, Inc.*, No. C-14-03236-RMW, 2015 WL 3488923, at *7 (N.D. Cal. June 2, 2015) (citation omitted).

Moog argues that Skyryse fails to identify any specific contract that was purportedly

_____

[21] Moog asserts that California law likely applies to this claim, as well as Skyryse's seventh and eighth counterclaims, *see* Moog MTD at 37 & 39, and Skyryse does not dispute this contention, *see generally* Opp. to Moog MTD.

interfered with because Skyryse only generally alleges that it had "various contracts" with Robinson Helicopter.  Moog MTD at 38.  Moog also argues that Skyryse fails "to allege facts that Moog intended to interfere with or disrupt Skyryse's unspecified contracts with Robinson [Helicopter]."  *Id.*  Moog finally contends that Skyryse does "not plead how its unidentified contracts were breached . . . or that any damages resulted."  *Id.* at 38-39.  Skyryse counters that it has alleged sufficient facts.  *See* Opp. to Moog MTD at 21.  Skyryse notes, for example, that its allegations – Moog took steps to "leverage relationships with Robinson Helicopter," knowing it was a Skyryse customer and partner to "learn more about what [Skyryse was] doing," to glean confidential information about Skyryse, and to "exert pressure" on Skyryse – are sufficient to state a claim for tortious interference with contractual relations.  *Id.*  Further, Skyryse argues that it adequately described the nature of its relationship with Robinson Helicopter.  *Id.* at 22.

The central inquiry is whether the pleading "sufficiently indicates the contractual rights that are at issue."  *ConsumerDirect, Inc. v. Pentius, LLC*, No. 8:21-cv-01968-JVS (ADSx), 2022 WL 16949657, at *3 (C.D. Cal. Aug. 25, 2022) (rejecting argument that failure to identify specific contracts and customers is fatal to the claim).  "To understand whether [a counterclaimant's] performance was disrupted require[s] the district court to determine what contractual rights [it] possessed."  *See United Nat'l Maint., Inc. v. San Diego Convention Ctr., Inc.*, 766 F.3d 1002, 1009 (9th Cir. 2014).  The Court concludes that Skyryse's allegations here are sufficient to determine what contractual rights are at issue.  Skyryse sufficiently alleges that this counterclaim is based on Skyryse's contracts with Robinson Helicopter by which they would "collaborate to develop a program to install Skyryse's FlightOS flight control system in a Robinson R66 helicopter" and whereby Robinson Helicopter would purchase Skyryse's FlightOS shipsets.  *See* CC ¶ 127.

Moog cites to multiple cases that have dismissed an interference with contractual relations claim due to insufficient allegations about the contractual rights possessed by the parties.  *See generally* Moog MTD.  For example, Moog points to *UMG Recordings*, where the counterclaimants failed to identify the third party or parties with whom they contracted, and the nature and extent of their relationship with that party or parties.  117 F. Supp. 3d at 1115.  In contrast, here, Skyryse has identified the third party, the contracts at issue, and the nature of the relationship.  Moog also cites *Image Online Design, Inc. v. Internet Corp. for Assigned Names & Numbers*, where the court dismissed the complaint because plaintiff did not allege "any facts identifying the particular contracts . . . [plaintiff] is alleging only that it has some contracts with

customers."  No. CV 12-08968 DDP (JCx), 2013 WL 489899, at *9 (N.D. Cal. Feb. 7, 2013).
Here, however, Skyryse has alleged facts identifying the contracts it has with Robinson Helicopter.
*See* CC ¶ 127.  While the Court appreciates Moog's arguments, the Court concludes that Skyryse's
allegations are sufficient at the pleading stage for the Court to determine what contractual rights
are at issue.  *See Byton N. Am. Co. v. Breitfeld*, No. CV 19-10563-DMG (JEMx), 2020 WL
3802700, at *6 (C.D. Cal. Apr. 28, 2020) (rejecting argument that the claim should be dismissed
for failure to identify a *specific* contract where the plaintiff "described the contracts, and a specific,
albeit unnamed, group of people who were parties to them" (emphasis added)).

Turning to the third element, Skyryse alleges that in an effort to "exert pressure" on Skyryse
to impede it from hiring Moog employees, Moog began "working to leverage relationships with
Robinson Helicopter who is one of [Skyryse's partners] to learn more about what they are doing."
CC ¶ 87.  Skyryse further alleges that Moog "intended to dis[rupt] the performance of Skyryse's
cont[r]act with Robinson Helicopter or knew that disruption of performance was certain or
substantially certain to occur."  *Id.* ¶ 129.  However, the Court concludes that these conclusory
allegations are insufficient to state a claim.  The facts alleged do not give rise to a plausible theory
that by contacting Robinson Helicopter, Moog intended to interfere with or disrupt Skyryse's
contracts with Robinson Helicopter.

Skyryse cites to *SIC Metals, Inc. v. Hyundai Steel Co.*, however, there the plaintiffs alleged
facts to plausibly suggest that the defendant knew it was certain or substantially certain that breach
would occur as a result of its conduct.  No. SACV 18-00912-CPC-PLAx, 2019 WL 1883901, at
*3 (C.D. Cal. Jan. 18, 2019).  For example, the plaintiffs alleged that the defendant knew that by
breaching its own obligations under a contract, disruption of a third-party's performance under a
second contract was certain or substantially certain to occur.  *Id.*  In contrast, here, Skyryse
provides no facts to support that Moog took steps to interfere or disrupt Skyryse's contracts with
Robinson Helicopter and that it knew that its actions were likely to disrupt these contracts.  Instead,
Skyryse alleges that Moog contacted Robinson Helicopter "to learn about Skyryse's business and
technologies."  CC ¶ 134.  Absent additional facts to show that Moog intended to disrupt or knew
that disruption of Skyryse's contracts with Robinson Helicopter was likely to occur, Skyryse has
failed to sufficiently plead the third element.

In addition, while Skyryse argues that "Moog knew of [its] relationship with Robinson
[Helicopter]," *see* Opp. to Moog MTD at 22, the Court questions whether Skyryse has adequately

pled knowledge of the contracts at issue.  Skyryse's only allegation as to Moog's knowledge of the contracts states: "On information and belief, Moog was aware of these contracts."  CC ¶ 127. Although Skyryse need not plead facts with specificity at the motion to dismiss stage, mere conclusory allegations will not suffice.  *See Swipe & Bite, Inc. v. Chow*, 147 F. Supp. 3d 924, 935 (N.D. Cal. 2015) (finding dismissal appropriate where Plaintiff merely alleged knowledge of agreements without any facts showing knowledge).  For at least these reasons, the Court dismisses Skyryse's tortious interference with contractual relationships claim, but grants Skyryse leave to amend.

### 7.  *Counterclaim Seven: Intentional Interference with Existing Business Relationships*

As for Skyryse's seventh counterclaim for intentional interference with existing business relationships, Moog argues that this is not a recognized standalone cause of action in the Ninth Circuit.  *See* Moog MTD at 37.  Skyryse counters that this cause of action was recognized in *SuccessWare, Inc. v. ServiceTitan, Inc.*, No. CV 20-5179 DSF (PVCx), 2020 WL 12967998, at *9 (C.D. Cal. Sept. 10, 2020).  Skyryse's counterclaim for "intentional interference with existing business relationships" looks identical to a claim for intentional interference with prospective business advantage.  In fact, the elements for both causes of action mirror one another.  *Compare id.*, *with* Section III.C.8, *infra*.[22]  The only apparent difference between the two claims is that a plaintiff must allege interference with "*existing*, not prospective" third parties.  *SuccessWare*, 2020 WL 12967998, at *9.

Nevertheless, the Court agrees with Moog that Skyryse has failed to allege any facts "regarding how Moog disrupted any relationship or proximately caused damages."  Reply ISO Moog MTD at 20.  For example, in *SuccessWare*, the plaintiff alleged that the defendant's "false statements have caused . . . [plaintiff's] customers to end their relationship with [plaintiff] and move their business to [defendant]."  2020 WL 12967998, at *9.  In contrast, here,  Skyryse merely alleges that "Moog's intentional interference has resulted in the actual disruption of Skyryse's existing and prospective business relationships."  CC ¶ 135.  Such conclusory allegations, without any factual support, are insufficient.  Accordingly, the Court dismisses Skyryse's seventh counterclaim with leave to amend.

### 8.  *Counterclaim Eight: Intentional Interference with Prospective Business Advantage*

---

[22] Moreover, the *SuccessWare* court noted that plaintiff appeared to be pleading a claim for intentional interference with prospective business advantage.  *See SuccessWare*, 2020 WL 12967998, at *9.

Next, Moog moves to dismiss Skyryse's counterclaim for intentional interference with prospective business advantage. To state a claim for intentional interference with prospective economic advantage, a plaintiff must plead: "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." *Piping Rock Partners, Inc. v. David Lerner Assocs., Inc.*, 946 F. Supp. 2d 957, 980 (N.D. Cal. 2013) (citation omitted).

Moog primarily argues that this claim fails because Skyryse "does not identify any specific or particular prospective business relationships." Moog MTD at 40. Skyryse counters that it "identifie[d] its relationship with Robinson Helicopter as a customer with whom it is working to develop future business plans, with which Moog interfered." Opp. to Moog MTD at 25. The Court agrees with Moog that "[t]o sustain this cause of action, [Skyryse] must allege a specific party with whom [Skyryse] had a relationship." *Teledyne Risi, Inc. v. Martin-Baker Aircraft Co. Ltd.*, No. CV 15-07936 SJO (GJSx), at *6 (C.D. Cal. Feb. 2, 2016) (dismissing claim where plaintiff failed to allege that defendant interfered with a specific relationship). As Moog points out, however, Robinson Helicopter is only identified as a current contractual customer under counts six and seven above, and not count eight. *See* Reply ISO Moog MTD at 20; *see also* CC ¶¶ 137-143. Although Skyryse states in its opposition brief that it identified Robinson Helicopter, *see* Opp. to Moog MTD at 25, the allegations for counterclaim eight only generally reference "prospective customers." *See* CC ¶¶ 138 ("Skyryse has invested significant time . . . to develop confidential and proprietary information about prospective customers . . ."); 139 ("Moog had direct knowledge of these prospective customers . . ."). The Court declines to permit Skyryse to amend its counterclaim through its briefing. *See Diamond S.J.*, 395 F. Supp. 3d at 1231.

Therefore, the Court dismisses the eighth counterclaim without prejudice. Skyryse is granted leave to amend.

9. *Counterclaim Nine: Unfair Business Practices*

The UCL creates a cause of action for business practices that are (1) unlawful, (2) unfair, or (3) fraudulent. Cal. Bus. & Prof. Code § 17200. Each "prong" of the UCL provides a separate and distinct theory of liability. *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007). Skyryse asserts causes of action under all three prongs.

a.   Unlawful Prong

An "unlawful" practice under the UCL is "anything that can properly be called a business practice and that at the same time is forbidden by law." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999) (quotation marks omitted).  Moog contends that Skyryse cannot meet the unlawful prong of the UCL because each of its other causes of action fail. Moog MTD at 41. Skyryse counters that it has alleged a cognizable UCL claim based on Moog's tortious interference with its contractual relationships.  *See* Opp. to Moog MTD at 26.  A claim under this prong hinges upon whether a plaintiff can formulate a claim under the predicate law. *Stokes v. CitiMortgage, Inc.*, No. CV 14-00278 BRO (SHx), 2014 WL 4359193, at *11 (C.D. Cal. Sept. 3, 2014).  Thus, if "a plaintiff cannot state a claim under the predicate law . . . [the UCL] claim also fails." *Id.*  Because Skyryse has not sufficiently pled a tortious interference with contract claim, as discussed above, the Court finds that Skyryse has not sufficiently alleged an "unlawful" business practice claim.

b.   Unfair Prong

"Unfair" conduct among competitors means "conduct that threatens an incipient violation of an antitrust law, or violates the spirit or policy of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech*, 20 Cal. 4th at 187.  Under the *Cel-Tech* test, a business practice is unfair if a plaintiff alleges that a defendant violated a "legislatively declared policy or proof of some actual or threatened impact on competition." *Id.* at 186.  Although Skyryse "does not plead . . . allegations typical of claims alleging violations of state or federal antitrust laws, a claim pursuant to the UCL's unfair prong does not necessarily require such specific allegations."  *Metricolor LLC v. L'Oreal S.A.*, No. 2:18-cv-00364-CAS(Ex), 2020 WL 3802942, at *17 (C.D. Cal. July 7, 2020).  Drawing all inferences in favor of Skyryse, the gravamen of Skyryse's unfair prong claim is that Moog engaged with it in bad faith, coerced Skyryse into cancelling part of their business relationship so that it could create a copycat business, and interfered with Skyryse's lawful hiring of Moog's California-based employees.  *See* CC ¶ 148.  Construing these allegations liberally, Skyryse appears to allege that Moog's conduct harmed competition in that Moog, through deceptive and improper means, improperly used Skyryse's confidential and propriety information to start a rival business and operated a scheme to "exert pressure" on Skyryse by inhibiting the lawful hiring of Moog employees.  At this stage of the proceedings, the Court finds that these allegations are

34

sufficient to state a claim for violation of the UCL pursuant to the UCL's unfair prong.

        c.   <u>Fraudulent Prong</u>

To state a claim under the fraudulent prong, a plaintiff must show that "members of the public are likely to be deceived. *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 951 (2002) (quotation marks omitted). Moog argues that Skyryse fails to allege any facts demonstrating that Moog is likely to mislead consumers at large. Moog MTD at 41. In opposition, Skyryse argues that Moog ignores its allegation that Moog and its new subsidiary, Genesys, announced to the public that they had "started development of the 4th axis on" for the Robinson R44 helicopter. Opp. to Moog MTD at 28. Skyryse asserts that this was deceptive to consumers because it suggested that Moog and Genesys made this development when Skyryse had developed and pioneered these advances. *Id.* However, there are no allegations in the counterclaims that consumers were publicly deceived by Moog's announcements regarding Genesys. In fact, Skyryse only alleges that Moog engaged in deceptive trade practices by "making false and misleading representations *to Skyryse.*" CC ¶ 147 (emphasis added). While there is one paragraph about Moog's announcement, *see id.* ¶ 77, nowhere else does Skyryse allege that this statement was deceptive to consumers. Because Skyryse's counterclaims do not allege this additional fact, the Court will not consider it. *See Schneider v. California Dep't of Corr.*, 151 F.3d 1194, 1197 (9th Cir. 1998) ("In determining the propriety of a Rule 12(b)(6) dismissal, a court *may not* look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss."). Similarly, the Court will not consider new legal theories raised in Skyryse's opposition as predicates for the UCL claim. *Azad v. Tokio Marine HCC-Med. Ins. Servs. LLC*, No. 17-CV-00618-PJH, 2017 WL 3007040, at *7 (N.D. Cal. July 14, 2017) ("Although plaintiffs' opposition raises two new predicates for the UCL unlawful claim . . . the court will not consider these arguments . . .").

Accordingly, the Court grants Moog's Motion only as to the unlawful prong and the fraudulent prong with leave to amend.

In summation, the Court denies Moog's Motion as to Skyryse's fourth counterclaim. The Court dismisses Skyryse's third, sixth, seventh, and eighth counterclaims with leave to amend. Finally, the Court grants-in-part and denies-in-part Moog's Motion as to Skyryse's first, second, fifth, and ninth counterclaims, as indicated above.

**IV.  <u>Conclusion</u>**

Based on the foregoing discussion, the Court (1) **DENIES** the Motion to Stay, (2) **GRANTS-IN-PART** and **DENIES-IN-PART** the Individual Defendants' Motion to Dismiss, and (3) **GRANTS-IN-PART** and **DENIES-IN-PART** Moog's Motion to Dismiss.