Rena Andoh (admitted *pro hac vice*)
  randoh@sheppardmullin.com
**SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP**
30 Rockefeller Plaza
New York, NY 10112
Telephone: (212) 653-8700
Facsimile: (212) 653-8701

Lai L. Yip (SBN 258029)
  lyip@sheppardmullin.com
Four Embarcadero Center, 17th Floor
San Francisco, CA 94111
Telephone: (415) 434-9100
Facsimile: (415) 434-3947

Travis J. Anderson (SBN 265540)
  tanderson@sheppardmullin.com
12275 El Camino Real, Suite 100
San Diego, CA 92130
Telephone: (858) 720-8900
Facsimile: (858) 509-3691

Kazim A. Naqvi (SBN 300438)
  knaqvi@sheppardmullin.com
1901 Avenue of the Stars, Suite 1600
Los Angeles, CA 90067
Telephone: (310) 228-3700
Facsimile: (310) 228-3701

Attorneys for Plaintiff and
Counterdefendant Moog Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MOOG INC.,<br><br>Plaintiff,<br><br>v.<br><br>SKYRYSE, INC., ROBERT ALIN PILKINGTON, MISOOK KIM, and DOES NOS.1-50,<br><br>Defendants.<br><br>―――――――――――――――<br><br>SKYRYSE, INC.,<br><br>Counterclaimant, | Case No. 2:22-cv-09094-GW-MAR<br><br>*Hon. George H. Wu*<br><br>**PLAINTIFF AND COUNTER-DEFENDANT MOOG INC.'S REPLY IN SUPPORT OF MOTION TO ENFORCE COMPLIANCE WITH THE MARCH 11, 2022 STIPULATED TRO (DKT. 25), AND FOR MONETARY AND ADVERSE INFERENCE SANCTIONS FOR CONTEMPT AND SPOLIATION** |

SMRH:4894-5839-5751

1    vs.

2  MOOG INC.,

3        Counterdefendant.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Date:    June 15, 2023
Time:    8:30 a.m.
Place:   9D, Hon. George H. Wu

Complaint Filed:      March 7, 2022
Counterclaims Filed: January 30, 2023

SMRH:4894-5839-5751

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION ............................................................1

II.   ARGUMENT..................................................................3

    A.   Skyryse Has Made Several Severely Untimely Productions of
     Moog Non-Public Information................................................3

        1.   The TRO is Straightforward and Unambiguous ........................3

        2.   Skyryse Should Have Sought Clarification of the TRO
          Before the Compliance Deadline If In Fact It Had a
          Legitimate Concern...................................................4

        3.   Moog, Without Obligation To Do So, Provided
          Substantial Assistance to Skyryse ...................................5

        4.   The Timeline of Events Shows Skyryse Has Not Made a
          Good-Faith Effort to Comply with the TRO ...........................7

        5.   Skyryse's CFO Stephen Koo Confirms That Skyryse's
          Preservation was Deficient...........................................9

        6.   Mr. Bandemer Confirms That no Attempt was Made to
          Identify Additional Instances of Moog Data on Skyryse's
          Systems..............................................................10

        7.   Skyryse's Legal Authority is Distinguishable ........................11

    B.   Skyryse Has Admittedly Used Moog Non-Public Information..........13

        1.   Skyryse Improperly Attempts to Shift the Burden to
          Moog ................................................................14

        2.   There Is No Dispute that Skyryse Possesses and Has
          Used Moog Documents and Information ...............................15

        3.   Skyryse Cannot Establish that it Obtained Moog
          Documents from Public Sources .....................................16

        4.   A Mini-Trial on Whether Moog Documents Are
          Protectable Trade Secrets Is Unnecessary and Irrelevant ........17

            a.   The Dreikorn Declaration is Irrelevant..........................17

            b.   The Baer Declaration is Irrelevant ...............................19

        5.   Skyryse's Legal Authority is Distinguishable ........................20

    C.   Sanctions are Appropriate for Skyryse's Untimely "Remedial"
     Efforts................................................................22

|  | 1. | The Timing of Skyryse's "Remedial" Efforts Highlights its Lack of Good Faith ............................................................22 |
|  | 2. | Skyryse's Legal Authority is Distinguishable .........................24 |
|  | 3. | Moog Proposes a Variety of Available Sanctions....................27 |
| III. | CONCLUSION | .........................................................................................28 |

1

2

# **TABLE OF AUTHORITIES**

3

**Page(s)**

<u>Cases</u>

*In re Dual-Deck Video Cassette Recorder Antitrust Litig.*
  10 F.3d 693 (9th Cir. 1993).......................................................................11, 12

*Est. of Nunez v. Corr. Physicians Med. Grp., Inc.*
  No. 16-cv-1412-BEN(MDD), 2019 WL 1024397 (S.D. Cal. Mar. 4,
  2019) ..................................................................................................................27

*FTC v. Lights of Am. Inc.*
  No. 10-cv-1333-JVS, 2012 WL 695008 (C.D. Cal. Jan. 20, 2012)...................26

*Galicia v. Nat'l R.R. Passenger Corp.*
  No. CV 17-8020-JFW, 2018 WL 6314191 (C.D. Cal. July 20, 2018) ..............26

*Gemsa Enters. v. Specialty Foods of Alabama, Inc.*
  No. 13-cv-00729-JAK, 2015 WL 12746220 (C.D. Cal. Feb. 10, 2015)............26

*Gianelli v. Home Depot, Inc.*
  No. 2:13-CV-01969-JAM, 2014 WL 5430480 (E.D. Cal. Oct. 24, 2014).........27

*Hamilton v. Signature Flight Support Corp.*
  No. 05-cv-0490-CW, 2005 WL 3481423 (N.D. Cal. Dec. 20, 2005)................24

*Harbor Breeze Corp. v. Newport Landing Sportfishing, Inc.*
  No. 17-cv-01613-CJC, 2020 WL 816135 (C.D. Cal. Jan. 23, 2020)................12

*In re Hitachi Television Optical Block Cases*
  No. 08-cv-1746-DMS, 2011 WL 3563781 (S.D. Cal. Aug. 12, 2011)..............25

*Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*
  774 F.3d 935 (9th Cir. 2014)...............................................................................4

*Kelly v. Wengler*
  822 F.3d 1085 (9th Cir. 2016)............................................................................14

*Laub v. Horbaczewski*
  No. CV 17-6210-JAK, 2020 WL 7978227 (C.D. Cal. Nov. 17, 2020) .............26

*LinTech Glob., Inc. v. Versapro Grp., LLC*
  No. 21-CV-10316, 2021 WL 7561430 (E.D. Mich. Dec. 10, 2021) ................12

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Moser v. Health Ins. Innovations, Inc.*
   No. 17-cv-1127-WQH, 2018 WL 6735710 (S.D. Cal. Dec. 21, 2018)
   ................................................................................................21, 22

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*
   No. 15-ml-2668-PSG, 2023 WL 1813530 (C.D. Cal. Feb. 7, 2023) ................22

*Network Appliance, Inc. v. Bluearc Corp.*
   No. C 03-5665 MHP, 2005 WL 1513099 (N.D. Cal. June 27, 2005), *aff'd*,
   205 F. App'x 835 (Fed. Cir. 2006) ............................................................12, 13

*Oracle Am., Inc. v. Hewlett Packard Enter. Co.*
   328 F.R.D. 543 (N.D. Cal. 2018) ......................................................................24

*Porter v. City & Cnty. of San Francisco*
   No. 16-CV-03771-CW, 2018 WL 4215602 (N.D. Cal. Sept. 5, 2018) .............25

*RG Abrams Ins. v. Law Offices of C.R. Abrams*
   No. 2:21-cv-00194-FLA, 2022 WL 17812440 (C.D. Cal. Dec. 19, 2022)........14

*Sanchez v. Jiles*
   No. 10-cv-09384-MMM, 2012 WL 13005996 (C.D. Cal. June 14, 2012)
   ................................................................................................24, 25

*Softketeers, Inc. v. Regal W. Corp.*
   No. 19-cv-00519-JWH, 2023 WL 2024701 (C.D. Cal. Feb. 7, 2023).........20, 21

*Storz Mgmt. Co. v. Carey*
   No. 2:18-CV-0068 TLN DB, 2019 WL 2615755 (E.D. Cal. June 26,
   2019) ..................................................................................................24

*Teledyne Techs., Inc. v. Shekar*
   No. 15-CV-1392, 2015 WL 3799559 (N.D. Ill. June 17, 2015), *aff'd*, 739
   F. App'x 347 (7th Cir. 2018) ........................................................................5, 7

*Wal-Mart Stores, Inc. v. Cuker Interactive, LLC*
   27 F.4th 622 (8th Cir. 2022)............................................................................21

*Zest Anchors, LLC v. Geryon Ventures, LLC*
   No. 22-CV-230-TWR, 2022 WL 16838806 (S.D. Cal. Nov. 9, 2022)
   ................................................................................................4, 17, 18, 19

<u>Other Authorities</u>

Rule 34 ...................................................................................................21

Rule 37 .....................................................................................................3

Rule 37(a)(5)(A) ......................................................................................27

Rule 37(e) ...............................................................................................24

# I.     INTRODUCTION

Skyryse does not deny that: 1) it failed to produce large volumes of Moog documents and data for up to a year after the TRO's production deadline ; 2) several of its personnel have possessed, used, and disclosed Moog documents and data; 3) its employee deleted 32 potentially relevant files after this lawsuit commenced and it made no attempt to resuscitate those documents until at least 9 months after the imposition of the TRO; and 4) it still, over a year after the imposition of the TRO, has yet to undertake a good faith effort to comprehensively identify Moog non-public information residing on its systems and remove it. Yet, Skyryse argues it has complied with the TRO. Even worse, Skyryse ***blames Moog*** for its serial violations of the TRO. Skyryse's Opposition turns the applicable legal standards on their head, attempts to distract the Court by conducting a "mini-trial" on whether the Moog documents at issue constitute trade secrets, and otherwise offers remedial efforts that are too little, too late. Skyryse has repeatedly flouted the Court's orders. Moog respectfully asks this Court to hold  to hold Skyryse in contempt and sanctioned for its contumacious and prejudicial conduct.

Seeking to excuse its failure to timely produce Moog non-public information on its systems, Skyryse points a finger at Moog claiming Moog did not in effect hold Skyryse's hand and assist it to comply with the TRO. This burden shifting is disingenuous and contrary to law, particularly since Skyryse voluntarily stipulated to the TRO, including its production requirements. Regardless, Moog went above and beyond and provided substantial assistance to Skyryse by identifying hundreds of thousands of stolen files, providing targeted search terms, and other detailed information. The relevant timeline of events further highlights Skyryse's lack of good faith. For example, Skyryse made no efforts to preserve or collect any data from its contractor Lori Bird until August 2022, five months after this lawsuit was filed. Even then, Skyryse did not produce approximately 25,000 pages of documents from Lori Bird's Skyryse-issued laptop and e-mail account for another

six months until February 2023. Many of these documents would have been uncovered by simply searching Bird's devices for the word "Moog." Skyryse did not make a good faith effort to search for and produce Moog non-public information as required under the TRO.

Moreover, it is evident that Skyryse still has made no meaningful attempt to systematically identify Moog documents that may continue to reside on its systems, or in its documents or data.  Skyryse's expert admitted that he made no attempt to identify whether Moog materials in the possession of Skyryse employees Reid Raithel and Tri Dao were disseminated within Skyryse. Skyryse does not contest that these materials came from Moog, but yet its expert looked only at whether any files were copied directly from the USB devices used to take the materials from Moog onto that employee's own Skyryse laptop.  He did not look to see if the materials on the USB devices ended up on any Skyryse device other than by directly copying the materials from the USB device to one specific computer.  This does not suffice as compliance under any reasonable reading of the TRO, and highlights why a physical inspection of Skyryse's systems is warranted.

Skyryse attempts to defend its pervasive use of Moog documents by arguing that the contents of those documents do not originate with Moog and are otherwise publicly available. Skyryse submits over 130 pages of expert declarations on these tangential and irrelevant issues. These are merits-based arguments regarding adequacy of trade secrets. The TRO does not use the term "trade secret," and that was intentional. The TRO is straightforward and unambiguous, and its purpose is clear and is in direct response to the uncontested fact that several Skyryse employees (and former Moog employees) stole a shockingly large volume of data from Moog, and Skyryse was required to facilitate a return of the same to Moog by April 1, 2022. The TRO on its face required Skyryse to return, among other things, any nonpublic documents acquired *from* Moog. It remains undisputed (including by Skyryse's own experts) that Skyryse failed to return nonpublic documents

acquired from Moog devices. How many of these documents and how much of the data taken constitute protectable trade secrets is an issue for another day. Ninth Circuit law mandates that if Skyryse had any legitimate confusion about the meaning and scope of the TRO, it should have sought clarity before its compliance deadline, something Skyryse failed to do or even make a good faith effort to do.

Finally, regarding the undisputed deletion of data by former Skyryse employee Alex Wang, Skyryse's expert has just now (in response to the Motion) recovered copies or "matches" of 30 out of 32 files that were previously represented as "unrecoverable." But, Skyryse's expert confirmed that he made no attempt to resuscitate the 32 files that were considered permanently deleted until 2023 – even though Skyryse's vendor FTI found that they were permanently deleted in June of 2022. The TRO has been in effect since March of 2022. The belated timing of Skyryse's remedial efforts, occurring only after Moog threaten motion practice, do not reflect good faith conduct. Rule 37, therefore, requires the imposition of at least monetary sanctions under these circumstances.

## II.   ARGUMENT

### A.   Skyryse Has Made Several Severely Untimely Productions of Moog Non-Public Information

#### 1.   The TRO is Straightforward and Unambiguous

Skyryse now argues that the TRO is vague for not defining "non-public information."  But Skyryse participated in the drafting of the TRO and stipulated to it, and apparently had no trouble understanding "non-public information" then. Moreover, the TRO itself is, in fact, clear.  Skyryse was required, for example, to deliver to Moog all "non-public information, documents, records, files, or data" that was "copied or taken from [Moog's] email, shared network drives, desktop computers, laptops, USB drives, databases, work-issued phones, and work issued tablets, including without limitation any and all information, documents, files, or data copied or downloaded by Kim and/or Pilkington from Plaintiff's email, shared

network drives, desktop computers, laptops, USB drives, databases, work-issued phones, and work issued tablets (if any)."  (Dkt. 25, ¶ 2.)  If Skyryse was in possession of **non-public Moog documents**, including all documents copied or downloaded by Kim, Pilkington, or any other former Moog employee, Skyryse was required to refrain from using those documents and deliver them to Moog.

Skyryse claims it does not know "what [Moog's] trade secrets are" or how "to identify what Moog views as non-public information as opposed to trade secrets."  This is irrelevant and an attempt to obfuscate.  Under the TRO, if Skyryse obtained a non-public document from a Moog device, it was required to return it.  In no way was  TRO limited to confirmed trade secrets. Identifying trade secrets was not part of the compliance process.

### 2. Skyryse Should Have Sought Clarification of the TRO Before the Compliance Deadline If In Fact It Had a Legitimate Concern

It is wholly improper for Skyryse to claim ambiguity and now dispute the meaning and scope of the TRO or the meaning of "Moog non-public information," more than one year after the production deadline. As the Ninth Circuit stated:

> To find the Defendants' self-serving interpretation of their obligations under our injunction reasonable would be to invite "experimentation with disobedience." The schemes available to those determined to evade injunctions are many and varied, and no injunction can explicitly prohibit every conceivable plan designed to defeat it. Though they had every opportunity, the Defendants did not seek clarification of their obligations. ***By construing their obligations narrowly to include only refraining from acts specifically enumerated in the injunction, and not acts likely to nullify the injunction, the Defendants assumed the risk that their attempts at technical compliance would prove wanting***.

*Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 954 (9th Cir. 2014) (emphasis added) (parties "acted at their peril" when they "undertook to make their own determination of what the decree meant," because "though they had every opportunity, the [defendants] did not seek clarification of their obligations."); *see also Zest Anchors, LLC v. Geryon Ventures, LLC*, No. 22-

CV-230-TWR, 2022 WL 16838806, at \*4 (S.D. Cal. Nov. 9, 2022) ("Had Defendants harbored serious doubts as to the scope of the Preliminary Injunction, they could easily have sought clarification from the Court.  Instead, Defendants adopted a self-serving interpretation of their obligations under the Preliminary Injunction and assumed the risk that their attempts at technical compliance would prove wanting.").

*Teledyne Techs., Inc. v. Shekar*, No. 15-CV-1392, 2015 WL 3799559 (N.D. Ill. June 17, 2015), aff'd, 739 F. App'x 347 (7th Cir. 2018) is instructive.  *Teledyne* was a trade secret misappropriation case where the court issued a TRO and injunction "requiring [former employee] to produce to [plaintiff] for imaging and inspection 'all computers and other devices in his possession' within five days of the PI's issuance." *Id*. at \*7. It also required production of "all information, data, files, and other Teledyne property." *Id*. at \*10. The former employee attempted to justify his failure to produce a computer kept in his home because it "contains his and his family's personal data." *Id*. at \*8. The court rejected this argument, finding: "If litigants were free to ignore any terms of an order that they felt were unreasonable or violated their privacy, the injunctive powers of the courts would be hollow indeed." *Id*. at \*8. The court further found: "If [former employee] required further protection, the appropriate response was not to simply flout the Court's commands but to timely move for a modification of the TRO or a protective order." *Id*. The court also reasoned: "it is not up to [former employee] to determine what materials the Court should have ordered him to produce—he is obligated to produce everything specified in the Court's orders whether or not he believes it relevant to Teledyne's lawsuit." *Id*. at \*10.  The same applies equally here.

### 3.     **Moog, Without Obligation To Do So, Provided Substantial Assistance to Skyryse**

Incredibly, Skyryse blames *Moog* for its failure to comply with the TRO,

1  claiming Moog "refus[ed] to take any steps that would help Skyryse locate Moog

2  non-public information."  The facts show otherwise.

3        On or before April 12, 2022, Moog provided the following detailed

4  information and documentation to Skyryse regarding certain of the non-public

5  information at issue in this case:

6      •  Moog attached to the Complaint a file log containing detailed

7          information for each of the 136,994 files copied by Ms. Kim on

8          November 19, 2021. (Dkt. 4-19.)

9      •  On March 23, 2022, at Skyryse's request, Moog provided a log with

10          hash values (unique alphanumeric identifiers) for approximately

11          62,000 files from Kim's Moog-issued laptop that may correspond to

12          certain of the 136,994 files that Kim copied from that laptop on

13          November 19, 2021. (Dkt. 180-3.)

14      •  On April 4, 2022, having newly discovered a separate theft by

15          Pilkington consisting of approximately 1.3 million additional Moog

16          files, Moog provided Defendants' counsel with a log showing, among

17          other things, folders copied by Pilkington and the timeline of his

18          related conduct. (Dkt. 180-4 at p. 4.)

19      •  On April 12, 2022, Moog's counsel also provided a list of 32 targeted

20          search terms to help identify non-public information taken from Moog

21          devices, and also advised that the word "Moog" should also be

22          "searched across all of Skyryse's systems, including the devices of

23          your employees." (Dkt. 180-5.)

24        Contrary to Skyryse's misrepresentations, Moog never gave Skyryse "a

25  hundred thousand file names and thousands of hash values to use as search terms"

26  and never stated that the information it provided to Skyryse was all Skyryse needed

27  to comply with the TRO.  Instead, Moog's counsel expressly noted that the 32

28  search terms "are not limiting" and that these terms "would not adequately capture

what we believe is perhaps the likeliest misappropriating use of the material—referencing Moog files in order to adapt processes and checklists . . . without necessarily verbatim word-for-word copying." (Dkt. 180-5, p. 3.) Moog's counsel also warned that it was providing the terms solely in response to Skyryse's counsel's request and that "Skyryse has its own obligations to consult with its current employees, e.g., Pilkington and Kim, to identify search parameters; they are the ones who stole Moog's files, and they worked at Moog for many years and have relevant technical background to provide you with search parameters." (*Id.*)

### 4. The Timeline of Events Shows Skyryse Has Not Made a Good-Faith Effort to Comply with the TRO

Skyryse repeatedly claims in its brief that it has "diligently" complied with the TRO. But the history of this case shows otherwise. On at least *nine* different occasions over the course of more than a year, information and/or documents that Skyryse should have produced by April 1, 2022 were belatedly produced—often in response to motion practice.

| Date | Event |
|------|-------|
| 3/11/22 | Stipulated TRO is filed and entered, requiring preservation of relevant evidence. (Dkts. 25, 28.) |
| 4/1/22 | TRO's deadline to produce Moog non-public information. (Dkts. 142-2; 142-3). |
| 4/29/22 | Skyryse produces additional devices and files containing Moog non-public information. (Dkt. 142-6.) |
| 5/4/22 | Skyryse serves Moog a letter admitting that Moog information was "accessed on Skyryse-issued laptops via personal USB devices held by Alin Pilkington or Misook Kim." (Dkt. 210-07.) The letter identifies three USB devices nine Skyryse laptops. |
| 5/5/22 | Skyryse produces additional files comprising Moog non-public |

| | information. (Dkt. 142-7). |
|---|---|
| **8/3/22** | Moog files a motion to compel seeking, among things, production of Skyryse laptops referenced in Skyryse's May 4 letter. (Dkt. 210.) The court grants in part Moog's motion on November 10, 2022. (Dkt. 292.) |
| **8/3/22** | Skyryse learned that its personnel Lori Bird "had been utilizing checklists and development plan templates she had either obtained from her time at Moog or from Alin Pilkington." (Dkt. 453-12, ¶ 13.) |
| **12/14/22** | Skyryse produces images of Skyryse-issued laptops for Achar, Chung, and Dao, all of which are laden with Moog data. |
| **1/17/23** | Hummingbird produces 120 documents, showing Skyryse's possession and use of Moog non-public information, the majority of which had not previously been produced by Skyryse. (Dkt. 400-3, ¶¶ 22-33; Dkt. 400-5, ¶¶ 19-38.) |
| **2/6/23** | Hyde produces 196 documents, showing Skyryse's possession and use of Moog non-public information, the majority of which had not previously been produced by Skyryse. (Dkt. 400-3, ¶¶ 22-33; Dkt. 400-5, ¶¶ 19-38.) |
| **2/17/23** | Skyryse produces 2,920 documents from Ms. Bird, littered with evidence of Skyryse's possession and use of Moog non-public information. Included in this production are certain of the missing documents produced by Hummingbird and Skyryse. (Dkt. 400-3, ¶¶ 44-45; Dkt. 400-5, ¶¶ 47-87.) |
| **3/16/23** | Moog files the instant Motion to Enforce. (Dkt. 400.) |
| **4/19/23** | In response to Moog's Motion to Enforce, Skyryse produces 40 additional documents that were previously produced by |

Hummingbird and/or Hyde. (Dkt. 453-1, ¶ 2.)

Skyryse has produced data and documents comprising Moog non-public information more than a year after the TRO's April 1, 2022 production deadline. Multiple times, Skyryse only did so after Moog was forced to file a motion seeking compliance with the TRO. The Hummingbird and Hyde productions emphasized Skyryse's non-compliance when they produced hundreds of documents involving Skyryse personnel that Skyryse had not previously produced.

Skyryse's failures in connection with Lori Bird are particularly illustrative. Skyryse's CFO Stephen Koo claims that Skyryse learned of Lori Bird's possession and use of Moog non-public information and documents (using a Skyryse computer and e-mail address) on August 3, 2022 and terminated her on August 28, 2022. (Dkt. 453-12, ¶ 13.) Even if true, this provides no explanation why it took ***an additional 6+ months*** to produce nearly 25,000 pages of materials, almost all of which were from Bird's Skyryse e-mail account. (Dkt. 400-3, ¶ 44.) A large volume of documents from Skyryse's February 17, 2023 production on behalf of Bird contain documents with "Moog" in them or within the metadata. (Dkt. 400-3, ¶¶ 44-45; Dkt. 400-5, ¶¶ 47-87.)  Thus, these documents would have been uncovered had Skyryse simply run the term "Moog" across Bird's devices and emails. Thus, Skyryse either deliberately or negligently failed to conduct this search.  Neither scenario is defensible. Skyryse even represented that the entirety of the nearly 25,000 page production was from Bird's personal devices, when only two such e-mails were, further underscoring Skyryse's misconduct. (Dkt. 400-2 at p. 2.)

### 5. Skyryse's CFO Stephen Koo Confirms That Skyryse's Preservation was Deficient

Skyryse's CFO Stephen Koo testified that: 1) he does not know if Lori Bird

ever received a litigation hold notice (Naqvi Dec., Ex. C (Koo Dep. Tr.) at 41:25-42:8, 50:2-14); 2) he does not know if Skyryse's litigation hold notice was sent to Skyryse contractors (*id.*, 41:11-23, 51:13-23); 3) Skyryse did not make any efforts to collect or preserve Lori Bird's Skyryse-issued or personal devices until August 2022 (*id.*, 49:4-25); and 4) he does not know of any preservation efforts in connection with Skyryse-issued or personal devices used by Skyryse contractors or personal devices used by Skyryse employees (*id.*, 32:7-25, 38:2-39:17).  Even more troubling, while Mr. Koo did testify that at the outset of this case Skyryse made certain efforts to preserve data on its cloud-based repositories, he was not aware of any preservation measures implemented in connection with Skyryse's non-cloud based source code repositories, Skyryse-issued electronic devices, or personal electronic devices used by Skyryse personnel. (*Id.*, 30:3-32:25.) This testimony highlights Skyryse's failure to comply with the TRO's preservation obligations.

### 6. Mr. Bandemer Confirms That no Attempt was Made to Identify Additional Instances of Moog Data on Skyryse's Systems

At deposition, Mr. Bandemer made clear that his assignment was limited to responding to the instances of copying Mr. Pixley identified in his declaration. (Naqvi Decl., Ex. D (Bandemer Dep. Tr.) at 14:12-15; 82:7-25; 91:3-92:5; 97:6-23; 98:18-100:23; 101:19-102:22; 105:8-13; 110:25-111:17; 113:15-114:3.)  Mr. Pixley explained how former Moog employee Reid Raithel copied 27,118 files from his Moog laptop to a USB drive (USB2) just before joining Skyryse.  (Dkt. 400-3, ¶¶ 46-47.) But, all that Mr. Bandemer did with respect to Mr. Raithel was review a daily-out log, which records any device attached to his laptop once a day at a specific time, and reviewed it only to see whether the one specific USB device that Mr. Pixley identified had been connected at the time the daily log recorded. (Bandemer Dep. Tr. at 26:5-12, 35:16-38:6.)  He made no other attempt to identify

1   copying or use of the 27,118 files on Raithel's USB2 drive. (*Id.*)

2   Mr. Pixley also explained how former Moog employee Tri Dao copied

3   39,278 files from his Moog laptop to a USB drive before joining Skyryse, and then

4   plugged in the same USB drive to copy 7,679 files from his Moog laptop to his

5   Skyryse-issued laptop. (Dkt. 400-3, ¶¶ 20-21.) Yet, Mr. Bandemer made no

6   attempt to identify whether Tri Dao plugged his USB device containing 39,278

7   files into any device other than his own Skyryse laptop (as opposed to other

8   Skyryse computers). (Bandemer Dep. Tr. at 97:18-23.)  Mr. Bandemer additionally

9   confirmed that he did not open the 39,278 copied files to confirm whether any of

10  them belonged to Moog, but only generally reviewed the file directories. (*Id.* at

11  73:5-75:25; 76:20-24; 78:18-79:17; 81:25-82:25.)

12  Skyryse's failure to adequately search its systems for Moog data

13  demonstrates why a physical inspection of Skyryse's systems is warranted. After

14  substantial motion practice and numerous violations and delays, Skyryse has

15  shown it will not comply with the TRO. Moog must be allowed access to

16  Skyryse's systems to provide at least some reasonable level of verification of

17  compliance.

18  ### 7.    Skyryse's Legal Authority is Distinguishable

19  Skyryse relies heavily on *In re Dual-Deck Video Cassette Recorder Antitrust*

20  *Litig.*, 10 F.3d 693, 695 (9th Cir. 1993) to argue that "Moog's sweeping

21  interpretation of this Stipulated Order would be 'absurd.'" (Opp. at 21.) That case

22  is nothing like this one. *Dual-Deck* involved a party's purported use of confidential

23  information from one proceeding in another proceeding, in violation of a protective

24  order. The court found no contempt, however, as there were no allegations that the

25  party had "disclosed confidential information" or that the "stated purposes of the

26  order were violated, or that any competitor or anyone else learned anything

27  inappropriate from [the party's] use of discovery." *Id.* at 694. The court concluded

28  that "a reasonable reading must connect [the order's] prohibitions to its purpose,"

which in that case was the "protection against disclosure of commercial secrets."

*Id.*      Here, by contrast, Skyryse's serial violations of the TRO undermine the *entire purpose* of the TRO, which was to require Skyryse to immediately conduct a good-faith search for, return, and cease using non-public information and documents taken from Moog. Rather than complying with those basic requirements, Skyryse has withheld Moog documents that it acquired possession of because of the theft of former Moog employees for over a year since the TRO was entered.

*Harbor Breeze Corp. v. Newport Landing Sportfishing, Inc.*, No. 17-cv-01613-CJC, 2020 WL 816135 (C.D. Cal. Jan. 23, 2020) is likewise distinguishable. There, defendants' website was alleged to have violated a permanent injunction.  The court found, however, that only "one page of Defendants' website" was at issue and "a technical glitch—specifically one single errant line of code—was to blame for the required updates not appearing on the mobile site" and the "glitch has since been cured and the page in question now complies with the Injunction." *Id*. at *7. Here, there is not just a "technical glitch," but over a year of numerous, repeated violations.

*LinTech Glob., Inc. v. Versapro Grp., LLC*, No. 21-CV-10316, 2021 WL 7561430 (E.D. Mich. Dec. 10, 2021) is likewise not on point.  There, the plaintiff claimed the defendant failed to produce a certain group of "proposal" documents pursuant to a court order.  The defendant claimed that the documents actually comprised a "capabilities statement," not a "proposal."  *Id*. at *10. The court declined to find contempt, finding that the scope of the word "proposal" could have "multiple characterizations," and the only proposal listed by name was one called "DEAMS ESA 2."  *Id*.  This case does not involve such hyper-technical or subjective violations. The TRO is unambiguous in what Skyryse was required to do by April 1, 2022.

*Network Appliance, Inc. v. Bluearc Corp.*, No. C 03-5665 MHP, 2005 WL

1  1513099 (N.D. Cal. June 27, 2005), aff'd, 205 F. App'x 835 (Fed. Cir. 2006),

2  which involved the production of documents in response to a discovery order, is

3  inapposite.  The court determined that "[a]t best, plaintiff can establish a three-

4  week delay in receiving a limited number of damages-related documents, all of

5  which were ultimately produced." *Id*. at *4. Here, the documents produced late

6  were not "a limited number" and they were late by more than a year, not three

7  weeks.

8  **B.    Skyryse Has Admittedly Used Moog Non-Public Information**

9  In an attempt to shift the goalposts of Moog's Motion and flip the burden on

10  Moog, Skyryse alleges that "Moog has failed to meet its burden to demonstrate by

11  clear and convincing evidence that the information allegedly used by Skyryse after

12  March 11 or not produced by April 1 constitutes 'Moog non-public information.'"

13  Rather than demonstrating compliance with the TRO by showing that (1) Skyryse

14  did not obtain the documents at issue from Moog; or (2) with respect to the

15  documents it did obtain from Moog, demonstrating the Moog documents at issue

16  were publicly available, Skyryse attempts to have a mini trade secret trial on

17  whether all of the information contained within the documents was originally

18  created by Moog or was potentially "derivable" from third-party or public sources.

19  (Opp. at 20, 23-26.)

20  The Court should not condone Skyryse's disingenuous attempt to change the

21  terms of the TRO, which Skyryse consented to, into requiring Moog to prove its

22  substantive trade secrets at the beginning of this case and with almost no discovery

23  taken from Skyryse.  The language and intent of the TRO is clear: Skyryse was to

24  stop using documents and information that it wrongfully obtained from Moog.

25  Whether or not Skyryse "could" have allegedly derived the some of the same

26  documents and information from third-party or public sources is irrelevant to

27  Moog's Motion and the TRO.  The fact of the matter is that Skyryse used ***Moog***

28  ***documents stolen by former Moog employees***, not documents from a third party or

public source. Skyryse's decision to not produce documents and information obtained from Moog, under the guise of its self-serving analysis of the content within those documents, blatantly disregards the terms of the TRO.

### 1. Skyryse Improperly Attempts to Shift the Burden to Moog

Moog's Motion established that Skyryse was in possession of Moog's non-public documents and used them after April 1, 2022, thus making a *prima facie* showing of Skyryse's contempt. "Once a prima facie showing of civil contempt is made, the burden shifts to the alleged contemnor to produce evidence explaining its noncompliance. While the inability to comply with a court order may be a defense to contempt, the party asserting that defense must show categorically and in detail why compliance is impossible." *RG Abrams Ins. v. Law Offices of C.R. Abrams*, No. 2:21-cv-00194-FLA, 2022 WL 17812440, at *5 (C.D. Cal. Dec. 19, 2022). "A contemnor in violation of a court order may avoid a finding of civil contempt only by showing it took all reasonable steps to comply with the order." *Kelly v. Wengler*, 822 F.3d 1085, 1096 (9th Cir. 2016).  A "party's record of continuing and persistent violations and persistent contumacy justifie[s] placing the burden of any uncertainty in the decree ... on [the] shoulders of the party who violated the order." *RG Abrams*, 2022 WL 17812440, at *5.

Rather than satisfy its burden, Skyryse attempts to shift the burden to Moog, arguing that Moog needs to prove its trade secret case before Skyryse can know if it is in compliance with a court order.  But Skyryse *stipulated* to this order, and did not convey any need whatsoever for any information from Moog to comply with the TRO—because it had no such need.  The documents Skyryse obtained from former Moog employees are on Skyryse's servers, and Skyryse is in the best position to know if it derived its own documents from Moog's documents. Skyryse failed to conduct this analysis by April 1, 2022, and based on Skyryse's Opposition and depositions of Skyryse's experts, Skyryse still has not conducted this analysis in order to make a good faith attempt at complying with the TRO.

## 2.     There Is No Dispute that Skyryse Possesses and Has Used Moog Documents and Information

Skyryse cannot seriously dispute that it possessed and used documents and information it obtained directly from Moog.  Instead, Skyryse focuses on whether the materials "belonged" to Moog or whether the information therein was derivable from public sources.  (Opp. at 9, 18, 23.)  Moog's Motion set forth an abundance of evidence that Skyryse was using Moog's documents long after April 1, 2022. (Mot. at 14-21.)  Skyryse's only apparent defense is that similar documents are in the public domain, but even the most cursory examination of the public domain documents shows Skyryse copied from Moog and not the public domain document. (Compare Dkt. 400-05 (Crozier Decl.), pp. 31-32 with Dkt. 451-03 (Dreikorn Decl.), p. 43, Figure 17.)

The TRO required Skyryse to stop using documents and information it received "of, *from*, or belonging" to Moog.  (Dkt. 25 (emphasis added).)  Skyryse did not happen to create identical documents to Moog's from looking at the public documents referenced in Skyryse's Opposition and cited in Skyryse's experts' declarations. Skyryse used ***Moog documents stolen by former Moog employees***. The TRO clearly encompassed prompt return of these stolen materials.

Skyryse's possession and use of Moog non-public documents is further confirmed by its own CFO. Mr. Koo admits that Skyryse did not remove Skyryse's SDTE and portions of its sRTOS software programs and frameworks (that were copied from Moog's MDTE and eRTOS programs) from Skyryse's systems until ***July 2022***. (Dkt. 454-12, ¶¶ 15-16.) This is clear indication that Skyryse personnel used Moog data in connection with SDTE and sRTOS well after the TRO was entered. Mr. Koo also states that Skyryse did not replace its software checklists until October 2022, when it purchased new checklists from third party ConsuNova. (*Id*., ¶ 17.) This is clear indication that Skyryse personnel continued to use and rely on Moog checklists all the way through October 2022, approximately seven

months after the TRO was entered. Even despite Skyryse's "remedial" actions, there is still no assurance that Moog's MDTE, eRTOS, and checklists have been fully wiped from Skyryse's systems. Mr. Koo was not aware of any efforts to remove SDTE, sRTOS, or prior checklists from Skyryse's personnel's Skyryse-issued electronic devices, personal devices, or e-mail accounts. (Koo Dep. Tr. at 60:6-61:5, 65:1-66:15, 71:8-73:1). Given the track record of Skyryse personnel using company-issued and personal devices to steal, possess, and use Moog data, it is likely that Skyryse personnel continued to have access to Moog's MDTE, eRTOS, and checklists on such devices.

Additionally, Mr. Bandemer made clear that Skyryse still has not undertaken any systematic effort to look for materials taken by certain former Moog employees when they came over to Skyryse, even though months have passed since Skyryse became aware of these takings. (Bandemer Dep. Tr. at 26:5-12, 97:18-23.)  This all underscores why Moog is entitled to at least a physical inspection of Skyryse's systems.

### 3. Skyryse Cannot Establish that it Obtained Moog Documents from Public Sources

Moog's expert's provided evidence that Skyryse was copying and using Moog's documents by comparing Skyryse's documents line by line. (Dkt. 400-3, ¶¶ 16-18; Dkt. 400-5 ¶¶ 58-99, Exs. D-2 to D-6, E-1 to E-5).  Given that Skyryse continued to pervasively and intentionally use Moog's documents after April 1, 2022, Skyryse's only good faith defense for failing to refrain from using Moog's documents under the TRO would be if Skyryse conducted an investigation and determined that Moog's documents were publicly available or confirmed Skyryse actually created its documents from a publicly available source rather than from the documents Skyryse received from Moog.  Yet, in its entire Opposition and 130 pages of expert reports, *Skyryse does not provide a single example of a copied Moog document that Skyryse obtained from a publicly available source, rather*

1   **than from a former or current Moog employee**. Instead, Skyryse focuses on

2   whether the Moog documents Skyryse continued to use were protectable trade

3   secrets or consisted only of information "belonging" to Moog.  That issue is not

4   before the Court in this motion – it is fundamentally irrelevant to the question of

5   whether Skyryse complied with its obligations under the TRO.

6          Thus, there can be no dispute that Skyryse has fundamentally violated the

7   TRO, both in letter and in spirit. *See Zest Anchors, LLC v. Geryon Ventures, LLC*,

8   No. 22-CV-230 TWR (NLS), 2022 WL 16838806, at *3 (S.D. Cal. Nov. 9, 2022)

9   ("In deciding whether an injunction has been violated it is proper to observe the

10  objects for which the relief was granted and to find a breach of the decree in a

11  violation of the spirit of the injunction, even though its strict letter may not have

12  been disregarded." The court further held that a good faith compliance exception

13  does not extend where the "where the only 'ambiguity' is whether the enjoined

14  party can avoid liability by hewing to the narrow letter of the injunction while

15  simultaneously ignoring its spirit.").

16                    **4.    A Mini-Trial on Whether Moog Documents Are Protectable**

17                    **Trade Secrets Is Unnecessary and Irrelevant**

18         Skyryse's attempt to turn this motion into a mini-trial on whether or not it

19  copied protectable Moog trade secrets should be rejected.  This litigation tactic

20  developed over a year after the TRO's compliance deadline is pure obstruction.

21  The terms of the TRO were clear.  If Skyryse was in possession of **non-public**

22  **Moog documents**, including all documents copied or downloaded by Kim and/or

23  Pilkington, Skyryse was required to refrain from using those documents and

24  deliver them to Moog. (Dkt. 25, ¶¶ 1-2.) The TRO did not allow Skyryse to make a

25  unilateral decision to only refrain from using and producing Moog documents it

26  thought could be protected under the law.

27                        a.    The Dreikorn Declaration is Irrelevant

28         Mr. Dreikorn declares that certain of the checklist documents identified by

Mr. Pixley and Mr. Crozier appear to be based on FAA standards and are similar to
checklists that can be purchased from third parties.  Even if true, Mr. Dreikorn's
analysis is not relevant to whether Skyryse violated the TRO because Mr.
Dreikorn's declaration does not allege that Skyryse actually obtained or created the
Skyryse documents at issue from a source other than Moog or that the Moog
document that was copied was publicly available.

Mr. Dreikorn never talked to a single person from Skyryse to ask whether
any of the documents cited in his declaration were "from [Moog] . . . and provided
to [Skyryse] by any current or former Moog employee."  (Naqvi Dec. Ex. A
(Dreikorn Dep. Tr.), 21:12-19 ("I don't talk about how one party has documents
from another party."); *id.*, 59:8-16, 78:7-9, 58:1-7 (repeatedly testifying that he did
not speak to any employee of Skyryse regarding the origins of any document); *id.*,
62:4-63:2 (admitting it is not a coincidence that Skyryse's PSAC uses identical
sentences to Moog's PSAC).

Mr. Dreikorn also did not find any of the Moog documents identified by
Messrs. Pixley or Crozier to be in the public domain. *Id.*, 31:20-32:5 ("Okay. So
you have no opinion on whether Skyryse took [any] investigation to determine if
any of these documents were public or non-public? . . . THE WITNESS: I didn't
look at Skyryse with regard to what actions it took to sort through the documents
and determine what documents to return and when they did that.  That was outside
– clearly outside the scope of my engagement."); *id.*, 26:6-13 ("Q. Right. I'm not
asking if you found the verbatim stamp; I'm asking if you found the document that
Figure 6 comes from that was Crozier's Exhibit C-4 publicly on the Internet? …
THE WITNESS: The answer would be no."); *id.*, 28:9-29:1 ("I do not make a
comment here rather with regards to public or non-public.  And to determine
whether it's public or non-public is going to require quite a bit more
investigation…."); *id.*, 30:19-24 ("Q. I'm asking is the document that Mr. Pixley
referenced in the public domain? . . . THE WITNESS: . . . I have not seen that

specific document in the public domain. . . ."); *e.g.*, *id.*, 34:25-35:1, 58:1-7, 63:10-66:7, 71:23-72:4, 83:5-84:13, 85:24-86:7 (repeatedly admitting he did not find identical copies of Moog's documents in the public domain).

Mr. Dreikorn admitted that he did not base his analysis on the language of the TRO, and his declaration should be ignored for purposes of evaluating whether Skyryse complied with the TRO.  (*See id.*, 16:2-12.)

### b. The Baer Declaration is Irrelevant

Mr. Baer's declaration also is irrelevant as to whether Skyryse violated the TRO.  Baer Decl., ¶ 5.  As with Mr. Dreikorn, Mr. Baer misses the point and narrowly construes the TRO to only relate to information that "belongs" to Moog rather than evaluated whether Skyryse obtained non-public information "from" Moog. (Baer Decl., ¶ 5) (Dkt. 25, ¶¶ 1-2.) While Mr. Baer correctly identifies that that Skyryse did not need to refrain from using information or documents from Moog that is "publicly available," his declaration does not cite a single instance of Moog's at issue documents and information as actually being publicly available. (Naqvi Dec., Ex. B (Baer Dep. Tr.) at 19:2-15 ("Q . . . And does your declaration evaluate whether any Moog documents as a whole are public? A . . . I didn't evaluate what a document, to be a public document, was. . . ."); *id.* at 20:22-23:7 ("Q . . . Do you provide an evaluation in your declaration as to whether a document as a whole from Moog originated outside of Moog?  . . . A: No.  So I didn't – I'm not necessarily evaluating that on a – as an entire document basis, but whether there were connections and contents that were available in the public domain. . . .").

While Skyryse implies that Mr. Baer concluded that documents such as those from Moog's eRTOS were publicly available, Mr. Baer's testimony does not support this conclusion:

> [Ms. Yip] So I'm not asking you whether or not eRTOS involves publicly available concepts. I'm asking whether or not you've seen any publicly available source code in eRTOS.

1     [Mr. Baer] So that wasn't something I looked for. I -- it's the type of
source code that involves a lot of public domain and publicly
2     available code, so I didn't look for that in particular.

3     [Ms. Yip] Where in the public domain is this – this exact text that's
excerpted in [Ex. 3 – Moog eRTOS Software Design Document
4     (SDD)]?  Where can it be found? . . . .

5     [Mr. Baer]: . . . The exact text I haven't identified in the public
domain. . . . And I don't believe that it's been identified as --- or
6     designated as not being in the public domain.  I don't – I don't have
an identification of where it is there at this time.

7

8     [Ms. Yip] I'm not asking you whether or not the routine's concepts
are available in the public domain.  I'm asking you whether or not
9     you're aware of this text, the actual code that's written here, being in
the public domain. . . .

10     [Mr. Baer] I haven't identified this exact text in the public domain.

11 Baer Dep. Tr. at 27:10-23, 41:24-42:13, 75:10-76:19.

12        The TRO did not allow for Skyryse to retain and use non-public documents

13 received *from* Moog simply because some of the information in those documents

14 may be derived from a public source.  *See* Dkt. 25, ¶¶ 1-2 ("of, *from*, or belonging

15 to Plaintiff") (emphasis added).  The documents at issue, as a whole, are still

16 "from" Moog.  Mr. Baer's and Mr. Dreikorn's declaration do not claim that

17 Skyryse obtained the documents at issue from a public source, and therefore, the

18 Court short ignore their irrelevant declarations.

19          **5.**      **Skyryse's Legal Authority is Distinguishable**

20        Skyryse misplaces its reliance on *Softketeers, Inc. v. Regal W. Corp.*, No.

21 19-cv-00519-JWH, 2023 WL 2024701 (C.D. Cal. Feb. 7, 2023).  (Opp., pp. 26-

22 27.) There, the court issued a preliminary injunction ordering the defendants to

23 "delete [permanently] or otherwise destroy any copies of any Software source code

24 or any portion thereof under their control that are stored on media they are unable

25 to surrender" and not to "disclos[e] or use source code." *Id*. at *13. The court

26 ordered the defendants to verify under oath their compliance with the injunction,

27 which the defendants did. *Id*. at *14. The court declined to issue contempt

28 sanctions because "Softketeers has not presented clear and convincing evidence

that Regal knew all along that it was using replacement code impermissibly derived from Softketeers's source code." *Id.* at *17. The court also reasoned that "the most obvious culprit—the Vietnamese contractor VTSWay—is neither a party to this litigation nor subject to the Court's preliminary injunction." *Id.* at *16. Here, in stark contrast to *Softketeers*: 1) Skyryse has never verified its compliance with the TRO under oath (nor can it); 2) Moog is not seeking to enforce the TRO against non-parties; 3) there is no dispute as to the party using Moog non-public information; and 4) there is clear evidence showing that Skyryse personnel knew they were using Moog non-public information (including discussion of which Moog program to "pilfer" data from). (See Dkt. 400-03., ¶¶ 27, 29, 42) (Dkt. 400-05, ¶¶ 20, 22, 24-28).

*Wal-Mart Stores, Inc. v. Cuker Interactive, LLC*, 27 F.4th 622, 625 (8th Cir. 2022) involved a contempt proceeding after a permanent injunction was issued. "The permanent injunction required Walmart to remove and permanently delete Cuker's trade secrets from its systems, and to file an affidavit of compliance," which Walmart did. *Id.* at 624. The district court declined to find contempt because the "visual examination of the website was insufficient to raise a good faith suspicion that Walmart lied about its compliance." *Id.* The Court of Appeal found no error, determining that the "look and feel" analysis of Walmart's website was insufficient. *Id.* Here, Moog is not claiming Skyryse's improper use of Moog non-public information based on conjecture or cursory review of Skyryse's website or products, but rather voluminous internal Skyryse e-mails and documents showing its possession and use of Moog data.

*Moser v. Health Ins. Innovations, Inc.*, No. 17-cv-1127-WQH, 2018 WL 6735710 (S.D. Cal. Dec. 21, 2018) is inapposite because there, the defendant requested a forensic examination of certain devices pursuant to a Rule 34 request for inspection. *Id.* at *3. The court denied the request because the defendant's sole justification was that the "plaintiff testified in his deposition that his computer

automatically deletes his browsing history." *Id.* at *6. The court concluded there was "no reason to believe plaintiff had a duty to preserve the browsing history on his computer [or] that any relevant browsing history would not be available to HII through other means." *Id.* Here, the issue is not Moog's demand for electronic devices through written discovery. Instead, Skyryse was required to produce Moog data in response to an existing, stipulated TRO. And, this case involves admitted deletion of data, admitted possession and use of Moog data, and an undisputed duty to preserve, none of which existed in *Moser*.

Finally, in *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, No. 15-ml-2668-PSG, 2023 WL 1813530 (C.D. Cal. Feb. 7, 2023), defendants filed a motion for sanctions arguing the plaintiffs failed to produce "working code" and expert materials in response to a stipulated expert protocol order. *Id.* at *17. The court denied the request because "Plaintiffs initially produced to Defendants what they thought was a working software code," plaintiffs "promptly fix[ed] the issues," and there were a "relatively small number of errors in thousands-of-lines of code." This case, conversely, does not involve inadvertent production of an incorrect set of software code for expert discovery. It involves a failure to produce mountains of data (that Moog is presently aware of) and perform basic searches by a stipulated deadline.

**C.** **Sanctions are Appropriate for Skyryse's Untimely "Remedial" Efforts**

**1.** **The Timing of Skyryse's "Remedial" Efforts Highlights its Lack of Good Faith**

Skyryse claims it has been "transparent with Moog and the Court" when it discovered Wang's spoliation. (Opp., p. 13.) The record demonstrates the opposite. After admitting that it possesses a "concern[ing]" amount of Moog non-public information, and has spoliated potentially relevant evidence (Dkt. 95), Moog sent a letter to Skyryse with a list of questions regarding Skyryse's disclosures, including

the spoliation (Dkt. 142-04.)  But Skyryse's evasive response failed to answer most
of Moog's questions, including what electronic devices were involved in the
deletion, when the deletion occurred, and what items were deleted.  (Dkt. 142-05.)
Skyryse's failure to provide even basic information about the spoliation forced
Moog to file a motion to compel this information.  (Dkt. 142-12.)  It was only in
Skyryse's June 14, 2022 opposition to the foregoing motion that it first disclosed
the nature and scope of the deletion of evidence, including the 32 potentially
relevant files deleted by Alex Wang from his Skyryse computer that were not
recoverable.  (Dkt. 156.)  And then, it was only in its April 24, 2023 opposition to
this Motion that Skyryse's expert Michael Bandemer claimed he was able to
recover copies or matches of 30 of the files, which Skyryse produced (but he was
unable to recover two of the files).  (Dkt. 454.)  In deposition, Mr. Bandemer
admitted that his work to recover the files did not begin until 2023 – at least 9
months after the imposition of the TRO.  (Bandemer Dep. Tr. at 39:6-17.)

The pattern is evident: Skyryse only provides information regarding the
admitted spoliation after forcing Moog to file a motion, which has occurred twice
now in connection with Mr. Wang's materials alone.  In light of the work
performed by Mr. Bandemer, it appears that Skyryse has been able to recover at
least approximations of the 32 documents FTI initially identified as permanently
deleted in June 2022.  What Skyryse does not address is just as critical: the fact
that Skyryse made no attempt to resuscitate these files until threatened with
sanctions, and the fact that Skyryse never produced the materials Mr. Bandemer
used to resuscitate the materials (thereby ensuring that Moog could not have
performed that procedure itself) until after its opposition brief was served and
Moog demanded production of the materials. (Naqvi Decl., Ex. E.)

Skyryse has no excuse for taking more than 10 months from its June 14,
2022 filing to conduct further "remedial" efforts and produce copies or matches of
30 of the deleted files.  If Skyryse was indeed acting in good faith, it would have

1   done this work and produced the underlying materials long ago when the data

2   deletion was first disclosed.

3                    **2.       Skyryse's Legal Authority is Distinguishable**

4        Skyryse relies incorrectly on *Oracle Am., Inc. v. Hewlett Packard Enter.*

5   *Co.*, 328 F.R.D. 543, 552 (N.D. Cal. 2018) to argue that the "recovered material

6   Mr. Wang deleted was not 'lost' within the meaning of Rule 37(e)."  (Opp. at 15.)

7   But in *Oracle*, the missing documents "predate 2013, when Oracle's preservation

8   obligations arose" and "Oracle produced those documents" later.  328 F.R.D. at

9   552.  Here, the files were deleted after the filing of this lawsuit (and well after

10  Skyryse's preservation obligations began), and exact copies of all 32 documents

11  are still unproduced.

12       Skyryse also relies incorrectly on *Hamilton v. Signature Flight Support*

13  *Corp.*, No. 05-cv-0490-CW, 2005 WL 3481423, at *3 (N.D. Cal. Dec. 20, 2005) to

14  argue that Moog has not provided "concrete evidence" that the spoliated files

15  would be favorable to Moog.  But in *Hamilton*, the plaintiff presented evidence

16  that the deletion—which occurred well before the lawsuit was filed—was

17  inadvertent.  Here, Skyryse submits no such evidence, and in fact, the deletion was

18  likely intentional because Wang had received a litigation hold notice before the

19  deletion.

20       Skyryse's heavy reliance on *Storz Mgmt. Co. v. Carey*, No. 2:18-CV-0068

21  TLN DB, 2019 WL 2615755 (E.D. Cal. June 26, 2019) is likewise misplaced.  In

22  *Storz*, the court declined to issue sanctions because no forensic examination of the

23  devices was conducted and "something more is needed beyond a vague reference

24  to the unknowable."  *Id.* at *5.  Here, by contrast, Skyryse's own experts have

25  conducted various forensic examinations of Wang's electronic devices and the

26  deletion of hundreds of files after this lawsuit commenced is undisputed.  (*See* Dkt.

27  156, pp. 12-13.)

28       Skyryse likewise relies incorrectly on *Sanchez v. Jiles*, No. 10-cv-09384-

MMM, 2012 WL 13005996, at \*14 (C.D. Cal. June 14, 2012).  In *Sanchez*, the
court denied a motion to exclude evidence in part, finding that "plaintiffs have
adduced no evidence that defendants destroyed or 'lost' the evidence so it would
be unavailable for litigation purposes."  *Id*. at \*14.  Moreover, the alleged
spoliation was done by a third party and the defendant "himself is not alleged to
have caused the loss of evidence."  *Id*.  Here, there is no dispute that certain
evidence is permanently lost, and that Wang was employed by Skyryse (and not a
third party) when the deletion occurred.

Skyryse's reliance on *Porter v. City & Cnty. of San Francisco*, No. 16-CV-
03771-CW, 2018 WL 4215602 (N.D. Cal. Sept. 5, 2018) is puzzling because that
case supports Moog's position.  The court found that "spoliation [had] occurred"
because a phone call recording "[could not] be restored or replaced" (like here) and
this had prejudiced the plaintiff (like here).  *Id*. at \*3, \*4.  The court also awarded
the plaintiff its "fees and costs incurred as a result of the sanctions motion."  *Id*. at
\*5.  The court declined to issue adverse inference sanctions because the evidence
indicated that the deletion occurred due to the defendant's "ESI retention policy"
and not to intentionally spoliate.  *Id*. at \*4.  By contrast, here the evidence shows
that Wang intentionally deleted files after this lawsuit commenced.

The *Hitachi* case Skyryse relies on is likewise distinguishable.  There, the
court found that "the files were not destroyed, [the] retrieved fragments more likely
than not are already produced documents, and [the] three that were irretrievable
were not relevant."  *In re Hitachi Television Optical Block Cases*, No. 08-cv-1746-
DMS, 2011 WL 3563781 at \*12 (S.D. Cal. Aug. 12, 2011).  Here, two files are
permanently destroyed, and exact copies of the other 30 documents have not been
recovered.  The *Hitachi* court also noted "Hitachi's speedy corrective action
against spoliation."  *Id*. at \*16.  Here, the spoliation took place in or around April
2022 and Skyryse's forensic vendor concluded that 32 files were unrecoverable as
of June 14, 2022.  (Dkt. 454, ¶ 12.)  Yet it took an additional 10 months, and the

filing of this Motion, for Skyryse to try to recover the 32 missing documents.

Skyryse also relies on *Gemsa Enters. v. Specialty Foods of Alabama, Inc.*, No. 13-cv-00729-JAK, 2015 WL 12746220, *9-11 (C.D. Cal. Feb. 10, 2015). (Opp. at 13.) There, however, the deletion of e-mails occurred before any litigation was filed. *Id*. at *6, *7. The court further concluded that "Bender's alleged deletion of emails was a substantial deviation from his employment duties, undertaken for personal purposes. *Id*. at *10. Here, there is no evidence that Wang's deletion of data was for reasons substantially apart from his employment duties.

*FTC v. Lights of Am. Inc.*, No. 10-cv-1333-JVS, 2012 WL 695008 (C.D. Cal. Jan. 20, 2012) is also unhelpful. There, the court determined that the "FTC was not obligated to impose a litigation hold at the commencement of the full-phase investigation" because "litigation was not 'reasonably foreseeable' at those points." *Id*. at *3. The court also found the defendants failed to show "FTC has access or control over DOE or PNNL's records, [and therefore] the FTC was not obligated to issue a litigation hold on those[] entities." *Id*. at *5, *6. Here, Skyryse had a duty to preserve when Wang deleted the files, and had access or control over the deleted files given Wang was a Skyryse employee and the deleted files were from a Skyryse-issued laptop.

The other cases relied upon by Skyryse are unhelpful. *See Laub v. Horbaczewski*, No. CV 17-6210-JAK, 2020 WL 7978227, at *20 (C.D. Cal. Nov. 17, 2020) (determining that majority of deleted data at issue took place before a "duty to preserve" arose and, as to any data deleted after duty arose, finding "there is no suggestion that those messages exist" in the first place); *Galicia v. Nat'l R.R. Passenger Corp.*, No. CV 17-8020-JFW, 2018 WL 6314191, at *4 (C.D. Cal. July 20, 2018) (finding no duty to preserve). Here, unlike *Laub* and *Galicia*, preservation obligations are not in question, the deleted files existed, and certain of them are permanently lost.

### 3.      Moog Proposes a Variety of Available Sanctions

Skyryse argues Moog seeks only "potentially case-dispositive sanctions [while] ignoring lesser sanctions that would be sufficient to cure any prejudice." Not so.  Moog's Motion expressly considered "lesser" sanctions such as the ability for Moog to inspect Skyryse's systems, an order compelling additional productions from Skyryse, and monetary sanctions. (Mot. at 31-34.)  While Skyryse suggests "additional discovery or preclusion of specific items of evidence[] would be sufficient" as sanctions in this case, it fails to explain how this would right Skyryse's wrongful deletion of documents or recover unrecoverable files. Given the unreasonable amount of time that it took Skyryse to recover some of the files deleted by Wang, and its refusal to conduct a proper and diligent search of its systems for Moog data (as discussed further below), an inspection of Skyryse's systems is the only way to ensure compliance with the TRO.

Also, an award of monetary sanctions is more than merited, especially given that Skyryse forced Moog to file this Motion before it was willing to produce various documents in compliance with the TRO, including the "recovered" Alex Wang files. *See* Rule 37(a)(5)(A) (imposing mandatory award of "attorney's fees" where "the disclosure or requested discovery is provided after the motion was filed"); *Gianelli v. Home Depot, Inc.*, No. 2:13-CV-01969-JAM, 2014 WL 5430480, at *2 (E.D. Cal. Oct. 24, 2014) ("[T]here is no basis for this Court to reconsider the award of expenses given that the requested discovery was not provided until after the motion to compel was filed.").

Skyryse cites to *Est. of Nunez v. Corr. Physicians Med. Grp., Inc.*, No. 16-cv-1412-BEN(MDD), 2019 WL 1024397, at *2 (S.D. Cal. Mar. 4, 2019) as an example where a court permitted additional depositions in lieu of other requested sanctions. But in *Nunez*, the court found that "no electronically stored evidence appears to have been lost or destroyed." *Id.*  That is clearly not the case here.

**III.    <u>CONCLUSION</u>**

Moog respectfully requests the Court grant the Motion and the relief requested therein.


Dated: June 1, 2023            SHEPPARD MULLIN RICHTER & HAMPTON LLP

By    _____
                              */s/ Rena Andoh*
                              Rena Andoh

                              Attorney for Plaintiff and Counterdefendant
                              MOOG INC.

1    **<u>CERTIFICATE OF COMPLIANCE</u>**

2        The undersigned, counsel of record for Moog Inc., certifies that this brief

3    contains 8,766 words, which:

4        __ complies with the word limit of L.R. 11-6.1.

5        _X_ complies with the word limit set by Court order dated April 17, 2023

6    (Dkt. 445).

7

8    Dated:  June 1, 2023              SHEPPARD MULLIN RICHTER & HAMPTON LLP

9
                                      By    _____*/s/ Rena Andoh*_____
10                                                Rena Andoh

11                                    Attorney for Plaintiff and Counterdefendant
12                                                MOOG INC.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28