# EXHIBIT D

1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3

4    MOOG, INC.,                      )
                                      )   Case No.
5            Plaintiff,               )   2:22-cv-09094
                                      )   GW-MAR
6            vs.                      )
                                      )
7    SKYRYSE, INC.; ROBERT ALIN       )
     PILKINGTON; MISOOK KIM, and      )   Page 1-126
8    DOES NO. 1-50,                   )
                                      )
9            Defendants.              )
                                      )
     _____
10   SKYRYSE, INC; ROBERT ALIN        )
     PILKINGTON; MISOOK KIM, and      )
11   DOES NO. 1-50,                   )
                                      )
12           Counterclaimant,         )
                                      )
13           vs.                      )
                                      )
14   MOOG, INC.,                      )
                                      )
15           Counterdefendant.        )

16

17   REMOTE VIDEOTAPED DEPOSITION OF MICHAEL BANDEMER

18                   TAKEN ON

19             FRIDAY, MAY 26, 2023

20

21

22   Reported by:

23   BRENDA R. COUNTZ, RPR-CRR

24   CSR NO. 12563

25   Job No. J9728075



MICHAEL BANDEMER                                                 May 26, 2023
MOOG vs SKYRYSE, INC.                                                      2

1
2
3
4
5
6
7
8
9            Remote Videotaped deposition of
10   MICHAEL BANDEMER taken via Zoom or teleconference
11   in Los Angeles, California, on Friday, May 26,
12   2023, before Brenda R. Countz, CSR No. 12563.
13
14
15
16
17
18
19
20
21
22
23
24
25



```
 1    APPEARANCES OF COUNSEL:

 2              (All counsel and participants present

 3               via Zoom and/or teleconference.)

 4

 5    FOR THE PLAINTIFF AND COUNTER-DEFENDANT

 6    MOOG, INC.:

 7              SHEPPARD MULLIN, RICHTER & HAMPTON, LLP

 8              BY:  RENA ANDOH, ESQ.

 9                   TAKUMA NISHIMURA, ESQ.

10              30 Rockefeller Plaza

11              New York, New York 10112

12              (212) 634-3092

13              randoh@sheppardmullin.com

14

15    FOR THE DEFENDANT AND CROSS-COMPLAINANT

16    SKYRYSE, INC.:

17              LATHAM & WATKINS, LLP

18              BY:  RUSSELL MANGAS, ESQ.

19              330 North Wabash Avenue

20              Chicago, Illinois 60611

21              (312) 876-7700

22              russell.mangas@lw.com

23

24    ALSO PRESENT:

25              ANY CELIS, Videographer
```



 1   from Moog to Skyryse?

 2        A.   That's my understanding.

 3        Q.   And what were you asked to analyze with

 4   respect to Reid Raithel?

 5        A.   With Reid, it was primarily information

 6   surrounding his use of a USB drive.

 7        Q.   You say information surrounding his use

 8   of a USB drive.  If I look at paragraph 51 of

 9   Mr. Raithel's declaration, you identify two

10   different USB drives, correct, USB 1 and USB 2?

11        A.   Correct.

12        Q.   Which USB drive were you asked to

13   analyze?

14        A.   I don't know what you mean by that.

15   Mr. Pixley referred to two of them.

16        Q.   When I asked you just now about what

17   you were asked to do with respect to Reid

18   Raithel, you said that you were asked to analyze

19   his activity with respect to a USB drive.

20             So I'm just trying to confirm, were you

21   asked to analyze one of the two USB drives or

22   were you asked to analyze his usage with both?

23        A.   I guess in the larger context, both.

24        Q.   Did you review an image or file log for

25   USB 2 in the course of your analysis?



1    from Mr. Raithel's Moog laptop indicates that

2    over 27,000 files were copied to USB 2."

3              Do you see that?

4        A.   Yes.

5        Q.   Did you search on Mr. Raithel's Skyryse

6    laptop for each of the 27,000 files that were

7    copied on USB 2?

8        A.   I'm sorry, say again?  What was that?

9              MS. ANDOH:  Ms. Countz, could you

10   please repeat the question.

11             (The record was read by the reporter.)

12             THE WITNESS:  No.

13   BY MS. ANDOH:

14       Q.   Did you look at any transfers that

15   Mr. Raithel made, beyond the ones that were

16   identified in the Pixley declaration?

17       A.   I'm not sure what you are referring to.

18       Q.   Are you aware of Mr. Pixley's

19   declaration?

20       A.   I am.

21       Q.   You just said that you didn't look at

22   all 27,000 files to see if they were on

23   Mr. Raithel's laptop.

24             I'm now asking you did you search for

25   any files that were on the USB 2 drive, other



1       A.    Correct.

2       Q.    So how do you know that the logs

3   contain no indication that a device like CF

4   1798654321 was ever connected to Mr. Raithel's

5   Skyryse laptop?

6            THE WITNESS:  I'm sorry, someone else

7   was saying something.  I don't know if that was

8   Russ or somebody else.  If so, I didn't hear him.

9            MR. MANGAS:  No, I didn't say anything.

10           MS. ANDOH:  Ms. Countz, could you

11  please reread the question?  Thank you.

12           (The record was read by the reporter.)

13           THE WITNESS:  Because I reviewed the

14  logs.

15  BY MS. ANDOH:

16      Q.    Okay.  So do you know whether the logs

17  contain any indication that 8073E7654321 was ever

18  connected to Mr. Raithel's Skyryse laptop?

19      A.    There was never a device connected to

20  the laptop as per these logs that was of the same

21  volume size as the ones that Mr. Pixley

22  identifies.

23      Q.    Did you look for any devices other than

24  the two that Mr. Pixley identified?

25      A.    I'm not sure what you mean by that.  I



1   looked at all the logs.

2       Q.    I'm not asking about the logs.

3             Did you look in the daily out logs to

4   see if there was evidence of any device other

5   than the two devices Mr. Pixley reviewed?

6             MR. MANGAS:  Objection.  I'm sorry,

7   Mike.  Give me one second.

8             Objection, outside the scope.  To the

9   extent you are asking him to give other than the

10  contents of the report, I think it's outside the

11  scope.

12            MS. ANDOH:  I'm not.  I'm asking him

13  whether he reviewed them in connection with this

14  declaration.

15            MR. MANGAS:  Sorry, let me state my

16  objection.

17            Mr. Bandemer's opinion is limited to

18  whether USB 2 was ever connected.  So I think to

19  the extent you are asking him about connections

20  other than USB 2, it's outside the scope.  So I'm

21  lodging that objection.

22            Mr. Bandemer, if you can answer the

23  question, you can go ahead and answer it.

24            THE WITNESS:  Madam Court Reporter, if

25  you could repeat the question, please.



1               (The record was read by the reporter.)

2               THE WITNESS:  So given all the

3      objections and everything here, what I can say is

4      I looked through all of the logs to identify

5      whether or not a device like USB 2 was connected,

6      and it was not.

7      BY MS. ANDOH:

8         Q.   Isn't it true that materials could have

9      been transferred from USB 2 to another device

10     that was then connected to Mr. Raithel's laptop?

11              MR. MANGAS:  Objection to form.

12              THE WITNESS:  So I need to ask you to

13     clarify.  What is the question?

14              MS. ANDOH:  Ms. Countz, can you please

15     read the question back?

16              (The record was read by the reporter.)

17              THE WITNESS:  So you're saying outside

18     of the scope of this laptop?

19     BY MS. ANDOH:

20        Q.   No.  What I asked you was --

21        A.   I mean this device was -- based on

22     these logs, this device was not plugged into this

23     laptop.  So I don't know what context you are

24     giving me for this question.

25        Q.   In preparing this opinion, did you



 1   check to see whether the files that were on USB 2

 2   were transferred in any way onto Mr. Raithel's

 3   Skyryse laptop?

 4        A.   What I did was I looked at evidence of

 5   the thumb drive or external drive being

 6   connected.

 7        Q.   Okay.  Please turn to paragraph 16 of

 8   your declaration.

 9             MS. ANDOH:  Actually, before we do

10   that, we've been going for about an hour.  Why

11   don't we take a break for about five minutes and

12   then we can go back.  This is a good time to do

13   that.

14             MR. MANGAS:  Okay.

15             THE WITNESS:  What time do you want to

16   be back on?

17             MS. ANDOH:  It's five past right now so

18   why don't we say ten past?

19             MR. MANGAS:  Okay.

20             THE VIDEOGRAPHER:  This marks the end

21   of media number 3.  The time is 9:04.  We are off

22   the record.

23             (Break taken.)

24             THE VIDEOGRAPHER:  This marks the

25   beginning of media number 4.  The time is 9:14



1  a.m.  We are on the record.

2  BY MS. ANDOH:

3       Q.   Mr. Bandemer, I'm going to refer you to

4  page 5 of your declaration which is paragraph 16.

5       A.   Okay.

6       Q.   You say in the first sentence:  "I

7  attempted to recover the 277 files identified by

8  FTI in June 2022."

9            Do you see that?

10       A.   Yes.

11       Q.   When did you make this attempt to

12  recover them?

13       A.   Are you asking me for a date?

14       Q.   I'm asking for an approximate date.

15       A.   Earlier this year.

16       Q.   So sometime in 2023?

17       A.   Yes.

18       Q.   Did you use an E01 to conduct your

19  review of the deleted files?

20       A.   Yes.

21       Q.   And what is an E01?

22       A.   It's an image -- it's a forensic image

23  container.

24       Q.   And when you say it's a forensic image

25  container, it contains a complete forensic image



1   specific because your question is unclear as to

2   what you are asking me.  I just asked for a

3   clarification and you didn't refer to it.  You

4   need to be more specific.

5        Q.   Did you review the file names of these

6   3,299 files to see if the file names were

7   consistent with the Atmel microcontroller

8   product?

9        A.   I reviewed the folder generally.

10       Q.   What do you mean by reviewed the folder

11  generally?  What steps did you take?

12       A.   Well, I browsed the directory.

13       Q.   And what did you find when you browsed

14  the directory?

15       A.   That it was all consistent with the

16  folder description of Atmel microcontroller.

17       Q.   And when you say you browsed the

18  folder, did you read every one of the file names?

19       A.   So you have to realize in forensics

20  this is not E-discovery and when we find

21  information like this, what we're doing here is

22  very standard.  We have identified the folder and

23  the contents and we browsed it generally.

24            But did I open 3,299 files?  No.  Did I

25  find the need to?  No.  Did everything that I



MICHAEL BANDEMER                                    May 26, 2023
MOOG vs SKYRYSE, INC.                                        74

1   viewed in that folder appear to be consistent

2   with the rest of the contents?   Yes.

3        Q.   All right.   Your next sentence says:

4   "An additional 9,525 files are found within a

5   CircuitPython folder."

6              Do you see that?

7        A.   Yes.

8        Q.   And then you say:   "My research

9   indicates that CircuitPython is a programming

10  language used to learn code, to code on low-cost

11  microcontroller boards."

12             Do you see that?

13       A.   Yes.

14       Q.   With respect to the CircuitPython

15  folder, did you also review the folder generally

16  by browsing the directory of the folder?

17       A.   Correct.

18       Q.   And you did not open each one of those

19  9,521 files specifically to see what they were?

20       A.   I'm sorry, are you asking if I opened

21  all of the 9,525 files?

22       Q.   Yes.

23       A.   I did not.

24       Q.   All right.   And you go on to say:   "An

25  additional 4,137 files are found in a Myarduino



1   folder."

2          MS. ANDOH:  For the court reporter

3   that's M-Y-A-R-D-U-I-N-O.

4   BY MS. ANDOH:

5          Q.   Do you see that?

6          A.   Are you asking me or the court

7   reporter?

8          Q.   No, I'm asking you do you see it?

9          A.   Yes.

10          Q.   And you say:  "Myarduino is a

11   commercially-available third-party platform often

12   used by hobbyists to create electronic projects."

13          Do you see that?

14          A.   Is that your question, whether I see it

15   or not?

16          Q.   Yes, my question is whether you see it.

17          A.   I do.

18          Q.   And I just want to confirm that you

19   also reviewed the folder generally from Myarduino

20   which include browsing the directory of the

21   folder but not opening each of the 4,137 files?

22          A.   Yes, I browsed it and looked at the

23   content to see if it was consistent with the

24   description of the folder and everything appeared

25   consistent with that.



1     Q.   You next say:  "Another 4,327 files are

2  found in an HDHomeRun folder.  HDHomeRun is a

3  third-party product designed to allow individuals

4  to watch live and reported television programs on

5  a computer network."

6          Do you see that?

7     A.   I do.

8     Q.   And I'll ask you the same question.

9          Did you review the folder generally,

10  meaning you browsed the directory of a folder but

11  you didn't open each of the 4,327 files?

12     A.   I did not open each of the 4,327 files.

13     Q.   And finally, you say that:  "Another

14  5,600 files are found in a ballard_driver folder.

15  A driver is a set of instructions that allows the

16  computer to understand how to use a device that

17  is connected to it."

18          Do you see that?

19     A.   I do.

20     Q.   And the same question.  I understand

21  that you reviewed the ballard_driver folder

22  generally and browsed the directory of the folder

23  but did not open each of the 5,600 files?

24     A.   I did not open 5,600 files.

25     Q.   So if I do some back of the envelope



MICHAEL BANDEMER                                    May 26, 2023
MOOG vs SKYRYSE, INC.                                        78

1    the contents of these other 12,390 files are,

2    right?

3         A.   Well, as I said, it's not a -- what's

4    the best word?  So having been involved in a lot

5    of these types of matters, it's not a curated

6    library.  A lot of it just appears to be personal

7    mish-mash of materials.

8              I've identified here the major folders

9    that have a large volume of content.  The other

10   stuff is a mish-mash of, you know, what appears

11   to be like hobbyist-type files and personal

12   files.

13             So I don't want to say -- I'm sorry, I

14   hadn't finished.  Do you want to interject.

15        Q.   Go ahead.

16        A.   So, I don't want to agree with your

17   representation because that's not exactly true.

18        Q.   Okay.  So just so that I understand

19   what you are and aren't opining on here, you are

20   not personally opining in this declaration that

21   none of these 12,390 files belong to Moog, right?

22        A.   I mean, as I said earlier, I think

23   we've covered this, it's not my task to identify

24   whether something is Moog or Skyryse or something

25   otherwise.



1          But within my forensic skill, I've
2     identified -- it's standard for me to, you know,
3     take a look at the context, especially in this
4     context, and review -- because Pixley doesn't
5     identify anything specific.
6          So I looked at it generally.  And if he
7     wants to point out a specific file or something
8     that he wants to speak to or you all want to
9     speak to, I'm happy to look at that.
10         I'm just talking about generally, all
11    this stuff looks like a bunch of hobbyist-type
12    work.  So I'll look to you all to define that
13    further.
14         But to me, it's very common for me to
15    look at a drive and understand the contents
16    generally, based on a curated folder and file
17    content.
18      Q.   So sitting here today, are you telling
19    me that it's your opinion that none of the 39,278
20    files that we're discussing belong to Moog?
21      A.   Again, I'm not sure what I could add to
22    my prior answer other than to say that I've
23    discussed and written in my declaration exactly
24    what I did and it's within the scope of my work.
25         It's not reasonable within a forensic



1  what line you're on?

2       Q.   I'm on paragraph 45, line 15.

3       A.   I got that.

4       Q.   If you don't talk over me I think you

5  would hear better where I'm directing you.

6       A.   Well, actually, you didn't --

7       Q.   I did.  I specified line 15 four times

8  now and I'm going to do it a fifth.

9            We are on paragraph 45, line 15, and it

10  says:  "Mr. Pixley does not specify which, if

11  any, of the 39,278 files contained alleged

12  confidential or proprietary data owned by Moog."

13            Do you see that?

14       A.   I do.  Thank you for finally directing

15  me to that line.

16       Q.   Again, I think if you don't talk over

17  me you will discover that I direct you to these

18  lines.

19            It then goes on, beginning on line 18,

20  to say:  "I understand from Mr. Bayer's

21  declaration that these do not appear to be Moog

22  confidential or proprietary information."

23            Do you see that?

24       A.   I do.

25       Q.   What I don't see between lines 15 and



1   20 in paragraph 45 is you opining on whether any

2   of these materials are confidential or

3   proprietary data owned by Moog.

4            I just want to be confirm, is that

5   correct, that you are not opining on that?

6        A.   Not opining on what?

7        Q.   On whether any of these 39,278 files

8   contain alleged confidential or proprietary data

9   owned by Moog?

10       A.   Yeah, it's not within the scope of my

11  expertise to make a determination as to whether a

12  particular file and its contents are Moog or

13  Skyryse.  And I'm just pointing out that Pixley

14  doesn't specify and does not elaborate on the

15  contents of this material.

16           So it is unreasonable for someone to go

17  open 39,000 files, at least from a forensic

18  standpoint.  And so Mr. Pixley doesn't do it and

19  he doesn't specify it and so there's no way for

20  me to respond to it.

21           Because if he had, then I could

22  potentially respond to it but he didn't.  And

23  that's what I'm trying to point out there in this

24  paragraph and, as you point out, lines 15 through

25  20.



```
 1   onto your laptop?

 2        A.   Not without a record of it.

 3        Q.   Okay.  Did you review system logs to

 4   see if there were any records of documents from

 5   the USB drive being opened on the laptop?

 6        A.   Well, that wasn't something reported by

 7   Mr. Pixley so that would be outside the scope of

 8   Mr. Pixley's declaration.

 9        Q.   So it was outside the scope of your

10   analysis?

11        A.   The issue that was raised was the

12   copying of these files and this particular folder

13   to his laptop.  And so I have addressed that

14   here.  Mr. Pixley doesn't go beyond that so I'm

15   addressing what it is he stated in his

16   declaration.

17             If there were some kind of concern or

18   evidence in that regard, that I'm sure Mr. Pixley

19   would have brought that to everyone's attention.

20        Q.   So you did not analyze, as part of your

21   work for this declaration, how many times that

22   USB drive was plugged into Tri Dao's Skyryse

23   computer, right?

24        A.   Again, that's a completely different

25   subject than what I reported on.
```



1    Q.   I'm just asking you whether you

2    actually performed that analysis as part of your

3    declaration?

4    A.   Again, Mr. Pixley doesn't report

5    anything about that, so I don't address that.

6    Q.   And in your work for this declaration,

7    you didn't analyze whether any of the documents

8    from that USB were opened on the USB while it was

9    connected to Tri Dao's Skyryse laptop, right?

10    A.   Well, let me refer to my report for a

11    second.   (Perusing.)

12         So if you refer to paragraph 47, you

13    will see the two files that I identified were

14    opened from the Myarduino folder.

15    Q.   But that's from the C drive, right?   He

16    opened them from his Skyryse laptop, not from the

17    USB, right?

18    A.   Correct, there is no evidence of him

19    opening them from the USB -- I'm sorry, the thumb

20    drive.

21    Q.   Did you review his system logs to see

22    whether he had opened files from his USB drive,

23    or did you only look to see if the files from his

24    laptop had been opened?

25    A.   No, I reviewed all of the forensic



MICHAEL BANDEMER                                    May 26, 2023
MOOG vs SKYRYSE, INC.                                         97

```
 1              THE VIDEOGRAPHER:  This marks the
 2    beginning of media number 6.  The timing is 10:57
 3    a.m.  We are on the record.
 4              MS. ANDOH:  Thank you.
 5    BY MS. ANDOH:
 6         Q.   So before the break we were talking
 7    about the thumb drive that Mr. Dao copied
 8    documents onto before his departure from Moog.
 9              Do you know whether Mr. Dao e-mailed
10    any files that he copied off of his USB drive?
11         A.   I mean, that's not a specific analysis
12    that I addressed.  What I'm addressing here is
13    Mr. Pixley who identified these files that were
14    copied to an external drive and then uploaded to
15    what he claims to be Tri Dao's Skyryse computer.
16              So this analysis is unrelated to your
17    question.
18         Q.   Do you know whether the USB drive was
19    plugged into any other Skyryse employee's
20    laptops?
21         A.   That's not something Mr. Pixley
22    identified and I have not addressed that issue
23    with him.
24         Q.   Did you look to see whether Mr. Dao had
25    any transfers from that USB drive, other than the
```



1   one that Mr. Pixley identified, to his Skyryse

2   laptop?

3        A.   In what sense?

4        Q.   Well, you refer to Mr. Pixley's

5   declaration where he opines about a transfer that

6   occurred of 7,679 files.

7             I'm asking whether you did any work to

8   see if there were any other transfers from the

9   USB drive other than that one that Mr. Pixley

10  describes?

11       A.   Yeah.  I might not be clear on exactly

12  what you're talking about.  But Mr. Pixley

13  identifies a transfer.  Are you asking whether he

14  should have looked at other devices or did I go

15  beyond the scope of his analysis?

16            I'm not really sure what you are asking

17  about.

18       Q.   I'm asking whether you made any attempt

19  to see if there were any transfers other than the

20  one that Mr. Pixley identified.

21       A.   What I did is I looked at the

22  connection of that device through a Skyryse

23  computer and evaluated the upload of those files.

24       Q.   So you looked at that single

25  transaction of downloading the 7,679 files?



1        A.   Yes.  I looked at what Mr. Pixley

2   identified in his declaration and I looked at

3   that.

4        Q.   So you did not look at whether there

5   were any other transfers off of that USB drive to

6   the laptop?

7        A.   Well, you say that but to where?  What

8   is the question, exactly?  The transfer is to

9   where?

10        Q.   The question is did you

11   identify -- strike that.

12             Did you do any analysis to determine

13   whether there were any downloads from the USB

14   drive to the laptop, other than the one that Mr.

15   Pixley discussed in his declaration?

16        A.   Yes.

17        Q.   And what was that work that you

18   performed?

19        A.   So we looked at the duration of the USB

20   connection information and looked at every file

21   created on the machine during that timeframe.

22        Q.   So you looked at the duration of the

23   USB connection on the date that Mr. Pixley

24   identified the transfer occurred?

25        A.   Correct.



1    Q.   And did you look to see whether the USB

2  was connected at any other time?

3    A.   I'm sure that Mr. Pixley, if that were

4  the state of things, would have identified that.

5  And so he didn't.

6           And so the primary focus of Mr.

7  Pixley's analysis is related to this USB device

8  and these 7600 files which we were able to

9  confirm and you can see my analysis of the

10  contents of those.

11           So there's no other evidence that there

12  was some other interaction.

13    Q.   I'm not asking what Mr. Pixley did, I'm

14  asking what you did.

15           I'm asking did you personally look to

16  see whether the USB was connected to the laptop

17  at any time other than the one instance Mr.

18  Pixley put in his declaration?

19    A.   Well, that was the focus of our

20  analysis because obviously Mr. Pixley would have

21  done that and he clearly identified an

22  interaction with the files.  And so that was the

23  scope of our investigation.

24    Q.   Again, you're not answering my

25  question.



1          Did you look to see whether the USB

2    drive was connected to the Skyryse laptop at any

3    time other than the one download that Mr. Pixley

4    identified?

5          A.   Okay, so you're using the word

6    "download" but that's out of context here.  So I

7    think you're going to have to rephrase that

8    question to make sure it's clear.

9          Q.   Did you look to see if there was any

10   instance other than the one that Mr. Pixley

11   identified in his declaration where the USB drive

12   was connected to the laptop?

13         A.   I'm not sure how to answer this any

14   differently.  We looked at the connection about a

15   particular device and it was approximately, what,

16   three or four minutes.  And we looked at

17   everything that was created on the computer

18   during that timeframe.

19         Q.   Mr. Bandemer, you've already discussed

20   your analysis of the instance that Mr. Pixley

21   describes.

22             Again, I'm asking you whether you

23   personally conducted any analysis to determine

24   whether the USB drive was connected to the laptop

25   at any point in time other than the one instance



 1  described in Mr. Pixley's declaration?

 2      A.   Yeah.  I can't recall.  Obviously we

 3  are focused on that because that's what Mr.

 4  Pixley identifies.  But we did not observe any

 5  other uploads.  If we had, we would have reported

 6  on it.

 7      Q.   So you can't recall whether you

 8  performed that analysis or not?

 9      A.   Not that I can't recall.  What I'm

10  saying is there was no reportable incidents there

11  and there is nothing outside of the scope of what

12  Mr. Pixley identified that we found to report on.

13      Q.   You just said that you can't recall

14  whether there were any instances.  Now you are

15  saying that there weren't?

16          MR. MANGAS:  Objection to form.

17          THE WITNESS:  What I'm saying is Mr.

18  Pixley reported on a particular incident and

19  we've investigated that incident and we observed

20  when this USB was connected.

21          There were no other connections that we

22  had to report on.

23  BY MS. ANDOH:

24      Q.   Do you have an opinion as to where the

25  39,000-plus files on the USB drive originally



1   USB connected device.

2        Q.   So the Ivanti log -- let me try to

3   paraphrase this just so we are on the same

4   page -- is a log that essentially shows

5   connections of external devices to a computer

6   that is on its system?

7        A.   In part, yes.

8        Q.   And you reviewed the Ivanti log for Tri

9   Dao that was produced that showed his connection

10  activity in connection with his Moog computer,

11  correct?

12       A.   Well, I reviewed it for purposes of

13  confirming what Mr. Pixley had identified.

14           MS. ANDOH:  All right.  I'm going to

15  drop a native version of the Ivanti log into the

16  chat because I think it's going to be much easier

17  for you to use than a PDF version, which is

18  basically unintelligible.

19           It says Exhibit 7 but it's actually

20  going to be marked as Exhibit 4, just for the

21  record.

22           THE WITNESS:  (Perusing.)

23           (Bandemer Exhibit 4, Native

24           Version of the Ivanti Log, was

25           marked for identification.)



1  the record it will be Exhibit 4 but we can just

2  refer to it as the Tri Dao Ivanti log, okay?

3       A.   Okay.

4       Q.   So the thing that I would like to ask

5  you first is how many devices are represented on

6  this log?

7       A.   Well, it would be any device that he's

8  connected to his computer is going to get

9  recorded by Ivanti.

10      Q.   And if I were to ask you on this log

11 what column shows me what device is being

12 connected at what time, what letter column would

13 that be?

14      A.   Sorry, you cut out there for a second

15 but I think you asked me what column displays the

16 device name, and that's column E.

17      Q.   The column called "Display Name",

18 correct?

19      A.   Correct.

20      Q.   So I just want you to confirm by

21 clicking on the filter that there are four

22 different devices that are represented by this

23 log, is that right?

24      A.   Correct.

25      Q.   And I just want to confirm that of



MICHAEL BANDEMER                                    May 26, 2023
MOOG vs SKYRYSE, INC.                                        111

1   those four devices, your declaration only focuses

2   on one of those four devices, correct?

3        A.   Well, it focuses on the device that the

4   transfer occurred on and Mr. Pixley identifies in

5   his declaration.

6        Q.   Okay.  And that transfer occurred from

7   a single device, right?

8        A.   Correct.

9        Q.   So there are three other devices that

10  are listed on this Ivanti log that you did not

11  investigate?

12       A.   Well, I don't think that's a proper

13  characterization.  Mr. Pixley clearly identifies

14  the transfer that's in question and we

15  investigated that.

16           There's no other transfers that have

17  been identified to investigate.

18       Q.   So just so that we are clear, you did

19  not look in Tri Dao's Skyryse laptop logs to see

20  whether any of these other devices had been

21  connected?

22       A.   That's not true.

23       Q.   So what other of these four devices did

24  you investigate with respect to connections to

25  Tri Dao's Skyryse laptop?



1  rephrase that question because that's not what I

2  said.

3      Q.   I'm asking you my question.

4           Did you review every connection to Tri

5  Dao's laptop for the duration of Mr. Dao's

6  employment with Skyryse?

7      A.   So, we looked at the connection history

8  that's in this log and we were able to confirm

9  what it is Mr. Pixley said.  Even though he

10 didn't specifically identify in his declaration,

11 we were able to recreate it and that's what we've

12 reported on.

13          I'm not really sure what you're asking

14 beyond that.

15     Q.   Okay.  So let's take down the Ivanti

16 log.  We're done with this.  No exhibit is up and

17 we're just talking about Tri Dao's Skyryse laptop

18 now, okay?

19          And the question that I'm asking you is

20 did you investigate every single connection that

21 was made from an external device to Tri Dao's

22 Skyryse laptop for the duration of his employment

23 at Skyryse?

24     A.   That's actually a different question.

25          So I think it's pretty clear from my



1   declaration, we investigated what Mr. Pixley had

2   identified in terms of a connection and an upload

3   and that's what we further examined.

4        Q.   Okay, so you didn't?

5             MR. MANGAS:   Objection to form.

6   BY MS. ANDOH:

7        Q.   Let's move on to your paragraph 49.

8        A.   I'm sorry, what paragraph?

9        Q.   Sorry, hold on one second.   Paragraph

10  49, page 14, line 13.

11       A.   Okay.

12       Q.   You refer in paragraph 49 to 11 Excel

13  spreadsheets that Mr. Pixley located on Eric

14  Chung's Skyryse-issued computer.

15            Do you see that?

16       A.   I do.

17       Q.   And then in paragraph 50 in the first

18  sentence on line 18 you say:   "In Mr. Bayer's

19  declaration he analyzes several Zip files from

20  Eric Chung's Moog laptop."

21            Do you see that?

22       A.   I do.

23       Q.   And I was personally confused by these

24  two paragraphs so I just want some clarification.

25            Are you trying to say that the 11 Excel



1   STATE OF CALIFORNIA     )  SS

2   COUNTY OF LOS ANGELES   )

3           I, BRENDA R. COUNTZ, Certified Shorthand

4   Reporter No. 12563 for the State of California,

5   do hereby certify:

6           That prior to being examined, the

7   witness named in the foregoing deposition was

8   duly sworn to testify the truth, the whole truth,

9   and nothing but the truth;

10          That said deposition was taken down by

11  me in shorthand at the time and place therein

12  named and thereafter transcribed and that the

13  same is a true, correct, and complete transcript

14  of said proceedings.

15          Before completion of the deposition,

16  review of the transcript [  ] was [  ] was not

17  requested.  If requested, any changes made by the

18  deponent during the period allowed are appended

19  hereto.

20          I further certify that I am not

21  interested in the outcome of the action.

22  Witness my hand this 30th day of May, 2023.

23

24  _____

25          Brenda R. Countz, CSR No. 12563



800.211.DEPO (3376)
EsquireSolutions.com