**LATHAM & WATKINS LLP**
Douglas E. Lumish (SBN 183863)
  doug.lumish@lw.com
Gabriel S. Gross (SBN 254672)
  gabe.gross@lw.com
Arman Zahoory (SBN 306421)
  arman.zahoory@lw.com
Rachel S. Horn (SBN 335737)
  rachel.horn@lw.com
140 Scott Drive
Menlo Park, California 94025
Telephone: (650) 328-4600
Facsimile: (650) 463-2600

*Attorneys for Defendant and
Counterclaimant Skyryse, Inc.*

*Additional counsel listed on signature
page*

**SHEPPARD, MULLIN, RICHTER
& HAMPTON LLP**
Rena Andoh (admitted *pro hac vice*)
  randoh@sheppardmullin.com.com
30 Rockefeller Plaza
New York, NY 10112
Telephone: (212) 653-8700
Facsimile: (212) 653-8701

Lai L. Yip (SBN 258029)
  lyip@sheppardmullin.com
Four Embarcadero Center, 17th Floor
San Francisco, CA 94111
Telephone: (415) 434-9100
Facsimile: (415) 434-3947

Travis J. Anderson (SBN 265540)
  tanderson@sheppardmullin.com 12275
El Camino Real, Suite 100
San Diego, CA 92130
Telephone: (858) 720-8900
Facsimile: (858) 509-3691

Kazim A. Naqvi (SBN 300438)
  knaqvi@sheppardmullin.com
1901 Avenue of the Stars, Suite 1600
Los Angeles, CA 90067
Telephone: (310) 228-3700
Facsimile: (310) 228-3701

*Attorneys for Plaintiff and
Counterclaim-Defendant Moog Inc.*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MOOG INC.,<br><br>Plaintiff,<br><br>v<br><br>SKYRYSE, INC., ROBERT ALIN PILKINGTON, MISOOK KIM, and DOES NOS. 1-50,<br><br>Defendants. | CASE NO. 2:22-cv-09094-GW-MAR<br><br>**JOINT STIPULATION RE: DEFENDANTS' MOTION TO OVERRULE MOOG'S OBJECTION TO SKYRYSE'S DISCLOSURE OF** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SKYRYSE, INC.,

                    Counterclaimant,

                    v

MOOG INC.,

                    Counterclaim-Defendant.

**CONFIDENTIAL INFORMATION TO VINCENT SOCCI**

Discovery Cut-Off: April 12, 2024
Pre-Trial Conference: August 12, 2024; 8:30 a.m.
Trial: August 27, 2024

Hearing:   June 28, 2023
Time:      11:00 a.m.
Judge:     Hon. Margo A. Rocconi
Location: Courtroom 790, 7th Floor

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

# <u>TABLE OF CONTENTS</u>

I.   SKYRYSE'S INTRODUCTORY STATEMENT ..................................... 1

II.   MOOG'S INTRODUCTORY STATEMENT ........................................... 2

III.   SKYRYSE'S CONTENTIONS ........................................................... 5

    A.   Relevant Facts ................................................................................ 5

        1.   Vincent Socci, M.S.E.E., M.B.A., B.S.E.E. ............................ 5

        2.   The Protective Order Governing the Treatment of
           Confidential Information .......................................................... 6

        3.   Moog's Objection to Mr. Socci ................................................ 7

    B.   Ripeness .......................................................................................... 9

    C.   Legal Standards ............................................................................ 10

    D.   Moog cannot show a risk of harm so great that it
        outweighs Skyryse's need to work with Mr. Socci in
        presenting its case. ...................................................................... 11

    E.   Moog cannot show that Skyryse's need to disclose
        designated information to Mr. Socci to prepare its case
        for trial is not "reasonably necessary." ...................................... 14

    F.   Conclusion .................................................................................... 15

IV.   MOOG'S CONTENTIONS ............................................................. 15

    A.   Legal Standard ............................................................................. 16

    B.   Relevant Facts .............................................................................. 17

        1.   Background Regarding Moog's Business ............................... 17

        2.   Mr. Socci Worked Thousands of Hours for Moog
           on the Trade Secret Programs at Issue in this Case ............... 18

        3.   Mr. Socci's Work at Moog Relates To the Stolen
           Trade Secrets in this Case ....................................................... 19

        4.   Mr. Socci's Work at Moog Also Provided Him
           With Access to Moog's Confidential Information
           Likely Not Subject to Discovery ............................................ 20

        5.   The Negotiated Protective Order Was Specifically
           Designed to Prevent Former Moog Employees
           From Viewing Moog's Stolen Trade Secret
           Information ............................................................................. 20

6.    Moog Provided the Basis for Its Protective Order Objection During the Parties' Meet and Confers ........................ 22

C.    Argument ................................................................................. 23

1.    Mr. Socci Should Be Disqualified from Working as an Expert for Skyryse ............................................. 23

2.    Mr. Socci Should Be Disqualified as an Expert for Skyryse Because Mr. Socci Is a Likely Fact Witness ........................................................................... 26

3.    Skyryse Can Find Numerous Other Non-Conflicted Experts in this Case ................................... 28

4.    Allowing Skyryse to Hire Moog's Former Employees as "Experts" Defeats the Purpose and Intent of the Protective Order in this Case .............. 30

5.    Skyryse Cannot Demonstrate Any Need to Give Mr. Socci Confidential Documents If He Is Disqualified as an Expert ........................................... 32

D.    Ripeness ................................................................................. 33

E.    Conclusion ............................................................................. 35

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Advanced Micro Devices, Inc. v. LG Elecs., Inc.*,
No. 14-CV-01012-SI, 2017 WL 3021018 (N.D. Cal. July 17, 2017) .......... 10, 15

*Advanced Semiconductor Materials Am. Inc. v. Applied Materials, Inc.*,
No. 95-20169, 1996 WL 908654 (N.D. Cal. Oct. 28, 1996) .............................. 10

*Atari Corp. v. Sega of Am.*,
161 F.R.D. 417 (N.D. Cal. 1994) .................................................................... 16

*Codexis Inc. v. EnzymeWorks Inc.*,
No. 3:16-CV-00826-WHO, 2017 WL 5992130 (N.D. Cal. Dec. 4, 2017) ........ 11

*Corley v. Google, Inc.*,
No. 16-cv-00473-LHK (HRL), 2016 WL 3421402 (N.D. Cal. June 22, 2016)
.................................................................................................................. 2, 15, 16

*Eastman Kodak Co. v. Agfa-Gevaert N.V.*,
No. 02-CV-6564, 2003 WL 23101783 (W.D.N.Y. Dec. 4, 2003) ............... 17, 32

*Hewlett-Packard Co. v. EMC Corp.*,
330 F. Supp. 2d 1087 (N.D. Cal. 2004) ...................................................... 16, 23

*Isis Pharms., Inc. v. Santaris Pharma A/S Corp.*,
No. 11-cv-2214, 2013 WL 3367575 (S.D. Cal. July 5, 2013) .......................... 10

*Marshall v. Northrop Grumman Corp.*,
No. 2:16-cv-06794-AB, 2019 WL 4143300 (C.D. Cal. July 23, 2019) ............. 16

*Morales-Toledano v. Deggeller Attractions, Inc.*,
No. 13-14106-CIV, 2013 WL 12148565 (S.D. Fla. Dec. 17, 2013), *report and recommendation adopted*, No. 13-14106-CIV, 2014 WL 12609709 (S.D. Fla. Jan. 6, 2014) ................................................................................................... 27

*Olin v. Facebook, Inc.*,
No. 18-CV-01881-RS (TSH), 2019 WL 5802020 (N.D. Cal. Nov 7, 2019) ..... 11

*Pellerin v. Honeywell Int'l Inc.*,
No. 11CV1278-BEN CAB, 2012 WL 112539 (S.D. Cal. Jan. 12, 2012) .... 16, 24

*Space Sys./Loral v. Martin Marietta Corp.*, No. CIV. 95-20122 SW, 1995 WL 686369
(N.D. Cal. Nov. 15, 1995) ............................................................................*passim*

*Staley v. Gilead Scis., Inc.*,
No. 19-CV-02573-EMC (LB), 2022 WL 3013120 (N.D. Cal. July 29, 2022)
............................................................................................................... 17, 32

*United States v. Freeman*,
498 F.3d 893 (9th Cir. 2007) ............................................................................ 27

*Wang Labs., Inc. v. CFR Assocs., Inc.*,
125 F.R.D. 10 (D. Mass. 1989) ................................................................... 24, 25

**RULES**

Fed. R. Evid. 702 ........................................................................................... 6

Fed. R. Evid. 702(a) ...................................................................................... 14

## I.      SKYRYSE'S INTRODUCTORY STATEMENT

Skyryse brings this motion to overrule Moog's objection to Skyryse sharing confidential information with its expert witness, Vincent Socci, M.S.E.E., M.B.A., B.S.E.E., a uniquely qualified engineer, aviation industry veteran, and technical consultant. Moog has objected to such disclosures, and to Skyryse's engagement of Mr. Socci, because around fifteen years ago he did some contract work for Moog (among many others in the industry) through his employer, On Target Motion. But Mr. Socci does not have any confidential information from that engagement, does not recall the details of that work, and has confirmed that he will not (and could not because he does not recall it) disclose any confidential Moog information he may have received. Moog claims Mr. Socci worked on "sensitive government programs" at issue in this case, and that the fact that he did so "precludes Mr. Socci from working for Skyryse." But this is not the test. Under the law and the protective order governing the treatment of confidential information in this action, Moog may prohibit Skyryse from sharing confidential information to Mr. Socci only if Moog can prove that doing so would create a risk of harm to Moog so great that it outweighs Skyryse's need to share such information with him to defend itself and prepare its case for trial. Moog has not come close to meeting this burden.

Moog has been unwilling or unable to identify *any* risk of harm it might suffer if Mr. Socci receives confidential information under the strict safeguards of the protective order. Moog has not offered any reason why he cannot be trusted to abide by the protective order—which he has explicitly agreed to honor—or any other confidentiality obligations. Nor has Moog provided any specifics about Mr. Socci's work for Moog many years ago, or how it could unfairly prejudice Moog in this action. Moog's silence on these issues betrays the tactical motive behind its objection: to deprive Skyryse of a valuable resource to maximize Moog's perceived litigation advantage. Respectfully, the Court should overrule Moog's objection and allow Mr. Socci to participate as an expert witness and receive confidential information.

## II.    MOOG'S INTRODUCTORY STATEMENT

Skyryse's motion is substantively deficient.  Skyryse fails to identify or analyze the primary legal issue before the Court, which is whether Mr. Socci should be disqualified from working as an expert witness for Skyryse based on his prior confidential relationship with Moog.  If Mr. Socci were to continue: (1) Skyryse would inevitably disclose Moog's confidential information to him; and (2) there would be continuing risk of Mr. Socci breaching his confidential relationship with Moog.  These risks outweigh Skyryse's purported needs as Skyryse has disclosed eight other technical experts it can use in this case.

Mr. Socci should clearly be disqualified as an expert witness for Skyryse due to his prior confidential employment relationship with Moog.  As a contractor for Moog, Mr. Socci spent approximately 3,000 hours working for Moog on sensitive government and military programs that are the subject of the very trade secret theft at the heart of this case.  Courts in this Circuit have "repeatedly ruled that it is usually improper to hire an opponent's former employee as an expert because such an expert is substantially likely to inflict unfair prejudices which the former employer cannot realistically discover or guard against."  *E.g.*, *Corley v. Google, Inc.*, No. 16-cv-00473-LHK (HRL), 2016 WL 3421402, at *2 (N.D. Cal. June 22, 2016).

Despite these facts and the applicable law, Skyryse's motion contains no legal analysis whatsoever relating to whether Mr. Socci should be disqualified, and therefore, prevented from accessing Protective Order materials.  Instead, Skyryse appears to be withholding that analysis in a yet-to-be filed supplemental brief, offering Moog no opportunity to respond to Skyryse's arguments in this Joint Stipulation.  By withholding these arguments, Skyryse appears to claim that the issue it has raised (whether there is risk of harm to Moog) is unrelated to Moog's objection to Skyryse using Mr. Socci as an expert in the first place.  Skyryse's argument makes no logical sense.  Obviously, the risk of Mr. Socci misusing Moog's confidential information

outweighs Skyryse's need to share such information with Mr. Socci because Skyryse has no need to share confidential, highly sensitive government and military secrets with an individual who will be disqualified from representing Skyryse against Moog. The Court should deny Skyryse's deficient motion and not allow supplemental briefing Skyryse should have included in this Joint Stipulation.

Skyryse's motion is procedurally improper as well.  Skyryse obtained authorization to file this motion prior to the resolution of the trade secret identification dispute under false pretenses.  The Court previously explained that it would not proceed with discovery motions prior to resolving the trade secret identification dispute between the parties.  (Heins Decl., Ex. B, p. 61.)  After receiving this response, on March 30 and April 7, 2023, Skyryse sought a discovery conference regarding Moog's objection to Mr. Socci as Skyryse's expert witness explaining that the issue "affect[ed] Skyryse's ability to respond to currently-pending motions in the case. . . ."  (Storey Decl., Ex. B, pp. 15-16.)  On April 18, 2023, the Court allowed Skyryse to file its motion based on Skyryse's plea.

The only pending motion Moog filed against Skyryse in the case at that time was Moog's Motion to Enforce Compliance With March 11, 2022 Stipulated TRO and for Monetary and Adverse Inference Sanctions.  Skyryse filed its Opposition to that motion on April 24, 2023 (with three different expert declarations) and Skyryse did not seek an extension of that Opposition deadline based on an inability to respond due to the present expert dispute before the Court.  Instead, over a month after beseeching this Court for permission to file this motion and a month after filing its Opposition, Skyryse revived this motion on May 25th while the trade secret identification remains unresolved.  Even worse, Skyryse's argues in this motion that the trade secret identification dispute actually could affect conditions relating to Mr. Socci's ability to act as an expert in this case.  *Infra*, Section III.D, n.2.  Skyryse's gamesmanship—preventing discovery from opening by challenging Moog's trade

1   secret ID while simultaneously receiving authorization to file its own motions under

2   false pretenses—should not be condoned.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## III.   SKYRYSE'S CONTENTIONS

### A.   Relevant Facts

#### 1.   Vincent Socci, M.S.E.E., M.B.A., B.S.E.E.

Vincent Socci is an electrical engineer with over thirty years of engineering, management, and leadership experience in the aviation and aerospace industries. (Socci Decl. ¶ 6.) His expertise is deep and wide-ranging, spanning safety-critical programs for electronics and software designs; product development; power electronics; embedded controllers; sensors and signal processing; avionics; power control and management systems; systems architecture; actuator controls; and software engineering. (*Id.* Ex. B.) This experience is particularly relevant to this case, which involves two aviation companies and sophisticated flight control technology.

Mr. Socci has never worked as an employee for either party. Rather, he founded and works for On Target Motion as its Chief Technical Officer. (*Id.* ¶ 8.) Mr. Socci and On Target Motion are not competitors to Moog or to Skyryse. (*Id.* at ¶ 9.) To the contrary, they have done work for many leading aviation companies, including Saab, Sensis, Northrop Grumman, Thales, Surescan, AAM, Crane Aerospace, and Kearfott, and are routinely entrusted with their confidences. (*Id.*) Mr. Socci provides a range of engineering services to his clients and does not consider himself or his company ever to have been responsible for competitive decision-making on their behalf. (*Id.* at ¶ 10.)

Experts with the breadth of experience needed in this case are difficult to find, and Mr. Socci's experience, expertise, and perspective make him uniquely qualified to assist Skyryse in this action and to explain the technical and scientific facts to Skyryse and its counsel, to the Court, and to the jury. For example, Moog has claimed that several dozen categories of trade secrets encompassing a range of flight control-related technologies are at issue, and claims these trade secrets are "reflected" in approximately 300,000 documents that Skyryse's team needs to review and understand, and eventually explain to the factfinder in a comprehensible way

through a qualified witness like Mr. Socci. Skyryse also has claims against Moog
that will require Mr. Socci's expertise and specialized knowledge related to Moog's
exploitation of Skyryse's proprietary, highly confidential, and state-of-the art trade
secret flight control technology, optionally piloted flight control system, and business information and strategies. (Dkt. 350, ¶¶ 41-44, 75-80.) Mr. Socci is among the
most qualified experts in the country in these fields, which is why Skyryse and its
counsel engaged him and "in good faith requires [his] assistance in connection with
this action." (Dkt. 89, § 6.4(c)) The specialized and technical knowledge Mr. Socci
has acquired over decades make him both indispensable to Skyryse and essential in
helping the trier of fact understand the evidence and determine disputed facts. *See*
Fed. R. Evid. 702.

### 2.    The Protective Order Governing the Treatment of Confidential Information

The parties stipulated to a protective order governing the treatment of confidential information exchanged in discovery. (Dkt. 89 (the "Protective Order").) Under the Protective Order, the parties, their counsel, and their experts are bound by a
series of safeguards,  including restrictions on using such information only in connection with this action and not "for any other purpose," securing confidential materials "in a secure and safe area," and ensuring all such materials are destroyed or
returned at the conclusion of this action. (*Id.*, §§ 6.1, 6.3, 13.1.) The Protective Order
requires an individual, like an expert witness, who is qualified to view such designated information to affirm that he will comply by signing an agreement to be bound
by the Protective Order. (*Id.*, § 6.4.)

The Protective Order also requires a party that intends to disclose to one of its
experts information designated confidential by another party first to make a written
request to the Designating Party. The Designating Party then has seven days to object, and if the parties cannot resolve an objection, "the Party seeking to make the
disclosure to the Expert may file a motion seeking permission from the Court to do

so." (*Id.* § 6.6(c).) "Any such motion must describe the circumstances with specific-ity, set forth in detail the reasons why disclosure to the Expert is reasonably neces-sary, assess the risk of harm the disclosure would entail, and suggest any additional means that could be used to reduce that risk." (*Id.*) The Protective Order also states that "*the Party opposing disclosure to the Expert shall bear the burden* of proving that the risk of harm the disclosure would entail (under the safeguards proposed) outweighs the Receiving Party's need to disclose the Protected Material to the Ex-pert."[1] (*Id.*)

### 3.    Moog's Objection to Mr. Socci

Skyryse disclosed Mr. Socci to Moog on March 2, 2023. (Storey Decl. at Ex. A.) Skyryse's disclosure included his name and address, a current copy of his CV, the categories of highly confidential information Skyryse sought to disclose to him, the name of his current employer, and the entities he worked for and the litigations in which he offered expert testimony for the preceding five years—in short, every-thing required by the Protective Order. (Dkt. 89, § 6.6(a).) Mr. Socci also maintains a publicly available LinkedIn profile about his professional experience that contains much of the same information as his CV, and in some instances more. It lists com-panies for which he has provided engineering contract services, "such as Northrop Grumman, Moog, Parker, Honeywell, Goodrich, Boeing, Airbus, Lockheed Martin, Hamilton Sundstrand, Curtiss-Wright, GE, Eaton, etc." (Socci Decl. Ex. B.) Skyryse also provided Moog with Mr. Socci's signed agreement to be bound by the Protec-tive Order. (Storey Decl. Ex. A.) In it Mr. Socci affirms, "I have read the protective order, I agree to abide by the obligations of the protective order as they apply to me." (Socci Decl. Ex. C, ¶ 11.)

Moog objected to Mr. Socci because he "worked for Moog as a contractor at least from 2005 to 2009," without elaboration. (Storey Decl. Ex. A.) Moog also base-lessly accused Skyryse of impropriety, suggesting that because Mr. Socci's CV does

---

[1] All emphasis in quotes has been added unless otherwise indicated.

not specifically reference his work for Moog fifteen years ago—even though his public LinkedIn profile *does*—Skyryse and Mr. Socci had "intentionally obscured" something "in the hopes that Moog would not find it." (*Id.*) This accusation is false. As Skyryse explained, it disclosed everything required by the Protective Order, and Mr. Socci's professional CV LinkedIn profile is publicly available, was never "obscured," and is readily accessible by Moog or anyone else who cares to view it. (Socci Decl. Ex. B, ¶ 7.) Furthermore, Moog, of course, already had independent knowledge of Mr. Socci's work for Moog. In meeting and conferring over this dispute, Moog seems to have dropped its objection based on an alleged lack of disclosure, but continues to object to Mr. Socci. (*See* Storey Decl. Ex. A.)

As the parties met and conferred, Moog did not raise any issues regarding Mr. Socci's qualifications as a subject matter expert. Moog also has never asserted that Skyryse and its counsel lacked a "good faith" basis for requiring Mr. Socci's assistance. (Dkt. 89, § 6.4(c)) Instead, Moog asserted that Mr. Socci worked on "at least one sensitive government program" for Moog. (*Id.*) Moog also claimed that Mr. Socci worked on what it described (by using the terminology from its own interrogatory response in this action) as "CUI Program Trade Secret 5" and "Trade Secrets 17 and 18." (*Id.*) But Moog refused to explain the nature or any details of the work Mr. Socci did for Moog. Nor did Moog explain how it could impact Mr. Socci's ability to abide by the Protective Order today. Moog never asserted that Mr. Socci is a competitor, or that he would divulge Moog's confidential information to a competitor. Moog intimated that Mr. Socci has confidentiality obligations to Moog, but—despite Skyryse's repeated requests—refused to provide any contracts or other agreements it may have with Mr. Socci showing such obligations, or provide any reason to think he would violate them if they exist. And Moog never identified any risk to Moog that would arise if Mr. Socci were permitted to review confidential materials in this action.

1    Mr. Socci does not recall the details of his work for Moog fourteen to eighteen

2    years ago, and only generally recalls the programs he worked on. (Socci Decl. ¶ 13.)

3    Nor is he aware of any continuing confidentiality obligations towards Moog. (*Id.*

4    ¶ 14.) Regardless, Mr. Socci has no intention of improperly using any Moog confi-

5    dential information he may have previously acquired, including for his anticipated

6    work on this case. (*Id.*) Mr. Socci is not aware of any ongoing contractual obligations

7    to Moog and, again, Moog has not identified any. Furthermore, to the best of his

8    knowledge, Mr. Socci does not have in his possession any confidential material of

9    Moog's. (*Id.* ¶ 15.) And he has represented in a sworn declaration that if, in the

10   unlikely event he recalls or comes across any confidential information he had only

11   obtained through his work for Moog all those years ago, he will keep it confidential,

12   will not use it in this case, and will not share it with Skyryse. (*Id.* ¶ 16.) He instead

13   will base his opinions only on his general expertise, information provided through

14   the discovery process, or his independent investigation as part of his work on *this*

15   action. (*Id.* ¶ 17.)

16   **B.    Ripeness**

17   The Court instructed the parties to include in this motion "a statement explain-

18   ing why this discovery dispute should or should not also be subject to Judge McCar-

19   thy's order staying discovery until the trade secret identification has been satisfied."

20   (Storey Decl. Ex. B.) Skyryse believes Moog's trade secret identification is deficient

21   and in violation of a prior court order, which is why it is the subject of a separate

22   motion Skyryse filed to enforce that order. (*See* Dkt. 473-1.) But the instant dispute

23   over Mr. Socci's involvement in this case is not subject to Judge McCarthy's stay

24   order. That's because Judge McCarthy only "deferr[ed] to a later date the consider-

25   ation of all *discovery demands and motions* except those related to Skyryse's Inter-

26   rogatory 1," which required Moog to sufficiently identify its alleged trade secrets.

27   (Dkt. 205 at 6.) This motion about Mr. Socci does not demand further discovery. To

28   the contrary, it asks the Court to overrule Moog's objection to Mr. Socci and Skyryse

sharing with him confidential discovery Moog already has provided (and may provide in the future). This motion seeks relief under the Protective Order already in place, implicates discovery that has already been provided, and is necessary to allow Skyryse to prepare its own claims and defenses even while other discovery is stayed. Moreover, Skyryse needs Mr. Socci's help to assess Moog's trade secret disclosures and to understand whether they are sufficiently specific to enable Mr. Socci, and Skyryse, to understand the claims Moog makes in this case. As such, this motion is ripe and should not be deferred until Moog comes into compliance with the Court's separate order compelling Moog to sufficiently identify its trade secrets. (*Id.*)

### C.   Legal Standards

In determining whether confidential information may be disclosed to an expert witness, courts balance the receiving party's "interest in selecting the experts most beneficial to its case with [the producing party's] interest in protecting its trade secrets from disclosure to competitors." *Advanced Semiconductor Materials Am. Inc. v. Applied Materials, Inc.*, No. 95-20169, 1996 WL 908654, at *8 (N.D. Cal. Oct. 28, 1996). The party opposing disclosure bears the burden of establishing that there is good cause to withhold the material. *Isis Pharms., Inc. v. Santaris Pharma A/S Corp.*, No. 11-cv-2214, 2013 WL 3367575, at *3 (S.D. Cal. July 5, 2013). Reflecting these principles, under the Protective Order Moog bears the burden of proving "that the risk of harm the disclosure would entail (under the safeguards proposed) outweighs the Receiving Party's need to disclose the Protected Material to the Expert." (Dkt. 89 § 6.6(c).)

When determining the extent to which such a disclosure carries a risk of harm, courts determine whether the expert in question works directly for a competitor or engages in competitive decision-making. *See e.g., Advanced Micro Devices, Inc. v. LG Elecs., Inc.*, No. 14-CV-01012-SI, 2017 WL 3021018, *2–3 (N.D. Cal. July 17, 2017) (granting the receiving party's motion to disclose confidential information to

its experts where the experts did not work "directly for [the objecting party's] competitor and [the objecting party] provided no concrete evidence that either one engages in or assists with competitive decision-making" at a competitor). Even where an expert has worked for a competitor, however, the work has to have been recent and relevant to the technology in the present case for it to preclude the disclosure of confidential information to that expert. *See Olin v. Facebook, Inc.*, No. 18-CV-01881-RS (TSH), 2019 WL 5802020, *3 (N.D. Cal. Nov 7, 2019) (holding that disclosure to one of the plaintiff's experts did not pose a risk of harm because the expert stopped working for Google, one of the plaintiff's competitors, seven years prior and because his work was not related to the technology in the present case).

### D. Moog cannot show a risk of harm so great that it outweighs Skyryse's need to work with Mr. Socci in presenting its case.

Moog cannot show any legitimate risk of harm it would suffer if Mr. Socci, under all the safeguards and restrictions of the Protective Order, is permitted to review confidential information. And Moog certainly cannot show that such a risk, if it exists, outweighs Skyryse's obvious interest in working with this highly qualified expert whose experience is uniquely applicable to this case. Accordingly, there is no basis to sustain Moog's objection and deprive Skyryse of the right to work with Mr. Socci to understand all the evidence and prepare its case for trial.

First, Moog does not allege, let alone show, that Mr. Socci works for a competitor or engages in or assists with competitive decision-making. Nor can it, for that would be untrue. *See Codexis Inc. v. EnzymeWorks Inc.*, No. 3:16-CV-00826-WHO, 2017 WL 5992130, at *8 (N.D. Cal. Dec. 4, 2017), *overturned on other grounds*, No. 3:16-CV-00826-WHO, 2019 WL 5257936 (N.D. Cal. Aug. 22, 2019) (granting motion to disclose confidential information to expert where the defendant "failed to meet their burden to establish that the companies with which [the expert] has an ongoing relationship directly compete with them"). Mr. Socci works for his own

company that does not compete with Moog and is not a decision-maker for a competitor. (Socci Decl. ¶¶ 9–10.) Moog has never claimed in the parties' extensive discussions over this dispute that Mr. Socci is a competitor or is working for one as a competitive decision-maker. Instead, the sole basis for Moog's objection is that Mr. Socci did some contract work for Moog, and even that was fourteen to eighteen years ago. This is not a sufficient basis to preclude an expert from receiving information designated confidential under a protective order, and reviewing it under court-ordered restrictions.

Second, Moog's justification for trying to bar Mr. Socci's involvement in this case is its cursory assertion that Mr. Socci previously worked on projects "related to" what it describes as "Trade Secret 5" and "Trade Secrets 17 and 18." (Storey Decl. Ex. A.) However, Moog would not explain how Mr. Socci's work purportedly relates to these alleged trade secrets, how his work might relate to the claims or defenses in this case or, more importantly, how his prior work could create some "risk of harm" that outweighs Skyryse's need to share evidence with its expert. (Dkt. 89 § 6.6(c).) Moreover, Moog's cryptic allusion to work Mr. Socci may have done related to trade secrets 5, 17, and 18 is insufficient. As Skyryse points out in its other pending motion (Dkt. 473-1), Moog describes trade secrets 5, 17, and 18 with little more than vague references to "flight control systems" that are collectively "reflected" in more than 5,000 files, with no elaboration or explanation of what specific portions of those files actually are, or are not, trade secrets.[2]

---

[2] The vagueness in Moog's objection and its deficient identification of trade secrets inhibits Skyryse's ability to propose any additional safeguards to address Moog's alleged concerns, though Skyryse does not believe any are necessary. (*See* Dkt. 89 §6.6(c) (allowing the party seeking to disclose confidential materials to the expert to "suggest any additional means that could be used to reduce" the purported risk of harm from disclosure).) For example, if Moog had more specifically described its alleged trade secrets and identified specific trade secret information that Mr. Socci acquired through his prior work for Moog, Skyryse could evaluate whether

1    Third, Moog's argument that disclosing confidential information to Mr. Socci

2    creates a risk of harm to Moog inherently assumes, with no basis, that he will violate

3    his agreement to be bound by the Protective Order and reveal Moog's confidential

4    information. Moog has not shown that Mr. Socci has violated or ever would violate

5    any obligation he owed to Moog. Moog offers no reason to think he would disregard

6    the restrictions and obligations imposed by the Protective Order or the additional

7    assurances he has given not to do so. (Socci Decl. at ¶ 16.) He will provide opinions

8    based only on his independent expertise and work on this case. (*Id.* at ¶ 17.) *Space*

9    *Sys./Loral v. Martin Marietta Corp.*, No. CIV. 95-20122 SW, 1995 WL 686369, at

10   *4 (N.D. Cal. Nov. 15, 1995) (holding expert may "provide his expert opinion based

11   on his independent research and expertise in the field" but is "prohibited from dis-

12   closing . . . or testifying about any knowledge he obtained while bound by his con-

13   fidential disclosure agreements . . . ."). Moog cannot meet its burden on this record.

14   At bottom, Moog's objection is not based on any real threat of a competitive

15   risk that is not sufficiently mitigated by the safeguards of the Protective Order that

16   the parties themselves negotiated at the outset of this action. The only case Moog

17   has pointed Skyryse to is *Space Systems/Loral v. Martin Marietta Corp.* (*See* Storey

18   Decl. Ex. A), but in that case, the court specifically distinguished between an expert

19   that had "access to confidential attitude control technology until *quite recently*" from

20   an expert whose "meaningful involvement with [the designating party] ended . . .

21   *over 15 years ago*." No. CIV. 95-20122 SW, 1995 WL 686369, at *2–3 (N.D. Cal.

22   Nov. 15, 1995). Similarly, here, Mr. Socci's work for Moog was fourteen to eighteen

23   years ago, and Moog has made no showing that his prior work creates some unac-

24   ceptable risk for Moog today. Moog's objection to Mr. Socci because he purportedly

25   worked on certain Moog programs over a decade ago is not a sufficient basis to

26

27   _____

28   Mr. Socci's work could exclude those alleged trade secrets. But absent such speci-
     ficity from Moog, Skyryse is unable to propose any such safeguards.

disqualify him or prevent him from reviewing confidential information under the safeguards of the Protective Order.

### E. Moog cannot show that Skyryse's need to disclose designated information to Mr. Socci to prepare its case for trial is not "reasonably necessary."

Disclosing Moog's purportedly confidential information to Mr. Socci is "reasonably necessary" for Skyryse and its legal team to understand the evidence and prepare its case for trial. (*See* Dkt. 89 § 6.6.) Moog has claimed that dozens of categories of trade secrets reflected in hundreds of thousands of files and encompassing a range of technologies are at issue, and these innumerable technical facts require an expert's understanding and explanation. *Supra* at III.A.1. Likewise, Skyryse's counterclaims about flight control technology, automating flight systems, and optionally piloted systems, among others, will similarly require specialized expertise and knowledge to understand and assist the factfinder. *Id.* Discovery and trial necessarily will involve complex, scientific evidence. This is precisely the sort of case in which expert testimony is essential. Mr. Socci's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).

Mr. Socci's unique education, training, and specific industry expertise is not commonplace or fungible. Mr. Socci is, among other things, an expert in aviation and aerospace electronics and software and has over thirty years of experience in his field. (Socci Decl. ¶ 6.) He is currently the Chief Technology Officer at On Target Motion, where he provides engineering services for safety-critical and high-reliability applications across the industry. (*Id.* at Ex. A.) Mr. Socci has been retained as an expert on multiple occasions and has testifying experience, uniquely qualifying him to assist the factfinder in this case. (*Id.*) *See also supra* at III.A.1. If Moog's objection were sustained, there are no guarantees Skyryse would be able to find a replacement with even nearly the fit Mr. Socci has for this case.

Skyryse has chosen to work with Mr. Socci based on his singular experience and expertise in the field. "In the ordinary course of litigation, a party is owed some degree of deference in retaining and preparing an expert with the relevant industry experience and availability." *Advanced Micro Devices, Inc.*, 2017 WL 3021018, at *2 (internal quotations removed). Even where there is an increased risk of improper use of confidential information—which is not the case here—courts permit the use of such experts where they "possess[] unique expertise." *See id.* Here, no evidence suggests that Mr. Socci's involvement would increase the risk that he or anyone would make improper use of confidential information provided through the discovery process. Thus, there is no need to show that Mr. Socci is uniquely positioned to assist Skyryse in this matter, but he plainly is. *See id.* at *3. Mr. Socci's deep, broad, and specialized experience and expertise uniquely position him to assist Skyryse in this action. *Supra* at III.A.1. No hypothetical or speculative risk of competitive harm to Moog outweighs Skyryse's legitimate need to have Mr. Socci review information designated as confidential under the Protective Order and participate in this action.

## F.     Conclusion

Skyryse respectfully requests that the Court grant this motion, overrule Moog's objection, and allow Mr. Socci to participate in this action as an expert witness and receive confidential information subject to the Protective Order.

## IV.   MOOG'S CONTENTIONS

Mr. Socci worked thousands of hours over a period of years at Moog developing some of the programs that are at the heart of this case.  Skyryse has no need whatsoever to disclose Moog's confidential information to an expert witness Skyryse is forbidden from using in this case, especially where the reason for the ultimate prohibition is directly relevant to the disclosure of confidential materials, namely because Mr. Socci "is substantially likely to inflict unfair prejudices which the former employer cannot realistically discover or guard against." *Corley*, 2016

1   WL 3421402, *2.  Preventing Skyryse from working with Mr. Socci is not prejudi-

2   cial to Skyryse.  Skyryse has already disclosed **ten different expert witnesses** in this

3   case, eight of whom have a technical background.  Mr. Socci is clearly not "uniquely

4   positioned" to assist Skyryse in this matter where an abundance of non-conflicted

5   experts can appear on Skyryse's behalf.

6       **A.   Legal Standard**

7       District courts have recognized that "disqualification may be appropriate . . .

8   when a party retains expert witnesses who previously worked for an adversary and

9   who acquired confidential information during the course of their employment."

10   *Marshall v. Northrop Grumman Corp.*, No. 2:16-cv-06794-AB (JCx), 2019 WL

11   4143300, at *2 (C.D. Cal. July 23, 2019) (citing *Space Sys./Loral v. Martin Marietta*

12   *Corp.*, No. 95-20122, 1995 WL 686369, at * 2 (N.D. Cal. Nov. 15, 1995)).  Courts

13   generally disqualify an expert based on a prior relationship with an adversary if "(1)

14   the adversary had a confidential relationship with the expert and (2) the adversary

15   disclosed confidential information to the expert that is relevant to the current litiga-

16   tion."  *Space Sys./Loral*, 1995 WL 686369, at * 2; *Hewlett-Packard Co. v. EMC*

17   *Corp.*, 330 F. Supp. 2d 1087, 1092 (N.D. Cal. 2004); *Pellerin v. Honeywell Int'l Inc.*,

18   No. 11CV1278-BEN CAB, 2012 WL 112539, at *1 (S.D. Cal. Jan. 12, 2012).  With

19   respect to former employees being hired as expert witnesses, at least the Northern

20   District of California "has repeatedly ruled that it is usually improper to hire an op-

21   ponent's former employee as an expert because such an expert is substantially likely

22   to inflict unfair prejudices which the former employer cannot realistically discover

23   or guard against."  *Corley*, 2016 WL 3421402, at *2 (citing *Space Sys./Loral*, 1995

24   WL 686369, at *2; *Atari Corp. v. Sega of Am.*, 161 F.R.D. 417, 421 (N.D. Cal. 1994).

25   "In addition to these two factors, the Court also should consider whether disqualifi-

26   cation would be fair to the affected party and would promote the integrity of the legal

27   process."  *Marshall*, 2019 WL 4143300, at *2.

28

1    Courts repeatedly deny individuals access to protective order materials if said

2    individual is disqualified from acting as an expert.  *Staley v. Gilead Scis., Inc.*, No.

3    19-CV-02573-EMC (LB), 2022 WL 3013120, at *4 (N.D. Cal. July 29, 2022) (hold-

4    ing that a proposed expert "is disqualified and may not receive information marked

5    confidential under the Supplemental Protective Order"); *Eastman Kodak Co. v.*

6    *Agfa-Gevaert N.V.*, No. 02-CV-6564, 2003 WL 23101783, at *1 n.1 (W.D.N.Y. Dec.

7    4, 2003) (noting that where the moving party sought "a protective order precluding

8    confidential documents being disclosed to him," "the legal analysis applicable to

9    expert disqualification controls the issuance of the protective order [the moving

10   party] seeks here.").

11       **B.    Relevant Facts**

12           **1.    Background Regarding Moog's Business**

13       Moog is a designer and manufacturer of electric, electro-hydraulic and hy-

14   draulic motion, controls and systems for applications in aerospace, defense, indus-

15   trial and medical devices.  (Pieroni Decl., ¶4.)  Moog has developed and supplies the

16   flight control systems for some of the most common commercial aircrafts used to-

17   day, and Moog frequently works on sensitive government research projects in addi-

18   tion to its commercial projects.  (*Id.*)  Every engineering employee at Moog is subject

19   to strict confidentiality obligations given Moog's contracts associated with the gov-

20   ernment and military businesses.  (*Id.*, ¶8.)  This includes contractors, such as Mr.

21   Socci, who are equally obligated as employees to adhere to government statutes and

22   regulations, as well as specific contractual requirements imposed by customers

23   (commercial and governmental) for the projects to which they are assigned.  (*Id.*)

24   Many of Moog's military projects are controlled by executive orders and regulations

25   categorized as Controlled Unclassified Information" ("CUI").  Material marked as

26   CUI includes information that requires sensitive protection but is not classified.

27   Reasons for such restrictions can include export controls, privacy regulations, court

28   orders, and ongoing criminal investigations, as well as national security.

### 2. Mr. Socci Worked Thousands of Hours for Moog on the Trade Secret Programs at Issue in this Case

On December 21, 2005, Moog hired Vince Socci as a contractor to work on Moog confidential projects.  (Pieroni Decl., ¶7.)  As a result of his hiring, Mr. Socci had a confidential relationship with Moog.  (*Id.*, ¶7-8.)  Moreover, Mr. Socci was required by law to not disclose confidential information relating to sensitive government and military projects.  (*Id.*)

From 2006 through approximately 2007, Mr. Socci worked as an electrical engineer in the Aircraft Group on the sensitive government program "██████ ████████ (*Id.*, ¶9.) ████████████████████████████████████ ████████████████████████ (*Id.*) ████████████████████████ ████████████████████████████████████████████████████ ████████████ (*Id.*) ████████████████████████████████ ████████████████████████████. (*Id.*) ████████ is a confidential project at Moog.  (*Id.*, 7-10)

While working on the ████████ program, Mr. Socci worked on ████████ ██████ under Moog's direction and control.  (*Id.*, ¶11.)  Specifically, Mr. Socci worked ████████████████████████████████████████████ ████████████████████████████████ (*Id.*) ████████████████ ████████████████████████████████████████████████████ (*Id.*) ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████ (*Id.*)  As part of his work for Moog, Mr. Socci obtained Moog's confidential information.  (*Id.*, ¶¶11-17, Pieroni Decl., Ex. A, Pieroni Decl., Ex. C.)

1    Moreover, while working on firmware aspects of the ▮▮▮ program, Mr.

2    Socci would have necessarily needed detailed knowledge of the ▮▮▮

3    ▮▮▮ with respect to the ▮▮▮

4    ▮▮▮. (*Id.*, ¶12.) Mr. Socci therefore had "inti-

5    mate knowledge" of the ▮▮▮ system's architecture. Mr. Socci also would have

6    worked with Moog's software engineers as the ▮▮▮

7    ▮▮▮

8    ▮▮▮. (*Id.*)

9    Mr. Socci worked approximately ▮▮▮ projects while at

10   Moog. (*Id.*, ¶13; Pieroni Decl., Ex. B.) Moog considers Mr. Socci's work on the

11   ▮▮▮ project to be substantial. (Pieroni Decl., ¶13.) Mr. Socci also worked on

12   the ▮▮▮ and G/ATOR program while at Moog. (*Id.*,

13   ¶15.) The ▮▮▮

14   ▮▮▮, and Mr. Socci's G/ATOR work focused on cable assemblies. (*Id.*)

15   Moog used the ▮▮▮ program to build out other projects, such as the

16   ▮▮▮ programs. (*Id.*, ¶14.) For example, ▮▮▮

17   ▮▮▮. (*Id.*) Moog

18   used ▮▮▮. (*Id.*)

19   Moreover, work on the ▮▮▮

20   ▮▮▮. (*Id.*)

21   **3.    Mr. Socci's Work at Moog Relates To the Stolen Trade Se-**

22   **crets in this Case**

23   Moog identified the ▮▮▮ program as "CUI Program Trade Secret 5" as

24   part of its trade secret identification. (*See* Heins Decl., ¶5.) Moog separately iden-

25   tified ▮▮▮ files as part of its trade secret identifica-

26   tion. *Id.* Mr. Socci's work on the ▮▮▮

27   ▮▮▮

28   ▮▮▮. (Pieroni Decl., ¶¶11-12.)

Moog also identified "██████" as part of Moog's non-CUI Trade Secret No. 18. (*See* Heins Decl., ¶5.)  Mr. Socci's work on ██████ is directly relevant to ██████ ██████████████████████████████████████████████████████ ██████ IP.  (Pieroni Decl., ¶14.)

**4.    Mr. Socci's Work at Moog Also Provided Him With Access to Moog's Confidential Information Likely Not Subject to Discovery**

Mr. Socci also had access to confidential Moog information that Skyryse would likely not otherwise be able to obtain via discovery in this case or any other expert witness that did not formerly work at Moog.  For example, Mr. Socci worked on Moog's █████████████████████████████████.  (Pieroni Decl., ¶15.)  Moog has not yet seen evidence of misappropriation of files related to these programs.  Mr. Socci's work on ██████████████████ project were also not stolen (to Moog's current knowledge) and likely will never be produced in discovery.  (*See also* Pieroni Decl., ¶17.)  Mr. Socci's knowledge of these confidential programs and files, including other Emerald hardware and firmware files that were not stolen by Skyryse, puts Mr. Socci in a far different position than any independent expert would have when working for Skyryse.  (*See* Pieroni Decl., ¶18.)  Mr. Socci's wealth of confidential knowledge gained at Moog is therefore highly prejudicial to Moog.  (*Id.*, ¶19.)

**5.    The Negotiated Protective Order Was Specifically Designed to Prevent Former Moog Employees From Viewing Moog's Stolen Trade Secret Information**

The present case relates to Skyryse's theft of over 1.4 million files from Moog and Skyryse's corporate raiding of Moog employees to exploit Moog's confidential and proprietary information.  (Dkt. 496-1 (Moog's [Proposed] Amended Complaint), ¶ 1.)  In an effort to prevent Skyryse's corporate raiding from being successful, Moog negotiated a protective order that included a provision for designating

material as "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY."  (*See* Dkt. 89, ¶ 1.9.)  "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" material includes "[c]urrent trade secrets or other information, the disclosure of which the party reasonably believes would result in imminent competitive, commercial, or financial harm to the Producing Party or its personnel, clients, or customers."  (*Id.*, ¶ 1.9(a).)  Importantly, the Protective Order gave Moog the ability to "Upward Designate" information produced by Skyryse.  (*Id.*, ¶ 4.3).)  Section 4.3 of the Protective Order therefore allows Moog to designate Moog's trade secret information in the possession of Skyryse as HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY if Skyryse failed to originally do so.  (*Id.*)

Material designated as HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY may only be disclosed to U.S. citizens who fall within the following categories:

(a) the Receiving Party's Outside Counsel;

(b) Designated In-House Counsel of the Receiving Party;

(c) Experts and/or Consultants;

(d) the Court, special masters, mediators, court reporters, and videographers;

(e) authors of any such designated material; and

(f) any person agreed to by the Designating Party in writing.

(*Id.*, ¶ 6.5).)  Moog and Skyryse agreed that only one counsel from each party could be designated as the "Designated In-House Counsel."  (*Id.*, ¶ 1.5).)

By design, ***the Protective Order does not allow Skyryse to show any of the stolen trade secret files at issue in this case to former Moog employees now working for Skyryse***.  Moog specifically negotiated the Protective Order to make sure Skyryse could not continue to have an unfair advantage in business and in this litigation by relying on former Moog employees to review confidential Moog documents Skyryse should have never had access to in the first place.  (*See* Heins Decl., ¶ 4.)

### 6.      Moog Provided the Basis for Its Protective Order Objection During the Parties' Meet and Confers

Despite Skyryse's unwillingness to discuss Moog's actual objection to Mr. Socci receiving access to materials under the Protective Order (i.e., that Mr. Socci should be disqualified from representing Skyryse because he was a former contractor of Moog), Moog confirms it repeatedly provided the basis of its objection during the parties' meet and confer conferences:

- On March 8, 2023, counsel for Moog stated "We object to Vincent Socci accessing any non-public materials associated with this case. Our records show that Mr. Socci worked for Moog as a contractor at least from 2005-2009." (Storey Decl., Ex. A, p. 10.);

- On March 10, 2023, counsel for Moog stated "Moog objects to Mr. Socci *serving as an expert for Skyryse* because Mr. Socci worked for Moog as a contractor from approximately 2005-2009. . . . To the extent Skyryse intends to continue seeking to use Mr. Socci, a former Moog contractor, as an expert witness against Moog in this litigation, we are available for a meet and confer on Tuesday, March 14th." (Storey Decl., Ex. A, p. 9 (emphasis added).);

- On May 14, 2023, counsel for Moog further informed Skyryse's counsel that Moog believed Mr. Socci should be disqualified from representing Skyryse, and cited *Space Sys./Loral v. Martin Marietta Corp.*, No. 95-20122, 1995 WL 686369, at * 2 (N.D. Cal. Nov. 15, 1995) as the legal basis for disqualification in this case.  (Heins Decl., ¶8.);

- On May 17, counsel for Moog responded to correspondence from Skyryse and stated: I note that your email below does not identify why you disagree with Moog's provided case law or give any legal justification for trying to use Mr. Socci as an expert in this case. Your email

1    also does not indicate that you have conducted any independent inves-

2    tigation with Mr. Socci about his specific work at Moog and any legal

3    obligations he has based on his employment at Moog.  (Storey Decl.,

4    Ex. A, pp. 7-8.)

5    Skyryse also understood Moog's objection during the meet and confer pro-

6    cess.  On March 22, 2023, Skyryse's counsel stated: "we understand that Moog is

7    objecting to Mr. Socci as an expert for Skyryse based on his prior Moog-related

8    work." (Storey Decl., Ex. A, pp. 6.)  Skyryse's decision to not address Moog's actual

9    objection in this joint statement is not justified.

10    **C.    Argument**

11    The Court should sustain Moog's objection to Mr. Socci obtaining access to

12    protective order materials and disqualify Mr. Socci as an expert witness for Skryse.

13    **1.    Mr. Socci Should Be Disqualified from Working as an Ex-**

14    **pert for Skyryse**

15    a.    Mr. Socci Had a Confidential Relationship with Moog

16    Relating to the Subject Matter of this Case

17    Mr. Socci had a confidential relationship with Moog when he was employed

18    as a contractor at Moog.  (Pieroni Decl., ¶¶7-17; Pieroni Decl., Ex. A; Pieroni Decl.,

19    Ex. B; *supra*, Moog Section IV.B.2-4.)  Mr. Socci's confidential relationship at

20    Moog relates directly to certain trade secrets at issue in this case.  *Supra*, Section

21    IV.B.2-3.  Specifically, Mr. Socci worked on the ███████████████████

22    ███████████████████ program, a sensitive government program

23    under strict confidentiality and disclosure regulations.  *Id.*  Mr. Socci's work on ███

24    ███████████████████████████████████████

25    ██████████████████.  *Id.*  Accordingly, Mr. Socci and Moog had

26    a confidential relationship, and Moog disclosed confidential information to Moog.

27    *Space Sys./Loral*, 1995 WL 686369, at * 2; *Hewlett-Packard Co. v. EMC Corp.*, 330

28

1   F. Supp. 2d 1087, 1092 (N.D. Cal. 2004); *Pellerin*, 2012 WL 112539, at *1 (S.D.

2   Cal. Jan. 12, 2012).  Mr. Socci should therefore be disqualified.

3         Where an employee "was privy to substantial confidential information . . .

4   relevant to the issues in [the] case," "[t]here is no doubt that [the expert] must be

5   disqualified."  *Space Sys./Loral*, 1995 WL 686369, at *2 (disqualifying expert

6   involved in designing a control system for the trade secret product at issue); *Pellerin*,

7   2012 WL 112539, at *3 (S.D. Cal. Jan. 12, 2012) (finding "a substantial risk [the

8   expert] may inadvertently use confidential information he is contractually barred

9   from disclosing to [party] in his role as expert" based on employer declarations that

10   expert received confidential information pertinent to the litigation).

11         Just as in *Space Sys./Loral* and *Pellerin*, Mr. Socci's confidential knowledge

12   from working on the Emerald program is directly relevant to the issues in this case.

13   Furthermore, like as in *Space Sys./Loral*, Mr. Socci had confidential agreements with

14   Moog and he was required, as a matter of law, not to disclose trade secrets relating

15   to Moog's governmental and military programs.  Moreover, there is no dispute that

16   Mr. Socci currently "deals with companies in competition" with Moog as part of his

17   current consulting business.  (Pieroni Decl., ¶19; *see Wang Labs., Inc. v. CFR*

18   *Assocs., Inc.*, 125 F.R.D. 10, 11 (D. Mass. 1989) (disqualifying an expert whose

19   consulting work including consulting with competitors of the plaintiff).

20                  b.      Skyryse's Arguments Do Not Rebut the Existence of Mr.

21                          Socci's Confidential Relationship with Moog

22         Skyryse does not provide any meaningful analysis relating to whether Mr.

23   Socci should be disqualified under standards set for in this Circuit.  The little relevant

24   information Skyryse does provide in this joint stipulation does not rebut: (1) Moog's

25   assertion of a prior confidential relationship with Mr. Socci through his employment;

26   (2) Moog's assertion that Moog disclosed confidential information to Mr. Socci

27   through his employment; and (3) that Mr. Socci's work for Moog is relevant to this

28   case.

1      First, Mr. Socci admits he did contract work for Moog.  (Socci Decl., ¶11.)

2      Second, Mr. Socci does not deny he had a confidential relationship with Moog

3   while at Moog or that he at one time received confidential information from Moog.

4   (*See generally id*., ¶¶11-14 (only asserting the lack of awareness of "ongoing

5   confidentiality obligations" and that he did not "retain . . . possession of any of the

6   Moog information).)  Notably, Mr. Socci does not indicate whether he undertook

7   any actions at all to confirm whether he had a past confidential relationship with

8   Moog at all.

9      Third, Mr. Socci admits that he "remember[s] the general programs [he

10   worked on for Moog," but conveniently does not state the identity of those programs

11   or whether he believes his work for Moog is directly relevant to this case.  (*Id.*, ¶12.)

12      Fourth, Mr. Socci admits working for many aviation companies as part of his

13   current consulting work, including "Saab, Sensis, Northrop Grumman, Thales,

14   Surescan, AAM, Crane Aerospace, Kearfott, and others."  (*Id.*, ¶8.)  The fact that

15   Mr. Socci does not have "decision-making authority" for any of these companies

16   does not lessen the risk of inadvertent disclosure of Moog's confidential information.

17   *see Wang Labs*., 125 F.R.D. 10, 11 (disqualifying an expert whose consulting work

18   including consulting with competitors of the plaintiff).

19      Fifth, Skyryse's brief discussion of *Space Sys./Loral* is inapposite.  Skyryse

20   argues that Mr. Socci is similarly situated one of the experts that did not get

21   disqualified in that case because Mr. Socci's work also happened fifteen years ago.

22   (*See* Skyryse's Section III.3.D)  But timing was specifically important in that case.

23   In *Space Sys./Loral*, the parties agreed the expert at issued "possess[d] no

24   confidential information concerning the Series 7000, the specific technology at issue

25   in this lawsuit," and only possessed confidential information related to a predecessor

26   product "that bear[ed] little resemblance" to the product at issue in the case.  *Space*

27   *Sys./Loral*, 1995 WL 686369, at *3.  Here, Mr. Socci worked for Moog **on the**

28   **development of the program** ███████ **actually at issue in the case**.  Moreover, in

1    this case, other programs at issue (████████████████████████████████████

2    ██████████████████.  The fact that Mr. Socci's employment ended 15 years ago is

3    irrelevant as his work at that time is relevant to this case.

4            Finally, Skyryse implies that Moog failed to provide its substantive reasons

5    for Mr. Socci's disqualification during the meet and confer process by only making

6    a "cursory assertion that Mr. Socci previously worked on projects 'related to' what

7    it describes as 'Trade Secret 5' and 'Trade Secrets 17 and 18.'  To be clear, Moog's

8    reference trade secrets by number, rather than name, was clear in the context of

9    Moog's trade secret ID and done to avoid running afoul of potential government

10   regulations relating to CUI programs.  Skyryse knew which programs were at issue.

11   But more importantly, Mr. Socci is clearly already working with Skyryse, and surely

12   Skyryse had the ability to ask Mr. Socci what he did when working for Moog and

13   whether his work related to the trade secrets in this case.  Mr. Socci's apparent

14   decision **not to tell Skyryse what programs he worked on at Moog** such that Skyryse

15   could not respond to Moog's objection only supports Moog's position that Moog

16   had a confidential relationship with Mr. Socci and that Mr. Socci does not dispute

17   the existence of this relationship.  (*See generally* Socci Decl., ¶¶11-14; Skyryse

18   Section III.D, p. 11:9-21.)  To the extent Skyryse is instead arguing here that an

19   alleged lack of specificity in Moog's trade secret identification is impacting its

20   ability to understand Moog's objections, then Skyryse should have waited to bring

21   this motion after the resolution of that related motion.  *Infra*, Moog Section IV.B.

22           **2.      Mr. Socci Should Be Disqualified as an Expert for Skyryse**

23                    **Because Mr. Socci Is a Likely Fact Witness**

24           Mr. Socci should also be disqualified because his work as a former employee

25   at Moog working on ███████ development means that he could be a potential fact

26   witness before the jury in this case.  For example, Mr. Socci could potentially be

27   called to testify regarding his understanding of the Emerald program, the value of

28   the Emerald program based on his internal conversations and work at Moog, and the

relationship of the stolen trade secret files in comparison to non-stolen files he knew of or also worked on. Permitting Mr. Socci to testify as both a fact witness ***and*** an expert witness regarding the identical or nearly identical subject matter would cause needless jury confusion and unfair prejudice to Moog.

First, Mr. Socci's qualification as an expert would imbue his fact witness testimony with "unmerited credibility." *United States v. Freeman*, 498 F.3d 893, 903 (9th Cir. 2007). Although there is no categorical rule in the Ninth Circuit barring a witness from testifying as both a fact witness and an expert witness, the Ninth Circuit has nonetheless recognized that the admission of such testimony can be accompanied by significant "dangers." *Freeman*, 498 F.3d at 902. Most importantly, "by qualifying as an 'expert,' the witness attains unmerited credibility when testifying about factual matters from first-hand knowledge." *Id.* at 903. Any "lack of clarity regarding [the witness's] dual roles [thus] create[s] a risk that there [will be] an imprimatur of scientific or technical validity to the entirety of his testimony." *Id.*; see Morales-Toledano v. Deggeller Attractions, Inc., No. 13-14106-CIV, 2013 WL 12148565, at *1 (S.D. Fla. Dec. 17, 2013) ("[T]his Court agrees that allowing [witness] to wear two hats at trial, both as the Defendant's corporate representative/fact-witness and as an expert witness, runs the risk of confusing the jury."), *report and recommendation adopted*, No. 13-14106-CIV, 2014 WL 12609709 (S.D. Fla. Jan. 6, 2014).

Second, allowing Mr. Socci to testify as both an expert and lay witness will create a "blurred distinction" potentially resulting in Mr. Socci relying upon and conveying inadmissible testimony as part of his lay testimony. *Id.* at 904 ("Once [the witness] stopped testifying as an expert and began providing lay testimony, he was no longer 'allowed . . . to testify based on hearsay information, and to couch his observations as generalized 'opinions' rather than as firsthand knowledge.'"). Here, there is substantial overlap between Mr. Socci's potential expert testimony (regarding value of technical files, industry standards, potential origins of documents

and files, and industry practices regarding confidentiality) and Mr. Socci's experience (value of ███ within Moog, industry standards he/Moog employees followed, actual origins of documents, and Moog's confidentiality practices).

Finally, allowing Mr. Socci to provide expert testimony, in addition to his factual testimony, leads to "increased danger that [Mr. Socci] will stray from applying reliable methodology and convey to the jury . . . 'sweeping conclusions' about [Moog's] activities, deviating from the strictures of Rules 403 and 702." *Id.* Such dual testimony "may lead to juror confusion because '[s]ome jurors will find it difficult to discern whether [Mr. Socci] is relying properly on his general experience and reliable methodology, or improperly on what he has learned of the case" through his own personal knowledge. *Id.*

### 3. Skyryse Can Find Numerous Other Non-Conflicted Experts in this Case

This Court should reject Skyryse's argument that Mr. Socci is "uniquely positioned" to assist Skyryse in this case. While Skyryse claims it has "chosen to work with Mr. Socci based on his singular experience and expertise in the field," Skyryse fails to tell the Court that Skyryse has already disclosed ten other experts in this case, including eight with a technical background. Skyryse has already disclosed the following technical experts:

- C. Douglass Locke, Ph.D. (a "full-time consultant with a variety of clients involved primarily in Military, Aerospace, Industrial Control, and Telecommunications systems [with] extensive technical and business background in areas such as software engineering, software performance, real-time architecture, design, implementation, and deployment, international standards, software engineering maturity, and software development management and organization has made a major impact on organizations creating complex systems");

- o Dr. Locke also worked for 20 years as either the Chief Scientist of the Lockheed Martin Systems Solutions organization or the Chief Scientist of IBM's/Lockheed Martin's Software & Systems Resource Center

- Jason Janet, Ph.D (doctorate in Electrical and Computer Engineering with over 25 years of experience at Avionic Instruments, Acme Aerospace, Aerospace Cooling Solutions, Teledyne Technologies (working with DARPA, NASA, and the Army), and ShelfWorks Technologies/RxMedic Systems/Vortex HC (spinoffs of Avionic Instruments), among others);

- Dr. Michael J. Dreikorn (43 years of global industry experience within the Aviation, Space, Defense, Maritime and regulated high-tech industries);

- Nikolaus Baer (who has worked as a software developer, research engineer, firmware developer, project engineer, product development engineer, and  intellectual property technical advisor since 2002);

- Michael Bandemer (who claims to have "led the preservation, forensic collection, analysis and search of electronically stored information ("ESI") and forensic artifacts in over 1,000 matters");

- David Jimenez (who claims to have 17 years of experience as a computer forensics examiner);

- Geoffrey Brown (more than 20 years of experience in information technology and over 17 years of experience in digital forensic collection and analysis, data analytics, investigations, and eDiscovery); and

- James Pooley (who works in IP strategy and dispute management, information security, and ADR with "a heavy concentration in trade secret and patent matters").

1   (Heins Decl., Ex. A (curriculum vitae of Skyryse's technical experts).)

2       Skyryse does not "need" to use Mr. Socci as an expert. Skyryse has already

3   demonstrated ample ability to find experts in the field, and Skyryse provides no

4   evidence or hardship in finding others even if it thinks the eight experts identified

5   above are not sufficient.[3]  The only "singular experience and expertise in the field"

6   that Mr. Socci has over Skyryse's other experts is his prior employment and

7   confidential relationship with Moog—the precise reason he should be disqualified.

8       This is not the first time Skyryse has falsely told the Court that it needs Mr.

9   Socci's ability in this case. As explained in more detail below, as part of Skyryse's

10  justification for even being allowed to bring this motion in the first place almost two

11  months ago, Skyryse told the Court that this motion "affects Skyryse's ability to

12  respond to currently-pending motions in the case." (Storey Decl., Ex. B, pp. 15-16.)

13  Yet, Skyryse waited over a month *after* filing its Opposition to Moog's currently-

14  pending, before even sending Moog a draft joint stipulation on this issue. (Heins

15  Decl., ¶¶6-7.) Notably, Skyryse did not seek leave before Judge Wu for an extension

16  to file its Opposition until the resolution of this issue. Instead, Skyryse submitted

17  three different expert declarations (from Dr. Dreikorn, Mr. Baer, and Mr.

18  Bandemer). Skyryse's claim that it "needs" Mr. Socci has already been proven to

19  be false.

20          **4.    Allowing Skyryse to Hire Moog's Former Employees as**

21                  **"Experts" Defeats the Purpose and Intent of the Protective**

22                  **Order in this Case**

23      Moog brought this litigation to stop Skyryse's theft of over a million

24  documents and corporate raiding of Moog employees to exploit Moog's stolen

25  confidential and proprietary information. *Supra*, Moog Section IV.B.5.  Moog

26  
_____

27  [3] To the extent Skyryse is actually arguing that only experts with prior work at Moog are qualified to opine on the trade secrets at issue in this case, that argument speaks

28  volumes about the gravity and seriousness of Moog's unfair competition claim against Skyryse.

specifically negotiated a protective order that would not allow Skyryse to benefit from their decision to hire former Moog employees to continue to view and assess Moog's stolen information.  *Id.*  That protective order allows a singular person at Skyryse to view Moog's stolen trade secret information, Skyryse's in-house counsel.  *Id.*  Moog negotiated that protective order with Skyryse's prior counsel, Gibson Dunn.  Skyryse's current counsel now is trying for an end run around the protective order by hiring a former Moog employee as an "expert."[4]

The purpose and intent of the Protective Order is clear.  As part of a ***stipulated*** Temporary Restraining Order ("TRO"), Skyryse was supposed to find, produce, and stop using Moog's stolen information.  (Dkt. 25, ¶1-2.)  Moog was allowed to designate its material that Skyryse produced as Moog's HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY material if Skyryse failed to do so.  *Supra*, Moog Section IV.B.5; Dkt. 89, ¶4.3.   And information designated as Moog's HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY could not be shown to former Moog employees.   *Supra*, Moog Section IV.B.5; Dkt. 89, ¶6.4.   Together, the stipulated TRO and Protective Order prevented Skyryse's corporate raid and use of Moog's stolen information.  Skyryse's decision to use an ex-Moog employee, who worked on the trade secrets at issue in this case, is an improper attempt to maneuver around the Protective Order in this case.  Moog objected accordingly, and the Court should not allow Mr. Socci access to protective order materials.

---

[4] Given the details of this case, Moog maintains that Skyryse's incomplete disclosure of Mr. Socci to Moog's counsel is suspect.  Skyryse's counsel surely knows that the purpose of disclosing expert CVs to opposing parties is entirely for the purpose of checking conflicts.  Moog does not find it believable that Mr. Socci did not inform Skyryse's counsel of his prior work for Moog.  While Mr. Socci publicly represents his work for Moog as a positive aspect of his work experience elsewhere, Moog mysteriously was missing from his CV provided to Moog's counsel, which led to delay in identifying this conflict in the first place.  Fortunately, Moog's independent research identified cause for expert disqualification early in this case before significant prejudice.

While a bad faith, but technically permissible, expert disclosure does not appear to alone be a reason for disqualifying an expert in the Ninth Circuit, Moog believes Skyryse's pattern of behavior with respect to representations about Mr. Socci should not be condoned.

**5.    Skyryse Cannot Demonstrate Any Need to Give Mr. Socci Confidential Documents If He Is Disqualified as an Expert**

Skyryse's entire motion misses the point.  Mr. Socci is not eligible to be an expert in this case because he "must" be disqualified based on his prior confidential relationship and employment with Moog.  *Space Sys./Loral*, 1995 WL 686369, at *2.  Instead of focusing on whether Moog and Mr. Socci had a pertinent confidential relationship, Skyryse asks this Court to undertake an extensive and irrelevant balancing analysis to determine whether Mr. Socci should separately get access to protective order material (apparently independent from whether Mr. Socci would be disqualified at a later point in time).  Specifically, Skyryse asks this Court to determine if the "risk of harm to Moog" is "so great that it outweighs Skyryse's need to share such information with him to defend itself and prepare its case for trial."

That balancing analysis is actually very simple if the disqualification issue is reached first.  Once the Court properly determines that Mr. Socci is disqualified from working as an expert for Skyryse, then Skyryse has no need to share confidential information with a disqualified expert.  *Staley*, 2022 WL 3013120, at *4 (holding that a proposed expert "is disqualified and may not receive information marked confidential under the Supplemental Protective Order"); *Eastman Kodak Co.*, 2003 WL 23101783, at *1 n.1 (W.D.N.Y. Dec. 4, 2003) (noting that where the moving party sought "a protective order precluding confidential documents being disclosed to him," "the legal analysis applicable to expert disqualification controls the issuance of the protective order [the moving party] seeks here.").  The risk of harm to Moog by any inadvertent disclosure by Mr. Socci, however minimal, is infinite compared to Skyryse's (lack of) needs.  Moog has met its burden in proving that Skyryse should not be allowed to disclose protective order material to Mr. Socci.

### D.  Ripeness

On March 27, 2023, Skyryse asked the Court for a discovery conference to address four potential motions.  (Heins Decl., Ex. B, pp. 62-63.)   The Court responded to that email, stating:

> After a thorough review of the docket, it appears that the
> Court cannot rule on the outstanding Motions to Compel,
> Dkts. 176 and 179, until Plaintiff Moog Inc. has complied
> with the transferor court's order to identify trade secrets,
> Dkt. 205.  The parties appear to dispute whether Plaintiff
> has complied with this order, and the Court is unable to
> determine whether Plaintiff has complied based on the
> limited information before it.   Therefore, if Defendants
> still contend Plaintiff has failed to comply with the prior
> court's order, Defendants may file an appropriate Motion
> without a telephonic conference. . . .

(*Id*., p. 61)  As Skyryse admits in this Joint Stipulation, Skyryse believes Moog's trade secret identification is still deficient, and Skyryse filed a separate motion regarding this issue.  (*See* Dkt. 472-2.)

After receiving the Court's above-quoted response to its first four discovery related motions, on March 30 and April 7, 2023, Skyryse sought a discovery conference regarding Moog's objection to Mr. Socci as Skyryse's expert witness explaining that the issue "affect[ed] Skyryse's ability to respond to currently-pending motions in the case. . . ."  (Storey Decl., Ex. B, pp. 15-16.)  On April 18, 2023, the Court allowed Skyryse to file its motion based on Skyryse's plea that this issue was necessary to respond to a motion and independent from the trade secret identification issue.  (*Id*. at p. 15)

The only pending motion Moog filed against Skyryse in the case at that time was Moog's Motion to Enforce Compliance With March 11, 2022 Stipulated TRO

and for Monetary and Adverse Inference Sanctions. (Dkt. 400.) Skyryse's filed its Opposition to that motion on April 24, 2023 (with three different expert declarations) and Skyryse did not seek an extension of that Opposition deadline based on an inability to respond due to the present expert dispute before the Court. (Heins Decl., ¶6.) Now, over a month after pleading this Court for relief, Skyryse revived this motion while the trade secret identification remains unresolved. (*Id*., ¶7.)

Skyryse also hypocritically claims that the trade secret identification dispute could affect Mr. Socci's ability to act as an expert in this case despite raising this motion now. *Supra*, Skyryse Section III.D, n.2 ("The vagueness in Moog's objection and its deficient identification of trade secrets inhibits Skyryse's ability to propose any additional safeguards to address Moog's alleged concerns. . . . For example, if Moog had more specifically described its alleged trade secrets and identified specific trade secret information that Mr. Socci acquired through his prior work for Moog, Skyryse could evaluate whether Mr. Socci's work could exclude those alleged trade secrets. But absent such specificity from Moog, Skyryse is unable to propose any such safeguards."). While Moog thoroughly disagrees that its trade secret identification is deficient (for the reasons stated in Dkt. 472-2, Skyryse's gamesmanship regarding the trade secret dispute, preventing discovery from opening by challenging Moog's trade secret ID while simultaneously receiving authorization to file its own motions under false pretenses, should not be condoned.

While Skyryse's motion is procedurally improper for the reasons discussed above, Moog does not object to the Court ruling on this dispute. Mr. Socci should be disqualified based on his prior confidential relationship with Moog, and Skyryse should not be allowed to use Mr. Socci as an expert in this case regardless of the resolution of the trade secret identification issue.

**E.    Conclusion**

Moog respectfully asks the Court to sustain its objection to Mr. Socci accessing protective order materials because Mr. Socci should be disqualified from working as Skyryse's expert in this case.

Dated:  June 7, 2023

Respectfully submitted,

LATHAM & WATKINS LLP

By */s/ Gabriel S. Gross*
Douglas E. Lumish (SBN 183863)
Gabriel S. Gross (SBN 254672)
Arman Zahoory (SBN 306421)
Rachel S. Horn (SBN 335737)
Menlo Park, California 94025
Telephone: (650) 328-4600
Facsimile: (650) 463-2600
Email: doug.lumish@lw.com
gabe.gross@lw.com
arman.zahoory@lw.com
rachel.horn@lw.com

Joseph H. Lee (SBN 248046)
Ryan Banks (SBN 318171)
650 Town Center Drive, 20th Floor
Costa Mesa, California 92626
Telephone: (714) 540-1235
Facsimile: (714) 755-8290
Email: joseph.lee@lw.com
ryan.banks@lw.com

Julianne C. Osborne (SBN 342870)
Alexa Solimano (SBN 335740)
505 Montgomery Street, Suite 2000
San Francisco, California 94111
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
Email: julianne.osborne@lw.com
alexa.solimano@lw.com

Kelley M. Storey
(Admitted *Pro Hac Vice*)
555 Eleventh Street NW, Suite 1000
Washington, D.C. 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
Email: kelley.storey@lw.com

Cassandra M. Baloga
(Admitted *Pro Hac Vice*)
1271 Avenue of the Americas
New York, New York 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email: cassandra.baloga@lw.com

Russell Mangas
(*Admitted Pro Hac Vice*)
330 North Wabash Avenue,
Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Facsimile: (312) 993-9767
Email: russell.mangas@lw.com

*Attorneys for Defendant and
Counterclaimant Skyryse, Inc.*

Dated: June 7, 2023

Respectfully submitted,

**SHEPPARD, MULLIN, RICHTER
& HAMPTON LLP**

By */s/ Rena Andoh*
Kazim A. Naqvi (SBN 300438)
Rena Andoh (admitted pro hac vice)
  knaqvi@sheppardmullin.com
  randoh@sheppardmullin.com
1901 Avenue of the Stars, Suite 1600
Los Angeles, CA 90067
Telephone: (310) 228-3700
Facsimile: (310) 228-3701

Lai L. Yip (SBN 258029)
  lyip@sheppardmullin.com
Four Embarcadero Center, 17th Floor
San Francisco, CA 94111
Telephone: (415) 434-9100
Facsimile: (415) 434-3947

Travis J. Anderson (SBN 265540)
  tanderson@sheppardmullin.com
12275 El Camino Real, Suite 100
San Diego, CA 92130
Telephone: (858) 720-8900
Facsimile: (858) 509-3691

1

## __ATTESTATION__

2

3
Pursuant to Civil Local Rule 5-4.3.4, I, Gabriel S. Gross, attest that

4
concurrence in the filing of this document has been obtained by all its signatories.

5

6

7
June 7, 2023                          _/s/  Gabriel S. Gross_____
                                         Gabriel S. Gross

8

9

10

11

12

13

14

15

16
US-DOCS\141533791.12

17

18

19

20

21

22

23

24

25

26

27

28