Rena Andoh (admitted *pro hac vice*)
  randoh@sheppardmullin.com
**SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP**
30 Rockefeller Plaza
New York, NY 10112
Telephone: (212) 653-8700
Facsimile: (212) 653-8701

Lai L. Yip (SBN 258029)
  lyip@sheppardmullin.com
Four Embarcadero Center, 17th Floor
San Francisco, CA 94111
Telephone: (415) 434-9100
Facsimile: (415) 434-3947

Travis J. Anderson (SBN 265540)
  tanderson@sheppardmullin.com
12275 El Camino Real, Suite 100
San Diego, CA 92130
Telephone: (858) 720-8900
Facsimile: (858) 509-3691

Kazim A. Naqvi (SBN 300438)
  knaqvi@sheppardmullin.com
1901 Avenue of the Stars, Suite 1600
Los Angeles, CA 90067
Telephone: (310) 228-3700
Facsimile: (310) 228-3701

Attorneys for Plaintiff and
Counterdefendant Moog Inc.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MOOG INC., | Case No. 2:22-cv-09094-GW-MAR |
| Plaintiff, | |
| v. | *Hon. George H. Wu* |
| SKYRYSE, INC., ROBERT ALIN PILKINGTON, MISOOK KIM, and DOES NOS. 1-50, | **PLAINTIFF AND COUNTERDEFENDANT MOOG INC.'S REPLY IN SUPPORT OF MOTION FOR LEAVE TO AMEND TO FILE AMENDED COMPLAINT** |
| Defendants. | Date:   June 29, 2023 |
| | Time:   8:30 a.m. |
| | Ctrm.:  9-D |

Complaint Filed:      March 7, 2022
Counterclaims Filed:  January 30, 2023

## **TABLE OF CONTENTS**

Page

I.  INTRODUCTION ........................................................................................1

II.  ARGUMENT..............................................................................................3

  A.  Moog's Conversion Claim is Not Futile.........................................3

    1.  New York Law Applies ..........................................................3

      a.  Moog Has Sufficiently Pleaded a Claim for
          Conversion Under New York Law...................................4

      b.  Skyryse's Choice of Law Analysis is Flawed.................6

    2.  Even if California Law Applies, the Conversion Claim is
        Not Preempted .......................................................................6

      a.  CUTSA Preemption Only Applies to Claims
          Involving Trade Secrets ...................................................6

      b.  Moog May Allege Conversion for the 1.1 Million
          Non-Trade Secret Moog Files Stolen by
          Defendants.........................................................................7

      c.  Moog's PAC Pleads Separate Trade Secret and
          Non Trade-Secret Data ...................................................10

      d.  Moog Has Standalone Property Rights in its Non
          Trade-Secret Proprietary Data.......................................12

      e.  Skyryse's Legal Authority is Distinguishable ...............13

    3.  Any Deficiencies Can be Cured Through Amendment...........15

  B.  Moog's Claim for Breach of the Implied Covenant of Good
      Faith and Fair Dealing Is Not Futile.............................................15

    1.  Moog's Allegations Are Proper and Not Duplicative.............16

      a.  Moog's allegations regarding Skyryse's hiring of
          20 Moog employees to sidestep the NDAs....................17

      b.  Moog's allegations regarding Skyryse's theft and
          misappropriation of Moog data after the Parties'
          business relationship ended............................................18

    2.  Skyryse's Cited Legal Authority is Distinguishable...............20

  C.  Leave to Amend Should be Granted ..............................................21

III.  CONCLUSION .........................................................................................22

1

2

**<u>TABLE OF AUTHORITIES</u>**

3

**Page(s)**

<u>Cases</u>

4

5

*Agency Dev., Inc. v. MedAmerica Ins. Co. of New York*
327 F. Supp. 2d 199 (W.D.N.Y. 2004), *aff'd*, 142 F. App'x 545 (2d Cir.
6    2005) ...................................................................................................................20

7

*Ali v. Fasteners for Retail, Inc.*
8    544 F. Supp. 2d 1064 (E.D. Cal. 2008) .................................................9, 12, 13

9

*Apple Mortg. Corp. v. Barenblatt*
10    162 F. Supp. 3d 270 (S.D.N.Y 2016) ...................................................................5

11

*Astroworks, Inc. v. Astroexhibit, Inc.*
257 F. Supp. 2d 609 (S.D.N.Y. 2003) ..................................................................5
12

13

*Butvin v. DoubleClick, Inc.*
No. 99 Civ. 4727(JFK), 2001 WL 228121 (S.D.N.Y. Mar. 7, 2001) ...............16

14

*Byton N. Am. Co. v. Breitfeld*
15    No. CV1910563DMGJEMX, 2020 WL 3802700 (C.D. Cal. Apr. 28,
2020) .....................................................................................................................8
16

17

*Calsoft Labs, Inc. v. Panchumarthi*
No. 19-cv-04398-NC, 2020 WL 512123 (N.D. Cal. Jan. 31, 2020).................14
18

19

*Cardonet, Inc. v. IBM Corp.*
No. C-06-06637 RMW, 2007 WL 518909 (N.D. Cal. Feb. 14, 2007) ...............4
20

21

*Clark St. Wine & Spirits v. Emporos Sys. Corp.*
754 F. Supp. 2d 474 (E.D.N.Y. 2010) .................................................................5
22

23

*Copart, Inc. v. Sparta Consulting, Inc.*
277 F. Supp. 3d 1127 (E.D. Cal. 2017) .............................................................12
24

25

*Credit Agricole Corp. v. BDC Fin., LLC*
135 A.D.3d 561 (1st Dep't 2016)........................................................................18

26

*Dalton v. Educational Testing Serv.*
27    87 N.Y.2d 384 (1995) ........................................................................................16

28

*Dorset Indus., Inc. v. Unified Grocers, Inc.*
  893 F. Supp. 2d 395 (E.D.N.Y. 2012) .......................................................16, 18

*First Advantage Background Servs. Corp. v. Private Eyes, Inc.*
  569 F. Supp. 2d 929 (N.D. Cal. 2008).......................................................1, 7, 9

*Friedman v. Maspeth Fed. Loan & Sav. Ass'n*
  30 F. Supp. 3d 183 (E.D.N.Y. 2014) ...............................................................18

*Gabriel Tech. Corp. v. Qualcomm Inc.*
  No. 08-cv-1992-MMA(POR), 2009 WL 3326631 (S.D. Cal. Sept. 3,
  2009) ................................................................................................................15

*Global Telecom Corp. v. Seowon Intech Co. Ltd.*
  No. 16-cv- 02212-AG(DFMx), 2018 WL 6074545 (C.D. Cal. Mar. 26,
  2018) ................................................................................................................14

*Henessey Food Consulting LLC v. Prinova Sols., LLC*
  No. 520CV806FJSTWD, 2022 WL 160272 (N.D.N.Y. Jan. 18, 2022) ...........19

*Hidden Brook Air, Inc. v. Thabet Aviation Int'l Inc.*
  241 F. Supp. 2d 246 (S.D.N.Y. 2002) ...............................................................3

*Hiossen, Inc. v. Kim*
  No. CV1601579SJOMRWX, 2016 WL 10987393 (C.D. Cal. Oct. 4,
  2016) ................................................................................................................15

*Hoelzer v. City of Stamford, Conn.*
  722 F. Supp. 1106 (S.D.N.Y. 1989) ...................................................................4

*Int'l Bus. Machines Corp. v. Liberty Mut. Ins. Co.*
  363 F.3d 137 (2d Cir. 2004).................................................................................3

*JPMorgan Chase Bank, N.A. v. IDW Grp., LLC*
  No. 08CIV9116(PGG), 2009 WL 321222 (S.D.N.Y. Feb. 9, 2009) ................21

*Lifeline Food Co. v. Gilman Cheese Corp.*
  No. 5:15-CV-00034-PSG, 2015 WL 2357246 (N.D. Cal. May 15, 2015)
  .....................................................................................................................12, 13

*Lodging Sols., LLC v. Miller*
  No. 19-CV-10806 (AJN), 2020 WL 6875255 (S.D.N.Y. Nov. 23, 2020).........20

*Macquarie Grp. Ltd. v. Pac. Corp. Grp., LLC*
No. 08CV2113-IEG-WMC, 2009 WL 539928 (S.D. Cal. Mar. 2, 2009)...........4

*Medidata Sol., Inc. v. Veeva Sys., Inc.*
No. 17 CIV. 589 (LGS), 2021 WL 467110 (S.D.N.Y. Feb. 9, 2021)...........6, 15

*Mirmehdi v. United States*
689 F.3d 975 (9th Cir. 2012)...........................................................15

*Mobilitie Mgmt., LLC v. Harkness*
No. 816CV01747JLSKES, 2016 WL 10880151 (C.D. Cal. Nov. 28,
2016) .......................................................................................3

*N.Y. Racing Ass'n v. Nassau Reg'l Off-Track Betting Corp.*
29 Misc. 3d 539 (N.Y. Sup. Ct. 2010)..............................................5

*P&G Auditors & Consultants, LLC v. Mega Int'l Commercial Bank Co., Ltd.*
No. 18-CV-9232-JPO, 2019 WL 4805862 (S.D.N.Y. Sept. 30, 2019)..............19

*Planet Payment, Inc. v. Nova Info. Sys., Inc.*
No. 07-CV-2520 CBA RML, 2011 WL 1636921 (E.D.N.Y. Mar. 31,
2011) .......................................................................................3

*PQ Labs, Inc. v. Yang Qi*
C 12–0450 CW, 2012 WL 2061527 (N.D. Cal. June 7, 2012)..........................7

*R.B. Dev., Co. v. Tutis Cap. LLC*
No. 12-CV-01460-CBA-SMG, 2018 WL 7076023 (E.D.N.Y. Nov. 14,
2018) .......................................................................................4

*SAES Getters S.p.A. v. Aeronex, Inc.*
219 F. Supp. 2d 1081 (S.D. Cal. 2002) ...........................................13

*Serv. Employees Int'l Union v. Roselli*
No. C 09-00404WHA, 2009 WL 3013501 (N.D. Cal. 2009)...........................10

*Silvaco Data Sys. v. Intel Corp.*
184 Cal. App. 4th 210 (2010).........................................................13

*SunPower Corp. v. SolarCity Corp.*
No. 12-CV-00694-LHK, 2012 WL 6160472 (N.D. Cal. Dec. 11, 2012)
.......................................................................................13, 14

*Synopsys, Inc. v. Ubiquiti Networks, Inc.*
   313 F. Supp. 3d 1056 (N.D. Cal. Mar. 13, 2018)..............................................15

*Think Vill.-Kiwi, LLC v. Adobe Sys., Inc.*
   No. C 08-04166 SI, 2009 WL 902337 (N.D. Cal. Apr. 1, 2009) .....................10

*Thyroff v. Nationwide Mut. Ins. Co.*
   8 N.Y.3d 283 (2007) ..........................................................................................5

*TMX Funding, Inc. v. Impero Techs., Inc.*
   No. C 10-00202 JF (PVT), 2010 WL 2509979 (N.D. Cal. June 17, 2010) .......10

*TransPerfect Glob., Inc. v. Lionbridge Techs., Inc.*
   No. 19CV3283 (DLC), 2020 WL 1322872 (S.D.N.Y. Mar. 20, 2020).........6, 15

*United Merch. Wholesale, Inc. v. IFFCO, Inc.*
   51 F. Supp. 3d 249 (E.D.N.Y. Sep. 15, 2014) .................................................19

*Virun, Inc. v. Cymbiotika, Inc.*
   No. 822CV00325SSSDFMX, 2022 WL 17371057 (C.D. Cal. Aug. 18,
   2022) ...............................................................................................................19

Statutes

28 U.S.C. § 1404..............................................................................................1, 4

28 U.S.C. § 1404(a) .............................................................................................3

Cal. Civ. Code § 3426.7(b) .............................................................................6, 15

UTSA ...............................................................................................................6, 9

Other Authorities

FRCP 15 ..............................................................................................................1

# I.     INTRODUCTION

Skyryse does not oppose Moog's Motion for Leave to Amend on grounds of prejudice, undue delay, or bad faith.[1] Skyryse instead only argues that Moog's two additional proposed causes of action are futile, notwithstanding FRCP 15's liberal amendment standard. Skyryse's misconstrues Moog's Proposed Amended Complaint ("PAC") and the relevant legal authority.

Contrary to Skyryse's argument, Moog is not seeking to add a conversion claim because of "serious deficiencies in Moog's trade secret misappropriation claim." Just the opposite, discovery has now confirmed that Skyryse and its personnel stole *approximately 1.4 million files* on their way out the door from Moog. Through substantial effort, Moog has identified *291,095 of those files* as reflecting protectable trade secrets which were misappropriated. But this still leaves approximately 1.1 million proprietary files which Defendants stole that are not the subject of Moog's trade secret claims. Skyryse's opposition suggests that, notwithstanding this staggering volume of non-trade secret information, Moog should have no recourse for Skyryse's theft of over a million files. Of course, this is not the law.

Moog's conversion claim is not preempted by CUTSA. *First,* as a threshold matter, Skyryse's argument for preemption relies on an incomplete choice of law analysis in order to conclude California law applies. But, both New York and California decisions make clear that there is no conflict between a claim for conversion under New York or California law and, based on the procedural posture of this case, New York law thus applies. And because New York law governs the claim, CUTSA preemption is simply inapplicable. Skyryse cannot use the transfer of this case under Section 1404 to change the applicable law. *Second,* even were

---

[1] Defendant Misook Kim filed a joinder to Skyryse's Opposition (Dkt. 510). Defendant Robert Alin Pilkington did not file any Opposition. Moog therefore substantively responds to Skyryse's Opposition.

California law to apply (it does not), CUTSA does not preempt tort claims which are not predicated on the misappropriation of trade secrets. Here, there is a clear delineation between the data underlying Moog's trade secret claim (291,095 specifically identified files) and its conversion claim (approximately 1.1 million non-trade secret, proprietary files). Unlike many of the cases cited by Skyryse, Moog's conversion claim is not a complete overlap with its trade secret claim—the two involve completely different sets of data files. Ninth Circuit authority is clear that, especially at this early stage in the case, Moog may allege conversion regarding the over one million stolen non-trade secret files, especially in the instance where Skyryse is also arguing that Moog has not sufficiently identified any trade secrets but that those same trade secrets preempt the conversion claim. ***Third,*** to the extent necessary, Moog can demonstrate property rights in the approximately 1.1 million non-trade secret files outside of trade secret law.

Moog's claim for breach of the implied covenant of good faith and fair dealing is likewise sufficiently alleged. The claim is not predicated on Skyryse's hiring of any one former Moog employee or no-hiring provisions. Rather, it focuses on Skyryse's deliberate conduct to circumvent the restrictions of the NDAs by getting direct or indirect access to Moog's confidential information by hiring a majority of Moog's flight control software engineering department.  As alleged, Skyryse undermined and sidestepped the entire purpose of the NDAs which was to share confidential information ***to explore projects between the Parties***. Moog's implied covenant claim is also predicated on Defendants' theft and use of Moog's trade secrets. These allegations are not duplicative of Moog's breach of contract claim, which is centered on Skyryse's improper use of confidential information that Moog shared with Skyryse ***during the course of their business relationship***. Moog's implied covenant claim concerns the massive amounts of Moog data that Skyryse personnel stole and misappropriated ***after*** the Parties' business

1  relationship ended. New York law upholds implied covenant claims under these

2  circumstances.

3  **II.    <u>ARGUMENT</u>**

4    **A.    Moog's Conversion Claim is Not Futile**

5      **1.    New York Law Applies**

6    Skyryse's argument that California law applies to the conversion claim is

7  misplaced, and only a transparent pretext to facilitate Skyryse's CUTSA pre-

8  emption argument, which of course is irrelevant if New York law applies. But,

9  Skyryse's choice of law analysis is wrong and New York law applies.

10    It is well-established that "after a [28 U.S.C. §]1404(a) transfer, the

11  transferee court must apply the choice-of-law principles of the original forum."

12  *Mobilitie Mgmt., LLC v. Harkness*, No. 816CV01747JLSKES, 2016 WL

13  10880151, at *3 (C.D. Cal. Nov. 28, 2016) (citing *Van Dusen v. Barrack*, 376 U.S.

14  612, 639 (1964)). Here, the transfer from W.D.N.Y to this Court was expressly

15  pursuant to Section 1404(a), so New York choice of law principles apply.

16    Under New York law, (1) "choice of law does not matter" "unless the laws

17  of the competing jurisdictions are actually in conflict"; (2) "[i]n the absence of a

18  substantive difference, a New York court will dispense with choice of law

19  analysis"; and (3) New York law should apply if it is "among the relevant

20  choices." *Int'l Bus. Machines Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d

21  Cir. 2004); *Hidden Brook Air, Inc. v. Thabet Aviation Int'l Inc.*, 241 F. Supp. 2d

22  246, 279 (S.D.N.Y. 2002) (a choice of law analysis is only conducted if there is a

23  "material conflict"); *Planet Payment, Inc. v. Nova Info. Sys., Inc.*, No. 07-CV-2520

24  CBA RML, 2011 WL 1636921, at *8 (E.D.N.Y. Mar. 31, 2011) (applying New

25  York law where there is no conflict because it is the law of the forum state and is

26  administratively easier).

27    Decisions from both New York and California make clear that there is no

28  conflict between New York and California law regarding a claim for conversion,

and therefore New York law applies here. *See Macquarie Grp. Ltd. v. Pac. Corp. Grp., LLC*, No. 08CV2113-IEG-WMC, 2009 WL 539928, at *11 (S.D. Cal. Mar. 2, 2009) (in analyzing choice of law after a Rule 1404 transfer, holding: "The conversion claim is also governed by New York law because there is not conflict between the two potential laws . . . . A New York court would apply New York conversion law."); *Cardonet, Inc. v. IBM Corp.*, No. C-06-06637 RMW, 2007 WL 518909, at *5 (N.D. Cal. Feb. 14, 2007) ("[T]he court likewise concludes that application of New York law to plaintiff's conversion claim would not conflict with fundamental California policy."); *R.B. Dev., Co. v. Tutis Cap. LLC*, No. 12-CV-01460-CBA-SMG, 2018 WL 7076023, at *7 (E.D.N.Y. Nov. 14, 2018) ("Applying the conversion laws of California . . . would not change the conversion liability determinations for defendants."). Because there is no conflict, New York law applies in analyzing whether or not Moog's conversion claim is futile.[2] *See Macquarie Grp.*, 2009 WL 539928, at *12  (finding New York law applied after a Rule 1404 transfer and that plaintiffs sufficiently pleaded a conversion claim under New York law).

> ### a.    Moog Has Sufficiently Pleaded a Claim for Conversion Under New York Law

In a throwaway footnote, Skyryse argues that even under New York law, the conversion claim would fail because Moog "does not allege that Skyryse's purported misappropriation completely excluded Moog's own ability to use its alleged trade secret information." (Opp., fn. 2). But, Skyryse is wrong on the law.

---

[2] Even if a conflict of law existed (which it does not), and the Court was required to analyze which state has the greater interest in adjudicating the claim, New York law would still apply. In New York, "[a]bsent 'special circumstances,' the law of the place of the injury applies [to a conversion claim]." *Hoelzer v. City of Stamford, Conn.*, 722 F. Supp. 1106, 1112 (S.D.N.Y. 1989). Here, the PAC alleges that the Moog data subject to the conversion claim is stored on Moog's servers, and that all the data copied by at least Kim was stored in Moog's New York servers. (PAC, ¶¶ 57, 67, 160.)  Thus, the location of the converted property and the injury are both in New York, so New York law should apply.

1   For conversion, "[u]nder New York law, a plaintiff must establish ... (1) the

2   property subject to conversion is a specific identifiable thing; (2) plaintiff had

3   ownership, possession or control over the property before its conversion; and (3)

4   defendant exercised an unauthorized dominion over the thing in question, to the

5   alteration of its condition *or* to the exclusion of the plaintiff's rights." *Apple Mortg.*

6   *Corp. v. Barenblatt*, 162 F. Supp. 3d 270, 284 (S.D.N.Y 2016) (emphasis added).

7   Complete exclusion of the plaintiff's rights is only one of multiple ways to allege

8   conversion. Alteration of converted property is another. *Id.*

9       The PAC alleges in significant detail how Moog had ownership, possession,

10  and control of a large volume of data, and that various Skyryse personnel

11  converted, and altered, Moog property. This includes Kim deleting the Moog data

12  from the hard drives she used to steal them (PAC, ¶¶ 178-189), and Skyryse

13  personnel sending, altering, and using Moog data for Skyryse projects (*id.*, ¶¶ 190-

14  223). Moog has thus adequately alleged conversion through Skyryse's unlawful

15  possession and alteration of Moog data.

16      Further, Skyryse does not dispute that intangible data can be the subject of a

17  conversion claim under New York law. *See Thyroff v. Nationwide Mut. Ins. Co.*, 8

18  N.Y.3d 283, 292–293 (2007) ("[E]lectronic records that were stored on a computer

19  and were indistinguishable from printed documents [are] subject to a claim of

20  conversion in New York."). And, numerous New York decisions have held that

21  even the copying of data is sufficient to constitute conversion. *See, e.g., Clark St.*

22  *Wine & Spirits v. Emporos Sys. Corp.*, 754 F. Supp. 2d 474, 484 (E.D.N.Y. 2010)

23  (denying motion to dismiss conversion claim involving copying of plaintiffs'

24  customers' credit card information); *Astroworks, Inc. v. Astroexhibit, Inc.*, 257 F.

25  Supp. 2d 609, 618 (S.D.N.Y. 2003) (denying motion to dismiss conversion claim

26  involving copying of a website); *N.Y. Racing Ass'n v. Nassau Reg'l Off-Track*

27  *Betting Corp.*, 29 Misc. 3d 539, 545-46 (N.Y. Sup. Ct. 2010) ("This court

28  concludes that NYRA may maintain an action for conversion of its live audio-

visual simulcast, even though it was not 'excluded' from access to the electronic
data transmission.").

Moog has adequately alleged a conversion claim under New York law.
Because New York law applies, Skyryse's entire preemption analysis under
CUTSA is irrelevant and properly disregarded. *See TransPerfect Glob., Inc. v.
Lionbridge Techs., Inc.*, No. 19CV3283 (DLC), 2020 WL 1322872, at *7
(S.D.N.Y. Mar. 20, 2020) ("Since New York law applies to these claims and New
York has not adopted the Uniform Trade Secrets Act, there is no statute to preempt
TransPerfect's common-law claims."); *Medidata Sol., Inc. v. Veeva Sys., Inc.*, No.
17 CIV. 589 (LGS), 2021 WL 467110, at *12 (S.D.N.Y. Feb. 9, 2021) ("New York
law does not preempt non-contract claims arising from the same operative facts as
a trade secret misappropriation claim, while California law does.").

### b.    Skyryse's Choice of Law Analysis is Flawed

Skyryse immediately jumps to analyzing which state has a greater interest
regarding Moog's conversion claim. (Opp., p. 7). But Skyryse does not analyze, as
is required, whether there is any conflict between New York and California law
regarding conversion claims (as explained, there is not). Further, Skyryse's cited
legal authority all relates to trade secret claims, not choice of law for conversion
claims.

### 2.    Even if California Law Applies, the Conversion Claim is Not Preempted

Even if the Court were to determine that California law applies to the
conversion claim, the claim is not futile despite CUTSA.

### a.    CUTSA Preemption Only Applies to Claims Involving Trade Secrets

While CUTSA inarguably preempts certain claims, it "does not affect . . .
civil remedies that are not based upon the misappropriation of a trade secret." Cal.
Civ. Code § 3426.7(b). "If a claim is based on confidential information other than a

trade secret, as that term is defined in CUTSA, it is not preempted." *PQ Labs, Inc.
v. Yang Qi*, C 12–0450 CW, 2012 WL 2061527, at *5 (N.D. Cal. June 7, 2012)
(internal quotes omitted). "By its own terms . . . CUTSA only provides remedies
for misappropriation of *trade secrets*, not of any confidential information, and
defines that term specifically." *First Advantage Background Servs. Corp. v.
Private Eyes, Inc.*, 569 F. Supp. 2d 929, 942 (N.D. Cal. 2008) (emphasis in
original).

Thus, while CUTSA may preempt claims that are predicated on trade
secrets, it does not preempt Moog's claims which are predicated on separate
confidential and non-trade secret information.

> **b.    Moog May Allege Conversion for the 1.1 Million Non-
> Trade Secret Moog Files Stolen by Defendants**

In this case, it is undisputed that various Skyryse personnel stole
***approximately 1.4 million files*** from Moog. To make its comprehensive Trade
Secret Identification ("TSID," *see, e.g.,* Dkts. 475-05, 476-05, 475-10, and 511),[3]
Moog was forced to undertake an enormously time consuming and strenuous effort
to evaluate the enormous volume of stolen files and determine what trade secret
information it would pursue. This effort resulted in the identification of 30 trade
secrets, each specifically numbered and described, and each corresponding to a
specifically identified set of stolen files, which in total constitute 291,095 stolen
files. Skyryse's Opposition acknowledges that Moog's TSID includes itemization
of roughly "300,000" documents. (Opp., p. 4.) Moog, through such efforts,
narrowed the number of stolen files for which it claims trade secret

---

[3] The documents filed with the Court do not represent the entire TSID.  On
February 21, 2023, Moog served on Skyryse a TSID that included Excel
spreadsheets listing the names and paths of the misappropriated files, which were
sortable, searchable, filterable, and separated into tabs by program, toolset, and
other categories.  In what Skyryse filed with the Court, each Excel spreadsheet was
printed to PDF and resulted in a single long flattened list, and does not accurately
represent what was served by Moog.

1   misappropriation by approximately *eighty percent*. This leaves approximately 1.1

2   million stolen files for which Moog is not presently claiming trade secret

3   misappropriation.  Thus, based on such analysis and the underlying facts

4   determined through the same, Moog moves to amend to include a conversion claim

5   relating to the theft of such voluminous non-trade secret data.

6   In contrast to most of the cases cited by Skyryse, there is a clear delineation

7   and separation between the stolen trade secrets and other Moog proprietary, non-

8   trade secret data stolen by Defendants. And unlike in such cases, Moog's

9   conversion claim is not merely duplicative and overlapping with its trade secret

10  claim. Skyryse essentially argues there is no available claim to be pleaded for its

11  stealing this massive amount of Moog data without authorization. This, of course,

12  is non-sensical. And, Ninth Circuit law confirms that in this early posture in the

13  case, where the confines of Moog's identified trade secrets are still being litigated,

14  Moog can advance both trade secret and conversion claims.

15  *Byton N. Am. Co. v. Breitfeld*, No. CV1910563DMGJEMX, 2020 WL

16  3802700 (C.D. Cal. Apr. 28, 2020) is instructive. There, as here, "Plaintiffs have

17  pleaded conversion with respect to confidential or proprietary property that does

18  not rise to the level of a trade secret." *Id.* at *9. There, similar to this case,

19  "Plaintiffs allege[d] that Breitfeld converted Byton's trade secrets and proprietary

20  or confidential information by divulging that information to Iconiq when he began

21  working there." *Id*. The court refused to find the conversion claim pre-empted

22  because: "The extent to which any particular piece of property or information

23  constitutes a trade secret, as opposed to merely proprietary or confidential

24  information, is a factual matter *unfit for resolution at the pleading stage*. Once the

25  parties have conducted enough discovery to define the scope of information or

26  property that Breitfeld divulged to Iconiq, the Court can determine whether

27  CUTSA preempts a conversion claim based on that information or property." *Id.*

28  (emphasis added).

1      Thus, given that Moog is alleging conversion over a specifically defined set

2  of non-trade secret data, it is permitted to advance a conversion claim unless and

3  until any portions of the approximately 1.1 million stolen files are deemed

4  protectable trade secrets. Other California decisions are in accord. *See, e.g., Ali v.*

5  *Fasteners for Retail, Inc.*, 544 F. Supp. 2d 1064, 1072 (E.D. Cal. 2008) ("The

6  Court finds that, at this point, it is still unclear how much of the allegedly

7  misappropriated information was a trade secret. Therefore, it would be premature

8  to hold that CUTSA preempts Plaintiff's conversion claim."); *First Advantage*

9  *Background Sers. Corp.*, 569 F. Supp. 2d at 942 (N.D. Cal. 2008) ("To the extent

10  the claim is based on these trade secrets, it cannot go forward. However, [the

11  plaintiff] may continue to pursue the [tort claim] so long as the confidential

12  information at the foundation of the claim is not a trade secret, as that term is

13  defined in [the UTSA]. If, in subsequent pleadings or briefs, or at trial, it is

14  established that the disclosures on which [the plaintiff] bases this claim were trade

15  secrets, the claim will be dismissed with prejudice.").

16      Further, the law is clear that Skyryse cannot have it both ways—it cannot

17  continually challenge the sufficiency of Moog's identified trade secrets while

18  simultaneously arguing that CUTSA preempts Moog's conversion claim based on

19  purported overlap with those same (allegedly deficient) trade secrets. Throughout

20  this case, Skyryse has argued that Moog's identified trade secrets are legally

21  deficient.  For example, in its opposition to Moog's motion to enforce regarding

22  the TRO, Skyryse argued that essentially every Moog document placed at issue in

23  Moog's motion is not a protectable trade secret because the information therein is

24  publicly available. (Dkts. 451, 451-02, 451-03.) And Skyryse further argued in its

25  recently filed motion to enforce regarding Moog's TSID that Moog "fails to

26  sufficiently identify specific trade secrets" and even claims that "Skyryse and the

27  Court are no closer to knowing what Moog's alleged trade secrets are today than

28  they were a year ago." (Dkt. 475, p. 2.) And Skyryse repeats these arguments in the

1   instant opposition. (Opp., p. 5:3-13.) Courts in the Ninth Circuit do not permit such

2   contradictory litigation tactics. *See Think Vill.-Kiwi, LLC v. Adobe Sys., Inc.*, No. C

3   08-04166 SI, 2009 WL 902337, at *2 (N.D. Cal. Apr. 1, 2009) (rejecting

4   defendants' preemption argument on motion to dismiss, holding that defendants

5   "cannot have it both ways" because "defendants' current argument—that the 'trade

6   secret' allegations are preempted by CUTSA—contradicts their primary defense

7   that TVK's information does not constitute 'trade secrets.'"); *Serv. Employees Int'l

8   Union v. Roselli*, No. C 09-00404WHA, 2009 WL 3013501, at *8 (N.D. Cal. 2009)

9   (rejecting motion to dismiss' preemption argument regarding conversion claim,

10  holding: "Defendants 'cannot have it both ways'–they cannot both claim on the

11  one hand that material is a trade secret while arguing on the other that it is not.");

12  *see also TMX Funding, Inc. v. Impero Techs., Inc.*, No. C 10-00202 JF (PVT),

13  2010 WL 2509979, at *4-5 (N.D. Cal. June 17, 2010) (analyzing whether CUTSA

14  preempted a conversion claim that had overlap with a trade secrets claim and

15  holding: "Defendants also dispute that TMX sufficiently identifies any trade secret

16  information. Regardless of whether the information is a trade secret, Defendants

17  may be liable for . . . conversion if they wrongfully deprived TMX of possession of

18  that information.").

19                    **c.    Moog's PAC Pleads Separate Trade Secret and Non**

20                            **Trade-Secret Data**

21          Skyryse incorrectly argues that "Moog's proposed conversion claim centers

22  on the same intangible property as its trade secret claim." (Opp., p. 12.) Indeed,

23  such argument is belied by the PAC's allegations.

24          As described above, Moog's trade secret claim and conversion claim

25  respectively pertain to distinct groups of stolen files. Skyryse is well-aware of this

26  delineation, both in view of the motion practice surrounding Moog's TSID, and

27  Skyryse's reference to the "300,000 documents" in its opposition. (Opp., p. 4.)

28  This delineation is not merely semantics. Moog has property rights in the

approximately 1.1 million stolen non-trade secret files, and Skyryse cannot simply be permitted to steal, possess, use, and disclose this massive volume of data just because the data may not be a trade secret. The PAC provides a number of factual allegations making clear that the data underlying Moog's respective trade secret and conversion claims are not the same:

- Out of the approximately 1.4 million stolen files, identifying the specific portions of the Toolsets, Programs, and other trade secrets at issue in the case (and referring to them throughout the PAC as the "Stolen Trade Secrets"), which are reflected in approximately 300,000 files. (PAC, ¶¶ 31-45.)

- Clarification that "the files stolen in this case go beyond the Programs and Toolsets identified in the tables." (*Id.*, fn. 3.)

- Specification that "former Moog employee and Skyryse personnel Reid Raithel stole approximately 27,000 Moog files on his way out the door before beginning employment at Skyryse" but that "[a]pproximately 13,011 of these files reflect trade secret material." (*Id.*, ¶ 45.)

- Identifying the various types of documents (with hit counts) copied by Kim, and the trade secret programs those documents related to. (*Id.*, ¶¶ 163-168.)

- Identifying the types of Moog documents used by former Moog employee Eric Chung at Skyryse, where these documents are not identified as trade secrets. (*Id.*, ¶¶ 31-45, 202-205.)

- In connection with the conversion claim, segregating "Stolen Trade Secrets" from the "other data stolen from Moog by Pilkington, Kim, Raithel, and others." (*Id.*, ¶¶ 267-271.)

Skyryse's argument fails in view of the plain text of the PAC.

|   |   |
|---|---|
| 1 | **d.**     **Moog Has Standalone Property Rights in its Non** |
| 2 |           **Trade-Secret Proprietary Data** |
| 3 | "To survive a motion to dismiss a conversion claim based on CUTSA |
| 4 | preemption, a plaintiff therefore must demonstrate a property right 'outside of |
| 5 | trade secrets law.'" *Lifeline Food Co. v. Gilman Cheese Corp.*, No. 5:15-CV- |
| 6 | 00034-PSG, 2015 WL 2357246, at *4 (N.D. Cal. May 15, 2015). "Courts |
| 7 | evaluating preemption of a conversion claim look to the source of the property's |
| 8 | value rather than a person's basis for owning it." *Copart, Inc. v. Sparta Consulting*, |
| 9 | *Inc.*, 277 F. Supp. 3d 1127, 1159 (E.D. Cal. 2017). |
| 10 | Moog maintains property rights in the approximately 1.1 million non-trade |
| 11 | secret files stolen by Defendants. On this point, *Ali v. Fasteners for Retail, Inc.*, |
| 12 | 544 F. Supp. 2d 1064 (E.D. Cal. 2008) is instructive. There, the court analyzed |
| 13 | whether the plaintiff had a property right in non-trade secret information to serve |
| 14 | as a basis of a conversion claim, and found as an initial matter that the plaintiff did |
| 15 | have property rights over non-trade secret information: "the information allegedly |
| 16 | converted are well defined interests. The source codes, cost data, and part numbers |
| 17 | are not amorphous. They are distinct groupings of proprietary information." *Id.* at |
| 18 | 1072. Second, the court found there was exclusive ownership in that "Plaintiff |
| 19 | controlled access to the information; only shared the information when it was in his |
| 20 | economic interest; and required others, when viewing the information, to sign |
| 21 | confidentiality agreements." *Id.* Finally, the court determined plaintiff had a |
| 22 | legitimate property right because "he invested a substantial amount of time, effort |
| 23 | and resources in compiling the information, marketing it, and keeping it private." |
| 24 | *Id.*; *see also Copart, Inc.*, 277 F. Supp. 3d at 1154 ("Here, Copart can show |
| 25 | economic value using circumstantial evidence of its investment of resources in |
| 26 | producing the information. Copart hired Sparta for approximately two years to |
| 27 | design and build its new online system and paid Sparta over $10 million for the |
| 28 | first seven associated milestones."). |

1    Here, the PAC's allegations track those in *Ali*. Regarding the converted non-

2  trade secret Moog data, Moog has alleged that it has: 1) controlled access to such

3  data, and requires employees and others to sign confidentiality agreements; and 2)

4  invested a substantial amount of time, effort, and resources in developing such data

5  and keeping it private. (PAC, ¶¶ 47-71, 224-242.) Moog has sufficiently alleged

6  property interests in all the data stolen by Defendants.[4]

7                    **e.      Skyryse's Legal Authority is Distinguishable**

8    Skyryse's heavy reliance on *Lifeline Food Co.*, 2015 WL 2357246, is

9  misplaced. In that case, the Court held "Lifeline's conversion claim . . . is not

10  factually distinct from its trade secret claim because both claims are based on

11  GCC's alleged use of the same recipes, formulas and manufacturing processes." *Id.*

12  at \*4. The court noted: "Lifeline does not allege facts claiming that GCC converted

13  property other than the alleged trade secrets." *Id.* at \*5. In other words, there was

14  complete overlap between the property underlying the trade secret claim and the

15  conversion claim.[5] Here, as described above, there is clear delineation between the

16  Moog data underlying its trade secret (291,095 specifically identified files) and

17  conversion claims (approximately 1.1 million non-trade secret files).

18    *SunPower Corp. v. SolarCity Corp.*, No. 12-CV-00694-LHK, 2012 WL

19  6160472 (N.D. Cal. Dec. 11, 2012), on which Skyryse also heavily relies, is

20

21  [4] Whether Moog has an ownership or property interest in the non-trade secret files
22  underlying its conversion claim is an issue to be litigated later in the case, and not
    the pleading stage given Moog's allegations (which must be accepted as true) that
23  it does own such materials. *See SAES Getters S.p.A. v. Aeronex, Inc.*, 219 F. Supp.
    2d 1081, 1088 (S.D. Cal. 2002) ("to determine the futility of amendment, the Court
24  is required to accept Aeronex's allegations in the proposed SAA as true").

25  [5] Skyryse also relies on cases which cite to and rely on *Silvaco*. There, unlike here,
    all of the plaintiff's non-CUTSA claims "depend[ed] on [the Defendants']
26  supposed use [] of software which embodie[d] and use[d]" the plaintiff's trade
    secrets." *Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 238 (2010).
27  Further, the court in Silvaco held: CUTSA will not preempt a conversion claim if
    there exists "the plaintiff's assertion of some other basis in fact or law on which to
28  predicate the requisite property right." *Id.* at 238-239. As demonstrated above,
    Moog has alleged a property right outside of trade secret law in the approximately
    1.1 million stolen non-trade secret files.

1   likewise distinguishable. First, the court observed the plaintiff used the terms

2   "confidential information" and "non-confidential proprietary information" "to refer

3   to the same computer files." *Id*. at *10. The court also noted the plaintiff did not

4   make "any effort to assign particular data to particular categories." *Id*. Second, the

5   court determined the complaint did not "provide sufficient information for the

6   Court to conclude that" the plaintiff had "a 'legitimate claim to exclusivity' in the

7   non-trade secret information." *Id*. at *11. Finally, the plaintiff did not allege "any

8   facts regarding what the non-trade secret information is, much less facts showing

9   SunPower invested substantial time and money in developing this information." *Id*.

10  at *12. Here, unlike in *SunPower*, and as explained above, Moog has clearly

11  delineated the trade secret and non-trade secret data at issue in this case, has

12  demonstrated a legitimate claim to exclusivity in the non-trade secret data, and has

13  alleged a substantial amount of time and money in developing such information.

14      *Global Telecom Corp. v. Seowon Intech Co. Ltd.*, No. 16-cv- 02212-

15  AG(DFMx), 2018 WL 6074545 (C.D. Cal. Mar. 26, 2018) which reviewed a

16  motion for judgment on the pleadings and not a motion to dismiss, is also

17  distinguishable. There, the court determined that certain of the property at issue did

18  not involve the plaintiff's "ownership or right of possession of the property," but

19  instead "only an expectancy." *Id*. at *4. The alternative bases for conversion were

20  from "payments Seowon alleges it should have received under its contracts with

21  Global," but did not in fact receive. *Id*.  In contrast, Moog's conversion claim has

22  nothing to do with an expectancy in possession of property, or payments that Moog

23  expected to receive.

24      The other cases relied upon by Skyryse are all distinguishable because they

25  all deal with scenarios where there was ***complete overlap*** between the property

26  underlying the conversion claim and the trade secret claim. *See Calsoft Labs, Inc.

27  v. Panchumarthi*, No. 19-cv-04398-NC, 2020 WL 512123, at *4  (N.D. Cal. Jan.

28  31, 2020) ("Plaintiffs' conversion claim revolves around the same intangible

property implicated by their misappropriation of trade secrets claim."); *Gabriel Tech. Corp. v. Qualcomm Inc.*, No. 08-cv-1992-MMA(POR), 2009 WL 3326631, at *12 (S.D. Cal. Sept. 3, 2009) (property underlying conversion claim had complete overlap with trade secret claim, and there was no distinction between the trade secret and non-trade secret data); *Synopsys, Inc. v. Ubiquiti Networks, Inc.*, 313 F. Supp. 3d 1056, 1081 (N.D. Cal. Mar. 13, 2018) (same).  Such authority is therefore inapposite.

### 3.    Any Deficiencies Can be Cured Through Amendment

To the extent the Court determines that Moog's conversion claim is insufficiently pleaded, leave to amend is properly granted to permit Moog to address such deficiencies. *See Mirmehdi v. United States*, 689 F.3d 975, 985 (9th Cir. 2012) ("requests for leave to amend should be granted with extreme liberality").

While Moog respectfully submits that it has adequately pled this claim, should the Court deem it necessary, Moog is prepared to amend its conversion claim to add additional facts to address any deficiencies regarding the approximately 1.1 million non-trade secret files at issue.

### B.    Moog's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing Is Not Futile

Skyryse argues that Moog's implied covenant claim is futile because it arises from "the lawful hiring of Moog's at-will employees" or "the alleged theft and misuse of Moog's purported trade secrets, which makes them entirely duplicative of Moog's breach of contract (and trade secret misappropriation) claims."[6] (Opp.,

---

[6] Skyryse admits that New York law applies to Moog's implied covenant claim. (Opp., p. 14.) Therefore, CUTSA preemption cannot apply to this claim. *See TransPerfect Glob., Inc.*, 2020 WL 1322872, at *7; *Medidata Sol., Inc.*, 2021 WL 467110, at *12. Further, even if CUTSA could apply, it does not preempt "contractual remedies, whether or not based upon misappropriation of a trade secret." Cal. Civ. Code § 3426.7(b); *see also Hiossen, Inc. v. Kim*, No. CV1601579SJOMRWX, 2016 WL 10987393, at *5 (C.D. Cal. Oct. 4, 2016)

1  p. 15.) But such argument both ignores the substance of Moog's implied covenant

2  claim and misapplies the law.

3      "The implied covenant of good faith encompasses any promises which a

4  reasonable person in the position of the promisee would be justified in

5  understanding were included in the agreement." *See Dorset Indus., Inc. v. Unified*

6  *Grocers, Inc.*, 893 F. Supp. 2d 395, 405-06 (E.D.N.Y. 2012). The covenant

7  requires that neither contracting party engage in conduct that will have the effect of

8  destroying or injuring the rights of the other party to receive the benefit of the

9  contract. *See Dalton v. Educational Testing Serv.*, 87 N.Y.2d 384, 389 (1995);

10  *Butvin v. DoubleClick, Inc.*, No. 99 Civ. 4727(JFK), 2001 WL 228121, at *8

11  (S.D.N.Y. Mar. 7, 2001) ("New York courts have recognized a separate cause of

12  action for breach of the covenant of good faith and fair dealing, however, in cases

13  involving efforts by one party to a contract to subvert the contract itself.").

14          **1.    Moog's Allegations Are Proper and Not Duplicative**

15      Moog's breach of contract claim against Skyryse is limited to the

16  "information gained from Moog regarding its flight control software for purposes

17  beyond the scope of the limited purpose of the Parties' business engagement in

18  Phase 1 under the SOW." (PAC, ¶ 305.) Indeed, Moog alleges that Skyryse used

19  information that Moog disclosed under the NDAs to "reverse engineer certain

20  components of Moog's flight control systems in an effort to develop a competing

21  flight control system" and to "engage in targeted hiring and data theft practices a

22  few years later." (*Id.*) Thus, the breach of contract claim is limited to Skyryse's

23  breaches involving information Moog disclosed to Skyryse under the NDAs

24  between 2018-2020 when the Parties were pursuing a business relationship.

25

26

27

28  ("CUTSA's suppression provision expressly carves out claims for breach of
   contract and breach of the implied covenant of good faith and fair dealing").

1
2

a.    **Moog's allegations regarding Skyryse's hiring of 20
Moog employees to sidestep the NDAs**

3        Moog's implied covenant claim is different, and is targeted to different

4 wrongful conduct during a different time period, than Moog's breach of contract

5 claim. The PAC alleges that "Skyryse prevented Moog from receiving the benefits

6 of the 2018 and 2019 NDAs by . . . hiring dozens of key, targeted Moog personnel

7 after the NDAs were entered into ***who have intimate knowledge about the***

8 ***confidential information that Moog disclosed to Skyryse under the 2018 and***

9 ***2019 NDAs***." (PAC, ¶ 322, emphasis added.) Thus, the gravamen of Moog's

10 implied covenant claim is not Skyryse's hiring of any single Moog employee in a

11 vacuum, but rather Skyryse's attempts to circumvent the restrictions and purposes

12 of the 2018 and 2019 NDAs by getting direct or indirect access to Moog's

13 Confidential Information by hiring a majority of Moog's flight control software

14 engineering department between 2021 and 2022. The 2018 and 2019 NDAs do not

15 expressly address a prohibition on Skyryse's poaching of Moog's entire software

16 engineering department, but the limited purpose of such agreements was so that the

17 Parties could share confidential information for the "integration of Moog's flight

18 control systems" with "Skyryse's aircraft platforms." (PAC, Ex. E, § 1.) By hiring

19 20 of Moog's software engineers with intimate knowledge of Moog's flight control

20 programs and trade secrets,[7] Skyryse undermined and sidestepped the entire

21 purpose of the NDAs which was only to share confidential information to ***explore***

22 ***projects between the Parties***. New York law recognizes the sufficiency of implied

23 covenant breach claims when there are allegations that the plaintiff was deprived

24

25

26

27

28

---

[7] The implied covenant claim also incorporates by reference other allegations
regarding: 1) Skyryse engaging in a "full court press" to "take from Moog as many
key employees as possible so that it could shortcut its own timeline and costs in
developing automated flight software and related products"; and 2) the 20
employees' "substantial and direct involvement in the building, testing, and
certification of the projects reflected in the Stolen Trade Secrets." (PAC, ¶¶ 138,
155.)

of the benefits of the parties' agreements and the defendant acted for self-interested reasons. *See Dorset Indus.,*, 893 F. Supp. 2d at 409-10 (upholding implied covenant claim where "defendant, 'for [its] own self-interested reasons,' offers a competing program directly to the retailers"); *Credit Agricole Corp. v. BDC Fin., LLC,* 135 A.D.3d 561, 561 (1st Dep't 2016) ("even if none of the provisions of the agreements were violated, defendants breached the implied covenant of good faith and fair dealing by deliberately manipulating and depressing the bids of other bidders during the auction of the debtor's assets, thereby acquiring all of the debtor's assets and depriving plaintiffs of the benefit of their bargain."); *Friedman v. Maspeth Fed. Loan & Sav. Ass'n*, 30 F. Supp. 3d 183, 195 (E.D.N.Y. 2014) ("[r]elied on for the breach of the implied duty claim is the allegation that Maspeth misrepresented its records and policy, depriving plaintiff of the fruits of their agreement.").

> **b.** **Moog's allegations regarding Skyryse's theft and misappropriation of Moog data after the Parties' business relationship ended**

Moog's implied covenant breach claim is also predicated on the allegations that Skyryse had "its employees steal approximately 1.4 million files from Moog without authorization" and it used "the Stolen Trade Secrets and other proprietary information in connection with the development, certification, and testing of Skyryse's flight control software and programs." (PAC, ¶ 322.) The NDAs only cover confidential information that the Parties exchanged with each other in connection with Phase 1 of their business relationship during the 2018-2020 time frame. They do not cover the 1.4 million files stolen by Skyryse personnel that were not previously disclosed to Skyryse pursuant to the 2018 and 2019 NDAs, and which were stolen from Moog in 2021 and 2022 after the Parties' business relationship ended. Thus, contrary to Skyryse's arguments, these allegations fall outside the express contractual provisions of the NDAs and are not duplicative of

Moog's breach of contract claims. Paragraph 305 (summarizing the breach of contract claim) is very different from Paragraph 322 (summarizing the implied covenant claim). Skyryse obscures the clear delineation in the law between an explicit condition and an implied covenant by essentially reading "implied" out of the implied covenant of good faith and fair dealing. *See United Merch. Wholesale, Inc. v. IFFCO, Inc.*, 51 F. Supp. 3d 249, 266 (E.D.N.Y. Sep. 15, 2014) (noting that the implied covenant is in addition to the express terms of a contract).

Moog justifiably expected that Skyryse would not turn around and undercut the NDAs by hiring 20 of Moog's employees with intimate knowledge of Moog's flight control systems after the Parties' business relationship ended, and that Skyryse would not steal a massive amount of Moog data on its way out the door. But, by having Skyryse personnel steal such a massive amount of trade secret and other proprietary data from Moog, Skyryse subverted the entire purpose of the NDAs. It instead used Moog's trade secrets and other proprietary information to develop its ***own*** flight control systems. These actions deprived Moog of the benefits of the NDAs which was to protect Moog's confidential information from improper and unauthorized use and exploitation by Skyryse. *See P&G Auditors & Consultants, LLC v. Mega Int'l Commercial Bank Co., Ltd.*, No. 18-CV-9232-JPO, 2019 WL 4805862, at *6 (S.D.N.Y. Sept. 30, 2019) (upholding implied covenant claim where the complaint alleged breaches based on "obtaining P&G's most sensitive items under false pretenses and then secretly sharing [the] same with P&G's competitor"); *Henessey Food Consulting LLC v. Prinova Sols., LLC*, No. 520CV806FJSTWD, 2022 WL 160272, at *8 (N.D.N.Y. Jan. 18, 2022) (denying motion to dismiss DTSA and breach of the implied covenant of good faith and fair dealing claim which was predicated on the misappropriation of trade secrets); *see also Virun, Inc. v. Cymbiotika, Inc.*, No. 822CV00325SSSDFMX, 2022 WL 17371057, at *5 (C.D. Cal. Aug. 18, 2022) (denying motion to dismiss DTSA and breach of implied covenant claims which were both based on defendant's

disclosure of plaintiff's trade secret formulations to third parties and holding: "Plaintiff alleges that Defendants violated these covenants arising from the Confidentiality Agreement both by disclosing formula and composition information to their later suppliers . . . . Because Plaintiff has properly alleged violations of the covenant at least as to Defendants' disclosures, this claim survives the motion to dismiss").

### 2.    Skyryse's Cited Legal Authority is Distinguishable

*Lodging Sols., LLC v. Miller*, No. 19-CV-10806 (AJN), 2020 WL 6875255 (S.D.N.Y. Nov. 23, 2020) is distinguishable because there, the alleged conduct forming the basis of the implied covenant claim was only the defendants' hiring of a single employee, despite a no-hire contractual provision between the parties. *Id*. at *9. The court held in turn that "[b]ecause the no-hire provision is unenforceable, Defendants' conduct did not deprive Plaintiff of any fruit of the contract to which it was entitled." *Id*. Here, as described above, Moog's implied covenant claim is not predicated on the hiring of any single employee. It does not implicate the enforceability of no-hire clauses. Instead, it involves the hiring of 20 targeted employees by a former business partner and to cause such employees to steal massive amounts of data to undermine the entire purpose of the contracts at issue.

*Agency Dev., Inc. v. MedAmerica Ins. Co. of New York*, 327 F. Supp. 2d 199 (W.D.N.Y. 2004), *aff'd*, 142 F. App'x 545 (2d Cir. 2005) is a summary judgment case and did not involve any trade secret claim. Regardless, in that case (unlike here), the plaintiffs conceded that there was no express breach of contract but claimed the implied covenant was breached when defendants recruited and hired one of the plaintiffs' officers and then terminated a marketing agreement with plaintiffs immediately thereafter. *Id*. at 203. The court determined there was no breach because the employee's employment was not integral to the performance of the marketing agreement, and the agreement would have been terminated anyway. *Id*. at 204. *Agency Dev* is nothing like the facts here, where Skyryse's numerous

1   acts of wrongful conduct undermine and usurped the entire purpose of the 2018
2   and 2019 NDAs—to ensure that Moog confidential information remained
3   confidential and was only used to further a business relationship ***between the***
4   ***Parties***.

5       *JPMorgan Chase Bank, N.A. v. IDW Grp., LLC*, No. 08CIV9116(PGG),
6   2009 WL 321222 (S.D.N.Y. Feb. 9, 2009) actually helps Moog. That case involved
7   an agreement whereby the defendant agreed to help the plaintiff recruit candidates
8   for one of its trading groups. *Id.* at *2. The agreement contained non-solicitation
9   and confidentiality provisions. *Id.* The plaintiff alleged the defendant breached its
10  agreements by recruiting several of the plaintiff's employees to work at a separate,
11  third party company. *Id.* at *3.  The court denied the motion to dismiss regarding
12  the alleged breach for failure to disclose that the third party competitor had hired
13  the defendant to recruit the plaintiff's employees. *Id.* at *7. The court found this
14  alleged breach was not duplicative of an express breach of contract, and that the
15  complaint adequately alleged the defendant "deprive[d] [it] of the benefits of the
16  Agreements." *Id.*

17      Here, the conduct underlying the implied covenant claim is different than the
18  express breaches of the 2018 and 2019 NDAs because it involves a different set of
19  Moog data that was wrongfully acquired years after the conduct underlying the
20  breach of contract claim. And, just like in *JPMorgan*, Moog here has alleged facts
21  demonstrating that Skyryse deprived it of the benefits of the 2018 and 2019 NDAs.

22      **C.    Leave to Amend Should be Granted**

23      To the extent the Court finds that Moog's implied covenant breach claim is
24  deficient, it respectfully requests leave to amend to add additional factual
25  allegations to demonstrate that Skyryse's conduct (separate from its express
26  contractual breaches) deprived Moog of the benefits of the 2018 and 2019 NDAs.

27      Further, Skyryse's Opposition is solely focused on Moog's causes of action
28  for conversion and breach of the implied covenant, and does not challenge the

1   other amendments Moog makes throughout its pleading. Thus, to the extent the

2   Court determines that either of Moog's proposed causes of action are futile, it

3   should still grant Moog leave to file the PAC without the additional proposed

4   causes of action.

5   **III.    CONCLUSION**

6         For the foregoing reasons, Moog respectfully requests the Court grant the

7   Motion and enter the Proposed Amended Complaint.

8

9   Dated: June 15, 2023      SHEPPARD MULLIN RICHTER & HAMPTON LLP

10

11                  By       */s/ Rena Andoh*
                      Rena Andoh

12

13              Attorney for Plaintiff and Counterdefendant
                  MOOG INC.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>**CERTIFICATE OF COMPLIANCE**</u>

2      The undersigned, counsel of record for Moog Inc., certifies that this brief

3   contains 6,989 words, which:

4      _X_ complies with the word limit of L.R. 11-6.1.

5      ___ complies with the word limit set by Court order dated _____.

6

7   Dated:  June 15, 2023          SHEPPARD MULLIN RICHTER & HAMPTON LLP

8
                                  By   _____
9                                              */s/ Rena Andoh*
                                             Rena Andoh
10
                                  Attorney for Plaintiff and Counterdefendant
11                                       MOOG INC.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28