Douglas E. Lumish (SBN 183863)
 doug.lumish@lw.com
Gabriel S. Gross (SBN 254672)
 gabe.gross@lw.com
Arman Zahoory (SBN 306421)
 arman.zahoory@lw.com
Rachel S. Horn (SBN 335737)
 rachel.horn@lw.com
**LATHAM & WATKINS LLP**
140 Scott Drive
Menlo Park, CA 94025
Telephone: (650) 328-4600
Facsimile: (650) 463-2600

Russell Mangas (*admitted pro hac vice*)
 russell.mangas@lw.com
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone: (312) 876-7700

Attorneys for Defendant and
Counterclaimant Skyryse, Inc.

Rena Andoh (*admitted pro hac vice*)
 randoh@sheppardmullin.com
**SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP**
30 Rockefeller Plaza
New York, NY 10112
Telephone: (212) 653-8700
Facsimile: (212) 653-8701

Lai L. Yip (SBN 258029)
 lyip@sheppardmullin.com
Four Embarcadero Center, 17th Floor
San Francisco, CA 94111
Telephone: (415) 434-9100
Facsimile: (415) 434-3947

Travis J. Anderson (SBN 265540)
 tanderson@sheppardmullin.com
12275 El Camino Real, Suite 100
San Diego, CA 92130
Telephone: (858) 720-8900
Facsimile: (858) 509-3691

Kazim A. Naqvi (SBN 300438)
 knaqvi@sheppardmullin.com
1901 Avenue of the Stars, Suite 1600
Los Angeles, CA 90067
Telephone: (310) 228-3700
Facsimile: (310) 228-3701

Attorneys for Plaintiff and
Counterdefendant Moog Inc.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MOOG INC.,<br><br>              Plaintiff,<br><br>       v.<br><br>SKYRYSE, INC., ROBERT ALIN PILKINGTON, MISOOK KIM, and DOES NOS.1-50,<br><br>              Defendants. | Civil Action No. 2:22-cv-09094-GW-MAR<br><br>**JOINT REPORT REGARDING MEET AND CONFER FOR MOOG'S MOTION TO ENFORCE (DKT. 400)** |

Pursuant to the Court's tentative ruling dated June 13, 2023 (Dkt. 532), and ensuing minute order dated June 15, 2023 (Dkt. 538), Plaintiff and Counterdefendant Moog, Inc. ("Moog") and Defendant and Counterclaimant Skyryse, Inc. ("Skyryse") (collectively, the "Parties") hereby respectfully submit this "joint document regarding outstanding issues to be resolved by the Court." (Dkt. 538). The Court's tentative ruling further instructed the Parties to confer regarding: "(1) the issues surrounding Skyryse's preservation measures, (2) the issues surrounding Skyryse's removal of SDTE, sRTOS, and prior checklists from Skyryse's systems, and (3) Moog's production and inspection requests (i.e. production of Skyryse-issued electronic devices issued to 15 Skyryse personnel, production of Skyryse's Google Drive Account, etc.)." (Dkt. 532, p. 22). The Parties telephonically met and conferred on June 20 and 21, 2023, and circulated written correspondence regarding the outstanding issues below. (*See* Exhibit 1 – Moog's June 15, 2023 e-mail; Exhibit 2 - Skyryse's June 19, 2023 letter; Exhibit 3 – Moog's June 20, 2023 letter). This joint report provides Moog's and Skyryse's respective positions regarding five of the six outstanding issues, and provides a joint statement on behalf of both Parties for the sixth issue.

## 1.   <u>Moog's Request for Production of Lori Bird and Reid Raithel's Skyryse-Issued Laptops</u>

### A.   Moog's Position

Moog seeks production of complete, forensic images of Lori Bird and Reid Raithel's Skyryse-Issued Laptops to iDS for Moog's review. In its Tentative Ruling, the Court suggested production of these devices. (Dkt. 532, fn. 19 ("Perhaps, the parties can agree to produce the laptops for Raithel and Bird as a starting point").)

During meet and confer, Skyryse objected to production of the entire laptops, claiming the production "necessarily would include countless irrelevant,

confidential, private, and personal files that are unrelated to the claims or defenses in this action." (Ex. 2, p. 1.) Skyryse instead proposed the parties "reach agreement on an appropriate set of search terms" and once such terms are run, Skyryse would "produce relevant, non-privileged information." (*Id.*, p. 2.) Skyryse also offered to produce certain limited information such as file or connection logs from the two laptops. Skyryse's proposals should be rejected for several reasons because they are improper, inconsistent with the Court's prior orders on these issues, and further obstruct Moog's discovery efforts.

**First**, the relevance of Ms. Bird and Mr. Raithel, and their Skyryse-issued laptops, is described in detail in Moog's Motion to Enforce and summarized again in its June 20, 2023 meet and confer letter. (Dkts. 400-03, ¶¶ 22-48; 400-05, ¶¶ 19-46; Ex. 3, pp. 2-3.) While Skyryse attempts to downplay the relevance of Mr. Raithel by arguing that "Mr. Bandemer already established that Mr. Raithel did not plug his device that Moog alleges contains Moog materials into his Skyryse laptop," Moog's June 20, 2023 letter demonstrates in detail why Mr. Bandemer's analysis was woefully incomplete and not dispositive on this issue. (Ex. 3, pp. 2-3.)

**Second,** Skyryse's proposal to run search terms runs directly contrary to prior orders issued in this case.  Specifically, at the outset of this case, the Parties submitted competing inspection protocols to Magistrate Judge McCarthy to govern the inspection and review of electronic devices produced to iDS. Moog's proposal, which was adopted by the Court, provided a secure way for outside counsel and experts to view the entirety of a laptop's contents, minus any materials redacted for privilege. (Dkt. 96.) Skyryse's protocol, like its proposal now, required the Parties to agree upon search terms, have iDS run those search terms, and then Moog would have access to any resulting hits after Skyryse conducted a privilege review. (Dkt. 99.) Judge McCarthy determined that, given the "unique circumstances of this case," "Moog's Protocol (which, although opposed by Skyryse, is not opposed by codefendants Pilkington and Kim) gives Moog the best opportunity to discover

what information was taken from Moog and/or spoliated by defendants." (Dkt. 109, p. 2.) Consistent with Judge McCarthy's order, Skyryse previously produced images of 7 computers (every one of them under Court order following motion practice), and the Parties have collectively produced images of 20 computers. Thus, Moog's request for the production of two additional computers is consistent with past practice and proportional to the specific needs it has demonstrated.

*Third,* the burden on Skyryse in producing the two laptops is minimal. Skyryse claims it has already preserved these laptops. It merely needs to produce a forensic image of the laptops to iDS, as it has done with many other similar devices. To the extent not already done so, Skyryse's forensic firm, FTI, can image a laptop quickly and with minimal effort. Moreover, to the extent that Skyryse argues that privilege review would be burdensome, Skyryse proposes to review a potentially high volume of documents even under its own proposal – specifically, reviewing the hits on the search terms prior to production.   Therefore, neither proposal materially changes the amount of work Skyryse would have to do.

*Fourth,* in November 2022, under similar circumstances Judge McCarthy ordered the production of three entire Skyryse laptops (belonging to Sathya Achar, Eric Chung, and Tri Dao) based on a much more limited showing of possession of Moog data on the laptops. For example, before Judge McCarthy ordered production of the laptops, Moog demonstrated that Mr. Achar was copied on three e-mails with Moog documents attached to them, and Mr. Dao was copied on a single e-mail containing Moog data. (Dkt. 282, pp. 3, 4). Notably, after the Achar, Chung, and Dao laptops were produced upon Court order, Moog ***discovered dozens of additional Moog documents contained therein which had not been previously produced by Skyryse***. This includes at least 81 documents on Achar's laptop which contained "Moog" in the company metadata field, and 173 documents which reflected "Moog" as the document origin. (Dkt. 400-03, ¶ 9). One hundred Moog spreadsheets were found on Eric Chung's laptop, including 22

spreadsheets which contained a Moog print header (*Id.*, ¶ 13.) The existence of hundreds of Moog documents on these laptops, which had not been previously produced by Skyryse, underscores why Skyryse cannot run its own searches and the entire laptops of Mr. Raithel and Ms. Bird must be produced.

*Finally,* Skyryse's proposal to have the Parties agree upon search terms to run across the two laptops at issue would fall far short of the needs of this case for several reasons, including: (1) even under Skyryse's proposal, Moog would not automatically get access to all resulting hits from search terms, but instead Skyryse would first determine what it deems "relevant" before producing such materials; (2) the process would not provide Moog any information about data that may have been deleted (and we know deletion has already occurred in this case in connection with other Skyryse personnel); (3) search terms alone cannot fully uncover Skyryse's misappropriation, in that many of the documents at issue include drawings, designs, schematics, executables, images, models, diagrams, hand drawn figures, and object files which cannot be searched through human words; (4) Moog has no insight as to whether certain distinctive words that may be run as search terms (such as "Moog") were deliberately replaced to obfuscate the theft, or to adapt the material to Skyryse's existing systems; (5) the use of search terms alone prevents Moog from conducting a sufficient forensic analysis, such as understanding when devices were connected to the laptops, the transfer or deletion of data, etc.; (6) Skyryse's proposal would only cause further delay as there would likely be dispute as to what constitutes "an appropriate set of search terms" which may require additional use of the Court's resources and time;  and (7) Defendants could have misappropriated Moog's data in a number of ways (including by using it as a reference instead of direct copying), and Moog should not be forced to "guess" at how Skyryse has misappropriated the data in order to provide search terms while wearing a proverbial blindfold.

Moog respectfully requests that Skyryse be ordered to produce complete

forensic images of Ms. Bird and Mr. Raithel's Skyryse-issued laptops to iDS within 30 days, after conducting a privilege review.

**B.     Skyryse's Position**

Skyryse has never refused and is not refusing to provide Moog with relevant information related to any of the issues in this Joint Report—not from Ms. Bird's and Mr. Raithel's laptops, nor from any of the other sources of information to which Moog seeks access. To the contrary, in addition to the *four terabytes* of data Skyryse already has provided (the equivalent of roughly 300 million pages of text), Skyryse has offered to conduct additional thorough searches of the requested devices and systems in a continued good-faith effort to provide Moog with the information to which it believes is entitled, and more. Moog, however, has uniformly rejected Skyryse's proposals. On this particular topic, Moog "will not agree to anything less" than complete forensic images of the entire Bird and Raithel laptops *regardless of the relevance of their contents and the invasive burden to Skyryse*, though this is not required by the parties' stipulation or the rules of discovery. (*See* Ex. 1.) Moog's refusal to entertain any reasonable compromise finds no support in the parties' stipulation and runs counter the Court's instruction to meet and confer in an effort to resolve outstanding issues. (Dkt. 532.)

Moog presents its blanket inspection demands as if the facts underlying its allegations were undisputed and as if it has proven its misappropriation case, entitling it to such sweeping relief. Not so. Skyryse denies Moog's allegations which remain unproven. The issues in this report arise from Moog's motion to enforce the March 11, 2022 Stipulated Order, which memorialized the parties' agreement for the "preservation and production" of information during what the parties expected would be a roughly two-month period before a hearing on Moog's long-threatened motion for a preliminary injunction. (Dkt. 25 ¶ 10.) By its own terms, the Stipulated Order was to dissolve once that hearing occurred. (*Id.* ¶ 12.) Moog never pursued that motion or that hearing, yet today, fifteen months later, it

attempts to leverage the Stipulated Order to obtain drastic relief: unfettered inspections of virtually everything in Skyryse's business including information that has nothing to do with this lawsuit. Moog demands all this even while the Court has found that Moog has failed to sufficiently identify the vast majority of its own trade secrets (Dkt. 534 at 10), and Moog has never explained what it views as its "non-public information" under the Stipulated Order.

The fact is, neither the Stipulated Order nor the rules of discovery require the indiscriminate and invasive productions and inspections of entire laptop computers, or other repositories, without regard for the relevance of their contents (or the associated burden or proportionality) as Moog demands.[1] Moog would have the Court order Skyryse to turn over all of the irrelevant, personal, private, and confidential information on these laptops that has nothing to do with the claims or defenses in this case. Without a specific showing of relevance or proportionality, neither the stipulation nor the law supports Moog's demand. *See, e.g.*, *Moser v. Health Ins. Innovations, Inc.*, No. 17-cv-1127-WQH(KSC), 2018 WL 6735710, at *3-5 & n.1 (S.D. Cal. Dec. 21, 2018) (declining to compel inspection of "any cell phones that used" telephone numbers identified in the complaint).

Moog tries to justify its refusal to compromise or even focus on relevant materials by arguing that the defendants turned over some entire devices to Moog earlier in this action. This is not a basis for Moog's latest demands. To the contrary, the Stipulated Order reflected Skyryse's *voluntary* agreement to turn over a limited set of devices used by Mr. Pilkington and Ms. Kim, the individual defendants whom Moog accused of copying its trade secrets. Skyryse agreed to produce those entire devices even though it had no way of verifying whether or not their contents contained Moog's "non-public information." As the case progressed,

---

[1] While Moog claims the Court endorsed the production of Ms. Bird's and Mr. Raithel's laptops, the Court in fact suggested that as a "starting point" for the parties' discussion. (Dkt. 532 at 23 n.19.) Skyryse attempted to advance that discussion and achieve a reasonable middle ground, but Moog refused to compromise.

Skyryse produced several other devices either voluntarily and out of an abundance of caution, or in response to a court order requiring Skyryse to provide additional discovery that Moog claimed it needed to identify its own alleged trade secrets in advance of a preliminary injunction motion (*see* Dkt. 284; Nov. 10, 2022 Tr. at 26:9-14),[2] and *not* because the Stipulated Order requires it. It does not.

Now, as it has always done, Skyryse has attempted to cooperate in good faith to provide Moog additional information it claims to need—even while all other discovery continues to be stayed. (Dkt. 534 at 10.) As Moog knows, Skyryse already has searched for and produced relevant information that was in Ms. Bird's[3] and Mr. Raithel's possession. Skyryse has explained it also is willing to run a sweeping set of search terms on their laptops, review the resulting "hits" for relevance and privilege, and produce them. Skyryse suggested, as a starting point, agreeing on a subset of the 100,000+ search terms Moog had previously provided. (*See* Ex. 2 at 2.) In a further effort to compromise, Skyryse also offered to provide Moog with complete listings of *all* the files on these laptops (regardless of relevance), so that if Moog makes reasonable requests for files not already produced, Skyryse can review those too for relevance and privilege. As to Ms. Bird's laptop, Skyryse explained that it was willing to consider producing any additional forensic artifacts Moog believes is necessary for its review (*id.*), and Skyryse is also willing to do the same for Mr. Raithel's laptop if Moog can

---

[2] Six months after receiving that discovery, Moog has still failed to identify its trade secrets. (*See* Dkt. 534.)

[3] Moog has wrongly claimed, in its briefing and correspondence, that when Skyryse produced files from Ms. Bird's device, it "falsely indicated" that they came from a personal device, not a Skyryse-issued laptop. (Ex. 3 at 2.) But as Moog knows because Skyryse explained it in writing months ago, Skyryse quickly "identified and resolved an inadvertent mistake by Skyryse's e-discovery vendor" that had erroneously indicated "that the produced documents relating to Ms. Bird were collected from personal devices and records." Skyryse's counsel explained that once it resolved this mistake, it confirmed to Moog's counsel "that some of these documents were collected from a Skyryse-issued computer as you noted." There was no "false representation," just a vendor error that was promptly corrected, and Moog knows this.

1    articulate a basis for the request.

2         Moog rejected every one of these reasonable proposals. It would not provide

3    a counter-proposal, or describe what specific information it was seeking from these

4    devices and why production of the entire device was necessary to obtain that

5    information. Respectfully, the Court should reject Moog's demand for these entire

6    laptops and instead order the parties to follow Skyryse's proposal, and meet and

7    confer on a set of search terms that will enable Skyryse to conduct a reasonable

8    search for relevant material.

9    **2.    Moog's Request for Production of Skyryse's Polarion Repository**

10        **A.    Moog's Position**

11        Moog seeks the production of Skyryse's entire Polarion repository into iDS

12   for Moog's review. The Polarion repository is where Skyryse's software process

13   documents and plans are stored. (Dkt. 400-05, ¶ 113). The Court's Tentative

14   Ruling noted that the Court is "troubled by the fact that several of Skyryse's

15   documents appear to be almost word-for-word identical to corresponding Moog

16   documents." (Dkt. 532, p. 21). These documents the Court is referring to are the

17   type that are stored in Skyryse's Polarion repository.  Skyryse has refused to

18   produce its entire Polarion Repository, and instead again proposes that the Parties

19   agree on an "appropriate set of search terms" to run across its Polarion Repository

20   before producing resulting hits after reviewing for relevance and privilege. (Ex. 2,

21   p. 2.)

22        Complete access to the Skyryse Polarion Repository is needed to determine

23   to what extent Skyryse personnel are continuing to access and use Moog data.

24   Skyryse has broadly represented to Moog and the Court that it is no longer using

25   Moog's certification documents (and has instead engaged a third party,

26   ConsuNova, to provide certification documents instead). Moog is entitled to vet

27   this claim, and there is no way to "prove a negative" without access to the entire

28   Polarion Repository. Until and unless Moog gets full access to Skyryse's Polarion

Repository, neither Moog nor the Court can have any assurance that Skyryse is no longer using Moog data in connection with its software process documents and plans. Skyryse's proposal to run search terms across its Polarion Repository is improper for the same reasons identified in above in connection with Ms. Bird and Mr. Raithel's laptops.

To reach a compromise, during meet and confer Moog proposed an alternative whereby instead of producing to iDS, Skyryse could make its Polarion Repository available for in-person inspection by Moog's expert on a secure computer at one of Latham's offices. (Ex. 3, p. 5.)  This in-person inspection would be subject to security protocols similar to those governing in-person inspection of source code.  Skyryse rejected the proposal.  Moog respectfully requests that Skyryse be ordered to produce its complete Polarion Repository to iDS (or to make it available for physical inspection) within 30 days, after conducting a privilege review.

### B.    Skyryse's Position

Polarion is a dynamic, web-based interface that Skyryse uses to manage engineering requirements. Skyryse has already voluntarily produced numerous documents exported from Polarion. Neither the March 11 Stipulated Order nor the rules of discovery require the indiscriminate production or inspection of the "*entire* Polarion repository" and all of its contents, as once again, that necessarily would include countless irrelevant, confidential files that are unrelated to the claims or defenses in this action.

The sole ground Moog has articulated for its demand is that "internal e-mails" demonstrate that "the Polarion repository is where Skyryse's software documents and plans are stored." (Ex. 3 at 5.) But the mere fact that Polarion exists is not a basis to produce all of the data it contains to Moog regardless of relevance, burden, or proportionality. The Stipulated Order is not a vehicle to allow Moog unfettered access to any device, system, or repository where it would like to check

for materials it could try to claim with hindsight are its trade secrets or non-public information—while Moog has yet to even identify its own trade secrets (Dkt. 534)—and Moog's demand for such access is not proper. *See, e.g.*, *Moser*, 2018 WL 6735710, at *3-5; *Lincoln Benefit Life Co. v. Fundament*, No. 18-cv-000260-DOC(JDEx), 2018 WL 6133672, at *3 (C.D. Cal. Nov. 7, 2018).

Still, as Skyryse explained to Moog, it is willing to run Moog's search terms over the current contents of Polarion and produce any relevant, non-privileged material. If, after reviewing the search results, Moog can articulate a specific need for other specific, identifiable relevant information from Polarion, Skyryse would produce it. But Moog continues to refuse anything less than an unfettered inspection of Skyryse's entire Polarion repository.

Moog's only superficial concession is that, rather than produce Polarion into the iDS environment (the platform hosted by a third party assisting in managing electronic discovery), Skyryse could instead permit Moog's expert Mr. Crozier to inspect the entire repository in person. (Ex. 3 at 5.) This is not a compromise; it places no limits on the scope of the wholesale inspection of the entire repository regardless of the relevance of its contents. That proposal is indistinguishable from the physical inspection of Skyryse's systems that Moog sought in its Motion and that the Court has tentatively denied. (Dkt. 400 at 32; Dkt. 532 at 23.) More importantly, Moog's purported "compromise" does not address the fundamental problem with this and all of Moog's remaining demands: Moog is trying to use the Stipulated Order to obtain broad access to Skyryse's enterprise-wide systems, with *zero* limitations as to scope or relevance, knowingly demanding access to irrelevant and confidential information. Respectfully, the Court should reject Moog's demand for the entire Polarion repository and instead order the parties to follow Skyryse's proposal, and meet and confer on a set of search terms that will enable Skyryse to conduct a reasonable search for relevant material.

### 3.     Moog's Request for Production of Skyryse's Google Drive Account

####     A.     Moog's Position

Moog seeks the production of Skyryse's entire Google Drive Account into iDS for Moog's review. Moog has demonstrated in detail the existence of copious amounts of Moog data on Skyryse's Google Drive Account, which defendants Kim and Pilkington had access to and shared with third parties. (Dkt. 400-05, ¶ 100-109) (Dkt. 400-03, ¶¶ 50-53) (Ex. 3, pp. 5-6.) Skyryse has refused to produce its entire Google Drive Account, and instead again proposes that the Parties agree on an "appropriate set of search terms" to run across its Google Drive Account before producing resulting hits after reviewing for relevance and privilege. (Ex. 2, pp. 2-3.)

Until and unless Moog gets full access to Skyryse's Google Drive Account, Moog and the Court will be prevented from understanding the full nature and scope of Skyryse's use and disclosure of Moog data. Skyryse's proposal to run search terms across its Google Drive Account is improper for the same reasons identified in above in connection with Ms. Bird and Mr. Raithel's laptops.

In an effort to reach a compromise, during meet and confer Moog stated that it is open to Skyryse removing from its production of its Google Drive Account any portions or folders which: 1) have no relation to flight control and have never stored any data or documents related to flight control; or 2) were never accessed by Hummingbird personnel, any former Moog employee, or the following Skyryse personnel: Amir Hallajpour, Chris Smith, David Lee, Diane Le, Hussein Khimji, Ian Young, Stephen Wang, Ilan Paz, Glenn Shintaku, and Thusa Dinh. (Ex. 3, p. 6.) This proposal was designed so that Skyryse could remove from production any folders which have no relevance to the subject matter of this case, or were not accessed by the various personnel that Moog has identified as possessing, transferring, or using Moog data. Skyryse rejected that proposal. Moog also proposed that in lieu of producing the Google Drive Account to iDS, Skyryse make

the drive available for physical inspection by Moog's experts. Skyryse did not agree to that proposal. Moog respectfully requests that Skyryse be ordered to produce its complete Google Drive Account to iDS (or make it available for physical inspection) within 30 days, after conducting a privilege review.

### B. Skyryse's Position

Moog anchors its demand for access to Skyryse's entire Google Drive account[4] in the claim that "Skyryse personnel shared a massive amount of Moog documents and data using the Google Drive Account, including with Hummingbird personnel." (Ex. 3 at 6.) Yet the only support Moog provided for that assertion is its experts' identification of a *single* Google Drive *folder* that defendant Mr. Pilkington allegedly shared with Hummingbird Aero. (*Id.* (citing Dkt. 400-5 ¶¶ 101-109; Dkt. 400-3 ¶¶ 50-53).) During the June 21 meet-and-confer, Moog's counsel stated that he thought there might be other materials on the Drive that are relevant, but that it was "hard" to identify any such materials without access to Skyryse's entire, enterprise-wide Google Drive. But such broad access would invariably include information unrelated to the claims or defenses in this case. Counsel's speculation that some portions of Skyryse's Google Drive *might be* relevant is not a sufficient basis to demand "full, unfettered access" to the entire repository.

Nevertheless, Skyryse again offered to work with Moog to develop search terms to target any additional "Moog materials" that Moog alleges were shared with or provided by Hummingbird—the only factual basis for Moog's demand. Skyryse is willing to run an appropriate set of search terms over any Google Drive folders shared with Hummingbird personnel, review the search hits, and produce relevant, non-privileged information. This should be more than enough for Moog to identify any material that could arguably constitute Moog's proprietary,

---

[4] Skyryse uses Google Drive, a cloud-based system for storing and managing certain types of files, on an enterprise-wide level.

confidential, or non-public information exchanged with Hummingbird. Once again, Moog refused.

Instead, Moog suggested it might consider allowing Skyryse to identify and withhold individual Google Drive folders that have "no relation to flight control" (without defining what that could mean in this dispute between aviation companies) or that were never accessed by any of a broad list of personnel, including several individuals who never worked for Moog. (Ex. 3 at 6.) Even if the categories remaining after that exercise were reasonably tailored to Moog's claims in this litigation (and they are not), Moog's proposed "compromise" improperly places the burden on Skyryse to demonstrate the *irrelevance* of its documents, rather than on Moog to articulate why the discovery it seeks is *relevant*. Indeed, Moog stated as much when the parties met and conferred, claiming it should be Skyryse's obligation to show what information within its company is *irrelevant* to justify any restrictions on the otherwise boundless discovery Moog now seeks. That duty does not fall to Skyryse either under the March 11 Stipulated Order or the ordinary rules of discovery in federal litigation. Respectfully, the Court should reject Moog's demand for the entire Google Drive account and instead order the parties to follow Skyryse's proposal and meet and confer on a set of search terms that will enable Skyryse to conduct a reasonable search for relevant material in portions shared with Hummingbird.

## 4. Moog's Request for Production of Skyryse's Git Repository

### A. Moog's Position

Moog seeks the production of Skyryse's entire Git Repository (which stores its flight control source code) into iDS for Moog's review. During this meet and confer process, Skyryse confirmed that the only source code made available for Moog's expert's inspection was "source code that was accessed by Defendants Kim and Pilkington whom Moog alleges misappropriated Moog's source code, including the flight control source code worked on by the software teams they

worked with." (Ex. 2, p. 3.) This admission was surprising to Moog and is troubling for several reasons.

Skyryse has broadly and repeatedly represented to Moog and the Court that Moog's data has been removed from its source code repositories. (*See, e.g.,* Dkt. 453 (Skyryse's opposition to Moog's motion to enforce) at p. 24 ("Skyryse months ago took steps to ensure that the source code for the SDTE framework is no long used at Skyryse"), p. 24 ("Skyryse months ago took steps to ensure that any files or directories in the sRTOS source code that could even arguably be Moog's are no longer used at Skyryse"); Dkt. 453-13 (Baer declaration) at p. 3 ("I have also reviewed Skyryse's current source code repository and can confirm that Skyryse has removed the SDTE code Mr. Crozier identifies"), p. 4 ("I have also reviewed Skyryse's current code base and confirmed that it no longer contains sRTOS code."), p. 5 ("I have also reviewed Skyryse's current source code repository and can confirm that Skyryse is no longer using the Doxygen Python scripts Mr. Crozier identifies"); Dkt. 453-12 (Koo declaration) at p. 4 ("Skyryse ha[s] taken steps at the direction of management to ensure that the source code for its SDTE, or desktop test environment, was entirely removed from its source code repository. I understand that code is no longer there, and cannot be used by Skyryse personnel, contrary to Moog's suggestion."), *id.* ("Skyryse ha[s] taken steps at the direction of management to examine the directories and files of source code for SRTOS, and to remove from its source code repository any files or directories that arguably constitute Moog's proprietary, confidential, or non-public information").)

It is obvious that Moog cannot vet this claim unless and until it has an opportunity to inspect the entirety of Skyryse's source code repositories. Skyryse cannot rely on the entire source code repository as a sword to oppose Moog's motion to enforce, only to then invoke purported overbreadth as a shield to block Moog's access to that same evidence. The fact that Skyryse only produced code accessed by Kim and Pilkington is not appropriate given: (1) Skyryse's broad and

repeated representations to the Court (see above) were not limited to code accessed by Kim and Pilkington; and (2) Moog has demonstrated in detail that Skyryse's possession, use, and disclosure of Moog data goes far beyond Kim and Pilkington and involves dozens of other Skyryse personnel. (Dkt. 400-03, ¶¶ 8-53.)  In fact, there are dozens of documents that show Pilkington, Kim, and Lori Bird, among others, sharing Moog documents and information with other Skyryse employees.

In an effort to reach a compromise, during meet and confer Moog proposed that in lieu of producing its Git Repository to iDS, that Skyryse make the entire Git repository available for in-person inspection under Skyryse's own source code inspection protocol (Dkt. 213-2).  As another alternative, Moog proposed that a Skyryse Git configuration manager physically walk Moog's expert through Skyryse's Git repositories from top to bottom, to ensure that folders and documents containing Moog data have not been moved or created elsewhere in the repositories (to which Mr. Crozier was not given access during his inspection in Austin). (Ex. 3, p. 7.) Skyryse has rejected both proposals. Moog respectfully requests that Skyryse be ordered to produce its complete Git Repository to iDS (or make it available for physical inspection under Skyryse's source code inspection protocol, Dkt. 213-2) within 30 days.

**B.    Skyryse's Position**

Yet again, Moog demands invasive and overreaching discovery into the entirety of a source code repository called Git that broadly contains some of Skyryse's most sensitive and confidential business information, having nothing to do with this action. Moog refuses to focus its demands on source code that may actually relate to the subject matter of this litigation. As Moog knows, Skyryse has already produced all of its source code from the Git repository that was accessed by Ms. Kim and Mr. Pilkington, the Individual Defendants whom Moog alleges misappropriated Moog's source code. This includes source code worked on by the software teams Ms. Kim and Mr. Pilkington worked with during their brief time at

Skyryse. That code has been available for months for Moog's experts to inspect. Indeed, Moog's experts have been inspecting a recent version and should have been able to confirm by now that it does not contain any code that Moog alleges to be its source code. It is not clear to Skyryse what additional information Moog thinks it requires. Moog nonetheless makes another sweeping demand to examine all of the source code in the *entirety* of Skyryse's source code repository—knowing that it contains some of the company's most valuable, proprietary, and confidential data that has nothing to do with this suit—without any showing of relevance or proportionality.

Still, in an effort to accommodate Moog's request, Skyryse again offered to perform additional searches designed to target whatever non-public information Moog asserts was taken, and to produce any responsive, non-privileged source code for inspection according to the parties' agreed-upon protocol. Moog refused. The only superficial "concession" Moog proposed was that, rather than provide its entire Git repository to iDS, Skyryse could instead permit Moog's expert Mr. Crozier to inspect the entire repository in person. (Ex. 3 at 7.) That is hardly a compromise, given that the Court already ordered any source code inspection should follow a protocol that requires in-person inspection on dedicated machines. (Dkt. 532 at 23.) More importantly, Moog's purported "compromise" does not address the fundamental problem with all of Moog's remaining demands: Moog broadly seeks access to Skyryse's systems, with *zero* limitations as to scope or relevance. Moog comes nowhere close to explaining why Skyryse should be required to divulge its most valuable, sensitive source code without any showing of relevance, burden, or proportionality. Respectfully, the Court should reject Moog's demand for the entire Git repository and instead order the parties to follow Skyryse's proposal and meet and confer on a set of search terms that will enable Skyryse to conduct a reasonable search for relevant material.

**5.** **Moog's Request for Information on Removal of SDTE, sRTOS, and Historical Checklists From Skyryse Personnel's Devices and E-mail Accounts**

### A.     Moog's Position

Skyryse's CFO Stephen Koo declared that Skyryse took certain efforts (on or after July 2022) to remove access to SDTE, portions of sRTOS, and its historical checklists from its "source code repository." (Dkt. 453-12, ¶¶ 15-17.) The Court "question[ed] why Skyryse failed to take these steps upon entering the TRO Stipulation." (Dkt. 532, p. 21). Mr. Koo also testified that he was not aware of any efforts to remove SDTE, sRTOS, or prior checklists from Skyryse's personnel's Skyryse-issued electronic devices, personal devices, or e-mail accounts. (Koo Dep. Tr. at 60:6-61:5, 65:1-66:15, 71:8-73:1). The Court noted that "Moog raises doubts as to whether its MDTE, eRTOS, and checklists 'have been fully wiped from Skyryse's systems.'" (Dkt. 532, p. 22).

Skyryse allegedly taking certain actions with respect to its central source code repository would not impact Skyryse personnel saving source code files locally on their company-issued or personal devices, or transmitting such information through e-mail accounts. Given the track record of Skyryse personnel using company-issued and personal devices to steal, possess, and use Moog data, it is likely that Skyryse personnel continued to have access to Moog's MDTE, eRTOS, and checklists on such devices or e-mail accounts.

During meet and confer, Moog asked Skyryse to confirm whether Skyryse has taken any efforts beyond its central source code repository to cut-off access to SDTE, portions of sRTOS, and its historical checklists. (Ex. 3, p. 8.) Skyryse's counsel stated he had nothing to add beyond Mr. Koo's testimony.

Moog respectfully requests the Court consider Skyryse's remedial and preservations efforts, or lack thereof, in ruling on Moog's pending Motion to Enforce, including in deciding whether to issue monetary sanctions. This also

underscores why Moog requires the production of the entire laptops of Ms. Bird and Mr. Raithel, at minimum, to determine if any portions of SDTE, sRTOS, or the historical checklists remain on those devices.

### B.    Skyryse's Position

As Skyryse has explained previously (and as Moog's expert witness's inspection should have confirmed by now) out of an abundance of caution Skyryse took steps to ensure that any code arguably related to SDTE was removed from its source code repository. (Dkt. 453-12 ¶ 15.) Similarly, Skyryse ensured that it had removed from its sRTOS source code any files or directories that arguably constitute Moog's proprietary, confidential, or non-public information, and that Skyryse was unable to confirm were based only on internal Skyryse information or information generally known in the industry. (*Id.* ¶ 16.)

Skyryse's practice is to maintain its operative codebase centrally in a source code repository, as is typically the case in the software development process, rather than on laptops, personal devices, or email accounts of individual employees. This is why Skyryse's remedial measures with respect to SDTE and sRTOS naturally focused on its source code repository. Nevertheless, Skyryse has preserved, searched, and produced documents from its employees' laptops and email accounts throughout this case, as Moog knows. Without waiving any privileges or other applicable protections from disclosure, Skyryse can confirm it also has instructed its employees to refrain from using any information (which would include source code, templates, and checklists) that could arguably constitute Moog's non-public information, as the Stipulated Order requires. (Dkt. 25 ¶ 1.) Skyryse has also instructed its employees to inform counsel if they identify any information that could arguably constitute Moog's proprietary, confidential, or non-public information. Nothing more is required by the Stipulated Order, particularly where there are real "uncertainties" around "what was included in the term 'nonpublic information.'" (6/15/23 Hrg. Tr. 19-20.) And Moog's new demand for still more

"removal" of information relating to SDTE, sRTOS, and checklists from computer devices and email accounts cannot be reconciled with the Stipulated Order's mandate to "preserve and not otherwise tamper with" Skyryse's email and computers.  (Dkt. 25 ¶¶ 5, 7.) Respectfully, the Court should deny Moog's demand for still more information on the topic, especially in view of the massive discovery Moog already has received from Skyryse computers and email accounts and the proposals Skyryse already has made to provide more information as described above.

**6.**      **Parties' Joint Statement Regarding Timeline Related to Mr. Wang's Laptop and Mr. Bandemer's Analysis of Volume Shadow Copies**

During the June 15, 2023 conference before the Court, there was discussion regarding when Mr. Wang's laptop, and certain volume shadow copies (VSCs) relied upon by Mr. Bandemer to recover the 32 deleted files, became available for Moog's inspection. Moog's and Skyryse's counsel appear to have been discussing two separate issues: 1) whether the four VSCs relied upon by Mr. Bandemer were produced to iDS and available to Moog for request as of June 2022; and 2) when the four VSCs in fact were made separately available to Moog for review. To ensure an accurate record and so there is no confusion amongst the Parties and the Court, the Parties jointly provide the following facts:

- On June 15, 2022, Skyryse produced to iDS an image of Mr. Wang's Skyryse-issued laptop. As permitted by the Inspection Protocol (Dkt. 96-2 at 5-6), Skyryse also provided a listing of privileged documents for iDS to excise from the image and which were only based on attorney-client privilege.  Moog has no way of directly verifying that representation. Skyryse produced a privilege log listing those excised files to Moog.

- On August 1, 2022, Moog e-mailed the other parties and iDS, suggesting that iDS "provide a file list to all parties of the Volume Shadow Copies from each Skyryse Windows laptop."

- On August 9, 2022, iDS e-mailed the Parties, listing 21 VSCs for the laptops of Misook Kim (7), Alin Pilkington (11), and Alex Wang (3). iDS did not list a fourth VSC for Mr. Wang's laptop.[5]

- iDS asked Moog to identify which VSC that it wanted "file listings for." On August 12, 2022, in response to iDS's request, Moog advised iDS "We would like the VSCs highlighted in-line below" and identified ten VSCs on the laptops of Kim, Pilkington, and Wang, including two out of the three VSCs for Mr. Wang's laptop.

- On August 16, 2022, Skyryse agreed that iDS could provide Moog with the file listings it requested and explained that if Moog wanted access to the underlying VSCs that "Skyryse will consider that request and will need to review those materials for privilege before they are made available for review." Moog was provided with those file listings by iDS.

- On October 6, 2022, Moog requested access to complete VSCs from the laptops of Ms. Kim, Mr. Pilkington, and Mr. Wang. Skyryse responded that Moog had not identified any "legitimate basis to demand access to the entire contents of the numerous backup files of volume shadow copies (VSCs) identified in your e-mail below, and the Court has not ruled that Moog is even entitled to such information." Regarding the VSCs for Pilkington and Wang, Skyryse further argued that "Moog has identified no basis at all for why it needs access to entire VSCs on the other two devices" and that "Moog's insistence on being provided immediate access to the VSCs simply because they exist is unreasonable, not proportional to the needs of the case, and overly burdensome." At this time, Skyryse was not aware that deleted files were recoverable from Mr. Wang's VSCs. After a discovery conference where the Court advised Moog to narrow its requests for VSCs

---

[5] iDS later clarified that it had "inadvertently missed" the fourth VSC from Mr. Wang's laptop.

to what it believed to be most relevant at the time, Moog narrowed its request at that time to seeking one VSC from Ms. Kim's laptop.  Skyryse agreed to provide Moog with access to that VSC.

- On April 20, 2023, after Mr. Bandemer recovered several of the deleted files from four volume shadow copies on Mr. Wang's laptop, Skyryse provided a file listing of privileged documents for iDS to excise from the VSCs and make those same four volume shadow copies available to Moog. Skyryse produced a privilege log listing those excised files to Moog.

- On April 27, 2023, iDS confirmed to Skyryse that it had made the four requested volume shadow copies available to Moog.  However, due to an error by iDS, it initially only provided Moog with access to three of the volume shadow copies.  When Moog reported to Skyryse that it could not access the fourth volume shadow copy, Skyryse followed up with multiple communications to iDS and iDS acknowledged that it had "inadvertently missed" the fourth volume shadow copy that Skyryse requested it produce and confirmed that it would provide that data to Moog "asap."

- On May 11, 2023, iDS provided the fourth volume shadow copy relied upon by Mr. Bandemer for Moog's review.

Dated: June 22, 2023

**SHEPPARD, MULLIN, RICHTER &HAMPTON LLP**

By: */s/ Kazim A. Naqvi*
Counsel for Plaintiff and
Counterdefendant Moog Inc.

**LATHAM & WATKINS LLP**

By: */s/ Gabriel S. Gross*
Counsel for Defendant and
Counterclaimant Skyryse, Inc.

1

# **ATTESTATION**

2

3
Pursuant to Civil Local Rule 5-4.3.4, I, Kazim A. Naqvi, attest that

4
concurrence in the filing of this document has been obtained by all its signatories.

5

6

Dated: June 22, 2023                                              */s/ Kazim A. Naqvi*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 1

**From:** Kazim Naqvi
**Sent:** Thursday, June 15, 2023 6:11 PM
**To:** SKYRYSEMOOG.LWTEAM@lw.com
**Cc:** Rena Andoh <RAndoh@sheppardmullin.com>; Travis Anderson <TAnderson@sheppardmullin.com>; Lai Yip <LYip@sheppardmullin.com>; Michael Heins <MHeins@sheppardmullin.com>
**Subject:** Moog/Skyryse - Meet and Confer

Counsel:

Pursuant to the Court's tentative ruling (Dkt. 532), and Judge Wu's statements during today's hearing, we write to meet and confer regarding the production of additional materials as set forth in Moog's Motion to Enforce. The Court's Tentative Ruling ordered the Parties to confer regarding: "(1) the issues surrounding Skyryse's preservation measures, (2) the issues surrounding Skyryse's removal of SDTE, sRTOS, and prior checklists from Skyryse's systems, and (3) Moog's production and inspection requests (i.e. production of Skyryse-issued electronic devices issued to 15 Skyryse personnel, production of Skyryse's Google Drive Account, etc.)." (Dkt. 532, p. 22).

Moog requests that Skyryse promptly produce the following materials, and/or provide the following requested information:

1. Complete forensic images of the Skyryse-issued laptops for Lori Bird and Reid Raithel. The involvement of Bird and Raithel, and their possession of Moog data (to the tune of hundreds or thousands of files), is discussed at length in Moog's Motion and Reply. The Court's Tentative Ruling states: "Perhaps, the parties can agree to produce the laptops for Raithel and Bird as a starting point." (Dkt. 532, fn. 19). There is more than good cause for the production of these laptops, as the Court has indicated. As you recall, in November 2022, Judge McCarthy ordered the production of three Skyryse laptops (belonging to Achar, Chung, and Dao) based on a much more limited showing of possession of Moog data on the laptops. Moog will not agree to anything less than productions of forensic images of the entire laptops.

2. Production of Skyryse's entire Polarion repository to iDS. The Tentative ruling noted that the Court is "troubled by the fact that several of Skyryse's documents appear to be almost word-for-word identical to corresponding Moog documents." Production of Skyryse's Polarion repository is necessary so that Moog can understand the full extent to which Skyryse personnel used and referred to Moog documents to create materials for Skyryse's use.

3. Production of Skyryse's entire Google Drive Account to iDS. As set forth in the Motion, Skyryse's Google Drive Account was used to share Moog materials with Hummingbird personnel. Production of the account is necessary so that Moog can understand the full extent to which Moog data was used at Skyryse and disclosed to third parties.

4. On June 13, 2023, Ms. Yip e-mailed Skyryse's counsel, and asked for confirmation regarding whether the source code made available to Mr. Crozier on May 16 included "*all* of the repositories in Skyryse's actual git instance." Skyryse has not responded to this e-mail. We request that Skyryse confirm that no data from the repositories in Skyryse's actual git instance was withheld from Mr. Crozier's inspection. If any such data was withheld, we request that it be produced to iDS or be made available for Mr. Crozier's inspection.

5. Confirmation that the E01 forensic image of Mr. Wang's laptop was a complete image and no files were withheld/removed from that image other than for privilege.

6. Confirmation whether Ms. Bird received a litigation hold notice from Skyryse and, if so, when she received it.

7. Confirmation that Ms. Bird's Skyryse-issued electronic devices and personal electronic devices have been preserved, and the date of preservation.

8. Confirmation from Skyryse whether any efforts have been made to remove SDTE, sRTOS, and prior checklists from Skyryse personnel's Skyryse-issued laptops, personal devices, or e-mail accounts.

Further, we were quite surprised and disappointed by certain factual misrepresentations that Skyryse's counsel made to the Court today. Specifically, Mr. Mangas represented to the Court that the volume shadow copies that Mr. Bandemer relied upon in connection with the Alex Wang materials were made available to Moog through iDS in June of 2022. This is simply false. As reflected in Mr. Mangas' May 4, 2023 e-mail (contained in the attached e-mail thread), he states: "On May 1, iDS confirmed that all four volume shadow copies (VSCs) identified in Mr. Bandemer's report were made available to Moog on April 27." As further reflected in the attached e-mail thread, one of the VSCs was not made available to Moog until on or after May 10, 2023. Skyryse's counsel did not correct these misrepresentations at any point during the proceedings with the Court today. We demand that Skyryse's counsel correct these misrepresentations in the Parties' joint filing due on June 22. If Skyryse refuses to do so, Moog will do so and reserves all rights in that regard.

Finally, we are further disappointed regarding Skyryse's continued refusal to pay the $775 in cancellation costs due to its cancellation of Mr. Bandemer's deposition on the evening of May 21. Moog intends to raise this issue with the Court in the joint statement to be filed next week, and will seek an order reimbursing Moog for these costs.

Please let us know your availability to telephonically meet and confer regarding the foregoing issues on Monday between 11 AM to Noon and 2:30 to 4 PM.

Thank you,
Kazim

**Kazim A. Naqvi**
+1 424-288-5336 | direct
KNaqvi@sheppardmullin.com | Bio

**Sheppard**Mullin
1901 Avenue of the Stars, Suite 1600
Los Angeles,  CA 90067-6017
+1 310-228-3700 | main
www.sheppardmullin.com | LinkedIn | Twitter

# Exhibit 2

**Gabriel S. Gross**
Direct Dial: +1.650.463.2628
gabe.gross@lw.com

140 Scott Drive
Menlo Park, California  94025
Tel: +1.650.328.4600  Fax: +1.650.463.2600
www.lw.com

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Austin | Milan |
| Beijing | Munich |
| Boston | New York |
| Brussels | Orange County |
| Century City | Paris |
| Chicago | Riyadh |
| Dubai | San Diego |
| Düsseldorf | San Francisco |
| Frankfurt | Seoul |
| Hamburg | Shanghai |
| Hong Kong | Silicon Valley |
| Houston | Singapore |
| London | Tel Aviv |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |

# LATHAM & WATKINS LLP

June 19, 2023

**VIA EMAIL**

Kazim Naqvi
Sheppard Mullin Richter & Hampton LLP
1901 Avenue of the Stars, Suite 1600
Los Angeles, California 90067-6017
knaqvi@sheppardmullin.com

Re:    *Moog Inc. v. Skyryse, Inc. et al.*, No. 2:22-cv-09094-GW-MAR (C.D. Cal.)

Dear Kazim:

We write in response to your June 15, 2023 email and in accordance with the Court's direction that the parties confer in good faith to attempt to resolve any outstanding disputes. Skyryse fully intends to abide by that expectation and looks forward to a productive discussion when your team is available this Monday.

Your June 15 email set forth eight individual requests, which Skyryse will be prepared to discuss on Monday. Your email, however, fails to address or explain the basis for many of Moog's demands. To understand Moog's positions, we will need to know from Moog, at a minimum, how the information it is demanding from particular data sources is relevant to the claims and defenses in this case. We address each of Moog's requests briefly below and respond without waiving and expressly reserving Skyryse's applicable privileges and other protections from disclosure.

**1.     Lori Bird's and Reid Raithel's Entire Laptop Computers.** Moog demands "[c]omplete forensic images of the Skyryse-issued laptops for Lori Bird and Reid Raithel" and you state that you are not interested in discussing any sort of compromise: "Moog will not agree to anything less than production of forensic images of the entire laptops."

First, neither the March 11 Stipulated Order, nor the rules of discovery, nor Judge Wu's tentative order require the indiscriminate and disproportionate production of images of "entire laptops" including 100% of their contents, regardless of relevance. This demand necessarily would include countless irrelevant, confidential, private, and personal files that are unrelated to the claims or defenses in this action. Second, Moog's apparent decision to accept nothing less than these "entire laptops" regardless of relevance, burden, or proportionality, and not even discuss a reasonable compromise, seems inconsistent with Judge Wu's order and expectation that the parties discuss this issue in good faith. Nonetheless, when we speak, we will do our best to see if the parties

LATHAM&WATKINS LLP

can agree on a mutually acceptable process to ensure that all relevant information from these de-vices has been searched for and produced.

To have a productive discussion, we request that Moog be prepared to discuss using search terms in an effort to target relevant information on these devices (perhaps, for example, a subset of the 100,000+ search terms the parties have discussed and Skyryse has used previously). Once we reach agreement on an appropriate set of search terms, Skyryse is willing to run them, review the search hits, and produce relevant, non-privileged information. If Moog believes there is rele-vant forensic analysis that it is entitled to perform on Ms. Bird's laptop,[1] please also be prepared to explain what it is and why it is relevant so we can consider whether producing any forensic artifacts or additional metadata would be appropriate.

**2.    Polarion Repository.** Moog demands the "[p]roduction of Skyryse's entire Polar-ion repository to iDS." As you know, Skyryse has already produced significant amounts of infor-mation regarding documents stored on Polarian to Moog. Skyryse is willing to augment its prior searches and is hopeful that the parties can agree on a mutually acceptable process to ensure that relevant materials from this repository have been searched for and produced. Once again, however, the March 11 Stipulated Order, the rules of discovery, and Judge Wu's tentative order do not re-quire the indiscriminate and disproportionate production of the "entire Polarion repository" and all of its contents, as that necessarily would include countless irrelevant, confidential files that are unrelated to the claims or defenses in this action.

To have a productive discussion, we request that Moog be prepared to discuss using search terms in an effort to target relevant information in this repository (perhaps, for example, a subset of the 100,000+ search terms the parties have used previously). Once we reach agreement on an appropriate set of search terms, Skyryse is willing to run them, review the search hits, and produce relevant, non-privileged information. If there is information Moog believes would not be captured by search terms, please be prepared to describe it and why it is relevant.

**3.    "Google Drive Account."** Moog demands the "[p]roduction of Skyryse's entire Google Drive Account to iDS" on the ground that "Skyryse's Google Drive Account was used to share Moog materials with Hummingbird personnel." Skyryse is willing to produce relevant ma-terial from the Google Drive folder or folders used to share information with Hummingbird and we are hopeful that the parties can agree on a mutually acceptable process to identify and produce relevant information. However, the March 11 Stipulated Order, the rules of discovery, and Judge Wu's tentative order do not require the indiscriminate and disproportionate production of the "en-tire Google Drive Account" and all of its contents, as that necessarily would include countless irrelevant, confidential files that are unrelated to the claims or defenses in this action. Please be prepared to discuss using search terms that Moog thinks will target the "Moog materials" that it alleges were shared with or provided by Hummingbird. Once we reach agreement on an appropri-ate set of search terms, Skyryse is willing to run them, review the search hits, and produce relevant,

---

[1] Mr. Bandemer already established that Mr. Raithel did not plug his device that Moog alleges contains Moog materials into his Skyryse laptop. (Dkt. 454 at ¶ 10.)

non-privileged information. If there is information that Moog believes would not be captured by
search terms, please be prepared to describe it and explain why it is relevant.

 **4.**  **Git Repositories Made Available to Mr. Crozier.** Moog seeks confirmation re-
garding whether the Skyryse source code Kevin Crozier inspected on May 16 included "all of the
repositories in Skyryse's actual git instance," and Moog demands the production of all of Skyryse's
source code, whether or not it is related to the claims or defenses in this case. Moog's demand is
overbroad (and inconsistent with Moog's refusals to produce its own source code[2]). In any event,
Skyryse has already produced all of its source code that was accessed by Defendants Kim and
Pilkington whom Moog alleges misappropriated Moog's source code, including the flight control
source code worked on by the software teams they worked with. Moog's experts have inspected a
recent version of that code and should have confirmed that it does not contain any code that Moog
alleges to be its source code. It is not clear to Skyryse what additional information Moog thinks it
requires. However, to the extent Moog believes it requires information regarding that code please
be prepared to discuss what information Moog believes it needs and why it is relevant.

 **5.**  **Alex Wang's Laptop.** Moog asks for "[c]onfirmation that the E01 forensic image
of Mr. Wang's laptop was a complete image, and no files were withheld/removed from that image
other than for privilege." We confirm that the image of Mr. Wang's laptop produced to iDS was
indeed a complete image and no files were withheld other than for privilege.

 **6.**  **Litigation Hold to Lori Bird.** Moog requests "[c]onfirmation whether Ms. Bird
received a litigation hold notice from Skyryse and, if so, when she received it." As Moog already
knows (Dkt. 400 at 19), Ms. Bird, a third-party contractor who worked off-site from Salt Lake
City, Utah, did receive litigation hold instructions. She received them no later than April 21, 2022
and confirmed receipt on April 22, 2022.

 **7.**  **Preservation of Lori Bird's Devices.** You request "[c]onfirmation that Ms. Bird's
Skyryse-issued electronic devices and personal electronic devices have been preserved, and the
date of preservation." We can confirm that Ms. Bird's Skyryse-issued MacBook was forensically
imaged on August 9, 2022, and two personal electronic devices were imaged on August 19, 2022.

 **8.**  **Removal of Materials from Skyryse Personnel's Devices and Accounts.** You
requested that Skyryse confirm whether "any efforts have been made to remove SDTE, sRTOS,
and prior checklists from Skyryse personnel's Skyryse-issued laptops, personal devices, or e-mail
accounts." As Mr. Crozier's inspection of Skyryse's recently-produced code should have con-
firmed, any code related to SDTE and sRTOS is not contained in any source code repositories
accessible to Skyryse. Skyryse's practice is to maintain its operative codebase centrally in the
source code repository as is typically the case in software development, rather than on "laptops,
personal devices, or e-mail accounts," of individual employees, so it is not clear what additional
confirmation Moog seeks. In addition, as stated in Mr. Koo's sworn declaration (and as identified

---

[2] Despite claiming that its source code is among its trade secrets, Moog has refused to produce any
of its source code to Skyryse beyond the code that was contained locally on the individual defend-
ants' Moog-issued devices.

LATHAM&WATKINS LLP

during Mr. Crozier's deposition), Skyryse has purchased a complete set of DO-178 and related checklists from a third party, Mr. Crozier's consulting firm ConsuNova, and has instructed its employees to use no other checklists. That said, Skyryse is amenable to discussing any additional measures Moog believes Skyryse would be appropriate for Skyryse take.

**Counsel's Statements at the Hearing.** We also write to address your accusations that Skyryse's counsel made "factual misrepresentations" during Thursday's hearing. We have now reviewed the transcript, which we know you didn't have yet when you made this accusation, and can confirm there was no inaccuracy on Skyryse's counsel's part. We reject your suggestion that Skyryse's counsel ever knowingly would misrepresent the facts to the Court. In fact, after reviewing the transcript, it appears it was Moog's counsel Ms. Andoh who was mistaken about the facts as she described them to the Court. She incorrectly stated that Mr. Wang's "full device was not turned over at that time. It was not turned over until after the filing of this motion and in concurrence with Skyryse's opposition to this motion in April 2023" (June 15, 2023 Hrg. Tr., 5:22-6:3.) This is inaccurate, since as you know, Skyryse turned over a complete image of Mr. Wang's "full device" to iDS in June 2022. We trust this was an honest mistake.

As Mr. Mangas accurately stated, "the laptop that [Skyryse's expert] Mr. Bandemer analyzed, including the volume shadow copies contained on that laptop where he was able to recover the additional 30 files[,] was turned over to iDS in June of 2022" and "[i]t was after Mr. Bandemer – Skyryse filed its opposition and identified where Mr. Bandemer located those files, that Skyryse gave additional instructions to iDS to proactively make all of that material available to Moog, so Moog could confirm or do whatever checks are necessary." (*Id.* at 11:11-21). In other words, Skyryse produced a complete image of Mr. Wang's laptop to iDS in June 2022. That image contained the four volume shadow copies (VSCs) Mr. Bandemer analyzed and discussed in his April 24, 2023 declaration. Moog could have made a reasonable request for those VSCs at any point between June 2022 and April 2023.[3]

Ms. Andoh told the Court that she would be "happy to provide an inventory from iDS in a supplemental [submission] if the Court wants to confirm what was and was not available in June of 2022." We have once again reviewed iDS's inventory log and, contrary to Ms. Andoh's claim, it clearly reflects that iDS received a complete image of Mr. Wang's laptop in June of 2022.[4] In August 2022, iDS even provided Moog with a listing of the VSCs contained on that image.[5]

---

[3] Instead, Moog made a blanket demand for access to more than 20 VSCs across multiple Skyryse employee laptops, then narrowed its request to one VSC from Ms. Kim's laptop. *See* October 25, 2022 email from K. Naqvi to R. Banks. Nonetheless, Skyryse proactively asked iDS to prepare Mr. Wang's VSCs for inspection after Mr. Bandemer had searched for and located files on those VSCs.

[4] *See*, Ex. A, MOOG-04208_EvidenceTracker_client_02232023.xlsx, Row 55.

[5] Skyryse also confirmed the production of Mr. Wang's laptop in an August 17, 2022 filing (Dkt. 242 at 4) (stating that Alex Wang's laptop was received by iDS on June 15, 2022), and once again in written correspondence to you on October 31, 2022, and you confirmed that Moog was "withdrawing its request for Mr. Wang's laptop." (October 31, 2022 letter from A. Zahoory to K. Naqvi.)

LATHAM&WATKINS LLP

(August 9, 2022 J. Vaughn email.)[6] As these records demonstrate, Moog has known for some time that Skyryse had provided to iDS an image of Mr. Wang's full laptop, including the VSCs it contained, and Ms. Andoh was mistaken in suggesting otherwise.

At the hearing, the parties' counsel may have been speaking past each another. Mr. Mangas accurately described the image of Mr. Wang's laptop Skyryse turned over to iDS in June 2022. Ms. Andoh may not have recalled that this image included the VSCs that Skyryse proactively instructed iDS to process and make available to Moog in April 2023, but there was no misrepresentation on Skyryse's or its counsel's part. And Ms. Andoh's statement that Skyryse did not turn over an image of Mr. Wang's "full device" until April 2023 was mistaken, as described above. Regardless, we do not think either side's counsel deliberately tried to misrepresent the facts at the hearing—and we urge you to refrain from leaping to such conclusions going forward—but when we speak on Monday let's discuss what sort of clarification of the record may be in order.

**Fee Charged for Mr. Bandemer's Deposition.** Finally, we turn to your demand that Skyryse reimburse Moog for a $750 "cancellation fee" that your court reporter charged Moog for Mr. Bandemer's rescheduled deposition. We don't think that's a reasonable request or that the parties should set an expectation of cost-shifting when a deposition scheduling conflict arises. As you know, Mr. Bandemer had a serious and unexpected family medical emergency that required last-minute changes in scheduling his deposition, which both sides needed to accommodate. As we have also discussed, we were surprised that your court reporter would charge such a fee, and we suggested you ask them to waive it. We expect they would, given (a) the emergency circumstances, (b) the many depositions yet to come, and (c) the business relationship the court reporting services presumably has with your firm. As we also discussed, this case will involve dozens of depositions going forward, and both sides inevitably will need to accommodate witnesses' scheduling conflicts from time to time. In light of all this (and in view of the parties' ongoing settlement discussions) we are surprised you seem insistent on litigating this issue. That said, when we speak on Monday let us know if you have called the court reporting service yet and asked them to waive the fee for the reasons explained above, so we can know whether this even remains a point of dispute. We urge you to reconsider burdening the Court such minor issues.

---

[6] Although Mr. Vaughn's August 9, 2022 email listed only three VSCs on Mr. Wang's laptop, he later clarified that iDS had "inadvertently missed" one and confirmed that all four VSCs analyzed by Mr. Bandemer were contained in the laptop image produced by Skyryse in June 2022. (May 10, 2023 email from J. Vaughn to R. Mangas.)

June 19, 2023
Page 6

**LATHAM&WATKINS** LLP

We look forward to what we hope will be a productive discussion on Monday.

Very truly yours,

Gabriel S. Gross
of LATHAM & WATKINS LLP

cc:     All counsel of record

# EXHIBIT A

| Matter_Number | lection Locat | iDS EID | Date Received | Data Source | Custodian Name/GeneralNotes | Party Item was Rcvd From | Encrypted / Bitlocker | Type (Desktop/Laptop/USB…) |
|---|---|---|---|---|---|---|---|---|
| MOOOG-04208 | CM Lab | E0001 | 4/1/2022 | Laptop | Misook Kim | Skyryse | | Laptop |
| MOOOG-04208 ` | CM Lab | E0002 S0001 | 4/1/2022 | Ext. HD | Alin Pilkington Contains a forensic image "APilkington_E002_20220401" | Skyryse | | Ext. HD |
| MOOOG-04208 | CM Lab | E0003 | 4/1/2022 | Mobile Device | Misook Kim | Individual Defendant | | Mobile Device |
| MOOOG-04208 | CM Lab | E0004 | 4/1/2022 | Laptop | Misook Kim | Individual Defendant | | Laptop |
| MOOOG-04208 | CM Lab | E0005 | 4/1/2022 | Laptop | Misook Kim | Individual Defendant | | Laptop |
| MOOOG-04208 | CM Lab | E0006 | 4/1/2022 | Laptop | Misook Kim | Individual Defendant | | Laptop |
| MOOOG-04208 | CM Lab | E0007 | 4/1/2022 | Mobile Device | Misook Kim | Individual Defendant | | Mobile Device |
| MOOOG-04208 | CM Lab | E0008 | 4/1/2022 | Ext. HD | Misook Kim | Individual Defendant | | Ext. HD |
| MOOOG-04208 | CM Lab | E0009 | 4/1/2022 | USB Drive | Misook Kim | Individual Defendant | | USB Drive |
| MOOOG-04208 | CM Lab | E0010 | 4/1/2022 | USB Drive | Misook Kim | Individual Defendant | Encrypted with "secure volume browser", requires password | USB Drive |
| MOOOG-04208 | CM Lab | E0011 | 4/1/2022 | USB Drive | Misook Kim | Individual Defendant | | USB Drive |
| MOOOG-04208 | CM Lab | E0012 | 4/1/2022 | USB Drive | Misook Kim | Individual Defendant | | USB Drive |
| MOOOG-04208 | CM Lab | E0013 | 4/1/2022 | USB Drive | Misook Kim | Individual Defendant | | USB Drive |
| MOOOG-04208 | CM Lab | E0014 | 4/1/2022 | Laptop | Alin Pilkington | Individual Defendant | | Laptop |
| MOOOG-04208 | CM Lab | E0015 | 4/1/2022 | Ext. HD | Alin Pilkington | Individual Defendant | | Ext. HD |
| MOOOG-04208 | CM Lab | E0016 | 4/1/2022 | Ext. HD | Alin Pilkington | Individual Defendant | | Ext. HD |
| MOOOG-04208 | CM Lab | E0017 | 4/1/2022 | Ext. HD | Alin Pilkington | Individual Defendant | | Ext. HD |
| MOOOG-04208 | CM Lab | E0018 | 4/1/2022 | Ext. HD | Alin Pilkington | Individual Defendant | | Ext. HD |
| MOOOG-04208 | CM Lab | E0019 | 4/1/2022 | Ext. HD | Alin Pilkington | Individual Defendant | | Ext. HD |
| MOOOG-04208 | CM Lab | E0020 | 4/1/2022 | Mobile Device | Alin Pilkington | Individual Defendant | | Mobile Device |
| MOOOG-04208 | CM Lab | E0021 | 4/1/2022 | Mobile Device | Alin Pilkington | Individual Defendant | | Mobile Device |
| MOOOG-04208 | CM Lab | E0022 | 4/1/2022 | Mobile Device | Alin Pilkington | Individual Defendant | | Mobile Device |

| MOOOG-04208 | CM Lab | E0023 | 4/1/2022 | Ext. HD | Alin Pilkington | Individual Defendant | | Ext. HD |
| MOOOG-04208 | CM Lab | E0024 | 4/1/2022 | USB Drive | Alin Pilkington | Individual Defendant | | USB Drive |
| MOOOG-04208 | CM Lab | E0025 | 4/1/2022 | USB Drive | Alin Pilkington | Individual Defendant | | USB Drive |
| MOOOG-04208 | CM LAB | E0026 | 4/29/2022 | Ext. HD | From Skyryse | Skyryse | | Ext. HD |
| MOOOG-04208 | | S0002 | | | Contains a forensic image "Achar_Sathyanarayana_F09845-1-LH2-E002" | Skyryse | | |
| MOOOG-04208 | | S0003 | | | Contains a forensic image "Chow_Lawrence_F09845-1-EH2-E026" | Skyryse | | |
| MOOOG-04208 | | S0004 | | | Contains a forensic image "Cranwell, Nigel - F09845-1-EH2-E028" | Skyryse | | |
| MOOOG-04208 | | S0005 | | | Contains a forensic image "Cranwell_Nigel_F09845-1-LH2-E013" | Skyryse | | |
| MOOOG-04208 | | S0006 | | | Contains a forensic image "Dao_Tri_F09845-1-LH2-E003" | Skyryse | | |
| MOOOG-04208 | | S0007 | | | Contains a forensic image "Gunderson_Dan_F09845-1-EH2-E025" | Skyryse | | |
| MOOOG-04208 | | S0008 | | | Contains a forensic image "Lab_F09845-1-LH2-E011" | Skyryse | | |
| MOOOG-04208 | | S0009 | | | Contains a forensic image "Le_Cynthia_F09845-1-EH2-E020" | Skyryse | | |
| MOOOG-04208 | | S0010 | | | Contains a forensic image "Lee_Alan_F09845-1-LH2-E006" | Skyryse | | |
| MOOOG-04208 | | S0011 | | | Contains a forensic image "Santiago_Correa-Mejia_F09845-1-LH2-E007" | Skyryse | | |
| MOOOG-04208 | | S0012 | | | Contains a forensic image "Stafford_John_F09845-1-LH2-E004" | Skyryse | | |
| MOOOG-04208 | | S0013 | | | Contains a forensic image "Rey_Gonzalo_F09845-1-EH2-E021" | Skyryse | | |
| MOOOG-04208 | | S0014 | | | Contains a forensic image "SEL_Lab_SoftwareDev.zip" | Skyryse | | |
| MOOOG-04208 | | S0015 | | | Folder "Google Drive Exports" | Skyryse | | |
| MOOOG-04208 | CM LAB | E0027 | 4/9/2022 | Laptop | From Skyryse Alin Pilkington | Skyryse | | Laptop |
| MOOOG-04208 | CM LAB | E0028 | 4/9/2022 | Laptop | From Skyryse Alin Pilkington | Skyryse | | Laptop |
| MOOOG-04208 | CM LAB | E0029 | 5/5/2022 | Ext. HD | from Skyryse | Skyryse | | Ext. HD |
| MOOOG-04208 | CM LAB | E0030 | 6/1/2022 | Laptop | Alin Pilkington | Moog | | Laptop |
| MOOOG-04208 | CM LAB | E0031 | 6/1/2022 | Laptop | Alin Pilkington | Moog | | Laptop |
| MOOOG-04208 | CM LAB | E0032 | 6/1/2022 | Laptop | Misook Kim | Moog | | Laptop |
| MOOOG-04208 | CM LAB | E0033 | 6/1/2022 | Laptop | Alin Pilkington | Moog | | Laptop |
| MOOOG-04208 | CM LAB | E0034 | 6/1/2022 | Laptop | Alin Pilkington | Moog | Bitlocker:{108BACB7-F0A6-42BA-B1A0-9B19D3959AB2} | Laptop |

| MOOOG-04208 | CM LAB | E0035 | 6/1/2022 Laptop | Misook Kim | Moog | Laptop |
|---|---|---|---|---|---|---|
| MOOOG-04208 | CM LAB | E0036 | 6/1/2022 Laptop | Misook Kim | Moog | Laptop |
| MOOOG-04208 | CM LAB | E0037 | 6/1/2022 Ext. HD | Misook Kim | Moog | Ext. HD |
| MOOOG-04208 | CM LAB | E0038 | 6/1/2022 Ext. HD | Misook Kim | Moog | Ext. HD |
| MOOOG-04208 | CM LAB | E0039 | 06/15/2022 00:00 Laptop | Mr. Wang | Skyryse | Laptop |
| MOOOG-04208 | CM LAB | E0040 | 06/15/2022 00:00 Ext HD | Mr. Wang | Skyryse | Ext. HD |
| MOOOG-04208 | CM Lab | S0016 | | Contains Forensic images - Alex Wang Flash Drive | Skyryse | |
| MOOOG-04208 | CM Lab | S0017 | | Contains Forensic images - Alex Wang Laptop | Skyryse | |
| MOOOG-04208 | CM Lab | E0041 | 6/30/2022 | "SKY_PROD_00000001 – 00004831" | Skyryse | |
| MOOOG-04208 | CM Lab | E0042 | 8/18/2022 Ext. HD | From Skyryse | Skyryse | Ext. HD |
| MOOOG-04208 | | S0019 | | Contains Forensic images - Mr. Brene's USB | | |
| MOOOG-04208 | CM Lab | E0043 | 12/2/2022 Ext. HD | From Skyryse | Skyryse | Ext. HD |
| MOOOG-04208 | | S0020 | | Contains Forensic images  - Achar, Sathyanarayana | Skyryse | |
| MOOOG-04208 | | S0021 | | Contains Forensic images - Chung, Eric | Skyryse | |
| mOOOG-04208 | | S0022 | | Contains Forensic images  - Dao, Tri | Skyryse | |

# Exhibit 3

**SheppardMullin**

Sheppard Mullin Richter & Hampton LLP
1901 Avenue of the Stars, Suite 1600
Los Angeles, CA 90067
310.228.3700 main
www.sheppardmullin.com

424.288.3700 direct
knaqvi@sheppardmullin.com

June 20, 2023

**VIA E-MAIL ONLY**

Douglas E. Lumish                     Doug.lumish@lw.com
Gabriel S. Gross                      Gabe.gross@lw.com
Joseph H. Lee                         Joseph.Lee@lw.com
Cassandra Baloga                      Cassandra.Baloga@lw.com
Kelley Storey                         Kelley.Storey@lw.com
Julianne Osborne                      Julianne.osborne@lw.com
Arman Zahoory                         Arman.zahoory@lw.com
Ryan Banks                            Ryan.banks@lw.com
**LATHAM & WATKINS LLP**
140 Scott Drive
Menlo Park, California 94025

Russell Mangas                        Russell.mangas@lw.com
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611

      Re:     *Moog Inc. v. Skyryse, Inc., et al.*
              U.S. D. C. - Central District of CA – Case No. 2:22-cv-09094-GW-MAR
              <u>Moog's Response to Skyryse's June 19, 2023 Letter</u>

Dear Counsel:

      This letter responds to Skyryse's June 19, 2023 letter (the "Letter"), which provided a response to Moog's June 15, 2023 e-mail that initiated the meet and confer process in connection with Moog's Motion to Enforce (Dkt. 400), and follows up from our June 20, 2023 meet and confer call. We respond to each of the outstanding issues in turn.

    **1.**   **Production of Complete Forensic Images of Lori Bird and Reid Raithel's Entire Laptop Computers**

      As it has throughout this case, Skyryse is refusing to produce relevant laptops of its personnel, even though it cannot be disputed that these laptops contain Moog documents and data. This position is improper and problematic for several reasons.

      First, as a starting point, the production of Bird's and Raithel's entire Skyryse-issued laptops was suggested by the Court, not Moog. (Dkt. 532, fn. 19 ("Perhaps, the parties can agree to produce the laptops for Raithel and Bird as a starting point")). If the Court believed production of the entire laptops was unreasonable, overbroad, or not proportional to the needs of the case, we do not believe it would have made this suggestion.

# SheppardMullin

Douglas E. Lumish, Esq.
Gabriel S. Gross, Esq.
June 20, 2023
Page 2

Second, the relevance of these two devices, and the necessity of their complete production, is described in detail in Moog's Motion to Enforce (Dkt. 400) and supporting papers. At Skyryse's request, we will briefly summarize the grounds again.

On October 25, 2022, Moog served a subpoena for documents to former Moog employee and current or former Skyryse contractor/employee Lori Bird. (Dkt. 400-01, ¶ 3). On November 17, 2022, Ms. Bird produced approximately 90 documents in response to the subpoena. (*Id*.). Her production, along with several others, confirms that Ms. Bird frequently possessed, received, accessed, transmitted, and used Moog documents and data (including proprietary source code documents and software development checklists and templates) during her tenure at Skyryse, including using her Skyryse e-mail account and Skyryse laptop. (Dkt. 400-03, ¶¶ 40-43) (Dkt. 400-05, ¶¶ 37-46, Exs. C-1 to C-6). Ms. Bird also frequently communicated with defendant Robert Alin Pilkington regarding the use of Moog documents and data while at Skyryse, including by discussing which Moog programs would be best to "pilfer" from. (*Id*.). For example, on December 18, 2021, Mr. Pilkington (while employed by Skyryse), e-mailed Ms. Bird no less than 89 documents comprising Moog software checklists, standards, development plans, and other related documents. (Dkt. 400-03, ¶¶ 40-43). They all contain "Moog" on their face or in their metadata, and some of them have "MOOG PROPRIETARY AND CONFIDENTIAL INFORMATION" legends. (*Id*.). Further, in her responses to Moog's subpoena for production of documents, Ms. Bird unambiguously stated that several categories of documents responsive to Moog's subpoena would be in the possession of Skyryse through Bird's Skyryse-issued laptop and/or e-mail account. (Dkt. 400-01, Ex. B).

On January 17, 2023, third party Hummingbird Aero produced 120 documents, and third-party Rex Hyde, produced 196 documents, in response to Moog's subpoenas. These productions are littered with evidence of Skyryse employees (using Skyryse e-mail accounts and devices), including Ms. Bird and Mr. Raithel, possessing, disclosing to third parties, accessing, and using Moog data and documents. (Dkt. 400-03, ¶¶ 22-39) (Dkt. 400-05, ¶¶ 19-38).

Then, without any advanced notice or warning, on February 17, 2023 at 9:08 p.m. PT (the business day before Moog's trade secret identification was due for service), Skyryse produced 2,920 documents (totaling 24,821 pages) from Ms. Bird. (Dkt. 400-01, Ex. A). In its cover letter, Skyryse falsely indicated that this production was from Bird's personal devices. The reality is that the production included only two e-mails from Bird's personal e-mail account. (Dkt. 400-03, ¶ 44). Further, the metadata associated with the production shows that at least 2,300 documents originate from Ms. Bird's Skyryse-issued Mac laptop (consistent with Bird's subpoena responses). (*Id*., ¶ 45). The timing of this production, only after Skyryse received multiple productions from third parties implicating Ms. Bird, is highly concerning and triggered the filing of Moog's Motion to Enforce.

Regarding Mr. Raithel, he copied 27,118 Moog files on his way out the door before joining Skyryse (approximately 13,000 of which Moog is seeking trade secret protection over). (Dkt. 400-03, ¶ 46). One of the USB devices used by Mr. Raithel to copy Moog data has not been returned. (*Id*.). Moog has already provided examples of Moog documents which Mr. Raithel possessed and transmitted using his Skyryse e-mail account, including identical metadata. (*Id*., ¶¶ 47-48). Further, while Skyryse contends that "Mr. Bandemer already established that Mr. Raithel did not plug his device that Moog alleges contains Moog materials into his Skyryse laptop," Mr.

# SheppardMullin

Douglas E. Lumish, Esq.
Gabriel S. Gross, Esq.
June 20, 2023
Page 3

Bandemer's analysis was woefully incomplete and is not dispositive on this issue. Mr. Bandemer's conclusions regarding Mr. Raithel's laptop were made solely by looking at the Daily Out logs on Mr. Raithel's computer. (Dkt. 454, ¶ 10). This is just one location of potential evidence regarding connection of a USB device. Mr. Bandemer did not examine evidence of more common artifacts such as: 1) recent file activity stored on the Mac computer, including file deletions, in multiple PLIST files, SFL2 files, SQLite databases, and file system event entries; 2) a comparison of file names from the Raithel Ivanti log list to files stored on the Mac or as an email attachment; 3) analysis of access to other storage media, as Mr. Bandemer assumes that Mr. Raithel would never copy files from the USB Drive 2 to another storage device for use at Skyryse; and 4) access to a personal cloud storage or personal email account for evidence of transferring files to Skyryse. Mr. Bandemer's limited, incomplete analysis appears designed to reach his conclusion. Indeed, we can confirm that Daily Out logs often do not show evidence of files copied from a USB thumb drive or external hard drive.

Third, there is ample precedent in this case for the production of entire computer devices. Indeed, one of the reasons Judge McCarthy entered the inspection protocol was precisely to facilitate the inspection of entire devices, and to date Skyryse has already produced images of 7 computers, and the Parties have collectively produced images of 20 computers. Judge McCarthy determined that, given the "unique circumstances of this case," "Moog's Protocol (which, although opposed by Skyryse, is not opposed by codefendants Pilkington and Kim) gives Moog the best opportunity to discover what information was taken from Moog and/or spoliated by defendants." (Dkt. 109, p. 2). Moog data can reside anywhere on these devices, and Skyryse's conduct to date has repeatedly demonstrated that Skyryse either cannot or will not conduct a sufficient search of these devices on its own.  Furthermore, Moog needs to examine forensic data on the devices related to the transfer, transmission, deletion, and copying of relevant data. Mr. Bandemer's superficial analysis of the forensic data with respect to Raithel, wherein he admitted that the logs he reviewed were not able to detect all connections of devices to the computer at issue, likewise indicates that he and Skyryse either cannot or will not conduct a sufficient analysis of the forensic data.  Moog's request for the production of two computers is not out of left field and is proportional to the needs of this case.

Fourth, the burden on Skyryse in producing the two laptops is minimal. Skyryse claims it has already preserved these laptops. It merely needs to produce a forensic image of the laptops to iDS, as it has done with many other similar devices. To the extent not already done so, Skyryse's forensic firm, FTI, can image a laptop quickly and with minimal effort.

Fifth, contrary to Skyryse's claims, Moog's access to these two laptops would not be "unrestricted." Moog's review of these laptops would be subject to the iDS Protocol, and the vigorous security mechanisms therein. There can be no legitimate concerns based on privacy or confidentiality given that the laptops would only be made available to Moog's outside counsel and experts, and inspection of the laptops can only be performed through iDS's secure, virtual environment.

Sixth, in November 2022, under similar circumstances Judge McCarthy ordered the entire production of three Skyryse laptops (belonging to Achar, Chung, and Dao) based on a much more limited showing of possession of Moog data on the laptops. For example, before Judge McCarthy ordered production of the laptops, Moog demonstrated that Achar was copied on three e-mails

**Sheppard**Mullin

Douglas E. Lumish, Esq.
Gabriel S. Gross, Esq.
June 20, 2023
Page 4

with Moog documents attached to them, and Dao was copied on a single e-mail containing Moog data. (Dkt. 282, pp. 3, 4). Notably, after the Achar, Chung, and Dao laptops were produced upon Court order, Moog **discovered dozens of additional Moog documents contained therein which had not been previously produced by Skyryse**. This includes at least 81 documents on Achar's laptop which contained "Moog" in the company metadata field, one document which contained the line "MOOG PROPRIETARY AND CONFIDENTIAL INFORMATION," and 173 documents which contained one of the following lines of text: "Material licensed to Moog Inc;" "Sold to MOOG INC;" "Downloaded by Moog Inc;" and, "Issued to Moog Inc." (Dkt. 400-03, ¶ 9). The laptops also included 100 Moog RBT spreadsheets found on Eric Chung's laptop, including 22 spreadsheets which contained a print header of "DO NOT TRANSMIT OUTSIDE OF MOOG USA OR TO Non-U.S. PERSONS*." The existence of hundreds of Moog documents on these laptops, which had not been previously produced by Skyryse, underscores why Skyryse cannot be trusted to comply with its discovery obligations and the entire laptops of Mr. Raithel and Ms. Bird must be produced.

Finally, Skyryse's proposal to have the Parties agree upon search terms to run across the two laptops at issue would fall far short of the needs of this case and is, in our view, only designed to delay and obstruct Moog's discovery efforts. Skyryse made these same proposals and arguments when opposing the entry of the Inspection Protocol. Back in May 2022, just like now, Skyryse proposed that the parties "work out an appropriate set of search terms" to run across Skyryse's devices, with resulting non-privileged hits being made available to Moog. (Dkt. 99-1, p. 3). Back then, just like now, Skyryse complained that it would be improper to "give Moog's lawyers and experts access to *all of the complete images* of the defendants' machines with no limitations as to scope, topic, or relevance." (*Id.*, p. 2, emphasis in original). Skyryse also complained, like it has now, that "Moog's proposal would allow its attorneys and experts to access innumerable files that have nothing to do with this case, that are not responsive to any of Moog's thousands of search terms, that are competitively sensitive and valuable, and that likely contain private and even personal information." (*Id.*, p. 10). As you know, the Court rejected Skyryse's arguments and implemented the Inspection Protocol to allow Moog full access to Skyryse's produced devices, and for good reason.

Skyryse's proposal to run "agreed upon" search terms across Ms. Bird's and Mr. Raithel's laptops is unworkable for several reasons, including: 1) the process would not provide Moog any information about data that may have been deleted (which has already occurred in this case by other Skyryse personnel); 2) search terms alone cannot fully uncover Skyryse's misappropriation, in that many of the documents at issue include drawings, designs, schematics, executables, images, models, diagrams, hand drawn figures, and object files which cannot be searched through human words; 3) Moog has no insight as to whether certain distinctive words that may be run as search terms (such as "Moog") were deliberately replaced to obfuscate the theft, or to adapt the material to Skyryse's existing systems; 4) the use of search terms alone prevents Moog from conducting a sufficient forensic analysis, such as understanding when devices were connected to the laptops, the transfer or deletion of data, etc.; 5) Skyryse's proposal would only cause further delay as there would likely be dispute as to what constitutes "an appropriate set of search terms" which may require additional use of the Court's resources and time; and 6) the number of ways in which Defendants could have misappropriated Moog's data (including by using it as a reference instead of direct copying) is limitless, and Moog should not be forced to "guess" at how Skyryse has misappropriated the data in order to provide search terms while wearing a

**Sheppard**Mullin

Douglas E. Lumish, Esq.
Gabriel S. Gross, Esq.
June 20, 2023
Page 5

proverbial blindfold, but should instead be entitled to discover for itself the scope, depth, and breadth of Skyryse's misappropriation.

For these reasons, and consistent with the discovery record and the Court's prior orders in the case, Moog requires the production of complete images of the Skyryse-issued laptops for Ms. Bird and Mr. Raithel.

### 2. Production of Skyryse's Complete Polarion Repository

Skyryse refuses to produce its entire Polarion repository, and instead again proposes that the Parties agree on an "appropriate set of search terms" to run across its Polarion repository before producing resulting hits.

Moog has already demonstrated the relevance of Skyryse's Polarion repository. The Court's Tentative Ruling noted that the Court is "troubled by the fact that several of Skyryse's documents appear to be almost word-for-word identical to corresponding Moog documents." (Dkt. 532, p. 21). As demonstrated in Skyryse's own internal e-mails, the Polarion repository is where Skyryse's software documents and plans are stored. (Dkt. 400-05, ¶ 113). Complete access to the Skyryse Polarion repository is needed to determine to what extent Skyryse personnel are continuing to access and use Moog data. (*Id.*, ¶ 17). Skyryse has broadly represented to Moog and the Court that it is no longer using Moog's certification documents (and has instead engaged a third party, ConsuNova, to use its certification documents instead).  Moog is entitled to vet this claim, and there is no way to "prove a negative" without access to the entire Polarion repository.

Until and unless Moog gets full access to Skyryse's Polarion repository, neither Moog nor the Court can have any assurance that Skyryse is no longer using Moog data in connection with its software plans and documents. Skyryse's production of bits and pieces of its Polarion repository is improper and only leaves Moog further in the dark. There can be no objections based on confidentiality or privacy given that Moog's inspection of these materials would be conducted through the iDS virtual environment. And, Skyryse's proposal to run search terms across its Polarion repository is improper for the same reasons identified in above in connection with Ms. Bird and Mr. Raithel's laptops.

In an effort to see if a mutually agreeable resolution can be reached, Moog is open to considering a process whereby our expert, Kevin Crozier, is given inspection access to Polarion in-person at Latham's Austin office (rather than having Polarion produced into the iDS inspection environment).

### 3. Production of Skyryse's Complete Google Drive Account

Skyryse refuses to produce its entire Google Drive Account, and instead again proposes that the Parties agree on an "appropriate set of search terms" to run across its Google Drive Account before producing resulting hits.

Moog has already demonstrated the relevance of Skyryse's Google Drive Account. Defendants Misook Kim and Robert Alin Pilkington had access to the Google Drive Account, and the drive was shared with many other Skyryse and Hummingbird personnel. (Dkt. 400-05, ¶ 100).

## SheppardMullin

Douglas E. Lumish, Esq.
Gabriel S. Gross, Esq.
June 20, 2023
Page 6

Various Skyryse personnel shared a massive volume of Moog documents and data using the Google Drive Account, including with Hummingbird personnel. (*Id.*, ¶¶ 101-109) (Dkt. 400-03, ¶¶ 50-53). Skyryse's Google Drive Account has never been made available for investigation and needs to be produced to determine to what extent it contains Moog non-public information. (Dkt. 400-05, ¶ 16).

Until and unless Moog gets full, unfettered access to Skyryse's Google Drive Account, Moog and the Court will be prevented from understanding the full nature and scope of Skyryse's use and disclosure of Moog data. Skyryse's production of bits and pieces of its Google Drive Account is improper and only leaves Moog further in the dark. There can be no objections based on confidentiality or privacy given that Moog's inspection of these materials would be conducted through the iDS virtual environment. And, Skyryse's proposal to run search terms across its Google Drive Account is improper for the same reasons identified in above in connection with Ms. Bird and Mr. Raithel's laptops.

In an effort to see if a mutually agreeable resolution can be reached, Moog is open to considering Skyryse removing from its production of its Google Drive Account any portions or folders which: 1) have no relation to flight control and have never stored any data or documents related to flight control; or 2) were never accessed by Hummingbird personnel, any former Moog employee, or the following Skyryse personnel: Amir Hallajpour, Chris Smith, David Lee, Diane Le, Hussein Khimji, Ian Young, Stephen Wang, Ilan Paz, Glenn Shintaku, and Thusa Dinh.  If Skyryse can identify any of these portions, including by providing the portion/folder names and their contents generally, Moog is prepared to consider removing these portions from production.

### 4.  Production of Skyryse's Entire Git Repository

Skyryse's confirmation that it has not produced all of its flight control source code is alarming and confirms Moog's suspicions that relevant source code was withheld from Mr. Crozier's inspection. Specifically, Skyryse confirms that it only produced "all of its source code that was accessed by Defendants Kim and Pilkington whom Moog alleges misappropriated Moog's source code, including the flight control source code worked on by the software teams they worked with." (Letter, p. 3). This is improper and problematic for several reasons.

Skyryse's internal e-mails confirm that it is using is using Git and JIRA as part of its configuration management system. (Dkt. 400-05, ¶ 25). In December 2022, Mr. Crozier conducted an inspection of Skyryse's source code and Git repository, but he was only granted access to a limited portion of Skyryse's source code as they were only made available as of April 15, 2022. Then, on May 16, 2023, Mr. Crozier conducted another inspection of an updated version of that same limited subset of Skyryse's source code and Git repository, made available as of April 2023.

Skyryse has broadly represented to Moog and the Court that Moog's data has been removed from its source code repositories.  It is obvious that Moog cannot vet this claim unless and until it has an opportunity to inspect the entirety of Skyryse's source code repositories. Skyryse's production of only bits and pieces of its Git repository is improper, and only heightens Moog's concerns that relevant code may have been withheld. The fact that Skyryse only produced code accessed by Kim and Pilkington is especially troubling. As Moog has demonstrated in detail, Skyryse's possession, use, and disclosure of Moog data goes far beyond Kim and Pilkington.

**SheppardMullin**

Douglas E. Lumish, Esq.
Gabriel S. Gross, Esq.
June 20, 2023
Page 7

Moog has demonstrated how dozens of other Skyryse personnel were involved in the possession, use, and disclosure of Moog documents and data, including but not limited to: Amir Hallajpour, Chris Smith, David Lee, Diane Le, Eric Chung, Gonzalo Rey, Hussein Khimji, Ian Young, Lawrence Chow, Lori Bird, Mario Brenes, Norman Butler, Paul Kapuan, Reid Raithel, Sathya Achar, Stephen Wang, Tri Dao, Ilan Paz, Glenn Shintaku, and Thusa Dinh. (Dkt. 400-03, ¶¶ 8-53). Thus, Skyryse's production of source code only accessed by Kim and Pilkington is not appropriate given the facts of this case.

Skyryse's production of bits and pieces of its Git repository is improper and only leaves Moog further in the dark. There can be no objections based on confidentiality or privacy given that Moog's inspection of these materials would be conducted through the iDS virtual environment. Moog seeks full access to Skyryse's entire Git repository.[1]

In an effort to see if a mutually agreeable resolution can be reached, Moog is open to considering having a Skyryse Git configuration manager walk Mr. Crozier through Skyryse's Git repositories from top to bottom, to ensure that folders and documents containing Moog data have not been moved or created elsewhere in the repositories (to which Mr. Crozier was not given access during his inspection in Austin).  The Git configuration manager could maintain control of the monitor, etc., while walking Mr. Crozier through the repositories.  Again, Skyryse has broadly claimed that its source code repositories are free of Moog data.  There's no way for Moog to vet this claim and "prove a negative" without some kind of access to the entire source code repositories.

## 5.  Removal of Moog Materials From Skyryse Personnel's Devices and Accounts

Skyryse's Letter is non-responsive on this issue. Moog understands Skyryse's contention that it has taken certain efforts (on or after July 2022) to remove access to SDTE, portions of sRTOS, and its historical checklists from its "source code repository." This was confirmed by Mr. Koo during his deposition. The Court "question[ed] why Skyryse failed to take these steps upon entering the TRO Stipulation." (Dkt. 532, p. 21). Regardless, Skyryse's limited "remedial" efforts provide Moog no comfort that these sets of data and documents (consisting of Moog documents or derived from Moog data) have been fully eradicated from Skyryse's systems and electronic devices.

Consistent with this concern is Mr. Koo's testimony that he was not aware of any efforts to remove SDTE, sRTOS, or prior checklists from Skyryse's personnel's Skyryse-issued electronic devices, personal devices, or e-mail accounts. (Koo Dep. Tr. at 60:6-61:5, 65:1-66:15,

---

[1] In a footnote, Skyryse quips: "Despite claiming that its source code is among its trade secrets, Moog has refused to produce any of its source code to Skyryse beyond the code that was contained locally on the individual defendants' Moog-issued devices." (Letter, p. 3, fn. 2). Skyryse's argument actually proves Moog's position. The source code files that Moog is seeking trade secret protection over have all been made available to Skyryse for inspection through the Individual Defendants' Moog devices since June 2022 (except for any source code files stolen by Ms. Kim which were subsequently wiped and spoliated). Thus, there are no trade secret Moog source code files at issue in this case (to the extent not spoliated by Ms. Kim) that have been withheld from Skyryse's inspection.

**SheppardMullin**

Douglas E. Lumish, Esq.
Gabriel S. Gross, Esq.
June 20, 2023
Page 8

71:8-73:1). Indeed, the Court noted that "Moog raises doubts as to whether its MDTE, eRTOS, and checklists 'have been fully wiped from Skyryse's systems.'" (Dkt. 532, p. 22). Skyryse allegedly taking certain actions with respect to its central source code repository would not impact Skyryse personnel saving source code files locally on their company-issued or personal devices, or transmitting such information through e-mail accounts. Given the track record of Skyryse personnel using company-issued and personal devices to steal, possess, and use Moog data, it is likely that Skyryse personnel continued to have access to Moog's MDTE, eRTOS, and checklists on such devices or e-mail accounts.

Moog is asking Skyryse to confirm Mr. Koo's testimony that Skyryse has not taken any efforts beyond its central source code repository to cut-off access to SDTE, portions of sRTOS, and its historical checklists. These efforts may include, but are not limited to, inspecting Skyryse personnel's laptops and e-mail accounts to confirm that SDTE, sRTOS, and the historical checklists have been removed.

### 6. Skyryse's Counsel's Statements During the June 15 Hearing

To be clear, Moog is not accusing Skyryse of knowingly misrepresenting facts to the Court. Having read the June 15 hearing transcript, and reviewed Skyryse's positions in the Letter, we agree that counsel may have been talking past each other to some degree during the June 15 hearing.

During the June 15 hearing, Mr. Mangas stated: "the laptop that Mr. Bandemer analyzed, including the volume shadow copies contained on that laptop where he was able to recover the additional 30 files was turned over to iDS in June of 2022." (6/15/23 Hrg. Tr. at 11:13-16). We understood this to mean a claim that the 4 VSCs that Bandemer relied upon were separately made available to Moog for inspection in June of 2022. We now understand based on the Letter that Skyryse does not dispute that the 4 VSCs were not separately made available to Moog for inspection until April and May of 2023, but instead is claiming that the 4 VSCs were contained in the forensic image of Mr. Wang's computer that was provided to iDS in June 2022 and that Moog could have requested access to those VSCs back in June of 2022. Skyryse's statements on the record, however, are still not fully accurate and require clarification to the Court.

First, Mr. Vaughn's August 9, 2022 e-mail (referenced in Skyryse's letter) only lists 3 VSCs for Mr. Wang's laptop. Moog did not and could not know that there was a fourth, relevant VSC for this device. Relatedly, it is undisputed that Moog did not receive access to this fourth, previously unlisted VSC until May 11, 2023.

Second, Moog had no reason to believe that any of the 3 listed VSCs could be used to resuscitate Mr. Wang's deleted files in June of 2022. Skyryse stated in a filed pleading that 32 of the files deleted by Wang were not recoverable, despite FTI's attempts to recover those files. (Dkt. 156, p. 12). Skyryse did not provide any details regarding what specific procedures were used by FTI to attempt to recover the files at the time, and Moog therefore had no reason to believe that FTI had not exhausted all potential remedies involving the shadow drives. Moreover, the responsibility for addressing Mr. Wang's spoliation has always been Skyryse's and not Moog's. Therefore, Moog also had no obligation to try and recreate the work of Skyryse's reputable forensic vendor.

**SheppardMullin**

Douglas E. Lumish, Esq.
Gabriel S. Gross, Esq.
June 20, 2023
Page 9

Third, and notwithstanding the foregoing, Moog did in fact request production of 2 of the 3 VSCs identified in Mr. Vaughn's August 9, 2022 e-mail. (*See* Mike Kim's August 12, 2022 e-mail). In response to this request, Skyryse did not agree to make the entire VSCs available for inspection, but instead only agreed that iDS could provide file listings from the two VSCs to Moog. (*See* Cassandra Baloga's August 16, 2022 e-mail). The file listings for the VSCs could not be used by Moog to conduct Mr. Bandemer's analysis because, as Mr. Bandemer acknowledged at deposition, once files are deleted or moved to a recycling bin, they are re-named. Thus, the mere file listings of the two VSCs would not allow Moog to search for the actual file names of the deleted files because those identical file names would not exist in the VSCs. So, contrary to Skyryse's arguments, Moog did in fact request production of two of the VSCs but Skyryse did not accommodate that request. Those VSCs were not made available for Moog's inspection until April 2023.

Given the foregoing, Moog intends to clarify for the Court in the forthcoming joint statement the issues identified above, including that that the 4 VSCs relied upon by Mr. Bandemer were not separately made available for Moog's inspection by Skyryse until after its Motion to Enforce was filed (despite Moog's prior requests that certain of the VSCs be produced back in August 2022). Moog further intends to point out that Mr. Bandemer confirmed in deposition that he used all four shadow copies in the process of resuscitating Mr. Wang's spoliated files.

### 7. Fees for Skyryse's Cancellation of Mr. Bandemer's Deposition

We continue to be surprised by Skyryse's refusal to take ownership over its last minute cancellation of Mr. Bandemer's deposition – which had already been cancelled once and rescheduled, resulting in a substantial delay to the Motion to Enforce briefing cycle. As we mentioned to you, this issue is a matter of principle and good faith to our client. The cancellation fees were caused by Skyryse's last-minute cancellation. That is not in dispute. While we understand Mr. Bandemer had urgent family medical issues, the fact remains that Moog is being charged $775 due to Skyryse cancelling his deposition on a Sunday night less than 12 hours before it was scheduled to commence. It is not Moog's obligation to deal with the issue caused by Skyryse, including to require the court reporting company to waive the cancellation fee. If Skyryse would like to call Esquire and discuss with them, that may be a helpful starting point. Given Skyryse's continued refusal to pay these costs, we do intend to bring this behavior to the Court's attention, particularly since Mr. Bandemer is the only expert that investigated Mr. Wang's deletion of files and therefore the cancellation fees are relevant to the fees and costs Moog is seeking.

Very truly yours,

Kazim Naqvi
for SHEPPARD MULLIN RICHTER & HAMPTON LLP