<pre>
 1                   UNITED STATES DISTRICT COURT
                   CENTRAL DISTRICT OF CALIFORNIA
 2                 WESTERN DIVISION - LOS ANGELES

 3

 4   MOOG INC.,                )   Case No. CV 22-9094-GW (MARx)
                               )
 5        Plaintiff,           )   Los Angeles, California
                               )   Wednesday, June 7, 2023
 6            v.               )   11:46 A.M. to 1:00 P.M.
                               )
 7   SKYRYSE, INC., et al.,    )
                               )
 8        Defendants.          )
     _____)
 9

10

11

12                   TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE MARGO A. ROCCONI
13               UNITED STATES MAGISTRATE JUDGE

14

15   Appearances:              See Page 2

16   Deputy Clerk:             Valerie Velasco

17   Court Reporter:           Recorded; CourtSmart

18   Transcription Service:    JAMS Certified Transcription
                               16000 Ventura Boulevard #1010
19                             Encino, California  91436
                               (661) 609-4528
20

21

22

23

24
     Proceedings recorded by electronic sound recording;
25   transcript produced by transcription service.
</pre>

```
 1   APPEARANCES:

 2

 3   For the Plaintiff:        Sheppard, Mullin, Richter and Hampton
                               LLP
 4                             By:  LAI L. YIP
                               4 Embarcadero Center, 17th Floor
 5                             San Francisco, California  94111
                               (415) 434-9100
 6                             lyip@sheppardmullin.com

 7                             Sheppard, Mullin, Richter and Hampton
                               LLP
 8                             By:  KAZIM A. NAQVI
                               333 South Hope Street, 43rd Floor
 9                             Los Angeles, California  90071
                               (310) 288-3700
10                             knaqvi@sheppardmullin.com

11                             Sheppard, Mullin, Richter and Hampton
                               LLP
12                             By:  RENA ANDOH
                               30 Rockefeller Plaza
13                             New York, New York  10112
                               (212) 653-8712
14                             randoh@sheppardmullin.com

15

16   For the Defendants:       Latham and Watkins LLP
                               By:   GABRIEL S. GROSS
17                                   RACHEL S. HORN
                               140 Scott Drive
18                             Menlo Park, California  94025
                               (650) 328-4600
19                             gabe.gross@lw.com
                               rachel.horn@lw.com
20

21

22

23

24

25
```

1   LOS ANGELES, CALIFORNIA, WEDNESDAY, JUNE 7, 2023, 11:46 A.M.

2       THE CLERK:  Calling Case No. LA 22-CV-09094-GW-MAR,

3   *Moog Inc. v. Skyryse, Inc., et al.*

4       Starting with the plaintiff's counsel, please state

5   your appearances.

6       LAI L. YIP:  Good morning, Your Honor.  My name is

7   Lai Yip with the Sheppard Mullin firm here on behalf of Moog,

8   and with me is my colleague Kazim Naqvi, my colleague

9   Rena Andoh is joining us by Zoom, and we may have a

10   representative from Moog on the line, Joe Polniak.

11       THE COURT:  Good morning.

12       MS. YIP:  Good morning.

13       GABRIEL S. GROSS:  Good morning, Your Honor.

14   Gabe Gross, Latham and Watkins.  My associate Rachel Horn and

15   I are here representing Skyryse, the defendant and

16   counterclaimant.

17       THE COURT:  Good morning.

18       MR. GROSS:  Good morning.

19       THE COURT:  All right.  Let me go ahead and hear

20   from plaintiff -- movant, I should say, on this motion.

21       MR. GROSS:  Thank you, Your Honor.  And I just

22   wanted to thank the Court for holding this in-person hearing.

23   The case, as the Court well knows, has been pending for some

24   time, but this is the first opportunity we've had to be in

25   this court and before Your Honor; so thank you for setting

1   aside the time to do it.

2          The motion before the Court right now is a

3   discovery motion.  It's not in the posture of a motion to

4   compel.  That was a motion to compel that was granted last

5   July that Skyryse, my client, filed to compel the

6   identification of trade secrets.  The court in New York,

7   before the case was transferred, took briefing, received

8   additional briefing by emails, held a hearing on the motion,

9   and that was after about five months of meeting with the

10  parties and their counsel regularly.  It seemed like almost

11  every week we were in front of Magistrate Judge McCarthy

12  there, and he issued a very specific, very reasoned order

13  based on his familiarity with the facts of this case.

14  Skyryse brings this motion to enforce it.  Moog, the

15  plaintiff, has provided a trade secret identification that we

16  view as deficient and noncompliant with the judge's very

17  clear order.

18          So there are really four points I'd like to address

19  in my time with the Court today.  First, I'd like to briefly

20  go over what it was that the court ordered Moog to do;

21  second, I'd like to spend a few minutes talking about what

22  Moog did instead and why it fails to comply with the judge's

23  order; third, I'd like to address some of Moog's

24  justifications that we saw in its briefing and why they just

25  don't hold water, why it really doesn't have an excuse for

1  defying what the court ordered last July; and then, finally,

2  fourth, I'd like to discuss what I think the next steps would

3  be that would be appropriate for this case.

4          So I will not bother advancing the digital slides

5  that we'd have to read right to left, but I would like to

6  spend some time talking about the court's order.  Slide 2 --

7  excuse me.  Slide 3 in front of the -- in the hard copies

8  that the Court has is just a cover page of Docket No. 205,

9  and this is a pretty short order.  It's about six pages, and

10 what Judge McCarthy did was he recounted the briefing and the

11 hearings and the process he had, and he described in Moog's

12 own words what the trade secrets were even on that first

13 page.  That description is obviously very high level.  What

14 he also pointed out, then, after going through --

15          THE COURT:  Mr. Gross, before -- I'm sorry to

16 interrupt you --

17          MR. GROSS:  Yes, Your Honor?

18          THE COURT:  -- but before we go forward, did

19 somebody previous to the hearing ask that this be an under-

20 seal hearing?  I don't know if we're going to be getting into

21 talking about trade secrets in particular.  I assume,

22 possibly, we will.  So, if so, is somebody making that motion

23 to lock the courtroom.

24          MR. GROSS:  Thank you for raising it, Your Honor.

25 We did bring it to the Court's desk attention ahead of time

1    anticipating that Moog may have such a request.  I don't

2    think it's been formally made, but I understand it's

3    available.  So I'm happy to turn it to Moog.

4              THE COURT:  Let's take care of that first.

5              MS. YIP:  So we are not certain whether there would

6    be any trade secret material being discussed today.  We don't

7    plan to, but we don't know how the argument is going to go

8    necessarily.  So we'd like to reserve the right to seal if we

9    need to.  We might have to raise something in rebuttal, but

10   we're not sure quite yet.

11             THE COURT:  All right.  In an abundance of caution,

12   I'll have the courtroom locked, and we'll proceed, and by the

13   end of the hearing, if one of you wants to make a motion to

14   -- if you want to make a motion to seal the transcript, that

15   will be up to you.

16             MS. YIP:  Understood.  Thank you, Your Honor.

17             THE COURT:  I'm sorry.  Please continue, Mr. Gross.

18             MR. GROSS:  Thank you, Your Honor.

19             So I would like to address what it was that Moog

20   was ordered to do.  This is in the brief, but I've distilled

21   it on Slide 3 in front of the Court right now.  The

22   magistrate judge in New York made some very specific orders.

23   One was that Moog had to identify with precision and

24   specificity that's particular enough to differentiate its

25   trade secrets from what's come before -- those trade secrets

1  -- and specifically said it's insufficient to describe them

2  by generic category.  He pointed out that only Moog was the

3  one who knows what it's trade secrets are, and that's

4  important because we'll discuss the volume issue that

5  plaintiff has raised here and why it's not a sufficient

6  excuse for failing to describe the trade secrets with

7  particularity.

8          The judge in New York also held that courts

9  shouldn't allow a plaintiff to simply point to documents as a

10  substitute for a detailed identification.  That was an issue

11  that had come up before Judge McCarthy.  Moog in response to

12  Interrogatory No. 1, which required the trade secret

13  identification, had suggested that the defendants could

14  simply look at the machines, the computers and hard drives

15  they'd turned over in discovery, and find them for

16  themselves, and the court said, "Well, that's not sufficient.

17  You have to, as plaintiff, identify them yourself."

18          Turning to Slide 4, we see a couple more excerpts.

19  The court held that source code -- and you even see this from

20  page 1 of the order -- source code is among the trade

21  secrets, and that's computer code written by humans in a

22  language that computers and humans can understand, and the

23  court held that Moog has to identify its source code trade

24  secrets specifically, including identifying specific lines of

25  code, and he offered some examples of how to do that: print

1  it out on paper and identify lines by number or by color

2  coding or the like.

3          The court also held --

4          THE COURT:  So you don't think his use of "for

5  example" made it a little more generic than that?

6          MR. GROSS:  I think it gave Moog flexibility to

7  decide how it would identify the particular lines or modules.

8  It doesn't -- you know, if it didn't need to be color coded,

9  it could have done by line numbers or excerpted in another

10  way, but I think the finding was clear in the holding that he

11  had that Moog had to identify the specific lines of code was

12  clear.  And frankly, that makes sense because the way code is

13  written, so much of it is constrained by programming

14  languages and conventions, it can't possibly be a trade

15  secret.  It's just how every coder needs to write in the --

16  within the constraints of a particular field.  So identifying

17  what in it is actually a trade secret is a serious thing and

18  an important one in a case like this.

19          Now, finally, the court held that when Moog makes

20  its identification, it has to identify the trade secrets it

21  intends to assert in this action, not every trade secret that

22  it think it might own or that might have been copied by its

23  employees when they worked there but the ones it intends to

24  assert in this action, and it deferred all other discovery

25  until that was done, and that's a point I'll return to

1    because we are 15 months into this case, and while Moog, on

2    one hand, has received a significant -- tremendous amount of

3    discovery, the defendants have received virtually none

4    because of this de facto stay that the judge put in place,

5    anticipating at the time that Moog was going to identify its

6    trade secrets so the parties could proceed to a preliminary

7    injunction hearing, which was never scheduled and hasn't

8    happened.

9          So that's what the court ordered Moog to do, and

10   now I'd like to discuss the second point, which is really

11   Moog's approach to its trade secret identification.  I touch

12   on this in Slide 5 in the materials before the Court, and as

13   the Court, I'm sure, has seen in the narratives which were

14   provided at Docket No. 485, the trade secret descriptions --

15   they're lengthy, they contain a lot of prose and some

16   diagrams, but they're very open ended.  They're not limited,

17   and they're very categorical.  They don't describe exactly

18   what a particular arrangement of components or products is

19   and say that's the trade secret.  Instead, they provide

20   descriptions of what Moog has accomplished with its

21   technology, what it hopes to do, what -- provides background

22   context of some of the technology.  What the Court will not

23   see anywhere in the trade secret identification is a single

24   specific line of code, just as Judge McCarthy ordered Moog to

25   provide.

 1            And then there's a pattern that we see throughout

 2   all hundred-or-so pages of the trade secret identification

 3   where Moog points to documents.  It describes in some

 4   categorical terms what an alleged trade secret is, and then

 5   Moog says, "It's reflected in documents found here in a

 6   spreadsheet," that counsel served on us, and sometimes it's

 7   referring to documents by the tens of thousand [sic], not by

 8   specific document, and there's no description anywhere about

 9   any one of those documents, which number nearly 300,000, as

10   to what in a particular document is or isn't a trade secret.

11   Moog just says, "Go look at the documents.  Here are 300,000

12   of them."  And that's a little bit of an overstatement for

13   particular trade secrets.  It might be 50,000 or 70,000 or

14   2,000 or 500, but the point is the same.  The trade secret

15   identification Moog served does not identify where in these

16   documents its alleged trade secrets are.  It's essentially

17   like saying to Skyryse, "You go figure it out."

18            So the --

19            THE COURT:  So are there any trade secrets they've

20   -- that they've identified that you believe meet the

21   particularity requirement?

22            MR. GROSS:  I couldn't find a one, Your Honor, and

23   we looked through --

24            THE COURT:  Not even the CUI TSID that has the

25   11-page narrative?  That's not specific enough?

1         MR. GROSS:  Well, Your Honor, in fact that one, I

2    think, is an example of sort of the obfuscation in the prose

3    itself because it's open-ended, not limiting, categorical,

4    and it's the opposite of the sort of thing that the Court or

5    the parties could use, for example, when -- or if Judge Wu

6    has to draft an order about a trade secret or instruct the

7    jury as to "Here's what trade secret No. 4 is."  That

8    11 pages of prose won't help the jury decide whether the

9    trade secret exists, is protectable, has been

10   misappropriated.

11         And, you know, Moog will have to prove itself for

12   each and every trade secret that it meets all of the elements

13   that qualify for trade secret protection, like it being not

14   generally known to the public, the subject of measures that

15   are reasonable to keep it trade secret, that it hasn't been

16   disclosed to third parties.  And when you look at that

17   11-page description, I agree it's long, and I agree it's

18   detailed.  It -- it's not concise.  It's open ended, it

19   doesn't end, it says it incorporates all the technical

20   overview from the beginning of the document, and it says it

21   includes but isn't limited to the documents that are cited in

22   it.

23         So, no, even that 11-page description, I think, is

24   deficient.  It's -- that's an example of not looking for a

25   needle in a haystack.  It's like an example of providing a

1    whole stack of needles and saying, "Somewhere in here is the

2    trade secret," and it's just not deficient [sic].  The Court

3    can't work with that, Moog itself can't work with that when

4    it's trying to prove its elements, and the parties and the

5    Court, as they figure out what the parameters of discovery

6    are, won't be able to rely on that 11-page description and

7    have a fair idea of what is relevant, what isn't relevant

8    because it's so open ended.

9              THE COURT:  All right.  Thank you.

10             MR. GROSS:  You're welcome.

11             Your Honor, turning to Slide 6, this is an example

12   of the language Moog chose to use in every one of the

13   30-or-so categories of trade secrets that it tried to

14   identify.  After the description -- let's use the 11-page one

15   for an example, although this one comes from a different

16   page.  In Docket No. 485-1, Moog says (reading), This trade

17   secret, however it was described in prose, is reflected in

18   the files identified in Exhibit A (end reading).

19             And on Slide 7 we put in some of the examples of

20   what those files in Exhibit A look like.  For what it calls

21   it's "CUI Trade Secret No. 1," it refers to 29,000 files.

22   And I won't bother reading through the examples on this

23   slide, Your Honor, but this proves the point I was making

24   earlier, which is that Moog is literally, for each of its

25   trade secrets, referring to dozens, hundreds, thousands, or

1   tens-of-thousands of files without any elaboration.

2          And it even gets worse.  For a couple of these

3   trade secrets -- and we see these on Slide 8.  They're

4   examples where Moog hasn't even offered a narrative

5   description.  So Moog accuses a defendant whose last name is

6   Kim of downloading and copying a bunch of files that it

7   claims it has trade secret rights in.  And so what it said

8   was "There's a trade secret we're calling 'Kim Download,' and

9   it's reflected in those 77,000 files," with no help, no

10  elaboration, no explanation of which of those files are or

11  aren't trade secrets, what in them could --

12          THE COURT:  Mr. Gross, can you give me an example

13  of what would satisfy you?  I mean, there's --

14          MR. GROSS:  Sure.

15          THE COURT:  -- you're saying the narrative is too

16  broad --

17          MR. GROSS:  Yeah.

18          THE COURT:  -- and you're saying there's no source

19  code that's being pointed at, but just give me an example of

20  what would be satisfactory.

21          MR. GROSS:  I'm glad you asked, Your Honor.  We

22  brought a couple of examples of what courts have used in the

23  past that I think have sufficed.  And of course they're fact

24  dependent, and I don't expect --

25          THE COURT:  Right.

1          MR. GROSS:  -- that there's a particular formula

2   that will work for every one of Moog's claims here.  But what

3   courts have done in the past -- and you can see this as they

4   instruct juries and develop verdict forms when these cases go

5   to trial -- is they refer to trade secrets usually

6   identifying a shorthand for something that is concrete and

7   specific and finite.

8          So there's a case that was in the Northern District

9   of California called *GFI Technologies*.  I -- I'm sorry.  I

10  can't recall if it was cited in the briefs or not, but we

11  have an example of the verdict form there and what -- that

12  was a -- that was, I think, decided just -- excuse me -- two

13  years ago, and what the court did there was it had identified

14  25 trade secrets; the plaintiff had said, "Every one of these

15  trade secrets is shown in a particular schematic diagram" --

16  not the diagram itself but that the trade secret information

17  was in a diagram.

18         The jury received copies of those 25 schematics,

19  and the court gave each of them a name that corresponded to

20  that schematic, and for each of those trade secrets, the jury

21  was instructed and told to fill out a verdict form answering

22  those essential questions about whether it qualifies for

23  trade secret protection; whether it was misappropriated;

24  whether for each trade secret, if you found misappropriation,

25  it was willful; and so on and so forth.

1              So that would be an example.  If Moog has in its

2    300,000 documents particular schematics or source code or

3    diagrams where it says, "That thing" -- "That thing has our

4    trade secret information in it," we're entitled to know that

5    now so we don't have to sort through 300,000 documents to

6    guess at what they might claim to the jury will be their

7    trade secret.  So that's one example.

8              Another example is from the *Proofpoint* case that is

9    cited in the briefing.  In that case the court used a

10   shorthand where the descriptions were roughly six- or eight-

11   lines long in narrative form that identified particular

12   technical trade secrets.  Now, there surely were documents

13   used at trial about those trade secrets, but the plaintiff

14   had to live with what it settled on, on its -- as its

15   disclosure of the trade secret in prose.

16             I've had other federal judges order trade secret

17   plaintiffs to identify their trade secrets with the

18   specificity of a patent claim.  That was Judge Orrick's

19   approach in a trade secret case that we had about five or six

20   years ago.

21             So I think there are different ways to go about

22   skinning this cat.  They're obviously fact specific, and

23   Moog, I think, deserves some and will have some flexibility

24   in catering to the facts of the case, but what it can't do is

25   help itself to a different form of relief than Judge McCarthy

1    ordered.  Judge McCarthy knew, because he'd heard it from

2    Moog over and over again, that source code was at issue and

3    said, "Okay.  You've got to show the other side what lines of

4    your code you contend is actually a trade secret."  So there

5    are ways to do this, but I'm afraid we don't see it in these

6    particular trade secret identifications.

7            So, Your Honor -- and it's particularly problematic

8    in the trade secrets where Moog has identified people,

9    instead of trade secrets, like Ms. Kim, who they say took

10   take trade secrets and "you'll find them in those 77,000

11   files."  There's another witness named Reid Raithel, and Moog

12   says, "Mr. Raithel copied files.  13,000 of them reflect our

13   trade secrets" -- nothing else.  That's just unworkable.

14   It's not sufficient.  It certainly doesn't satisfy what the

15   order requires.

16           So, Your Honor, I think it's pretty apparent and

17   pretty black-and-white that Moog didn't follow the

18   instructions the court laid out, but just to drive the point

19   home, I think we see this in the briefing, because Moog has

20   all but conceded that.

21           On Slide 9 we've juxtaposed some of the things the

22   court ordered with what Moog sent.  So the court last July

23   told Moog to identify its trade secrets with precision and

24   specificity, including identifying with particularity every

25   trade secret it intends to assert in this case, not every

1    trade secret it owns or it could assert but, like, "Use your

2    decision-making skills, Plaintiff, and decide how you're

3    going to proceed on your case."  But Moog is now telling the

4    Court that it can't be forced to pick and choose among its

5    trade secrets to protect at this early juncture, this early

6    juncture being 15 months into the case after it's received

7    4 terabytes of discovery.  Yes, it does have to pick and

8    choose.  That's what Judge McCarthy ordered it to do.

9         On Slide 10 we see a quote from Judge McCarthy's

10   order pointing out that this requirement, what Interrogatory

11   1 requires and what courts around the country require of

12   specifically identifying trade secrets will enable the court

13   to put proper bounds and scope on discovery, but Moog is

14   telling the Court today that how it's going to go about

15   presenting its case as it goes forward is for Moog to

16   determine as discovery proceeds.  Judge McCarthy said the

17   opposite.  He -- first of all, he gave them a bunch of

18   discovery and then said, "You pick your trade secrets so we

19   can put some proper bounds on discovery.  You don't get to

20   proceed with more unlimited discovery before you define" --

21   excuse me -- "defined your trade secrets."

22        The court also said, "Identify your specific lines

23   of code" -- this is Slide 11 -- and Moog today is saying it

24   doesn't read the court's order to require it to identify

25   specific lines of code, it doesn't agree that the order

1    requires that, but the order says what it says, Your Honor.

2            Finally, as to this pointing to documents, the

3    court addressed that type of discovery where you invoke

4    Rule 33(d) and identify documents to the other side, and he

5    said it was insufficient.  But Moog was candid.  By its

6    count, it identified 291,095 files for which it seeks trade

7    secret protection.  That's not what it was ordered to do --

8    just identify 300,000 files.

9            So I think the mismatch between the approach Moog

10   chose to take and what Judge McCarthy in the transferor court

11   ordered is pretty clear.  And the court was just right in its

12   order, Your Honor.  It's supported by ample case law,

13   supported by scholarship that he cites in the order, and it's

14   informed by five months of meeting with the parties' counsel,

15   sometimes every week or every other week, and intimate

16   familiarity with the case.

17           So that brings me to my next point, Your Honor, and

18   it's really the last point, which is where we go from here.

19   And I think I understand the Court's hesitance about finding

20   that there isn't a single trade secret description in those

21   documents that is sufficient, but I think that's what the

22   inescapable conclusion is when you look at the open-ended

23   language, the refusal to describe with precision in

24   narratives what an actual trade secret does and, instead,

25   speak in vague terms about what they do or what they achieve

1    or what their goals are, I think the Court should grant this

2    motion and should find that the trade secret identifications

3    in their current form are just noncompliant and order Moog to

4    try it again if it intends to pursue its trade secret claims

5    and comply with that order, provide the precision and

6    specificity and source code lines and point to documents with

7    helpful explanation, not a bucket of 300,000 of them, if it

8    wants to proceed on its trade secrets because, if we don't

9    have a finding that it's not compliant, then it just

10   incentivizes a plaintiff to continue to withhold or hide or

11   delay identifying what it's actually going to tell the jury

12   is its trade secret and pursue at court.

13          So, Your Honor, there are, I think, three main

14   justifications that Moog has offered in its briefing.  It's

15   basically said, "It's too much.  It's too much volume.

16   That's a problem.  We can't identify our trade secrets with

17   the precision and specificity the court required because

18   there's just too much."  They've suggested it's just too

19   early: "This is an early juncture in the case.  We need to

20   let the case unfold before we're held to the standard."  And

21   then, as we've seen, their third argument is "Well, we don't

22   agree with the order," and I think we can do away with that

23   one.  They don't get to choose whether to comply with a

24   federal court's order.

25          But on those first two excuses, I don't think they

 1  hold up.  The volume excuse, the "it's too much," at this

 2  point in the case really doesn't make sense.  Moog has

 3  alleged that its own former employees, while they worked

 4  there, copied over a million files and in those files

 5  somewhere are its trade secrets and those are the bases for

 6  its trade secret claim.  It suggested that it's just too

 7  much, but this is -- this argument doesn't hold water because

 8  Moog chose to bring a trade secret claim.  It also has a

 9  breach of contract claim against the defendants saying they

10  breached confidentiality obligations by copying all those

11  files when they shouldn't have.  Those are claims against its

12  own employees.  And it has breach of contract claims against

13  Skyryse as well that aren't tied to particular trade secrets.

14          But it chose to bring a trade secret case, and now

15  it's time to decide which ones it intends to assert, and as a

16  master of its Complaint and the plaintiff's discretion that

17  it enjoys, it -- now is the time that it needs to focus and

18  choose which trade secrets it's actually going to assert.  It

19  can't bring a million to the Court.  It can't bring a million

20  to the jury -- or 300,000 or even a hundred -- in order to,

21  you know, try a case in an orderly manner.  It has to make

22  that choice, and that's what Judge McCarthy ordered it to do.

23          Now, it's other excuse, as I understand it, is that

24  it's just too early and it wants more discovery.  We saw that

25  in the quote I discussed a moment ago, where it says it wants

1    to choose how to present its case as it continues to take

2    more discovery, and that really doesn't hold up, Your Honor,

3    and here's why:

4        When we litigated this motion the first time back

5    in New York, Judge McCarthy, even though he granted in part

6    the motion to compel the trade secret identification with all

7    those specific instructions, he was sympathetic to Moog's

8    argument that it needed more discovery before it actually

9    identified the trade secrets it would assert, and he gave

10   them unilateral discovery to do that.  And it was phrased as

11   "expedited" discovery at the time, but it was, frankly, more

12   electronic discovery than I've ever seen in a case like this.

13   It expanded to fill 4 terabytes of data.

14       Moog has had for a year more discovery than most

15   plaintiffs ever get in a trade secret -- in a trade secret

16   case like this.  So the idea that it's too early now for it

17   to identify its trade secret -- or its trade secrets and that

18   this juncture of the case isn't the right time I just don't

19   think holds up.

20       And it got that extraordinary relief.  It was

21   really the opposite of what the usual course is.  As I'm sure

22   Your Honor knows, in California under the state civil

23   procedure codes, the trade secret identification is required

24   by statute before the plaintiff gets any discovery.  That's

25   typically the way these trade secret identification orders

1   and discovery proceeds.  Moog, instead, got a tremendous

2   amount of discovery and I -- it reminded me of the adage that

3   "To whom much is give much is expected."  And so they were

4   given a tremendous amount of discovery.  They told the court

5   they would use it to narrow their focus and come to court

6   with just the finite trade secret disclosure that I think we

7   all expected but don't have yet.

8           So, Your Honor, with that, I think I've made the

9   points I want to make.  I'm happy to answer the Court's

10  question or heed my time -- the rest of my time to my

11  colleague.

12          THE COURT:  All right.  Thank you.

13          MR. GROSS:  Thank you, Your Honor.

14          MS. YIP:  Your Honor, may I approach?  With slides?

15          THE COURT:  Yes.  You can give them to Valerie.

16          (Pause.)

17          MS. YIP:  (Off microphone.)  So these slides do

18  contain confidential date, but as of right now, I don't

19  intend to go into the confidential data.  It's just there

20  (indecipherable) --

21          THE COURT:  Valerie, is this being recorded?  What

22  she's saying?

23          THE CLERK:  Yes.

24          THE COURT:  Okay.  If you'll go to the podium.

25          (Pause.)

1      MS. YIP:  Your Honor, before responding to

2  Skyryse's comments, I think it would be helpful to provide

3  the Court with some context as to how we got here.

4      So this entire dispute is about a particular

5  interrogatory, Interrogatory No. 1, and that interrogatory

6  states (reading): Identify for each defendant each alleged

7  trade secret that you contend that defendant misappropriated.

8  It doesn't say anything about the trade secrets that we

9  intend to assert before a jury or the trade secrets that we

10  intend to assert at trial.  It also doesn't say anything

11  about identifying source code line by line.

12      When we originally responded to the interrogatories

13  in April of last year, we took the position that we should

14  provide a narrative identification after discovery.  Skyryse

15  disagreed and brought its motion.  The dispute that was

16  before Judge McCarthy was not about whether a previous

17  identification that we had done was sufficient or whether a

18  previous identification that we had done required a line-by-

19  line identification of source code.  This is because at the

20  time the motion to compel was brought we had not yet served a

21  narrative identification in response to Interrogatory No. 1.

22      In July of last year, when Judge McCarthy issued

23  his order, the order was expressly tied to Interrogatory

24  No. 1.  He said he would exercise his discretion, quote, "by

25  requiring Moog to 'answer in full Skyryse's Interrogatory No.

1   1...'"  Why is it important that that the court tied the

2   order to Interrogatory No. 1?  Because it requires us to

3   examine exactly what Interrogatory No. 1 calls for.  As I

4   mentioned earlier, it doesn't call for what we intend to

5   assert to a jury or a trial.  It doesn't say anything about a

6   line-by-line identification.

7          Now, one of the forms of relief that Skyryse has

8   asked for from Your Honor is to compel a line-by-line

9   identification of source code, but Skyryse itself, in its

10  briefing to the court that resulted in the order that Skyryse

11  seeks to enforce today, took the position that responding to

12  Interrogatory No. 1 would not require a line-by-line

13  identification.

14         If you go to Slide 2 of the slide set that I

15  provided, it contains an excerpt from the reply brief.  This

16  is Docket 194, and at page 9 Skyryse says, quote, "Moog also

17  argues that providing a narrative response 'would require

18  Moog to list each and every line of code from the tens of

19  thousands of source code files.'  Interrogatory No. 1

20  requires no such thing.  It asks Moog to identify its trade

21  secrets, not 'every single line of non-public source code.'"

22         So Skyryse's own position in its briefing to the

23  court was that no line-by-line identification was required.

24  So we believe that we very reasonably and fairly did not

25  interpret Judge McCarthy's order for a response to

1   Interrogatory No. 1 to require something that Skyryse itself

2   said on the record was not required by the interrogatory.

3          We also believe that implicit in Skyryse's

4   admission in its reply brief is the recognition that to

5   require something like that, a line-by-line identification

6   for tens of thousands of source code files, would be

7   extremely burdensome and unreasonable, and in actuality, it

8   would take many months to do something like that.

9          And what would occur here is because we have this

10  procedural mechanism whereby discovery is stayed until a

11  trade -- this trade secret dispute is resolved, it would

12  functionally grind this case to a halt, and that's very

13  problematic for Moog because we have a need for relief here.

14  We have had our trade secrets taken from us, and they include

15  highly sensitive government and military data, and we need

16  protection for that information.

17          Skyryse's other arguments regarding the supposed

18  deficiency of our trade secret identification is largely

19  premised on a mischaracterization of our trade secret

20  identification.  It's like as if Skyryse is talking about

21  some other trade secret identification that's out there,

22  rather than the one that's before us and before the Court.

23  For example, they say over and over again that we merely

24  pointed to documents, but even a cursory review of the trade

25  secret identification shows that's not true.  What we have

1   actually done is provide a narrative description that breaks

2   down our trade secrets into 30 trade secrets by program, by

3   tool set, by other specific category, and for each trade

4   secret, we provide a description, and we key that trade

5   secret to a specific set of files in a searchable, sortable

6   Excel spreadsheet that you can also filter.  So what we're

7   talking about is a very usable document that satisfies the

8   particularity requirement at this stage of the case.

9           Skyryse has not pointed to a single case where a

10  trade secret identification like ours was rejected at this

11  stage of the litigation.  On the other hand, we have a case,

12  the *WeRide* case out of the Northern District of California,

13  in which the court approved a trade secret identification

14  that is very similar to ours.  Structurally it's very

15  similar.  It breaks out the trade secrets one by one, trade

16  secret 1, 2, 3, 4, and so on.  For each trade secret the

17  plaintiff provides a description, and then it says that the

18  trade secret that was described is reflected in a list of

19  files, and then it lists the files.  If there is one case to

20  read for this motion, it would be the *WeRide* case.  It's one

21  of our leading cases and very, very instructive.

22          Interestingly, Skyryse relies on a case in its

23  portion of the joint submission to the Court at page 8, the

24  *Advanced Modular* case, which is a California Appeals Court

25  case that makes observations that are very instructive for us

1   here.  The court discusses the particularity requirement, and

2   then it says, quote, "But it remains true that, at this very

3   preliminary stage of the litigation, the proponent of the

4   alleged trade secret is not required, on pain of dismissal,

5   to describe it with the greatest degree of particularity

6   possible, or to reach such an exacting level of specificity

7   that even its opponents are forced to agree the designation

8   is adequate.  We question whether any degree of specificity

9   would satisfy that lofty standard."

10         We believe that implicit in the court's statement

11   that I just read is the recognition of the inherent tension

12   in a procedural mechanism whereby discovery is stayed until a

13   trade secret identification is considered to be adequate.

14   Because what it does is it incentivizes defendants to

15   continually question and challenge the adequacy of a trade

16   secret identification because the moment that they don't,

17   discovery opens and they are subject to discovery.

18         So we would expect that, if we did supplement after

19   today our trade secret identification, the defendants would

20   come back and say, "It's not adequate"; and if we were to

21   supplement again, the defendants would come back and say,

22   "It's still not adequate"; and it would loop and loop like

23   that with additional visits to the Court, and as I mentioned

24   earlier, this would functionally bring the case to a stop

25   because discovery would not be able to proceed, and that is

1   very problematic for Moog, especially because the reason why

2   we are here is because the defendants took our data; the

3   defendants took 1.4 million files.  Counsel earlier said that

4   we chose to bring this trade secret lawsuit.  We had to bring

5   this trade secret lawsuit because of the defendants' actions.

6   If the defendants did not take 1.4 million files, we would

7   not have to be here today.

8          Now, turning to some of Skyryse's comments made

9   both today and in its supplemental brief, Skyryse says that

10  the court ordered us to identify the trade secrets that we

11  intend to present at trial.  As I mentioned earlier, that's

12  not a correct characterization of what the court ordered.

13  The court ordered us to respond in full to Interrogatory

14  No. 1, which says nothing about what we intend to present at

15  trial.  The phrase "intends to assert" appears just once in

16  the order on page 6, and the court says that Moog needs to

17  identify what "it intends to assert in this action," and

18  right now the trade secrets we intend to assert in this

19  action are the 30 trade secrets that we identified.

20         We are still a ways off from trial, which is in

21  August 2024, and discovery is still very early functionally

22  because of the various stays that have been imposed on

23  discovery to date.  More importantly, we are still early in

24  our discovery into Skyryse's use of our trade secrets.

25  Counsel earlier mentioned Reid Raithel.  Part of the issue

1    that we have is that we still don't have the device that

2    Mr. Raithel used to take our data.  He never returned it to

3    us.  We still don't have the Skyryse-issued laptop that

4    Mr. Raithel used during his employment at Skyryse in which we

5    would expect to find use of the files that he downloaded.

6           There is absolutely no rule or case that requires

7    us to jettison trade secrets that we seek protection for at

8    this stage of the case, before merits discovery has even

9    taken place, and we certainly would not want to do that,

10   especially given the highly sensitive government and military

11   data that's present in those trade secrets.

12          In Skyryse's supplemental brief, they attempt to

13   distinguish a number of our cases.  The actual facts of those

14   cases show that they are not distinguishable, and we discuss

15   those facts in our portion of the joint submission, but there

16   is one case that I'd like to highlight here, and that's the

17   *MicroVention* case.  Skyryse says that the plaintiff in

18   *MicroVention*, quote (reading), did not just identify

19   thousands of documents and claim they reflected its trade

20   secrets, as Moog has done (end reading).  But Moog here did

21   not just identify thousands of documents and claim them as

22   trade secrets.  Again, we have this strange disconnect

23   between what the trade secret identification actually is and

24   looks like and the way that Skyryse characterizes it and

25   describes it.

1          We provided, as I mentioned earlier, a very

2    detailed description, about a hundred-pages long, breaking

3    down the trade secrets into 30 trade secrets and then keying

4    documents to those trade secrets.  The fact that there's a

5    high volume is not our doing.  It's defendants' doing.  If

6    they didn't take 1.4 million files, we wouldn't have to be in

7    a position where the volume is what it is.  But just because

8    they took a lot of documents doesn't mean that we have to

9    jettison our trade secrets.

10          Interestingly, in footnote 3 of *MicroVention*, which

11   Skyryse cites to try to distinguish the case, the

12   *MicroVention* court does say something -- make a finding that

13   is also very instructive here.  *MicroVention* says, quote,

14   "even if only some of the information in the document is a

15   trade secret, it would be extremely burdensome to require

16   Plaintiff to list them all -- a burden created by the scale

17   of the allegations of theft against Balt.  These unique

18   factual circumstances can be considered by the Court in

19   determining whether Plaintiff has identified trade secrets

20   with 'reasonable particularity' by referencing documents."

21          We have the same situation here.  The fact that we

22   have a trade secret file listing that, combined, identifies

23   291,000 files is a function of the defendants' theft of

24   1.4 million files.  Notably, defendants have never disputed

25   that they took 1.4 million files.  That's an undisputed fact.

 1   Moog has had to sift through 1.4 million files to get down to

 2   291,000 files, which is an 80 percent reduction.  We did that

 3   at great time and expense, and on top of that, we provided

 4   the approximately 100 pages of description of the trade

 5   secrets reflected in those files.

 6            Under the *MicroVention* case, both the scale of the

 7   theft and the burden involved should be considered by the

 8   Court in determining whether our trade secret identification

 9   is enough, and we would submit that our trade secret

10   identification is particular enough.

11            THE COURT:  Can I just ask --

12            MS. YIP:  Yeah.

13            THE COURT:  -- I had asked Mr. Gross about this.

14   The 11 -- so there's the trade secret that you discuss and

15   explain at length for 11 pages, and then the next four all

16   seem to have boilerplate that's just kind of copied.  So are

17   -- I mean, I'm assuming that all five of those you think are

18   disclosed with sufficient particularity, but I'm looking at

19   that seeing that there's a dramatic difference.

20            MS. YIP:   So we mentioned in the preliminary

21   statement to our trade secret identification that for certain

22   trade secrets -- this is Trade Secrets 1 through 5 and, I

23   believe, 9 through 24 and, maybe, 25 through 29?  I may have

24   those exact numbers incorrect, but it's something like that

25   -- that we described those trade secrets -- 1 through 5, and

1   7 and 8, and a few of them -- with great detail to provide

2   context for the Court and for the defendants as to the

3   technology that's involved but that we do not believe that

4   that kind of detail is necessary.  A lot of the elements that

5   are in the -- the first trade secret in the CUI trade secret

6   ID, for example, and 1 through 5 and 7 and 8 in the non-CUI

7   trade secret identification, is broadly applicable to the

8   other ones, and so we provided that detail so that that

9   context could be applied to the other ones but not because we

10  believe that it's necessary.

11          And if you look at the *WeRide* case, you'll see that

12  they have, also, differences between the extent of the

13  narrative for each of their trade secrets.  The initial trade

14  secret has -- is much lengthier than some of the trade

15  secrets later on.  Of course, a lot of that identification is

16  redacted so we have to make some inferences, but you can see

17  -- if you go, actually, to Slide 4 -- and the page numbering

18  is a little faint, but it is Slide 4 -- we compare side by

19  side Trade Secret 9 in the *WeRide* trade secret identification

20  to one of our trade secrets -- one of the shorter ones --

21  Trade secret 10, and you'll see that here the *WeRide*

22  description is only -- is less than 6-lines long.

23          So it's not about length.  It's about identifying

24  the trade secret, and here what they did was they described

25  it and then listed the files, and that's what we did.  So

1   it's not an issue of Is it long enough?  We did provide a lot

2   of detail for the first CUI trade secret and some of the

3   others in the non-CUI, but it's not necessary.

4           THE COURT:  All right.  And with respect to the

5   non-CUI TSIDs, you have an "other" category.  Why would you

6   use an "other" category, instead of, you know, using the tabs

7   -- individual tabs that you used in the CUI disclosure?

8           MS. YIP:  So our "other" category is -- it's --

9   they are broken down as well.  So we see that there's a trade

10  secret 20- -- there's four trade secrets that are identified

11  in the "other" categories, and those are 21, 22, 23, and 24,

12  and each of those are actually broken out by tab.  So, if you

13  look at Trade Secret 21, for example, and you go to the end

14  of it -- the end of the description, it'll say that these

15  trade secrets are reflected in exhibit such-and-such, tab

16  such-and-such.

17          THE COURT:  Okay.  That was just a little

18  confusing.  Thank you.

19          MS. YIP:  Understood.  Understood.

20          I'd like to address briefly one of Skyryse's

21  arguments in its supplemental brief, its argument that

22  Judge McCarthy's order to provide a line-by-line

23  identification is law of the case and binding on the Court.

24  Obviously, we disagree that Judge McCarthy's order required a

25  line-by-line identification.  We also disagree that

1  Judge McCarthy's order required anything more than what we

2  have already done.  However, even if Judge McCarthy's order

3  is interpreted, for example, to require a line-by-line

4  identification, this Court is entitled to exercise its power

5  to reach a different result.

6         One of the cases that Skyryse cites in its brief is

7  the *Hall v. Alternative Loan Trust* case, and it is true that

8  the *Hall* case says, quote, "Under the law of the case

9  doctrine a transferee court does not directly review either

10 the transfer order or other rulings of the transferor court."

11 But in the very next breath, the *Hall* case cites -- provides

12 a quote from the United States Supreme Court case *Arizona v.*

13 *California*, quote, "Nevertheless, law of the case directs a

14 court's discretion, it does not limit the tribunal's power."

15        We would submit that to the extent this Court

16 determines that Judge McCarthy's order required a line-by-

17 line identification or for our trade secret identification to

18 provide anything more than it already does that the Court

19 exercise its power to reach a different result.

20        THE COURT:  Wouldn't that be the district judge who

21 would have to make that determination?

22        MS. YIP:  I wasn't aware that it would have to be

23 the district judge if it's before --

24        THE COURT:  It's sort of like reviewing an order --

25 a magistrate judge order, which I don't inherently have the

1  power to do -- review another magistrate judge's order and

2  use my own -- overrule parts or that sort of thing.

3          MS. YIP:  That's not something that we have looked

4  into specifically, whether or not there's a distinction here

5  before -- between the magistrate judge and the district judge

6  in terms of the exercise of this power.  Of course, we're

7  happy to look into it and submit additional briefing on it to

8  Your Honor.

9          THE COURT:  Yeah, I -- some of this I -- is -- and,

10 please, if movant can think about this too -- maybe getting

11 into the district judge's hands in some situations.  I mean,

12 I handle discovery disputes, right, motions to compel.  So to

13 the extent that we're going beyond those parameters, I just

14 want you to keep that in mind.

15         MS. YIP:  Understood.  We would of course

16 fundamentally -- fundamentally, however, we -- our position

17 is that our trade secret ID is adequate under

18 Judge McCarthy's order and that nothing more is needed.

19         I wanted to address a few points towards the end of

20 Skyryse counsel's presentation.

21         Your Honor had asked about what would satisfy

22 Skyryse, and counsel had identified a few examples.  He said

23 that the trade secret identification has to be concrete,

24 specific, and finite.  Of course, we would submit that our

25 trade secret identification is exactly those things.  Counsel

1 referred to a case *GFI Technologies*.  I looked through the

2 briefing and the supplemental brief.  I don't see it cited.

3 So we're not familiar -- I'm not familiar today with exactly

4 what happened in that case, but based on the way that counsel

5 described it, he said that there were 25 schematics that were

6 presented to the jury in connection with a verdict form.

7 That, to me, suggests that that was -- that in that case they

8 were at a very different procedural posture than we are at

9 now.  We are very far away from any verdict form, we're very

10 far away from trial, and, also, we're not talking about

11 25 schematics.  We're talking about 1.4 million files that

12 had to be reduced through great time and effort by 80 percent

13 to about 291,000, and so it seems, to me, that that case is

14 highly distinguishable both procedurally and factually.

15 The *Proofpoint* case is interesting because in that

16 case the -- in that case the court actually identified what

17 would be an example of an adequate identification, and it

18 cited a case that itself cited the *WeRide* case.  So

19 ultimately it cited the *WeRide* case, and the *Proofpoint* case

20 described as an example of an adequate identification an

21 identification with -- that was 20 pages with ten trade

22 secrets identified and then listing all of the files.  So

23 that is what we've done here.

24 And then in terms of the third case that counsel

25 referred to, the case before Judge Orrick, he didn't say what

1   the name of the case is.  I don't know what case he's

2   referring to.  If it's going to be a material issue here,

3   obviously we'd like an opportunity to read the case and

4   respond to it, but standing here today, I don't know what

5   case that is.

6          On the Reid Raithel issue and the "Kim Download" --

7   the Misook Kim issue which was identified in counsel's

8   slides, as we mentioned in our briefing, the problem with

9   those two individuals is that the devices that they used to

10  take our data was never returned to us.  We don't actually

11  have those files.  We did the best with what we could.  We

12  have logs showing that they downloaded files, we've used

13  those, and we've done our best based on file names and file

14  paths, but we are actually at a -- we have a discovery issue

15  there.  We --

16         THE COURT:  So you haven't been able to view the

17  "Kim Download" files?

18         MS. YIP:  No.  Because what happened with Ms. Kim

19  is that she took -- she downloaded about 137,000 files from

20  her Moog laptop onto a -- an external hard drive shortly

21  before she left Moog to join Skyryse.  When we discovered

22  that she had done that, we notified her and then -- and we

23  said -- we asked for the device back, and when we got it

24  back, it had been completely wiped and formatted, which means

25  it's completely irretrievable.  You can't try to recover the

1   documents from that hard drive itself.  It's now just a blank

2   hard drive.  So she spoliated the evidence and gave us a hard

3   drive that was blank.  On Reid Raithel, we haven't gotten the

4   hard drive back -- we haven't gotten his Skyryse-issued

5   laptop, as I mentioned earlier.

6           And I'll close just by saying that, again, if

7   today's -- today's motion is about enforcing a prior court

8   order, and based on everything that I have explained, we

9   would submit that we have complied with Judge McCarthy's

10  order and that Skyryse's motion should be denied and that we

11  should move this case forward.

12          Thank you, Your Honor.

13          THE COURT:  Thank you.  And I'll give you a brief

14  amount of time for rebuttal to what Mr. Gross is about to

15  say, but we should be wrapping this up in the next ten

16  minutes or so.

17          MS. YIP:  Understood.  Thank you.

18          THE COURT:  Thank you.

19          MR. GROSS:  Thank you, Your Honor.  And I'll do my

20  best to be as brief as I can.

21          I had intended to share -- and my colleague

22  Ms. Horn will -- the verdict forms I mentioned from the *GFI*

23  case and the *Proofpoint* case.  We did bring copies.

24          The point about those, though, was not that we're

25  very far away from trial in this case and those cases were at

1    trial.  The point is to show why a particularized trade

2    secret identification is so important:  It sets the

3    boundaries of discovery.  It determines relevance.  It helps

4    the court administer the case.  It ultimately informs the

5    jury instructions and the verdict form.  So, when I hear the

6    plaintiff say, "We're so far away from trial we don't need to

7    identify our trade secrets with more particularity now," that

8    suggests, to me, that they'd prefer to wait until all the

9    discovery is completed.  They've got the cart before the

10   horse.  They've already received just a tremendous amount of

11   discovery.

12          So I -- so we'll -- please, Ms. Horn, if you would,

13   just share those documents with the Court and with counsel.

14          Ms. Yip spent a significant amount of time talking

15   about *WeRide*, talking about the briefing that was before

16   Judge McCarthy, and making the same arguments that

17   Judge McCarthy rejected about the level of specificity

18   required.  *WeRide* wasn't under a detailed order like Moog is

19   under Judge McCarthy's order.

20          When Ms. Yip pointed to the briefing that preceded

21   Judge McCarthy's order, she pointed to a quote from Skyryse

22   where Skyryse described its own interrogatory as not

23   requiring Moog to list each and every line of code from tens

24   of thousands of source code files.  That's not what the

25   interrogatory requires.  It's not even what Judge McCarthy's

1  order required.  It requires Moog to list its trade secret

2  lines of source code.  And Judge McCarthy considered that

3  argument, got the briefing, heard it at hearings, and issued

4  the order that he did.  Moog continues to act as though it

5  doesn't exist or as though this Court should exercise an

6  extraordinary amount of discretion to undo it and hold it to

7  a much more lenient standard than Judge McCarthy already

8  decided to hold it to under a very well-reasoned and

9  supported order.

10         Your Honor, there is something that I think

11  exemplifies how Moog knows that its trade secret is

12  deficient, and that's its own conduct in discovery.  The

13  interrogatories that Skyryse served at the outside -- at the

14  outset of the case that it hasn't been able to pursue

15  discovery on because of the stay included No. 1,

16  interrogatory to get the trade secret identification; and

17  then it also included Nos. 2 through 9, which were: For every

18  trade secret you've identified, give us your theory of the

19  case.  Tell us how it was developed and by whom so we can

20  discover the circumstances.  Explain the secrecy measures

21  that you subjected it to, if any.  Explain any public or

22  other disclosures to third parties of these trade secrets.

23  Describe why and how it derives independent economic value

24  from its secrecy.  All of those are required by the trade

25  secret law.

1      When Moog served its trade secret identifications

2  on us, it followed it with a commitment to supplement those

3  interrogatory responses for each and every trade secret, and

4  then I think it recognized what a tremendous undertaking that

5  would be since it invoked 300,000 files for its trade secrets

6  and didn't describe them with particularity, and it reneged

7  on that promise and has not supplemented those interrogatory

8  responses, I think, because it can't.  I think it knows it

9  has a problem.

10      And even, Your Honor, with respect to the 11-page

11  description -- I had a chance to go back and scan it while

12  Ms. Yip was arguing.  Even that 11-page description, which I

13  believe was the CUI Trade Secret No. 1 -- even that one

14  invokes 29,000 files.  If the Court were to find that that

15  complies with the order, Moog could turn it into anything by

16  invoking any item from any one of those 29,000 documents in

17  any combination it hasn't disclosed and ambush the defendants

18  at trial with a new trade secret that it cherry-picked from

19  the massive documents that are implicated by that 11-page

20  trade secret description and its reference to all those

21  files.  That is not what the court ordered.

22      Your Honor, the *WeRide* argument that Ms. Yip was

23  leaning heavily on -- this case isn't *WeRide*.  *WeRide* wasn't

24  under that order, and in that case WeRide did identify what

25  the court called "HD mapping algorithms" with a sufficient

1   level of specificity, but it's just irrelevant.  That is not

2   this case.  That plaintiff was not under this order.

3        Your Honor, the last point I'll make is about the

4   stay of discovery.  When Judge McCarthy settled the issue

5   last July, the only claims in the case were by Moog against

6   the defendants, and he stayed all other discovery, which was

7   largely related to those claims and those defenses until this

8   trade secret identification issue was settled.  We're at a

9   different posture now.  Skyryse has brought claims of its

10  own.  They have survived Moog's attempt to dismiss them --

11  claims of trade secret misappropriation arising from the two

12  companies' collaboration, claims of breach of contract and

13  breach of the implied covenant -- and Moog has refused to

14  provide any discovery about them invoking this order, saying

15  Judge McCarthy stayed all discovery when the only claims in

16  the case where theirs so they're not providing any discovery

17  about ours.

18        We urge the Court -- request that when the -- if

19  the Court grants this motion, it does so making clear that

20  while the discovery stay as to the claims and defenses Moog

21  brought -- or the discovery about those claims and defenses

22  is still stayed, there is no reason for Skyryse, who's

23  ten months away from the end of discovery, to not get

24  discovery on its own claims, which is the way we're stuck

25  right now in view of this order.

1            THE COURT:  Well, it seems like the identification

2     process has taken quite a bit of labor.  I don't -- there

3     seems to be a lot of attorneys listening in today.  And, I

4     mean, if the Court were to lift the discovery stay for you,

5     doesn't that mean that you will be -- you'll immediately

6     start asking Moog for discovery while they should be, maybe,

7     looking into making their trade secret identification more

8     clear to you, right, if I go in that direction.  So it just

9     seems, to me, that that might not be -- if that's what -- if

10    that indeed is what you're asking, it seems like as a

11    practical matter -- I don't know if they have, you know,

12    hundreds of people working on this case, but it seems a

13    little impractical to me.

14            MR. GROSS:  I hear your point, Your Honor.  I do

15    disagree with it.  We've gotten to know one another and our

16    teams fairly well, and they are substantial, and I think

17    litigants like these companies and the firms they've hired

18    can do this.  I think they can walk and chew gum and get both

19    parts of the case moving and parallel -- or at least one part

20    while another one is stayed until the sufficiency of the TSID

21    issue is finally resolved.  We do have a finite amount of

22    time before trial now.  It's, I think -- I think the close of

23    discovery is ten months away.  We have yet to receive

24    discovery.  We need to get going.  If we proceed in a

25    sequential fashion like you're suggesting, Your Honor, I

1  cannot see how that doesn't require moving deadlines that

2  Judge Wu already set for this case.  So that's one of our

3  fears.  We'd like to keep the case moving, and there's a

4  significant portion of it -- the counterclaims, at a minimum

5  -- that are -- pardon me -- that are unaffected by this

6  issue.

7          THE COURT:  All right.  Well, I'll take that all

8  into consideration.  I certainly don't want to jam up

9  Judge Wu and his schedule, but I do think we can all be

10 reasonable here.

11          MR. GROSS:  No, I understand.  All right.  Thank

12 you, Your Honor.

13          THE COURT:  Let me just ask you this: There is a

14 Ninth Circuit case that I saw where the trial court granted a

15 hearing where expert testimony on trade -- the identification

16 of trade secrets -- whether or not they were sufficiently

17 particular.  Do you think that would be helpful in this

18 situation?  It seems like, to me -- but you -- both side have

19 given me really excellent briefing and arguments.  The only

20 problem is you don't agree so that makes it a little more

21 difficult for me.  Do you think expert testimony is

22 necessary?

23          MR. GROSS:  Your Honor, I'd like the opportunity to

24 give that a little more thought.  I'd be happy to share my

25 instant -- my first reaction and impression of that idea now,

 1  but it is one I'd like to give a little more thought to.

 2          I think I can predict what the expert testimony

 3  from both sides is going to look like, and it's going to

 4  largely mirror the arguments that you've heard from counsel.

 5  After living with the case for, now, a year and half, I think

 6  that surely the expert witnesses Skyryse has worked with

 7  would be and would say they would be confounded, for reasons

 8  we've discussed today, by the types of descriptions in the

 9  trade secret identification today, and I have no doubt that

10  Moog would have a consultant on its side that would say

11  they're crystal clear and provide all the specificity one

12  would need.  So I'm not sure it will move the needle or --

13          THE COURT:  Right.

14          MR. GROSS:  -- change the arguments, but it's

15  something I'd be happy to give some more thought to.  And if

16  we think it -- inform the decision.

17          THE COURT:  Okay.  So you're saying it would be

18  largely duplicative?

19          MR. GROSS:  I do think so --

20          THE COURT:  You all are experts basically?

21          MR. GROSS:  Well, I wouldn't presume to be an

22  expert in the technology these clients are engaged in, not at

23  all, but we have seen a few trade secret cases and have

24  gotten to know the facts of this case --

25          THE COURT:  Right.

1          MR. GROSS:  -- quite well.

2          THE COURT:  Yeah.

3          MR. GROSS:  So I do appreciate the inquiry on it.

4          Thank you, Your Honor.

5          THE COURT:  Thank you.

6          Ms. Yip?

7          MS. YIP:  Your Honor, may I approach with copies?

8          THE COURT:  Yes, you may.

9          (Pause.)

10          MS. YIP:  So mindful of the time, I'll try to go

11   through just a few of the points that counsel made.

12          So counsel said that we have not responded to other

13   interrogatories because -- relating to the trade secret

14   identification because of this dispute, and I just wanted to

15   clarify that the reason why we haven't yet is because Skyryse

16   has asserted -- Skyryse itself has refused to respond to

17   discovery and essentially discovery is stayed.  Discovery is

18   stayed until this trade secret dispute is resolved.

19          Moreover, as a practical matter, these other

20   interrogatories that counsel is referring to is about the

21   trade secret identification, so security measures and value

22   and so forth, and it's -- doesn't seem to us like it would be

23   very efficient if, as a result of this dispute, the trade

24   secret identification were to change substantially for us to

25   respond to these interrogatories that would themselves have

1  to change later.  So there's both a practical issue and a

2  procedural issue there.

3           On the *WeRide* case, counsel said that in the *WeRide*

4  case they identified algorithms and that we didn't.  Again,

5  there is this very puzzling disconnect between how Skyryse

6  characterizes the trade secret identification and the trade

7  secret identification itself.  It has many algorithms in it,

8  describes algorithms.  I won't go into the detail here just

9  because it's sensitive and confidential and given the time,

10 but an actual exam of the trade secret identification will

11 show that it has functionality described, algorithms

12 described, and so forth.

13          Skyryse has refused to respond -- as I mentioned

14 earlier, Skyryse has refused to respond until the trade

15 secret identification that we have served is deemed adequate

16 by them or if the trade secret dispute has been resolved, and

17 we would note that Skyryse itself has brought trade secret

18 claims, and if what they're saying is that they should be

19 entitled to discovery from us, there is some inconsistency

20 there because they have a trade secret claim and they have

21 not served an identification of trade secrets in connection

22 with their trade secret claim.  So, if we're going to be fair

23 here about discovery, they should not be able to get further

24 discovery from us until they have made their trade secret

25 identification as well.

1              To force us to move forward with discovery,

2    responding to their discovery requests, not only would that

3    be extremely burdensome for us -- and we do not -- it would

4    be very costly and burdensome and is not something where --

5    as easy as what counsel seems to suggest that it would be.

6    We do not have infinite resources.  We do have costs and

7    expenses to think about.  It would be very burdensome, and it

8    would also be unfair because this reciprocal trade secret

9    identification has not been made by Skyryse.

10             In terms of the expert testimony issue and whether

11   or not that would help with the dispute, of course we would

12   be happy to review the case that Your Honor's referring to

13   and give it some additional thought as well.  Right now,

14   standing here today, we probably think that it's not going to

15   be super helpful to have expert testimony and also that it is

16   -- we're at a procedural posture in the case where it should

17   not be necessary.  There are trade secret identifications

18   made without this kind of expert testimony because the

19   standard that has to be met is not one that requires that

20   level of evidence, and so to require expert testimony here

21   would not only delay the proceedings -- and as I mentioned

22   earlier, we really do need to move forward with this case.

23   Counsel said we need to get going, and we couldn't agree

24   more.  We need to get going with this case.

25             And I would end by just going back to the

1    *Advanced Modular* case that I mentioned earlier -- the

2    California Appeals Court case -- where the court recognized

3    that this is -- trade secret identification is not about

4    identifying to defendants' satisfaction because, if we were

5    to do that, we would be here forever.  The defendants are --

6    in general, are not incentivized to find a trade secret

7    identification adequate because of what will happen

8    afterwards, discovery opening, and so, if we want this case

9    to move forward, we have to first start with the first

10   principles of what exactly is required here, and the

11   particularity standard has been fully satisfied by the trade

12   secret identification served by Moog.

13            THE COURT:  And if I find that that's not

14   altogether true -- again, not saying that I will -- how long

15   would it take you to correct this?

16            MS. YIP:  It really depends on what it is that the

17   Court would deem needs to happen for the correction, and so I

18   think the "devil's in the details" there.  For example, if we

19   were to have to do a line-by-line identification of source

20   code -- which, of course, we believe is not required, but if

21   we were required to do that, that would take a very, very,

22   very long time.  We're talking about many tens of thousands

23   of source code files that have been taken by the defendants

24   which do reflect our trade secrets.  So that would take many

25   months.  If it was something --

```
 1                THE COURT:  How many months?  Several months?

 2                MS. YIP:  It's a little hard for me to say --

 3                THE COURT:  Weeks?  Months?

 4                MS. YIP:  Yeah, but --

 5                THE COURT:  Let's just say, hypothetically, I don't

 6    think any of it -- I find that none of it is sufficiently

 7    particular.

 8                MS. YIP:  So -- yeah, if we had to -- so because --

 9    Your Honor asked earlier about what it would take to make

10    this satisfactory.  I struggle with the same question.  I

11    don't know what it is that Skyryse is looking for, and so,

12    because that's a moving target, it's really hard for me to

13    say, but if we were to peg it to the one concrete thing they

14    have asked for, which is a line-by-line identification of

15    source code, that seems, to me, like that would take at least

16    four to six months.

17                THE COURT:  Okay.  Thank you.

18                MS. YIP:  Thank you, Your Honor.

19                THE COURT:  All right.  Is there anything further

20    since -- we got a couple minutes before 1:00 o'clock.

21    Anything you want to say, Mr. Gross that --

22                MR. GROSS:  Oh, Your Honor, it's so dangerous --

23                THE COURT:  -- that might be helpful?

24                MR. GROSS:  -- to ask that to an attorney --

25                THE COURT:  Yeah, I know.  I know.
```

1          MR. GROSS:  -- right, if you have anything else.

2          THE COURT:  I know.  I'm a type A, and we've got

3    two minutes before 1:00 so --

4          MR. GROSS:  Well, I really appreciate the time.  I

5    was just concentrating on something that had come up, and I

6    just wanted to flesh out the record on it.

7          Ms. Yip was describing trade secrets that Moog has

8    alleged two employees had copied and taken with them --

9    Misook Kim and Reid Raithel -- and she described the

10   allegation about Ms. Kim having wiped her hard drive.  This

11   is a road we've been down with Judge McCarthy.  The

12   allegations in the Complaint that Moog used to initiate the

13   lawsuit describe with granular detail their forensic

14   investigation into each and every file that they allege

15   Ms. Kim copied.  They have the data.  They've always had the

16   data.  They have their own versions of these things.  The

17   idea that they need to take still more discovery, after

18   they've gotten a year of it and 4 terabytes of it from the

19   defendants and a bunch of third parties, to identify their

20   trade secrets -- I think that's "water under the bridge."  I

21   don't think it's a sound argument.  It's not one that should

22   move the Court.

23         Thank you, Your Honor.

24         THE COURT:  Thank you.

25         Anything further, Ms. Yip?

1              MS. YIP:  Just respond really quickly to that?

2              THE COURT:  Yeah.  Of course.

3              MS. YIP:  Because Ms. Kim spoliated the device,

4    wiped the device entirely, all we can do is approximate.  We

5    don't have the files that -- we don't know exactly what are

6    the files that she took because she deleted them.  We can

7    make an approximation based on what we know, but that's the

8    best that we can do.

9              And that's all I -- that's all my commentary,

10   Your Honor.

11             THE COURT:  Okay.  Let me ask you this: Not being

12   an expert myself in any of this, the source code is just part

13   of the programs; right?  It's not considered the actual trade

14   secret?

15             MS. YIP:  It would be considered part of the trade

16   secret.

17             THE COURT:  Part of the trade secret.

18             MS. YIP:  Yeah.  But it's not all of it --

19             THE COURT:  But not --

20             MS. YIP:  Yeah.

21             THE COURT:  -- standing alone?

22             MS. YIP:  Correct.  There's a lot more --

23             THE COURT:  Okay.

24             MS. YIP:  -- than just source code.

25             THE COURT:  All right.  I think I sort of

1    understand that.

2           Okay.  All right.  Well, thank you very much.  As I

3    said before, your arguments were excellent and very helpful.

4    So thank you.

5           MR. GROSS:  Thank you, Your Honor.

6           MS. YIP:  Thank you.

7           THE CLERK:  This court is adjourned.

8        (Proceedings adjourned at 1:00 p.m.)

9    ///

10   ///

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5                              CERTIFICATE

6        I certify that the foregoing is a correct transcript

7    from the electronic sound recording of the proceedings in the

8    above-entitled matter.

9    /s/ Julie Messa_____        June 24, 2023_____
     Julie Messa, CET**D-403         Date
10   Transcriber

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25