Douglas E. Lumish (SBN 183863)
  doug.lumish@lw.com
Gabriel S. Gross (SBN 254672)
  gabe.gross@lw.com
Arman Zahoory (SBN 306421)
  arman.zahoory@lw.com
Ryan T. Banks (SBN 318171)
  ryan.banks@lw.com
**LATHAM & WATKINS LLP**
140 Scott Drive
Menlo Park, CA 94025
Telephone: (650) 328-4600
Facsimile: (650) 463-2600

Russell Mangas (*admitted pro hac vice*)
  russell.mangas@lw.com
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone: (312) 876-7700

Attorneys for Defendant and
Counterclaimant Skyryse, Inc.

Rena Andoh (*admitted pro hac vice*)
  randoh@sheppardmullin.com
**SHEPPARD, MULLIN, RICHTER & HAMPTON LLP**
30 Rockefeller Plaza
New York, NY 10112
Telephone: (212) 653-8700
Facsimile: (212) 653-8701

Lai L. Yip (SBN 258029)
  lyip@sheppardmullin.com
Four Embarcadero Center, 17th Floor
San Francisco, CA 94111
Telephone: (415) 434-9100
Facsimile: (415) 434-3947

Travis J. Anderson (SBN 265540)
  tanderson@sheppardmullin.com
12275 El Camino Real, Suite 100
San Diego, CA 92130
Telephone: (858) 720-8900
Facsimile: (858) 509-3691

Kazim A. Naqvi (SBN 300438)
  knaqvi@sheppardmullin.com
1901 Avenue of the Stars, Suite 1600
Los Angeles, CA 90067
Telephone: (310) 228-3700
Facsimile: (310) 228-3701

Attorneys for Plaintiff and
Counterdefendant Moog Inc.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MOOG INC.,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>SKYRYSE, INC., ROBERT ALIN PILKINGTON, MISOOK KIM, and DOES NOS.1-50,<br><br>　　　　Defendants. | Civil Action No. 2:22-cv-09094-GW-MAR<br><br>**JOINT REPORT REGARDING MEET AND CONFER ON SEARCH TERMS AND OTHER ISSUES SET FORTH IN THE COURT'S ORDER AT DKT. 564** |

Pursuant to the Court's final ruling regarding Moog's Motion to Enforce dated June 30, 2023 (Dkt. 564) (the "Order"), and the parties' joint stipulations filed on July 28, 2023 and August 4, 2023 (Dkts. 588, 589, 596, 598) (the "Stipulations"), Plaintiff and Counterdefendant Moog, Inc. ("Moog") and Defendant and Counterclaimant Skyryse, Inc. ("Skyryse") (collectively, the "Parties") hereby respectfully submit this joint report "setting forth their respective positions on any outstanding issues." The Court's ordered the Parties to "meet and confer regarding search terms, including search terms to locate schematics and other drawings/images, to run across the Polarion Repository, the Git Repository, and the Google Drive Account folders noted above, and to have a finalized set of search terms by July 31, 2023." (Dkt. 564 at 10.) The Stipulations twice continued the deadline to agree on search terms and protocols, to August 11, 2023. The Parties have met and conferred telephonically and in writing throughout the past six weeks. This joint report provides Moog's and Skyryse's respective positions regarding all outstanding issues that have not been agreed upon by the Parties.

**MOOG' STATEMENT**

**I.      Preliminary Statement**

While the Parties have been able to resolve many disputes in response to the Order, at least three key disputes remain unresolved.

***First,*** despite the Court's order that Skyryse must produce a "complete forensic imag[e]" of Reid Raithel's Skyryse-issued laptop (Dkt. 564 at 10), Moog recently discovered that the laptop image produced by Skyryse is far from complete. Critical data such as all of Mr. Raithel's e-mail files, as well as other folders related to file access and activity, are missing. Moreover, the limited data collection is dated April 8, 2022, shortly after the case was filed, even though Mr. Raithel continued to use his Skyryse laptop (including potential Moog information on that laptop) well after this date. Skyryse does not dispute any of this. These issues should have been disclosed to the Court and Moog long ago. Moog has

serious concerns that Mr. Raithel's Skyryse-issued laptop was not sufficiently preserved during the pendency of this lawsuit. The Court should order that Skyryse produce a current, complete forensic copy of Mr. Raithel's Skyryse-issued laptop, along with any other data preserved from the April 8, 2022 collection from Mr. Raithel's laptop that has not yet been produced.

*Second,* after encouraging the Court to order search terms be run through the data and metadata stored on its Google Drive repository as an alternative to giving Moog's retained experts access to the repository – specifically reassuring the Court that "search terms work" during the June 29 hearing (6/29/23 Hrg. Tr. at 15:15) – Skyryse has now represented that metadata is not searchable. This also should have been previously disclosed to the Court and Moog when Skyryse represented that it could apply search terms that would include metadata. Moog has suggested a number of potential solutions over the past 45 days, but ultimately, Skyryse is unwilling to process its full Google Drive such that metadata is searchable. As discussed with the Court and demonstrated throughout Moog's Motion to Enforce (Dkt. 400), the ability to search metadata is critical because in many instances, it is only in the metadata that Moog's ownership of materials becomes evident. For example, Moog's experts have found dozens of documents in Skyryse's possession containing the name "Moog" or various iterations thereof in document metadata indicating the author of the document. Skyryse's objections based on burden also lack credibility due to its total lack of transparency in response to Moog's repeated requests for information.  The Court should order Skyryse to comply with the Order within 14 days, and run all of Moog's proposed search terms through the entirety of the Google Drive once the Google Drive contents have been processed so that the metadata is searchable.

*Third,* due to the volume and breadth of defendants' theft (approximately 1.4 million files across dozens of programs), Moog prepared a list of 437 search

terms for the meet and confer process,[1] but Skyryse has objected to 21 of those terms. Based on the limited search term hit count information provided by Skyryse to date, however, none of the search terms at issue present an undue burden to Skyryse. In aggregate, Skyryse represents it would have to review approximately 113,000 documents from its Google Drive and Git repositories. Given the size and nature of this case, as well as Defendants' theft and misappropriation of approximately 1.4 million Moog files, such a volume is proportional to the needs of the case and the Court's Order. The Court should disregard Skyryse's objections to certain of Moog's proposed search terms.

Moog respectfully requests that the Court schedule a hearing on the outstanding issues set forth herein. The Parties currently have a hearing scheduled on August 24, 2023 regarding Skyryse's Motion Objecting to Magistrate Judge Rocconi's June 14, 2023 Order (Dkt. 555). It may be most convenient for the Court and all Parties to schedule the hearing on the instant issues on the same date.

## II.  Skyryse's Failure to Produce a Complete Forensic Image of Reid Raithel's Skyryse Laptop

The Court's order on Moog's Motion to Enforce and for Sanctions dated June 30, 2023 provides in relevant part: "The Court orders Skyryse to produce ***complete forensic images*** of Ms. Bird and Mr. Raithel's Skyryse-issued laptops to iDS within 30 days of this Order, after conducting a privilege review." (Dkt. 564 at 10, emphasis added).

On July 28, 2023, Skyryse advised iDS that "FTI has shipped to iDS images for the laptops of Reid Raithel and Lori Bird." Skyryse provided no other information regarding the images. The images of those devices became available for Moog's review on August 3, 2023.

---

[1] Approximately 70 of these search terms focused on software-related files and data (and contained search terms based on Moog flight control programs and other terms unique to Moog software documents), whereas the other 367 terms consisted largely of unique alphanumeric identifiers specific to Moog facilities, contracts, and equipment.

Moog's experts have conducted an initial assessment of these images. While it appears that Skyryse did produce a complete forensic image of a Mac computer with Ms. Bird's user data to which limited privilege redactions were applied, it appears that Skyryse did not produce a complete forensic image of Mr. Raithel's Skyryse-issued laptop. Specifically, it appears that on April 8, 2022, shortly after this lawsuit was filed, there was a limited collection of files from Mr. Raithel's Skyryse computer, called "DCCollection_2022_04_08_16-38-42.L01," and this is what was produced to iDS instead of a complete forensic image.  Beyond the completeness issues, the date of the collection is also independently concerning since it does not capture all of Mr. Raithel's activity on his computer during his tenure at Skyryse in possession of Moog nonpublic information.  According to his LinkedIn page, Mr. Raithel did not leave Skyryse until April of 2023.

The collection of Mr. Raithel's files is incomplete and deficient. ***Mr. Raithel's e-mail files are missing***. The collection is also missing critically relevant files and logs maintained by the operating system that track a person's recent file and folder activity, including missing folders which contain information about file activity tracked by the operating system (including deleted files) and folders which contain an index of file activity. Notably, the image of Ms. Bird's Skyryse-issued laptop image contains all of these critical pieces of information.  This information is especially important in the case of Mr. Raithel, because these missing logs are the location most likely to contain evidence of Mr. Raithel plugging in and removing the hard drive he used to steal files from Moog.

Moog raised these issues with Skyryse via e-mail on August 7, 2023, and demanded immediate compliance with the Court's Order. (*See* Ex. A). In response, Skyryse acknowledged that the collection of Mr. Raithel's Mac laptop was not complete, and was instead "performed at a logical level" using a tool called "Cellebrite Digital Collector" due to an alleged "limitation inherent in DC with respect to the version of OS X on Mr. Raithel's laptop." (*Id*.) Later during meet

and confer, Skyryse contended that the partial collection was required because of an issue with using Cellebrite in conjunction with an M1 computer processor and Mac OS Version 12.0 or 12.1 that was on Mr. Raithel's laptops.

However, Skyryse's explanation is not credible. Cellebrite has two collection functions: imaging and collection. The "collection" function was used in connection with Mr. Raithel's laptop, where the examiner manually selects what data to collect from the following buckets: User Files, System Data, System Files, and Additional Files. Even if there were collection hurdles because of the combination of the computer processor and operating system version on Mr. Raithel's laptop, Skyryse evidently did not use the "Additional Files" option to collect all available data and files (such as Mr. Raithel's e-mail files and the relevant logs) that were not captured by the other buckets. As a result, relevant and available data on Mr. Raithel's laptop was not collected and has not been produced. Notably, Skyryse produced complete images of Lori Bird's and Alin Pilkington's Mac OS Version 12 laptops (same OS as Mr. Raithel's) using Cellebrite (same tool used with Mr. Raithel). And, the incompleteness of the collection also does not address the date of the collection (April 8, 2022), which precludes Moog from discovering key evidence regarding Mr. Raithel's viewing and use of Moog information in the year between the collection date and his departure from Skyryse.

Moog's concerns regarding Mr. Raithel's laptop are heightened because of Skyryse's lack of transparency regarding this issue.  Given the opportunity to discuss this very issue with the Court during the June 29 hearing, after having the opportunity to review the Court's tentative ruling ordering the turnover of a complete image of Mr. Raithel's laptop (the language of the tentative in this regard was identical to the Court's final order), Skyryse was silent.  Instead, it argued that "we still think that discovery from those laptops may be in order, but there is a way to find out what is relevant, not turn over the entire machines…."  (6/29/23 Hrg.

Tr. at 31:3-6.)  Had the Court agreed with Skyryse, Moog might never have become aware of the serious issues with the collection of Mr. Raithel's laptop.

While Skyryse communicated to Moog during the meet and confer process that they were previously unaware of this issue, the partial collection is also consistent with Moog's objections to the incomplete analysis performed by Skyryse's expert Michael Bandemer in connection with Mr. Raithel's laptop, where he only reviewed "daily out" logs instead of several other critical pieces of data.  (Dkt. 508 at 10-11.) Specifically, Mr. Bandemer admitted in deposition that the "daily out" logs were the only logs he was instructed to review, even though they were woefully inadequate to determine whether Mr. Raithel had plugged in the hard drive he had used to steal Moog materials.  Given these new revelations, Moog questions whether Mr. Bandemer's analysis was incomplete because the relevant logs from Mr. Raithel's laptop were not collected at all. If that is the case, Skyryse was placed on notice of potential issues regarding completeness of Mr. Raithel's data at the beginning of 2023.

Skyryse should have disclosed that its collection of Mr. Raithel's laptop was not a complete image when the Parties previously conferred about these issues pursuant to the Court's instruction following the June 15, 2023 conference on these issues, and certainly before the incomplete image was produced to iDS on July 28, 2023. Skyryse has represented to Moog that Mr. Raithel's actual laptop has been collected and therefore could be re-imaged as a complete forensic image per the Court's June 29 Order.  Moog therefore respectfully requests that the Court order Skyryse to produce a complete and current forensic image of Mr. Raithel's Skyryse-issued laptop to iDS within 7 days. Moog also reserves the right to seek additional relief as a result of Skyryse's nondisclosure and failure to comply with the Court's Order.

///

///

**III.    Moog's Proposed Search Terms for Skyryse's Google Drive, Polarion, and Git Repository**

**A.    Meet and Confer Summary**

A true and correct copy of the Parties' written meet and confer correspondence, between July 11, 2023 and August 11, 2023, is attached hereto as Exhibit B. A relevant timeline summary for the Court's convenience is attached hereto as Exhibit C. As reflected in the meet and confer correspondence:

- Skyryse contradicted the search capabilities that it represented to the Court, advised that metadata was not searchable for Google Drive, and refused to agree to a process whereby metadata would be searchable.

- Moog repeatedly asked for the same types of information for several weeks, with Skyryse either not responding or taking several weeks to respond.

- The information provided by Skyryse kept changing.

- Skyryse failed to investigate basic, threshold issues with FTI until they were suggested by Moog during the meet and confer process.

- Moog provided various potential solutions to Skyryse to solve the issue regarding metadata searching in Google Drive, but Skyryse would not agree to any of them.

- Moog stipulated to two extensions of the Court's initial deadline of July 31 to agree on search terms, to accommodate Skyryse's delay in providing relevant information.[2]

Moog did everything it could to avoid burdening the Court with these issues. But, after conferring with Skyryse extensively over the past six weeks, and given the

---

[2] The meet and confer summary also demonstrates how on August 8 and 9, the Parties agreed in writing to exchange their portions of this joint statement at 3:00 PM on August 11. Moog's counsel noted he had a commitment in the late afternoon on August 11 and could not do a later exchange. Then, 24 minutes before the exchange deadline, Skyryse demanded the deadline be pushed back by 3 hours to 6:00 PM. (Ex. B at 1-2.) This is not the first time Skyryse has broken agreed-upon procedures for joint filings, including the timing of joint exchanges or page limits. (*See* Dkt. 365, fn. 1).

inconsistent and deficient level of information provided by Skyryse, it is evident that these issues cannot be resolved without further assistance from the Court.

**B.      Skyryse's Google Drive Account**

**1.      Metadata is Critical to this Case**

Metadata is data that provides information about the authorship, company of origin, creation, modification, storage, security, and other properties of a document. Such metadata provides critical information in a case like this where theft, misappropriation, and obfuscation are involved.

Moog's Motion to Enforce (Dkt. 400) demonstrates how the metadata for documents in Skyryse's possession reflects theft and misappropriation of Moog data. For example, the Declarations of Bruce Pixley and Kevin Crozier in support of Moog's Motion to Enforce demonstrated, among other things, that: 1) 81 documents on Skyryse employee Sathya Achar's laptop contained "Moog Inc." or "Moog" in the company metadata field; 2) the metadata for at least 11 different spreadsheets located on Skyryse personnel Eric Chung's Skyryse-laptop reflected they were created by Eric Chung on June 5, 2015 (before Skyryse was formed), and which corresponded to identical spreadsheets on defendant Robert Alin Pilkington's Moog laptop; 3) various software-related documents shared between Skyryse and Hummingbird personnel contained "Moog" or iterations thereof in the document metadata; and 4) dozens of Moog software checklists in the possession of Skyryse personnel Lori Bird contain "Moog" or iterations thereof in the document metadata. (Dkt. 400-3, ¶¶ 9, 12-16, 23, 24, 30, 34, 41, 47) (Dkt. 400-5, ¶¶ 31, 40, 42.) Thus, Moog has established that independent from the name or contents of particular documents, metadata for documents in Skyryse's possession reflect they are Moog documents.

**2.      Skyryse Represents that it Can Search Metadata**

Moog's Motion to Enforce sought production and/or inspection of portions of Skyryse's Google Drive repository, and the entirety of Skyryse's Polarion and

Git repositories. In its tentative ruling issued on June 13, 2023, the Court directed the Parties to meet and confer about, among other things, Moog's requests for production of Google Drive, Polarion, and Git. (Dkt. 532 at 22.)

After conferring, the Parties submitted a joint report to the Court. (Dkt. 546.) Therein, Skyryse vehemently objected to making its Google Drive, Polarion, and Git repositories available for inspection by Moog's retained experts. For Polarion and Git, Skyryse asked the Court to order the Parties to "meet and confer on a set of search terms that will enable Skyryse to conduct a reasonable search for relevant material." (Dkt. 546 at 11, 17.) Regarding Google Drive, Skyryse stated it was "willing to run an appropriate set of search terms over any Google Drive folders shared with Hummingbird personnel, review the search hits, and produce any relevant, non-privileged information." (*Id*. at 13.)

The searching of metadata was expressly discussed by counsel and the Court during the June 29 hearing. Moog's counsel expressly raised the concern in connection with Google Drive that search terms would be inadequate to capture documents that did not contain text demonstrating Moog ownership on its face. (6/29/23 Hrg. Tr. at 14:11-15:6.)  Skyryse's counsel said bluntly in response, "Search terms work."  (6/29/23 Hrg. Tr. at 15:15.)  In fact, in advocating for why search terms should be used instead of production of entire repositories, Skyryse's counsel stated later in the hearing: "But to go back to the point here, one of the reasons search terms work, and they may include the ***metadata***, which is the information about the files as opposed to their contents too . . ." (6/29/23 Hrg. Tr. at 19:25-20:2, emphasis added.) In response, Moog's counsel explained to the Court why metadata is critical in this case. (*Id*. at 21:5-21.)

### 3. Skyryse's Proposal Does Not Comply with the Court's June 29 Order

Shortly after the Parties started conferring, Skyryse told Moog that metadata was not searchable within Google Drive. This was surprising to Moog and contrary

to Skyryse's representations to the Court. This issue should have been investigated

and disclosed by Skyryse when it was requesting the Court adopt its search term

proposal, not after the Court's Order largely adopted Skyryse's search proposal.

Further, Skyryse later advised Moog that it cannot limit its search to the

Google Drive folders accessed by Hummingbird personnel, former Moog

personnel, and other Skyryse personnel identified in Moog's Motion to Enforce.

This is notwithstanding Skyryse's previous proclamation in June 2023 that it was

"willing to run an appropriate set of search terms over any Google Drive folders

shared with Hummingbird personnel, review the search hits, and produce any

relevant, non-privileged information." (Dkt. 546 at 13.) Again, this is something

that Skyryse should have investigated before representing to the Court and Moog

that such search functionality was available. And even if Skyryse were to claim

that it was unaware of the need to search metadata prior to the June 15 hearing, it

was absolutely on notice by the June 29 hearing. (*See* Dkt. 546 at 4-5.)

Skyryse's position is that it should only be required to run Moog's proposed

search terms within Google Drive without any metadata searching, and then

process resulting hits into Relativity whereby metadata can be searched in the

second round. But, searching metadata after the first sweep undermines the entire

purpose of a comprehensive search. If, for example, a document contains "Moog"

in the metadata but not in the file name or contents of the document itself (as

shown in dozens of examples throughout this case), it would not be picked up in

the first sweep. This is problematic for obvious reasons.

Skyryse has also argued that metadata searching is not necessary because

Moog's other proposed search terms will invariably hit on documents that contain

"Moog" in the metadata. However, Moog has no way of knowing what these

additional, relevant documents are, and therefore Moog has no idea if they would

or would not hit on other search terms. This is a black box that Moog has no

insight about. What Moog *does* know, however, is that if Skyryse has additional

documents with "Moog" in the metadata (as reflected in dozens of other files in the case), then that data is highly probative of theft and misappropriation. Moog would be substantially prejudiced and blocked from unearthing evidence of Defendants' possession and misappropriation of Moog data if metadata is not searched in Skyryse's Google Drive.

### 4.    Skyryse's "Burden" Concerns Lack Credibility

Skyryse refuses to comply with the Court's order and allow for searching across metadata in Google Drive based on alleged burden, including costs for processing and hosting its Google Drive data. Skyryse estimated these costs to be approximately $136,000 to process the entire Google drive and approximately $100,000 in hosting fees. While Moog understands there may be costs associated with processing large volumes of data, Moog is troubled by the fact that when advocating for a search term approach to the Court, Skyryse argued that permitting an inspection of the entire drive would be overbroad and that identifying portions of the Google Drive which are not relevant would be unduly burdensome. And, now, Skyryse is claiming that the very process it advocated for, and the Court ordered in response, is too burdensome. It is now evident that it would have been far less burdensome on Skyryse to make its Google Drive and Git repositories available for controlled, physical inspection (as Moog requested) rather than the search term process that Skyryse advocated for.

Skyryse claims that it must process the entirety of its Google Drive in order to search metadata. Even though it is not, and never has been, Moog's obligation to teach Skyryse how to do the data searching and processing, or to advise Skyryse on how FTI should do its job, Moog has proposed multiple methods in which metadata can be searchable through Google Drive without having to process the entire repository.[3] (Ex. B at 8-9.) While Skyryse claims it is looking into these

---

[3] Google provides two tools to extract data—Google Vault and Google Takeout. Skyryse chose to use Google Vault (which does not allow for metadata searching) to extract data from its Google Drive in the first instance without first discussing

1    issues, to date, Skyryse has not agreed to any of those proposals and contends they

2    are not feasible.[4]

3                      **5.      Moog's Requested Relief**

4            Without doing a proper investigation into its own systems, Skyryse

5    represented that it could and would apply search terms across metadata. Now

6    Skyryse is failing to live up to its promises. While Moog has offered potential

7    solutions as part of a good faith meet and confer process, it is Skyryse's obligation

8    to comply with the Court's Order in terms of searching and processing its

9    repositories.

10           Moog respectfully requests that the Court order Skyryse to comply with its

11   Order in full regarding Google Drive within 30 days, including that Skyryse apply

12   Moog's search terms to all available metadata for documents stored in Google

13   Drive. If the Court elects not to issue such an order, Moog respectfully requests the

14   Court to order Skyryse to produce log files for each of the individuals at issue

15   (Hummingbird personnel, former Moog personnel, and other identified Skyryse

16   personnel) so that Moog can review and request production of particular files.

17           **C.    Skyryse's Git Repository**

18           The Parties have reached an agreement on the searching methodology for

19   Skyryse's Git repository. However, as discussed further below, the Parties remain

20   at an impasse regarding Moog's proposed search terms, including as run across

21   Skyryse's Git repository.

22

---

23   with Moog through the meet and confer process. Moog thereafter suggested using
     Google Takeout which would create individual JSON files containing metadata.
24   Skyryse claimed that Google Takeout would not allow for keyword searching or
     de-duplication, but the key issue is that Google Takeout should be used to extract
25   data from Google Drive (with JSON files), and then another tool could be used to
     search and cull the data. Any complaints by Skyryse about having to re-do the
26   extraction or use a second tool should not be countenanced because Skyryse did
     not extract the data properly the first time.
27
     [4] To the extent the Parties reach agreement on any of the outstanding issues
28   addressed in this Joint Report before any hearing is held, the Parties can submit a
     status report to the Court.

**D.     Skyryse's Polarion Repository**

The Parties have reached an agreement on the searching methodology and search terms to be run across Skyryse's Polarion repository.

**E.     Moog's Proposed Search Terms**

Moog proposed a total of 437 search terms, one portion of which was targeted towards software-related documents and the other portion related to documents relating to hardware and electronics. Skyryse has objected to 21 of those terms based on alleged overbreadth and burden. Skyryse has not articulated any objection to any of the 21 proposed search terms based on relevance.

Because Moog agreed in meet and confer to drop its "platform" search term from Skyryse's Git repository and agreed to further narrow its "Git" and "Jira" search terms, the search term hits identified by Skyryse for the 21 search terms in question across its Google Drive and Git repositories are as follows:

| Search Term | Google Drive Hits | Google Drive Hits + Family | Google Drive Unique Hits | Git Hits | Git Hits + Family | Total Hits | Total Hits + Family |
|---|---|---|---|---|---|---|---|
| AIN | 849 | 1190 | 168 | 452 | 593 | 1301 | 1783 |
| AMP | 2725 | 3880 | 1094 | 1277 | 1288 | 4002 | 5168 |
| Bird | 5181 | 7693 | 882 | 0 | 0 | 5181 | 7693 |
| CCDL | 3549 | 6331 | 1381 | 149 | 149 | 3698 | 6480 |
| Chung | 1544 | 1655 | 263 | 0 | 0 | 1544 | 1655 |
| Din | 1257 | 1816 | 327 | 497 | 499 | 1754 | 2135 |
| "Git" and "guide" | 433 | 534 | 43 | 117 | 117 | 550 | 651 |
| "Jira" and "guide" | 646 | 747 | 137 | 7 | 7 | 651 | 754 |
| Platform | 7139 | 8547 | 8 | N/A | N/A | N/A | N/A |
| PSAC | 2495 | 4210 | 236 | 132 | 134 | 2627 | 4343 |
| SCMP | 1381 | 2367 | 20 | 119 | 120 | 1500 | 2487 |
| SDD | 1926 | 3709 | 396 | 622 | 764 | 2548 | 4473 |

| SDP | 1952 | 4162 | 100 | 548 | 549 | 2500 | 4711 |
|---|---|---|---|---|---|---|---|
| SQAP | 1302 | 2256 | 5 | 95 | 96 | 1397 | 2352 |
| SVN | 1314 | 2235 | 378 | 1664 | 1664 | 2978 | 3899 |
| IO_ | 20 | 24 | 5 | 27011 | 27163 | 27031 | 27187 |
| API_ | 8 | 12 | 2 | 21492 | 21659 | 21500 | 21671 |
| TS_ | 10 | 10 | 6 | 7557 | 7559 | 7567 | 7569 |
| ETC | 0 | 0 | 0 | 5925 | 6068 | 5925 | 6068 |
| SS_ | 28 | 28 | 20 | 4969 | 4969 | 4997 | 4997 |
| TD_ | 0 | 0 | 0 | 4015 | 4158 | 4015 | 4158 |

Skyryse has further represented that based on Moog's narrowed search terms, the total number of documents that Skyryse would have to review from its Git repositories is 50,579 documents, and 62,479 documents from Google Drive, for a total of 113,058 documents.

On an aggregate level, given the facts and circumstances of this case, approximately 113,000 documents for Skyryse to review is not disproportional to the needs of this case. To the extent Skyryse complains the number of documents would be even higher if metadata is searched, such an argument fails because: 1) it is hypothetical and there is no way of knowing how many additional documents would be included; and 2) any additional burden is self-imposed because Skyryse is the party that argued for a search term approach. Any concerns based on volume or scope are a result of Skyryse's massive theft and misappropriation of approximately *1.4 million* Moog files. This is a large, expensive case. Skyryse is represented by Latham & Watkins and is using one the largest forensic vendors, FTI, in connection with electronic discovery matters. That Skyryse may need to review approximately 113,000 documents or more based on Moog's search terms is proportional to the needs of the case given the scale of Defendants' theft and misappropriation, and the concerns identified by the Court regarding Skyryse's possession and/or use of Moog data in its Order.

On an individual search term level, as reflected in the chart above, there is no search term that presents an undue burden based on hit counts. Notably,

1  Skyryse was only able to provide unique hit counts for Google Drive. For

2  particular search terms, unique hit counts are the most relevant indicator of burden

3  because that demonstrates how many unique documents hit on search terms in the

4  aggregate. For example, if there are 10,000 hits on the search term "AIN," and

5  10,000 hits on the search term "AMP," but "AIN" and "AMP" are used exclusively

6  together in the same documents, then Skyryse would only have to review 10,000

7  documents instead of 20,000 documents. As reflected above, the highest unique hit

8  count in Google Drive for any particular search term is 1,381 documents. These

9  relatively low unique hit counts are proportional to the needs of this case.

10          Skyryse's has particularly objected to Moog's proposed search term of

11  "Platform" with a capital P for Google Drive. Platform is the formal name of one

12  of Moog's trade secrets (Dkt. 475-005 (Moog's TSID), Trade Secret #4), is a

13  prominent feature of Moog's original and amended complaints, and is one of

14  Moog's key technologies (*see, e.g.*, Dkt. 579, ¶¶ 34–37.).  Defendants took over

15  4,500 unique files relating to Platform (see Dkt. 475-006 (Moog's TSID, Ex. 2,

16  "Platform" tab), as well as versions of these files (*see, e.g.*, Dkt. 579 ¶¶ 46, 54),

17  which likely number in the hundreds or thousands.  That defendants may need to

18  review several thousand files that hit on "Platform" is proportional, given the scale

19  of defendants' theft of Platform.  It is also fair, given it was Defendants' theft of

20  Platform that necessitates the search for that term to begin with.  Moreover, the

21  total number of unique hit counts for "Platform" in Google Drive ***is just 8***

22  ***documents***. Thus, the inclusion of the "Platform" search term provides minimal

23  additional burden on Skyryse.

24          Moog respectfully requests that the Court overrule Skyryse's objections as

25  to the 21 search terms at issue, and order Skyryse to search its Google Drive and

26  Git repositories with all 437 search terms provided by Moog. Moog further

27  respectfully requests that the Court schedule a hearing on August 24, 2023 to

28  address the outstanding issues addressed herein.

**SKYRYSE'S STATEMENT**

## I.   INTRODUCTION

Pursuant to the Court's Order, the Parties have met and conferred extensively over the course of the past five weeks to try to come to an agreement on an appropriate set of search terms to be run across Skyryse's Google Drive, Git Repository, and Polarion repositories.  (Dkt. 564 at 10.)  This has been a slow and painstaking process, both because of the complexity of these repositories, which contain multiple terabytes of data of varying types, and because of the large number of very broad search terms Moog has proposed (437 search terms all together, many of which are generic terms commonly used in the industry with no special connection to this case).  The Parties have twice requested an extension of the deadline set by the Court to agree to a finalized set of search terms (*see* Dkts. 588, 596) but, regrettably, have not yet been able to reach agreement.

The obstacles to reaching agreement over an appropriate search strategy arise from Moog's delay in proposing an initial set of search terms, the breadth of the terms it ultimately did propose, and its refusal to consider any meaningful modifications to those terms that might help target relevant information.  Skyryse has worked closely with its e-discovery and forensic vendor and its in-house IT personnel, and has proposed reasonable compromises for an effective search strategy. As explained below, Skyryse's proposals strike the right balance between getting Moog the information it claims to need (on top of the over four terabytes of discovery it has already received) and avoiding inflicting more excessive burden and expense on Skyryse in furtherance of a fishing expedition sure to ensnare troves of irrelevant but competitively sensitive information.

The Court ordered the parties to meet and confer regarding search terms on June 30.  Moog did not propose any search terms until eleven days later, at which time it provided a set of 84 terms related to software and metadata.  Then, on July 20, nearly three weeks after the Court's Order, Moog provided Skyryse with a

second set of 353 "hardware" search terms, expanding the total to 437 search terms. In this way, Moog delayed the process by three weeks, after which it demanded that Skyryse process, analyze, and search what would amount to terabytes of data over multiple repositories, all in the remaining week-and-a-half before the initial July 31 deadline set by the Court. (Dkt. 564.)

Despite these unreasonable demands, Skyryse spent hundreds of hours working with its vendors and its IT team to assess Moog's proposed keywords and the universe of data those keywords implicated. Specifically, Skyryse ran Moog's more than 400 proposed search terms, provided multiple reports to Moog showing that they hit on an enormous and unreasonable number of files—161,181 separate documents—which would take months for Skyryse's e-discovery vendor to process and for Skyryse to review and produce. Skyryse also determined that if just 15 of these search terms were removed, then the overall number of hits dropped significantly to a reasonable number Skyryse would agree to. But, inexplicably, Moog refused to meaningfully narrow its proposed terms and takes the position that the remaining *422* terms are not enough. As shown below, these 422 terms are more than enough, and the Court should permit Skyryse to proceed with them, dropping only the 15 most significant offenders from the original set.

Moog also demanded that its search terms be run across the metadata for Skyryse's Google Drive repository. But as explained to Moog, this would impose an additional $250,000 in costs on Skyryse with little or no additional relevant documents being collected. To avoid this needless waste of money and time, Skyryse proposed that, instead, it run the final set of search terms against the entirety of the contents and file names in its Google Drive—and not just the subset of folders ordered by the Court. Yet Moog again refused. This compromise approach would give Moog access to even a greater base set of documents than was otherwise required, and is likely to capture all of the same documents that a metadata search would locate. Nothing more should be required by the Court.

In the end, Moog's 437 overly broad search terms and demands for metadata searches across all repositories are unworkable, and would impose undue burden and expense on Skyryse far out of proportion with the needs of this case. Accordingly, Moog's requested approach should be rejected, and Skyryse's compromise approaches set forth below should be adopted.

## II.   GOOGLE DRIVE

In its Order, the Court denied Moog's request for production of Skyryse's entire Google Drive and instead ordered the parties to agree on a set of search terms to run against certain folders on that repository—specifically, "the Google Drive Account folders that were accessed by Hummingbird personnel, former Moog employees, or the identified Skyryse personnel in the parties' Joint Report." (Dkt. 564 at 7.)  Moog responded with an unreasonable set of 437 overly broad search terms, and has not committed to narrowing that set.

### 1.  Search Terms

Moog's search terms include numerous generic terms that have no specific relevance to this action.  For example, "AMP," "AIN," "SDD" and "SDP" are generic terms commonly used in the industry and are consequently pulling in documents that have no relation to Moog.  The same is true of Moog's proposed terms like "JIRA," a commonly used project tracking system, and "Git," a commonly used repository.  These search terms are unreasonable, unduly burdensome, and no proportional to the needs of this case.

By way of compromise, Skyryse has offered to apply all but 15 of Moog's search terms.  Specifically, if only the following 15 terms were eliminated from the search set, then the number of documents (before a privilege or relevance review) would decrease across all of the repositories substantially.

| Search Term | Number of Documents that Hit on Each Term in all Repositories |
|---|---|
| Platform | 158,600 |
| Git | 49,556 |
| IO_ | 27,031 |
| API_ | 21,500 |
| TS_ | 7,567 |
| Jira | 6,882 |
| ETC. | 5,925 |
| AMP | 4,002 |
| SS_ | 4,997 |
| TD_ | 4,015 |
| CCDL | 3,698 |
| SVN | 2,978 |
| PSAC | 2,627 |
| SDP | 2,500 |
| SDD | 2,548 |

While also overbroad and certain to yield many thousands of irrelevant documents, the reduced set still gives Moog a huge number of search terms and a huge number of documents to review, while reducing the burden and expense on Skyryse.

## 2.  Metadata

Beyond its unreasonable search terms, Moog insists that Skyryse to do the impossible: run these search terms over the *metadata* for every file on Skyryse's Google Drive repository before it is loaded into a review database.  As Skyryse has explained to Moog, this is technically impossible[5], and the work-arounds Moog demands impose enormous and unreasonable expense on Skyryse.  Here again, Skyryse proposed a number of reasonable compromises—including that Moog's search terms (less the 15 discussed above) be run across the *entire* Google drive instead of only across certain folders—but Moog refused them all.

Moog has insisted that its search terms be applied to all of the metadata on Skyryse's Google Drive "in the first sweep."  But this is not possible.  As discussed above, there simply is no tool that would permit this.  Rather, to apply the search terms to the Google Drive metadata, all of the 9.48 *terabytes* of files from that drive would first need to be loaded into a new e-discovery database, regardless of their relevance to this case, and then they would need to be processed for privilege and relevance.  According to Skyryse's vendor, the additional cost just to process and host the Google Drive files on a review database to permit keyword searching of their metadata would be roughly $250,000.[6]  This is, on its face, unduly burdensome and expensive.

Skyryse proposed to Moog, and repeats here, that a more reasonable approach would be simply to run the final set of search terms (*i.e.,* Moog's terms minus the 15 discussed above) against all of the contents and file names of the files

---

[5] Moog claims that "Skyryse represented to the Court that it could adequately run search terms on Google Drive, including on metadata, in lieu of making its entire repository available."  (Ex. 1, K. Naqvi August 9 email.) This mischaracterizes Skyryse's counsel's statements at the June 29 hearing.  Skyryse's counsel was clear that "one of the reasons search terms work" generally is because "they may include the metadata."  (Dkt. 570, June 29 Hearing Tr. at 20:25-21:1.)  This in no way was a representation that metadata for Google Drive specifically can be searched with its standard tools—it cannot.

[6] If the Court were to compel this additional processing to run Moog's keywords across the Google Drive files, Skyryse respectfully requests that the additional costs be borne by Moog, not Skyryse.

1   in the Google Drive.  This approach gives Moog protection by not limiting the

2   search only to select folders, but avoids the needless expense imposed by Moog's

3   metadata demands.   It is highly likely that any documents that would hit on

4   Moog's search terms in the metadata would also hit on those search terms in the

5   contents of the documents or their file names, and Moog has yet to provide any

6   examples of documents that *do* contain relevant information in the metadata but *do*

7   *not* hit on one of Moog's more than 400 search terms in the document itself.  As

8   such, the exorbitant expense of running the search terms against the Google Drive

9   documents' metadata is unlike to yield any additional documents that would not

10  already have been produced by simply apply the search terms to the files

11  themselves.

12          Moog, of course, refused this proposal and reverted opportunistically to its

13  original demand that Skyryse hand over its entire 9.48 terabyte Google Drive.  This

14  repository, however, is extremely sensitive in that it is used across the entire

15  business, and the Court has already denied this demand from Moog.  Specifically,

16  the Court ruled that "[t]he TRO Stipulation does not entitle Moog to 'full,

17  unfettered access' to Skyryse's entire Google Drive Account, especially since

18  Moog has identified only a single Google Drive folder that Mr. Pilkington

19  purportedly shared with Hummingbird employees." (Dkt. 564 at 7.)  Just four days

20  ago, Moog also proposed several other tools might be used in searching the Google

21  Drive. Although Skyryse is still investigating these proposed tools, none appears to

22  be workable.  For example, Moog proposes that Skyryse use a tool called Google

23  Takeout instead of Google Vault to process the Google Drive data.  But Google

24  Takeout is only an export function and does not have the searching and de-

25  duplication capabilities that Google Vault has, and as a result is unhelpful for the

26  Parties' purposes here.

27          Respectfully, the Court should again reject Moog's demand for the entire

28  Google Drive account, and its demand that Skyryse spends hundreds of thousands

of dollars in the wasteful exercise of importing that entire repository into an e-discovery database for searching.  Rather, at most, Skyryse's proposal should be adopted: the 422 search terms should be applied to all of the file names and contents in that Google Drive repository, and nothing more.

## III.    GIT REPOSITORIES

As Skyryse informed Moog at the start of the Parties' search term negotiations, there are two Git repositories containing Skyryse's code: Skyryse's current repository, which was imaged in April 2023, and an older version of Skyryse's Git repository, which was imaged for purposes of this litigation in April 2022 but is no longer in use or accessible by Skyryse employees and has been maintained for litigation preservation purposes only.  Portions of both repositories have been made available to Moog for inspection pursuant to the Source Code Protocol and Skyryse has already taken steps to remove from its current repository any code that Moog alleged constituted Moog non-public information (*see* Skyryse Opposition to Moog's Sanctions Motion, Dkt. 452-1 at 22-23.)

Here again the parties' dispute centers around Moog's overbroad set of 437 search terms, which hit on a total of 97,172 separate code files in both the old and new Git repositories. This is an excessive number that would take inordinate time and resources to compile and review, and invariably would include irrelevant data. When Skyryse reported this hit count to Moog and requested that Moog propose removing terms or making modifications to ensure that its terms targeted Moog information, Moog was unwilling to modify its terms except to modify the term "Git," which on its face is a vastly over broad, to remove the term "Platform" which caused tens of thousands of hits, and replace the term "Jira" with ("Jira" AND "guide").[7]  If the 15 search terms addressed above are removed, then the hits

---

[7] And even these minor modifications Moog claims it is still assessing, and has not committed to implementing.

on the Git repository drop substantially to a number that is still undoubtedly overbroad, but one Skyryse can live with.

Although Skyryse has asked Moog to consider dropping several of its generic search terms, or narrowing them, for example, by using Boolean searches to target Moog-specific programs and documents (such as "AMP AND Moog"), to date, Moog has proposed only three modifications to its 437 terms. Moog now argues that it cannot modify its search terms unless it can see the number of "unique hits" on each term—that is, the number of code files that hit only on each individual term but no others. But as Skyryse has informed Moog, its e-discovery vendor confirmed that unique hit counts are not available within Git. Moog has never responded in substance to challenge that technical constraint. Moreover, unique hit counts are not a useful metric here. With over 400 search terms at play, it is inevitable that for some given individual search terms on their own, only a small number of documents will hit. But this does not change the simple fact that the total number of code files that hit on all Moog's 400-plus terms is 97,172. Without a fair narrowing of Moog's search terms, each of those files would need to be loaded to Relativity and reviewed, imposing substantial expense and burden beyond what is reasonable or proportional in this case.

Accordingly, Skyryse respectfully requests that the Court endorse its proposal to reduce Moog's search terms to eliminate the 15 listed above.

## IV.   POLARION

The Parties appear to be close to reaching an agreement on the search terms and protocols to be run across the Polarion repository. As Skyryse has informed Moog, the Polarion repository is a dynamic, web-based interface containing fragments of information rather than full files, although it can link to full files that exist outside of Polarion. Links can be followed to retrieve the attachments, which exist outside of Polarion, provided the links are still functional. As with Google Drive, metadata is not searchable through Polarion. Because of the way Polarion

is set up, Skyryse determined that the best way to run Moog's search terms was to have the engineer who manages Polarion run the terms manually through the database and export out of Polarion any of the fragments of information that hit on those search terms.   For the sake of completeness, Skyryse requested that this engineer also download any linked attachments that hit on Moog's search terms, even though those documents may not actually reside within Polarion.

Skyryse has shared all of the above information regarding the Polarion repository with Moog and invited Moog, in turn, to share any input or searching suggestions it had based on discussions with its own experts.  Moog has not come back to Skyryse with any different or additional information, so Skyryse has proceeded with its search as described above.  Skyryse also agreed to Moog's demand that Skyryse search Polarion for fifty-two specific SKY-DOC documents (and all versions thereof)  in a good faith effort to work with Moog.  Nothing more should be required.

## V.      REID RAITHEL AND LORI BIRD'S LAPTOPS

Per the Court's order, Skyryse produced an image of both Reid Raithel's and Lori Bird's Apple laptops to iDS on July 28, 2023.  Contemporaneously with that production, Skyryse provided iDS with a list of files to withhold based on privilege.  All of the withheld files are on Ms. Bird's laptop.  The images provided to iDS were made by Skyryse's e-discovery vendor, FTI, using Cellebrite Digital Collector ("DC").

On Monday, August 7, 2023, Moog raised a complaint alleging incompleteness of the image of Mr. Raithel's Apple laptop.  It has raised no such complaints about Ms. Bird's laptop.   Skyryse immediately investigated and determined that DC is an industry-standard tool for imaging Apple computers, and the collection of data from both Apple computers was done to the fullest extent possible.  As such, Skyryse, via its e-discovery vendor, complied in full with its obligations.  It is true that DC is limited to collecting an image at a logical level

when used to image certain Apple computers, specifically, Apple computers such as Mr. Raithel's running the 12.0 version of macOS.[8]   But this limitation is inherent in DC, and not a constraint Skyryse or its vendor imposed in this case or which could somehow have been changed for this case.   And, more importantly, the logical level image from DC still collected all of the user-created data on Mr. Raithel's computer.

Moog also complains that the image of Mr. Raithel's laptop was created too long ago.   But the Court did not require that Skyryse provide an image of Mr. Raithel's laptop from a certain date, and the image that was provided post-dates the start of Mr. Raithel's employment at Skyryse and so would capture any relevant files from his Skyryse computer at that time.   Moreover, Skyryse is in the process of determining whether any additional responsive, non-privileged information resides on Mr. Raithel's laptop that can be collected, including any that post-dates the image, and will produce any such information as appropriate.

For these reasons, the Court should order no further relief concerning Mr. Raithel's laptop.

Dated: August 11, 2023

**SHEPPARD, MULLIN, RICHTER &HAMPTON LLP**

By: */s/ Kazim A. Naqvi*
Counsel for Plaintiff and
Counterdefendant Moog Inc.

**LATHAM & WATKINS LLP**

By: */s/ Gabriel S. Gross*
Counsel for Defendant and
Counterclaimant Skyryse, Inc.

---

[8] Ms. Bird's computer is running macOS 10.15.7, which is not subject to the same limitation.

# **ATTESTATION**

Pursuant to Civil Local Rule 5-4.3.4, I, Kazim A. Naqvi, attest that

concurrence in the filing of this document has been obtained by all its signatories.


Dated: August 11, 2023                                    */s/ Kazim A. Naqvi*